CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
3/18/2021
JULIA C. DUDLEY, CLERK
BY:  s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 6:19-cr-00013 |
| v. | MEMORNANDUM OPINION & ORDER |
| QUENTIN LOWELL HORSLEY, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Defendant Horsley has filed three motions to suppress evidence law enforcement obtained conducting searches. First, he seeks to suppress evidence obtained from an apartment where he was staying, arguing that the search warrant was based on information that was stale or lacked sufficient connection to the location. Second, Horsley challenges the warrantless seizure of cell phones that law enforcement seized from his hotel room when he was arrested, arguing there was no valid search incident to arrest. Third, he argues that law enforcement's subsequent warrantless search and seizure of evidence found in a Jaguar in the hotel parking garage was unlawful and any such evidence should be suppressed. Horsley has also previously filed a motion in limine to exclude the testimony of Ms. Roberta Haskins, which this Court denied without prejudice to Horsley's ability to re-raise any such objections during her testimony.

For the following reasons, the Court concludes that Horsley's motions to suppress are without merit.

**Analysis**

1. Motion to Suppress Evidence Seized from 1009 Misty Mountain Road

Horsley moves to suppress evidence seized from the search of 1009 Misty Mountain Road, Apartment 1212 in Lynchburg. First, Horsley argues that the search warrant was based on

stale information, because, when Detective Booth of the Lynchburg Police Department sought a search warrant on February 11, 2019, it had been nearly four months since law enforcement allegedly purchased cocaine from Horsley in November 2018. Second, Horsley argues that there was no information underlying the search warrant that specifically linked the Misty Mountain apartment to criminal activity. Horsley asserts that none of the controlled buys took place at the Misty Mountain apartment, and that, at bottom, Detective Booth had nothing more than a "hunch" that the Misty Mountain apartment might contain evidence of drug distribution. See Dkt. 79. Horsley further asserts that at the suppression hearing, Lynchburg Police Department Detective and Drug Enforcement Agency Task Force Officer Daniel Bailey "admitted that law enforcement had no evidence that any drug activity took place at Misty Mountain Road." Dkt. 114 at 4. Horsley also asserts that Detective Bailey admitted "that the last evidence of drug activity involving Mr. Horsley was recorded in November 2018, several months before the apartment was search[ed] in February 2019." Id. See also id. ("[A]dopt[ing] the legal authority set forth in [Horsley's] original motion under the doctrine of staleness regarding his request to suppress the search of Misty Mountain Road.").

The Government asks the Court to deny Horsley's motion to suppress evidence from the Misty Mountain apartment. Dkt. 111 at 1–7. The Government argues that the affidavit supporting the search warrant "provided an ample basis to the issuing judicial officer of a protracted and continuous narcotics distribution conspiracy," including eight controlled buys from Horsley using three different confidential reliable informants. Id. at 3. In the Government's view, evidence of this "continuous pattern of activity" was timely and supported issuance of the search warrant in February 2019. Id. at 4. The Government also argues that the affidavit established probable cause that the Misty Mountain address would contain evidence of drug distribution. Id.

at 4–5. Finally, even if the Court concludes the search warrant lacked probable cause for staleness or sufficient connection to the Misty Mountain apartment, the Government argues that suppression of the evidence is not warranted under the "good faith exception" to the warrant requirement articulated in United States v. Leon, 468 U.S. 897 (1984). Dkt. 111 at 6–7.

A search warrant passes constitutional muster when it is issued by a neutral magistrate and supported by probable cause. Illinois v. McArthur, 531 U.S. 326, 330 (2001). That neutral magistrate is to make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him," that "there is a fair probability that contraband or evidence of a crime will be found at a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). A reviewing court's duty is to ensure that the magistrate had a "substantial basis" for finding probable cause existed, id. at 238–39, affording the magistrate "great deference" in making that determination, United States v. Jones, 942 F.3d 634, 638 (4th Cir. 2019).

To be sure, "there is no question that time is a crucial element of probable cause." United States v. McCall, 740 F.2d 1331, 1335 (4th Cir. 1984). A search warrant may only issue upon allegations of "facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." Id. at 1335–36 (quoting Sgro v. United States, 287 U.S. 206, 210 (1932)). Staleness becomes an issue either when (1) "the facts alleged in the warrant may have been sufficient to establish probable cause when the warrant was issued, but the government's delay in executing the warrant possibly tainted the search," or (2) "the warrant itself may be suspect because the information on which it rested was arguably too old to furnish 'present' probable cause." Id. at 1336 (citations omitted). However, "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." United States v. Farmer, 370 F.3d 435, 439 (4th

Cir. 2004) (citation omitted). Rather, a court "must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." Id. (citation omitted).

"The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 140 (2009). Indeed, "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated warrant,' unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" United States v. Bynum, 293 F.3d 192, 195 (4th Cir. 2002) (quoting Leon, 468 U.S. at 922 n.23). If the officer's reliance on the search warrant was "objectively reasonable," evidence seized pursuant to that warrant should not be suppressed. Leon, 468 U.S. at 922. "The Leon Court admonished that searches conducted 'pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." United States v. Williams, 548 F.3d 311, 317 (4th Cir. 2008) (quoting Leon, 468 U.S. at 922).

In this case, the Court need not determine whether the search warrant of the Misty Mountain Road apartment was supported by probable cause. Even if it were not, the Court would still conclude that Leon's good faith exception applies, and that the evidence resulting from the search of the Misty Mountain apartment should not be suppressed. See United States v. Legg, 18 F.3d 240, 243 (4th Cir. 1994) (recognizing that a "reviewing court may proceed to the good faith exception without first deciding whether the warrant was supported by probable cause").

Horsley has not shown and cannot show that the supporting affidavit to the search warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Williams, 548 F.3d at 317–18 (quoting Leon, 468 U.S. at 923).[1] Rather, the Court finds that Lynchburg police officers' reliance on the search warrant was objectively reasonable. Dkt. 107-1.

As to Horsley's challenge that the evidence underlying the search warrant was "stale," the affidavit underlying the search warrant showed "criminal activities of a protracted and continuous nature"—indeed, extending over a fourteen-month period—which "rendered the recency of the information" in the affidavit "less crucial" in supporting probable cause. Farmer, 370 F.3d at 439. Evidence of a longstanding or widespread drug conspiracy will often tend to support a finding of probable cause, notwithstanding a gap in more recent information. See, e.g., United States v. Alvarez, 358 F.3d 1194, 1204 (9th Cir. 2004) (search warrant issued December 1999 not stale based on evidence through May 1999, when other evidence showed "the case involved an extensive and longstanding drug conspiracy"); United States v. Leasure, 319 F.3d 1092, 1099 (9th Cir. 2003) (when evidence supports "the existence of a widespread, firmly entrenched, and ongoing narcotics operation … staleness arguments lose much of their force"); United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985) ("When criminal activity is protracted and continuous, it is more likely that the passage of time will not dissipate probable cause.").

---

[1] There is no argument, much less any basis to conclude, that any of the other circumstances when an officer's reliance on an affidavit would be "objectively unreasonable" are present here: such as that the issuing magistrate or judge was misled by false or misleading information, that the magistrate had "wholly abandoned" the neutral, judicial role, or that the warrant was facially deficient with respect to the place or things to be searched. Williams, 548 F.3d at 317–18.

Significantly here, Detective Booth attested that he had made eight controlled drug purchases of cocaine from Horsley between August 2017 and November 2018 using three different confidential reliable informants. Dkt. 107-1 at 6. The affidavit included descriptions of the confidential reliable informants' cocaine purchases from Horsley. The three informants told Booth that Horsley is "a multiple kilogram dealer of cocaine" in Lynchburg, that he "sells large quantities of cocaine," and that Horsley is the "plug," which the affiant based on his training and experience understood to mean the "main supplier" in the area. Id. at 6–7. Such evidence of the ongoing nature of a cocaine distribution operation, especially alongside the evidence of its substantial size, "rendered the recency of the information" in Detective Booth's affidavit "less crucial." Farmer, 370 F.3d at 439.

Horsley also argues that probable cause did not establish a sufficient nexus with the Misty Mountain Road apartment. See Dkts. 79 at 2, 114 at 4–6. In support of the argument, Horsley notes that Detective Bailey conceded that none of the controlled buys at issue were conducted at the Misty Mountain Road apartment or in the parking lot. Dkt. 111-1 at 30:2-19, 32:16-20; see also Dkt. 114 at 4. The Fourth Circuit has clearly stated that it has "upheld warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." Williams, 548 F.3d at 319 (citing cases). Indeed, the Fourth Circuit has "consistently determined that there was probable cause to support search warrants—and not merely sufficient indicia of probable cause to justify application of the Leon good faith exception—in similar circumstances." Id.

The record contains ample evidence of both elements articulated in <u>Williams</u>. First, the search warrant was supported by an affidavit attesting to eight controlled buys using three different confidential reliable informants who all indicated Horsley was trafficking in substantial amounts or kilograms of cocaine. Dkt. 107-1 at 6. Second, the affiant also attested that based on "[his] training and experience" that "subjects involved in the distribution of narcotics tend to keep narcotics, records of sales, people who owe them money, names and addresses of those involved in the drug trade, phone numbers," among other things, and that the affiant "knows these items can often be found within a residence." <u>Id.</u> The search warrant also sought evidence of drug trafficking—the type of which is unlikely to diminish over time—including "bank statements, drug sales, ledgers and owe sheets … telephone number books and papers or documents containing lists of names, phone numbers, and/or addresses, any personal writings relating to illegal drug distribution." Dkt. 107-1 at 3.

There were also numerous pieces of evidence specifically tying Horsley to the Misty Mountain Road apartment. Horsley was observed multiple times at this residence. Four cars Horsley had been known to drive were parked there "on a regular basis in front of the 1200 building," and that "[b]ased on information obtained from GPS units " on two of the vehicles, "Horsley has been to 1009 Misty Mountain Rd. before, and after, controlled purchases were made using [confidential reliable informants]." <u>Id.</u> at 7–8; <u>see also</u> Dkt. 111-1 at 30:12–31:16 (attesting that "several purchases happened just down the road from Misty Mountain," including one purchase roughly "a quarter mile down the road," but none were made at or outside of the Misty Mountain Road apartment). Law enforcement also responded to a disorderly conduct call on February 1, 2019 at the Misty Mountain Road Apartment. Horsley and Kaeisha Coles—both of whom informants had told the affiant had lived there—spoke with officers responding to the

call and advised that they were arguing about their relationship and there was no physical violence. Dkt. 107-1 at 8. To be sure, there was no evidence visible of drug use or narcotics at that time. See id.; see also Dkt. 111-1 at 34:5-25. But nonetheless, that was yet further evidence of a connection between Horsley and the residence. The Court finds that Detective Booth's assertions of "training-and-experience based knowledge to tie" Horsley's drug trafficking to the Misty Mountain Road apartment are entitled to weight and constituted further evidence to establish that nexus.

For these reasons, the Court finds that the search warrant contained more than sufficient indicia of probable cause to render official belief in its existence objectively reasonable. Under the Leon good-faith exception, suppression of evidence from the search of the Misty Mountain Road apartment would not be appropriate. See Williams, 548 F.3d at 317-18. The motion to suppress the evidence therein is denied.

2. Motion to Suppress Evidence Seized from His Hotel Room

Next, Horsley has moved to suppress any evidence seized from the February 11, 2019 search of his hotel room at the MGM Hotel in Maryland, following Horsley's arrest. Horsley specifically argues that the cell phones in the room were seized unlawfully, without a warrant and that no exception to the warrant requirement applied, such as the search incident to arrest exception. Dkts. 84, 114 at 1–2.[2]

---

[2] While "open bags" with "wads of money in the bag in open view" were also seized from the hotel room, Dkt. 111-1 at 42:1-3, Horsley has only challenged the seizure of the two cell phones from the hotel room, and not the seizure of money, Dkt. 84 at 1 ¶ 5 ("Having failed to obtain a search warrant, or otherwise obtain consent to search, Mr. Horsley moves to suppress any evidence seized from the seizure of the cell phones from the hotel room."); Dkt. 114 at 1 ("Motion to Suppress Seizure of Cell Phones from Hotel Room"); see also id. at 1–2 (arguing that "Agent Abadir did not have a search warrant or consent to seize the cell phones," and that the "agent could have secured a search warrant to seize the phones, and no exigency justified their seizure").

Horsley argues that he "was in the custody of multiple marshals, handcuffed, and sufficiently detained," and "[t]here was no risk he would access the phones or tamper with them." Dkt. 114 at 2. Horsley cites testimony from DEA Special Agent Abadir at the motion to suppress hearing that he could not have reached for the cell phones because he was in handcuffs and under arrest when she entered his hotel room. Id. at 1. He further notes Agent Abadir's testimony on cross examination that one cell phone was on the nightstand on the other side of the bed from Horsley, and that she could not say on which of the two nightstands (on either side of the bed) the other cell phone was located when she seized it. Id. In Horsley's view, "no exigency justified [the cell phones'] seizure" and Agent Abadir should have gotten a search warrant. Id. at 2. He argues the warrantless search here was improper, citing United States v. Knapp, 917 F.3d 1161 (10th Cir. 2019). In that case, the Tenth Circuit held that a warrantless search of a closed purse was improper where the defendant was handcuffed and standing three feet away from the purse and several officers stood nearby.

The relevant facts are as follows. Agent Abadir testified that Horsley was arrested in his hotel room at the MGM Hotel in Maryland in the early morning hours of February 11, 2019. Dkt. 111-1 at 41:16-18, 43:12-20. Horsley was handcuffed behind his back. Id. at 55:11-19. Agent Abadir testified that the hotel room was "pretty small." Id. at 42:21-22; id. at 51:1 ("The room was fairly small … ."). The room had one bed which Agent Abadir thought was a queen-size bed, two nightstands and a table. Id. at 42:21-25, 49:2-13, 56:10-11. Horsley and Ms. Brandy Callen were in the room, as were several U.S. Marshals and Agent Abadir. Id. at 41:5-7, 16-18, 49:14-23.[3]

---

[3] Ms. Callen testified that Horsley "is the father of my two kids and he was my husband." Dkt. 111-1 at 7:11-12.

Agent Abadir initially testified that one of the cell phones in the room was located "on the nightstand" and the other phone was on "the table adjacent to the bed"—both were "very close" to where Horsley was arrested. Id. at 42:9-14, 19-25. She testified that he was "arrested right next to the bed, and the nightstand was … right there next to the bed," while the "table adjacent to the bed was just a foot away." Id. at 42:21-25. While Agent Abadir perceived that Horsley could not reach the phones because he was in handcuffs at the time, she testified that he "absolutely" would have been able to reach them if he were not in handcuffs, because they were only "several feet away." Id. at 43:9-23.

On cross examination, Agent Abadir explained that Horsley was standing "on the right side of the bed," and "in-between the bed and the bathroom" when she entered the room, while Ms. Callen was sitting on the bed. Id. at 50:1-8. She clarified on cross that the rectangular table was on the other side of the bed from Horsley but thought that he could still reach it from where he was standing since the room was "fairly small." Id. at 50:13–51:7. Agent Abadir also stated that she could not recall on which of the two nightstands on either side of the bed the other cell phone was located. Id. at 51:8-16, 52:5-9. However, she still maintained that Horsley could have reached it regardless which nightstand it was. Id. at 52:13–53:2. On redirect, Agent Abadir again testified that one nightstand was "immediately next to" him, while the other "was still within his reach." Id. at 56:4-17. While she could not recall which nightstand the cell phone was on, Agent Abadir testified that both nightstands were within his reach. Id. at 56:18-24.

Ms. Callen also testified at the suppression hearing. Id. at 57–59. She testified that Horsley answered the door and he was "by the door" to the hotel room and in handcuffs when Agent Abadir entered. Id. at 57:24–58:16. Ms. Callen testified that one of the phones was on the

bed and another one was on a table, and that without "superhero arms," Horsley would not have been able to reach either of them from where he stood. Id. at 59:12-13.

Under Fourth Circuit precedent and considering the facts of this case, the Court concludes that the seizure of the cell phones and evidence from Horsley's hotel room falls within the search-incident-to-arrest exception.

The search-incident-to-arrest exception to the warrant requirement "provides that when law enforcement officers have probable cause to make a lawful custodial arrest, they may—incident to that arrest and without a warrant—search 'the arrestee's person and the area within his immediate control." United States v. Ferebee, 957 F.3d 406, 418 (4th Cir. 2020) (quoting United States v. Currence, 446 F.3d 554, 556 (4th Cir. 2006) (quoting Chimel v. California, 395 U.S. 752, 763 (1969))). Such searches serve important purposes, including removing from the area any weapons the defendant might use to resist arrest or escape, and "to prevent the concealment or destruction of evidence." New York v. Belton, 453 U.S. 454, 457 (1981).

As the Fourth Circuit explained in Ferebee, courts have "routinely upheld searches incident to arrest in cases where the defendant was handcuffed at the time of the search." 957 F.3d at 418–20. Because "handcuffs are not fail-safe," id. (quoting United States v. Shakir, 616 F.3d 315, 320 (3d Cir. 2010)), there remains a risk that a handcuffed defendant will attempt to flee or do officers harm or "tamper with evidence while handcuffed," id. at 419. In Ferebee, the Fourth Circuit upheld as valid a search incident to arrest of a closed backpack. The defendant was handcuffed behind his back and had been led outside of a house through an open front door. The defendant, arresting officer and others "mill[ed] about in a small area only steps away from the open front door with the officers and backpack immediately inside the front door." 957 F.3d at 419. The defendant was "not under [the officer's] physical control," and there was "no

impediment to [the defendant's] movement beyond the handcuffs." Id. The Fourth Circuit found significant the fact that he was "only a few steps away from the backpack," and could reach the backpack "within seconds." Id.

Here, as in Ferebee, Horsley was handcuffed behind his back, but he was not under any officer's physical control or faced any other impediments beyond the handcuffs to his movement. Dkt. 111-1 at 55:11-19. The evidence further shows clearly that Horsley was "only a few steps" from the cell phones, if not closer, and could have reached them "within seconds." See Ferebee, 957 F.3d at 419. The hotel room was "pretty small," or "fairly small" and just had a few pieces of furniture. Dkt. 111-1 at 42:21-22, at 51:1. To be sure, Agent Abadir ultimately could not recall on which of the two bedside tables rested one of the cell phones, and there was some conflicting testimony whether the other cell phone rested on a table by the bed or on the bed itself (as Mr. Callen testified). But even affording Horsley the benefit of any discrepancy in the evidence, Horsley would still have been just "a few steps" from them and could have reached them "within seconds." Such a finding is further supported by Agent Abadir's consistent testimony that, regardless which nightstand the cell phone was on, Horsley could have reached the cell phones. E.g., id. at 52:13–53:2, 56:4-24. Moreover, even if Horsley could not have reached the cell phones without "superhero arms," as Ms. Callen testified, nothing in the record would tend to show he could not have taken "a few steps" to the cell phones and the law does not require the Court to presume his feet must remain planted in the absence of any such evidence. Nor does this case present circumstances like those present in Arizona v. Gant, 556 U.S. 332 (2009), where the defendant "was handcuffed and locked in the back of a police car." Ferebee, 957 F.3d at 418-19 (distinguishing Gant). Nothing in the record would tend to show Horsley was "secured" within

the meaning of Gant. To the contrary, the facts show he could have reached either of the cell phones in the hotel room in short order.

Finally, although Horsley relies on the Tenth Circuit's decision in Knapp, the Fourth Circuit in Ferebee distinguished Knapp. Instead, the Fourth Circuit relied on a contrary line of authority finding warrantless searches valid where a handcuffed defendant was still nearby, and the police could reasonably believe that the defendant could access the evidence. Ferebee, 957 F.3d at 419–20. For instance, the Fourth Circuit found more persuasive the Eighth Circuit's decision in United States v. Perdoma, 621 F.3d 745, 750-53 (8th Cir. 2010), in which that court upheld a warrantless search of bag in a public bus terminal after Gant, even though the defendant was handcuffed and in the presence of several police officers.[4] For these reasons, Horsley's argument is unpersuasive in light of, if not foreclosed by, Fourth Circuit precedent. Because

---

[4] By contrast, the dissent in Ferebee cited the Tenth Circuit's decision in Knapp more favorably, for the proposition that "the search of an arrestee's purse was not a search incident to arrest when the arrestee was in handcuffs and several police officers were nearby—even though the purse was only a few feet from the arrestee." Ferebee, 957 F.3d at 424 (Floyd, J., dissenting). The dissent further noted that in Perdoma the handcuffed arrestee remained "in close proximity" to his bag and had "already run from the officer once." Id. Even under the dissent's articulation of the standard, the seizure of the cell phones and evidence in Horsley's hotel room would still fall within the search-incident-to-arrest exception. To be sure, Horsley was restrained and there were officers nearby, but the testimony was that Horsley remained in the small hotel room and in "close proximity" to the cell phones, mere steps away from the evidence under Agent Abadir's testimony or that of Ms. Brandy Callen. In Ferebee, by contrast, the handcuffed defendant was outside in the yard and was "separated from the area to be searched," while "multiple officers remained inside with the bag." Id. at 425. There was much less separation of space between handcuffed defendant and evidence than in Ferebee, and no reason to think that Horsley was subject to any greater restraint than the defendant in that case.

Agent Abadir conducted a valid seizure of the cell phones[5] and evidence in the MGM Hotel incident to Horsley's arrest, the Court will deny the motion to suppress this evidence.[6]

3. <u>Motion to Suppress Evidence Seized from Jaguar</u>

In his final motion to suppress, Horsley argues that the Court should suppress evidence found in the Jaguar in the MGM Hotel parking garage. Dkts. 78, 114 at 2–4. Horsley argues that the officers lacked consent or a search warrant, and that no exception to the warrant requirement was applicable. Dkt. 78 at 1. In addition, Horsley asserts that he had a reasonable expectation of privacy in the vehicle, and that a vehicle left in a secure parking garage and a key left for a hotel valet is not abandoned. Dkt. 114 at 3. In response, the Government contends that law enforcement had probable cause to believe the Jaguar was the proceeds of drug trafficking and thus subject to forfeiture, and then had executed a lawful inventory search of the vehicle. Dkt. 111 at 7–14. Horsley did not specifically contest that argument, though he had argued no exception to the warrant requirement was applicable and that he had an expectation of privacy in the vehicle.[7]

---

[5] Detective Bailey testified that law enforcement later executed legal process on the cell phones to search their contents. Horsley has not challenged any such legal process or subsequent search, but rather, the probable cause underlying the cell phones' seizure. The Court sustained Horsley's counsel's objection that any subsequent search of the phones was not relevant to the issue of probable cause underlying their seizure on February 11, 2019. <u>See</u> Dkt. 111-1 at 28:17–29:17.

[6] The Court need not consider the Government's alternative argument that the evidence was lawfully seized under the plain view exception. Dkt. 111 at 17–19.

[7] The Government had initially challenged Horsley's standing to assert a privacy interest in the Jaguar. Dkt. 88 at 2–3. However, after the motion to suppress hearing, the Government dropped its challenge to Horsley's standing (Dkt. 111 at 7–14), and later asserted that "[t]he facts before the Court establish that the defendant had a reasonable expectation of privacy in the Jaguar because he was the owner of the vehicle and had purchased it with drug proceeds," Dkt. 115 at 1.

A.    *Probable Cause that the Jaguar Was Subject to Forfeiture as Proceeds of Drug Trafficking*

The Fourth Amendment does not require the police to obtain a warrant "before seizing an automobile from a public place when they have probable cause to believe that it is forfeitable contraband." Florida v. White, 526 U.S. 559, 561 (1999); United States v. Brookins, 345 F.3d 231, 235 (4th Cir. 2003) ("[U]nder the relevant forfeiture statutes, the police may seize an automobile without first obtaining a warrant when they have probable cause to believe that it is forfeitable contraband") (citing White, 526 U.S. at 565). There is statutory authority to criminally forfeit "any property constituting, or derived from, any proceeds … directly or indirectly" obtained from the distribution of narcotics. See 21 U.S.C. § 853(a)(1). There is also statutory authority to civilly forfeit "all proceeds traceable to such an exchange" for controlled substances. See 21 U.S.C. § 881(a)(6). "A police officer has probable cause to conduct a search when 'the facts available to [him] would 'warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." Florida v. Harris, 568 U.S. 237, 243 (2013) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)); see also Dkt. 111 at 8 (arguing that probable cause is met under these standards).

Lynchburg Police Department Detective and Drug Enforcement Agency Task Force Officer Daniel Bailey testified about what information law enforcement used to determine that the Jaguar constituted the proceeds of drug trafficking. See Dkts. 111 at 9, 111-1 at 20–28. The Government first points to several pieces of evidence to support a reasonable belief that Horsley had purchased the Jaguar. Dkt. 111 at 9–10. Specifically, Detective Bailey had testified that during one of the controlled drug purchases from Horsley, Horsley had listed several vehicles that were his, including a Jaguar. Dkts. 107-1 at 8, 111-1 at 26:22–27-13. Horsley also had been seen "quite a few times" driving the Jaguar that was ultimately seized, even if not on "a regular

15

basis," and further that Jaguar was seen parked at the Misty Mountain Road address "several times." Dkt. 111-1 at 26:9-21; see also Dkt. 107-1 at 7–8 (testimony of Detective Booth, who had observed Horsley drive a four-door black Jaguar that had been parked in front of the Misty Mountain Road address "on a regular basis").

Next, the Government points to evidence that it contends would support a reasonable belief that Horsley's expenses were made with drug proceeds. Dkt. 111 at 9–10. Namely, Detective Bailey testified that Horsley was "obtaining kilogram quantities—then reselling in ounce quantities" of narcotics. Dkt. 111-1 at 22:1-2; id. at 25:13-16 ("Q. Prior to the execution of the search warrants, multiple sources of information indicated that Mr. Horsley was a multi-kilogram dealer of cocaine, correct? A. Correct."). He also testified that selling one kilogram of cocaine could yield $60-70,000. Id. at 25:19-25. Further, Detective Bailey testified that records from the Virginia Employment Commission stated that Horsley had no reported employment. Id. at 22:14-20. Moreover, during the "year, year-and-a-half period" in this case (about August 2017 to November 2018) while Horsley was under surveillance, law enforcement had not observed Horsley go to a regular job, nor had any other sources of information indicated he was employed. Id. at 22:14–23:24. In addition, Detective Bailey testified that probable cause was also supported by social media posts and other sources that Horsley had traveled to Dubai, Miami, Vegas, and Hawaii. Id. at 22:7-13.

To be sure, not all evidence pointed uniformly in this direction. For instance, the Jaguar was registered in the name of Horsley's sister. Id. at 36:15-20. Detective Bailey also could not testify to the date of sale of the Jaguar, for how much it was purchased, or with what funds Horsley's sister may have purchased it. Id. at 36:21-25, 37:2-4, 37:20-22. Detective Bailey also did not know Horsley's sister's employment status, id. at 37:23-25, though he had testified that

there was no evidence Horsley held regular employment over a year and a half, id. at 23:1-24.

Nonetheless, the Government argues that, based on the totality of the investigation, Detective

Bailey had developed evidence of probable cause that the Jaguar constituted the proceeds of drug

trafficking. Dkt. 111 at 10.

The Court finds that probable cause existed for law enforcement to reasonably believe

that the Jaguar was the proceeds of drug trafficking, and therefore was subject to forfeiture and

seizure. Detective Bailey based that determination on, among other things, the number of

controlled purchases of narcotics law enforcement was purchasing from Horsley over a fourteen-

month period, as well as information from multiple reliable confidential informants that Horsley

was a "multi-kilogram" drug dealer in the area. See, e.g., Dkt. 111-1 at 21:13–23:24. Moreover,

in connection with that and other evidence of drug trafficking, numerous sources of information

including state employment records, law enforcements' observations over their course of their

investigation, and statements of sources and confidential reliable informants, all established that

Horsley did not have regular, reported income for at least the fourteen-month period of the

investigation. See, e.g., id. at 22:14-25 (Virginia Employment Commission responded that

Horsley did not have employment for at least a year and a half); id. at 23:1-7 (law enforcement

did not observe Horsley go to a regular job during surveillance); id. at 23:17-24 (sources of

information did not indicate he had a regular job; "I recall one specifically said that he had not

known Mr. Horsley to have a legitimate job for over a year and a half.").

The evidence described that Horsley was engaged in sizable and long-term drug

trafficking activities, in combination with the substantial evidence that Horsley did not have

regular employment for a significant period of time (about a year and a half), established

probable cause that the Jaguar was the proceeds of drug trafficking. Numerous cases explain that

evidence of drug trafficking combined with lack of legitimate sources of income will support a finding of probable cause that unexplained wealth (i.e., money, automobiles, or other expensive property) are proceeds of that drug trafficking. See, e.g., United States v. Thomas, 913 F.2d 1111, 1114 (4th Cir. 1990) ("[W]here a defendant's verifiable income cannot possibly account for the level of wealth displayed and when there is strong evidence that the defendant is a drug trafficker, then there is probable cause to believe that the wealth is either a direct product of the illicit activity or that it is traceable to the activity as proceeds."); United States v. $95,945.18, United States Currency, 913 F.2d 1106, 1111 (4th Cir. 1990) ("Given that Baxter had little income and no bank account, and advanced no reason for why he would be carrying such a large amount of money in a bowling bag, the government has shown far more than just a probability that the cash was being used to finance a cocaine transaction."); United States v. $174,206.00 in U.S. Currency, 320 F.3d 658, 662 (6th Cir. 2003) (holding that the evidence established that the property was traceable to the drug offenses and subject to forfeiture under 21 U.S.C. § 881(a)(6) when, among other things, the claimants' "legitimate income was insufficient to explain the large amount of currency found in their possession"). Notwithstanding the fact that the Jaguar was registered in his sister's name, evidence reflected that Horsley had stated during a controlled drug buy that he owned four vehicles, including a Jaguar, and officers had observed him driving the four vehicles including the Jaguar. Dkts. 107-1 at 8, 111-1 at 20:17–21:3, 27:4-6. Detective Bailey also testified that "it is typical that most narcotic distributors do not normally put vehicles in their own name" to avoid any attempt at forfeiture. Dkt. 111-1 at 37:5-19.

At bottom, the fact that law enforcement had not uncovered all details of the purchase and de facto ownership of the Jaguar did not negate a more-than-ample showing of probable cause that it was Horsley's and was the proceeds of drug trafficking.

B.      *Jaguar Lawfully Seized and Searched*

The Government further argues that because law enforcement developed probable cause to believe that the Jaguar constituted the proceeds of drug trafficking, and therefore subject to forfeiture, law enforcement could then seize and search the Jaguar without a warrant. Dkt. 111 at 10–14. The Government contends that the Agent Abadir's warrantless seizure of the Jaguar was appropriate under the Supreme Court's decision in Florida v. White and under the automobile exception to the warrant requirement. Id. at 10–12. The Government also argues that Agent Abadir conducted a proper inventory search of the vehicle pursuant to DEA policy. Id. at 12–13. By contrast, Horsley contends that he "did not abandon the vehicle when it was left with [the] valet. His key was secured with the valet desk. The car was locked. No one abandons their property—and their right to be secure from warrantless search—merely by parking a car in a garage." Dkt. 114 at 3–4. In Horsley's view, he maintained a reasonable expectation of privacy in the car's contents. Id. at 3. He also maintains that a hotel manager or valet cannot give third party consent for the search of a hotel room or vehicle. Id. at 4.

The Supreme Court held in Florida v. White that the Fourth Amendment does not "require[] the police to obtain a warrant before seizing an automobile from a public place when they have probable cause to believe that it is forfeitable contraband." 526 U.S. at 561; see also Brookins, 345 F.3d at 235 ("[U]nder the relevant forfeiture statutes, the police may seize an automobile without first obtaining a warrant if they have probable cause to believe that it is forfeitable contraband.") (citing White, 526 U.S. at 565). Indeed, in that case the Supreme Court held that "because the police seized respondent's vehicle from a public area—respondent's employer's parking lot—the warrantless seizure did not involve any invasion of respondent's privacy." White, 526 U.S. at 566.

In this case, the Court has already addressed how law enforcement had probable cause to believe that the Jaguar was forfeitable as the proceeds of drug trafficking. To the extent Horsley argues that the Jaguar could not be seized because he had a reasonable expectation of privacy in it or that the MGM Hotel parking garage was not a "public space," see Dkt. 114 at 3–4, the Court finds any such argument to be without merit.

After Agent Abadir secured the evidence from Horsley's hotel room, she testified that she went down to the valet area of the hotel because Detective Bailey had told her that Horsley was driving a Jaguar and that they should seize as forfeitable proceeds of drug trafficking. Dkt. 111-1 at 44:8-18; see also id. at 27:14–28:16 (testimony from Detective Bailey describing decision communicated to Agent Abadir to seize the Jaguar for this reason). Agent Abadir asked the valet for the keys to the Jaguar, and then went down to the "garage area" and immediately located the Jaguar. Id. at 44:21:24. She testified that the garage was "tied to the MGM Hotel area" and that "only people going to the hotel would park there." Id. at 45:2-4; see also id. at 47:9-11 (testifying that garage was used for commercial purposes by the casino). Agent Abadir also testified that she was "able to just walk up to the vehicle." Id. at 45:4-6. To be sure, she initially testified that the parking garage was not a "public place." Id. at 44:25–45:6. However, the Court declines to attribute any conclusive legal significance to that statement. In the complete context of Agent Abadir's testimony, it is clear she meant that "only people going to the hotel would park there," id. at 45:2-3, and further, that there were no impediments on her or any member of the public's ability to access the garage. Id. at 45:4-5 ("Q. … So it's owned by the hotel, but were you able to just walk up to the vehicle? A. Yes."); id. at 47:24–48:1 (testifying no "ticket" required). Some of the vehicles in the garage were vehicles parked by the valet, others were not. Id. at 47:12-19.

Under governing precedent and the facts of this case, the Court concludes that a parking garage of this nature would constitute a public area in which Horsley would have no reasonable expectation of privacy. In <u>Florida v. White</u>, the Supreme Court held that the seizure of the respondent's vehicle from his employer's parking lot was a seizure from a "public area," and "did not involve any invasion of respondent's privacy." 526 U.S. at 566. Similar principles apply in the context of hotel or motel parking lots, and to underground or above-ground parking garages. <u>See, e.g.</u>, <u>United States v. Washburn</u>, 383 F.3d 638, 642 (7th Cir. 2004) ("We have always rejected the notion that a hotel occupant enjoys the same expectation of privacy in his car in the parking lot of the hotel as he does in the room itself," as the parking lot is "readily accessible to the public and not generally thought of as a place normally used as a residence.") (citing cases, internal quotation marks omitted); <u>United States v. Cruz Pagan</u>, 537 F.2d 554, 558 (1st Cir. 1976) (holding that law enforcement's entry of "underground parking garage" or condominium did not violate the Fourth Amendment, as there was no reasonable expectation of privacy in the area). Here, no evidence in the record tends to show there were obstacles to public access to the parking garage of the MGM Hotel: the garage was used by hotel and casino guests; some cars were parked by valets and others were not; and Agent Abadir was able to "just walk up to the vehicle," and no "ticket" was required to get it. Dkt. 111-1 at 45:2-6; <u>id.</u> at 47–48. The seizure was lawful given law enforcement's probable cause to conclude that the Jaguar was forfeitable as proceeds of drug trafficking, and Horsley had no expectation of privacy in the Jaguar in the parking garage that would have been a material factor supporting a contrary conclusion. <u>See</u> <u>White</u>, 526 U.S. at 566.

Finally, the Court addresses the legality of Agent Abadir's warrantless search of the Jaguar. The Government contends that both the "automobile exception and inventory search"

exceptions to the warrant requirement apply such that "law enforcement officers who have probable cause to believe an automobile is subject to forfeiture may both seize the vehicle from a public place and search it without a warrant." Dkt. 111 at 12 (quoting United States v. Gaskin, 364 F.3d 438, 458 (2d Cir. 2004)). The Court agrees. Agent Abadir's subsequent search of the Jaguar as well as the seizure was lawful.

As the Fourth Circuit explained, under the "automobile exception" to the warrant requirement, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." Brookins, 345 F.3d at 235. The "automobile exception" is a "well-established exception" to the warrant requirement. United States v. Kelly, 592 F.3d 586, 589 (4th Cir. 2010). There is no doubt on this record that the Jaguar was "operational and therefore readily mobile," id. at 591, as the Jaguar had been driven to the MGM Hotel just the night before and was parked in the parking garage. See Dkt. 111-1 at 8–9. Another such exception is an "inventory search," which is an administrative search following arrest and preceding incarceration generally "conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." United States v. Banks, 482 F.3d 733, 739 (4th Cir. 2007). An inventory search must be conducted pursuant to "standardized criteria" which must be "administered in good faith" to ensure the purpose is not merely to "gather incriminating evidence against the owner." Id.

Myriad cases from the Fourth Circuit and other circuits establish that a vehicle subject to forfeiture could be seized and searched without securing a warrant. For instance, in United States v. $29,000-U.S. Currency, the Fourth Circuit explained that "several courts of appeal have held that a search without a warrant of an automobile following its valid seizure is reasonable," and

22

that "[t]he right to search a car subject to forfeiture exists even though police do not actually seize it." 745 F.2d 853, 856 (4th Cir. 1984) (citation omitted). Thus, the court held that "[t]he searches of Schneider's car leading to the discovery of the $29,000 were valid because the car was subject to forfeiture and could be seized without process." Id. See, e.g., United States v. Bizzell, 19 F.3d 1524, 1526 (4th Cir. 1994) (same); United States v. Decker, 19 F.3d 287, 290 (6th Cir. 1994) ("[W]e have no hesitancy in joining those circuits that hold that a pre-forfeiture inventory search of a vehicle does not require a warrant."); United States v. Pace, 898 F.2d 1218, 1245 (7th Cir. 1990) ("The cases generally hold that where police have probable cause to believe a car is subject to forfeiture, or have validly seized a car for forfeiture, the police may search the car without a warrant.").

As previously stated, there was probable cause for law enforcement to believe the Jaguar was subject to forfeiture as proceeds of drug trafficking, and therefore could be seized without a warrant. Horsley had no privacy interest in his Jaguar parked in the MGM Hotel parking garage that would warrant another conclusion. Agent Abadir's uncontradicted testimony established that her search of the Jaguar was conducted pursuant to DEA policy and procedures "to account for personal property," and accordingly she placed phones, money, and high end jewelry from the car into DEA self-sealing envelopes. Dkt. 111-1 at 44:16-17, 45–47. She also searched the vehicle to ensure it did not contain contraband or anything dangerous, which is part of DEA policy following seizure of vehicles. Id. at 46:9-14. The record evidence establishes that law enforcement conducted a proper inventory search in this case, which Horsley has not seriously challenged in briefing or argument. Accordingly, because the pre-forfeiture inventory search of the Jaguar did not require a warrant, Horsley's motion to suppress the evidence from the Jaguar is without merit.

**Conclusion**

For these reasons, Horsley's motion to suppress the evidence seized from the Jaguar,

Dkt. 78, motion to suppress the evidence seized from the Misty Mountain Road apartment,

Dkt. 79, and motion to suppress the evidence seized from the MGM Hotel room, Dkt. 84, will be

**DENIED**. Horsley's motion in limine to exclude the testimony from Roberta Haskins has been

and will be **DENIED,** for the reasons stated on the record at the suppression hearing (Dkt. 111-1

at 5–6), and such denial is *without prejudice* to Horsley's ability to raise any such objections in

the course of Ms. Haskins' testimony. Dkt. 80.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion and Order to all

counsel of record.

Entered: This  18th  day of March, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE