UNITED STATES DISTRICT COURT

FOR THE

WESTERN DISTRICT OF VIRGINIA

LYNCHBURG DIVISION

* * * * * * * * * * * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | * CRIMINAL NO. 6:19-CR-00013 |
| | * MARCH 22, 2022 9:30 A.M. |
| Plaintiff, | * JURY TRIAL |
| | * VOLUME I OF IV |
| vs. | * |
| | * |
| QUENTIN LOWELL HORSLEY, | * Before: |
| | * HONORABLE NORMAN K. MOON |
| Defendant. | * UNITED STATES DISTRICT JUDGE |
| * * * * * * * * * * * * * * | * WESTERN DISTRICT OF VIRGINIA |

APPEARANCES:

For the Plaintiff: SEAN M. WELSH, ESQUIRE
United States Attorney's Office
Western District of Virginia
255 West Main Street, Room 130
Charlottesville, VA 22902

For the Defendant: ANTHONY F. ANDERSON, ESQUIRE
BROOKS A. DUNCAN, ESQUIRE
Anderson Legal
P.O. Box 1525
Roanoke, VA 24007

Court Reporter: Judy K. Webb, RPR
210 Franklin Road, S.W., Room 540
Roanoke, Virginia 24011
(540)857-5100 Ext. 5333

Proceedings recorded by mechanical stenography, transcript produced by computer.

**INDEX**


| | PAGE NO. |
|---|---|
| JURY SELECTION | 8 |
| PRELIMINARY JURY INSTRUCTIONS | 105 |
| OPENING STATEMENTS: | |
| By Mr. Welsh | 111 |
| By Mr. Anderson | 118 |


**WITNESS INDEX**


| GOVERNMENT'S WITNESSES: | PAGE NO. |
|---|---|
| **Chad Davis:** | |
| Direct by Mr. Welsh | 123 |
| Cross by Mr. Anderson | 129 |
| **Brandon Isner**: | |
| Direct by Mr. Welsh | 131 |
| Cross by Mr. Anderson | 138 |
| **Titus Burgess**: | |
| Direct by Mr. Welsh | 139 |
| Cross by Mr. Anderson | 143 |

**WITNESS INDEX (Continued)**

**Jacqueline Abadir:**

| | |
|---|---|
| Direct by Mr. Welsh | 144 |
| Cross by Mr. Anderson | 150 |
| Redirect by Mr. Welsh | 151 |

**Christopher Booth:**

| | |
|---|---|
| Direct by Mr. Welsh | 152 |

**EXHIBIT INDEX**

| GOVERNMENT'S EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| 1 through 17 | | 126 |
| 18 | | 133 |
| 19 | | 133 |
| 20 | | 133 |
| 21 | | 133 |
| 22 through 25 | | 142 |
| 26 | | 147 |
| 27 | | 148 |
| 28 | | 149 |
| 29 | | 166 |
| 30 | | 170 |
| 31 | | 174 |
| 32 | | 175 |

**EXHIBIT INDEX (Continued)**


| GOVERNMENT'S EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| 33 | | 178 |
| 34 | | 180 |
| 35 | | 186 |
| 36 | | 186 |
| 37 | | 183 |
| 38 | | 184 |
| 39 | | 191 |
| 40 | | 191 |
| 41 | | 192 |
| 42 | | 192 |
| 44 | | 190 |
| 45 | | 196 |
| 46 | | 196 |
| 47 | | 195 |
| 48 | | 198 |
| 49 | | 202 |
| 50 | | 202 |
| 51 | | 200 |
| 52 | | 205 |
| 83 | | 146 |
| 90 | | 150 |
| 119 | | 173 |
| 121 | | 185 |

**EXHIBIT INDEX (Continued)**

| GOVERNMENT'S EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| 123 | | 190 |
| 125 | | 196 |
| 127 | | 201 |
| 129 | | 207 |
| 148 | | 133 |
| 149 | | 133 |
| 150 | | 136 |
| 151 | | 163 |
| 157 | | 138 |
| 158 | | 137 |

(Court convened at 9:30 a.m.)

THE COURT: Good morning. Before we get started, I want to tell you that I'm having a lot of back trouble, so it's hard for me to get up and down. And when we recess, please leave, don't wait for me to get up. We'll try to do the best we can.

Call the case, please.

THE CLERK: I'm still waiting on the paperwork from downstairs.

THE COURT: Well, you can go ahead and call the case.

THE CLERK: This is the *United States of America versus Quentin Lowell Horsley*, Case Number 6:19-CR-13, defendant number 1.

THE COURT: Is the government ready?

MR. WELSH: Yes, Your Honor.

THE COURT: Defendant ready?

MR. ANDERSON: Your Honor, good morning. If it please the Court, the defendant is ready.

This matter is set, I believe, for a three- or four-day trial. We have witnesses that we would expect to call. We've advised them, with the Court's permission, to be on call starting Thursday. So assuming that gives the government -- and they may take longer. But I wanted the Court to know we're announcing ready, but our witnesses we haven't asked to be here until Thursday or Friday.

MR. WELSH: I think that's appropriate, Your Honor.

THE COURT: All right. Thank you.

(Pause in the proceedings.)

THE COURT: Are there any matters before the jury is called?

MR. ANDERSON: Not from the defendant, Your Honor.

THE COURT: All right.

MR. WELSH: Your Honor, I do have one matter. The government has subpoenaed a witness who, to our diligence, has not appeared this morning and has not had contact with our office to report that they will appear. I don't have the officer available to testify as to service, but I would be asking for a bench warrant, as a material witness, for the arrest of the witness.

THE COURT: Okay. Are you asking for it now?

MR. WELSH: I would, Your Honor. If Your Honor is asking for me to have a law enforcement witness testify as to service, I don't have that person available and we could do that at a later time. Otherwise, I'm asking for a material witness warrant for Jaimz Bowman who has been listed on the government's witness list.

THE COURT: All right. If the government -- if the clerk can act with that knowledge.

(Pause in the proceedings.)

THE COURT: Bring the jury up.

(Venire panel enters the courtroom.)

THE COURT: All right. You may be seated.

Good morning, ladies and gentlemen.

If you would like to call the jury.

THE CLERK: Ladies and gentlemen, as your names are called, please answer and announce your presence.

Julie Richardson Allen.

PROSPECTIVE JUROR ALLEN: Here.

THE CLERK: Beth Wingfield Bell.

PROSPECTIVE JUROR BELL: Here.

THE CLERK: Gordon Michael Brady.

PROSPECTIVE JUROR BRADY: Here.

THE CLERK: James Richard Christian.

PROSPECTIVE JUROR CHRISTIAN: Here.

THE CLERK: Lauren Elizabeth Davis.

PROSPECTIVE JUROR DAVIS: Here.

THE CLERK: Steven Chester Doss.

PROSPECTIVE JUROR DOSS: Here.

THE CLERK: Robert Melvin Draft.

PROSPECTIVE JUROR DRAFT: Present.

THE CLERK: Megan Froeschl.

PROSPECTIVE JUROR FROESCHL: Here.

THE CLERK: Sheryl Renee Johnson.

PROSPECTIVE JUROR JOHNSON: Here.

THE CLERK: Rex Edward Knudson.

PROSPECTIVE JUROR KNUDSON: Here.

THE CLERK: Kellie McCormick.

PROSPECTIVE JUROR MCCORMICK: Here.

THE CLERK: Kathy Crance McDonald.

PROSPECTIVE JUROR MCDONALD: Here.

THE CLERK: Cynthia Mae Ramsey.

PROSPECTIVE JUROR CYNTHIA RAMSEY: Here.

THE CLERK: Jennifer Marie Ramsey.

PROSPECTIVE JUROR JENNIFER RAMSEY: Present.

THE CLERK: Jackson Alexander Reynolds.

PROSPECTIVE JUROR REYNOLDS: Present.

THE CLERK: Jeffrey Ross Sellers.

PROSPECTIVE JUROR SELLERS: Here.

THE CLERK: Stephen Vincent Stangelo.

PROSPECTIVE JUROR STANGELO: Here.

THE CLERK: Andrew Devon Washburn.

PROSPECTIVE JUROR WASHBURN: Here.

THE CLERK: James Edgar Whitehead.

PROSPECTIVE JUROR WHITEHEAD: Here.

THE CLERK: Ladies and gentlemen, please stand and raise your right hands and be sworn.

(Venire panel sworn.)

THE CLERK: You may be seated.

Ladies and gentlemen, in order to serve as a juror in this court you must be a citizen of the United States who has

attained the age of 18 years and has resided in the Western District of Virginia for one year; you must not be under charge or have been convicted in any court, state or federal, of a crime punishable by imprisonment of a period of more than one year, unless your civil rights have been restored; you must be able to read, write, and understand The English language, and must be able both Physically and mentally of rendering efficient jury service.

Do you and each of you qualify on these grounds? You do.

THE VENIRE: (Responds affirmatively.)

THE CLERK: Thank you.

Ladies and gentlemen, I will now ask you several questions concerning the case which is to be tried today for the purpose of ascertaining whether you can hear the facts fairly and impartially and render a just verdict.

The plaintiff in this case is the United States of America.

And if you will please stand.

The plaintiff is represented by Sean M. Welsh, an assistant U.S. attorney with the United States Attorney's Office in Charlottesville, Virginia.

The defendant is Quentin Lowell Horsley.

If you will please stand.

The defendant is represented by Anthony F. Anderson

and Brooks A. Duncan of Anderson Legal Law Office in Roanoke, Virginia. Thank you.

The purpose of my mentioning this is to ask each of you whether you are related by blood or by marriage to any of the parties you have just been introduced to in this action. If you are, please state so to the judge. You are not? Thank you.

Do you know of any reason why you cannot hear the facts of this case fairly and impartially and render a just verdict?

In a moment, the Judge will ask you-all some additional questions, some of which will require an additional response. We ask that you please raise your right hand -- sorry, raise any hand and wait for the microphone to be brought to you before speaking so the court reporter can hear everything that is being said. In addition, when you speak, please state your first and last name so we have it on the record.

Your Honor, I'll turn it over to you.

THE COURT: Good morning, ladies and gentlemen. Thank you for being here today.

Before we begin the process of jury selection, I first wish to give you a brief overview of some of the steps the Court has taken and is taking to minimize the risk of the spread of COVID-19.

First, the Court will encourage everyone in the courthouse to wear a mask and socially distance whenever possible, whether vaccinated or unvaccinated.

Second, the Court will order all persons in the courtroom to wear a mask, except counsel when they are speaking, or when a witness is testifying.

The Court will also order everyone in the courtroom to practice social distancing, except counsel, litigants, and court staff, and the jurors when in the jury box and as otherwise directed by the court staff.

Third, the Court will specifically order all litigants, lawyers, witnesses, and court staff in this case to attest before coming to the courthouse that they're either vaccinated or have tested negative within three days of their appearance. If there are any witnesses who can't meet these rules, they would testify by Zoom.

And lastly, specifically for jurors, the Court will have all jurors, of which the Court expects there will be 14, to be masked at all times while seated in the jury box.

While the Court has not excluded unvaccinated prospective jurors, the Court will require that all jurors, vaccinated or not, comply with all of the aforementioned rules.

One matter before we begin the process of jury selection. I wish to give you a general overview of this case

so that you know what it is about and can better answer questions of the attorneys.

This case is scheduled to last four days, including today. Now, this is a criminal trial. The government has charged the defendant, Quentin Lowell Horsley, with conspiring to distribute and possessing with distribute [sic] controlled substances, and distributing controlled substances. If you are selected to serve on the jury, I will explain these charges to you in more detail.

Now, the events of this case are alleged to have taken place between August 2017 and February 2019.

Soon I'm going to be asking you some more questions about your qualifications to serve as jurors in this case. Specifically, there are several reasons for these questions. First, it may be, though otherwise qualified, some of you may not be eligible to sit on this particular case for any variety of reasons. The need to ask questions -- we need to ask questions to determine that.

Also, under the rules that govern jury selection in this Court, the parties play a role in choosing the jury that is to try their case. That is why we have more of you here than we really need to sit on the jury. Under the rules, the parties are entitled to exercise strikes to eliminate persons from the jury panel, and then the remaining jurors will hear the case. The parties need to know more about you in order to

make intelligent decisions about who to strike.

As I said before, if the Court, clerk, or counsel ask you a question and you have a response, any response, please raise your hand and they will call on you. Do not feel awkward about raising your hand or letting us know your response. It is vital that you do answer correctly.

When you indicate that you want to respond to a question, the lawyer will ask you to identify yourself by name and there may be some follow-up questions. Also, if you feel your answer to any particular question is personal and you do not want to answer in front of everyone, you may raise your hand and come forward and we will take up the matter at sidebar.

I would ask, however, that you not feel awkward or embarrassed about answering routine questions, even if it involves having to speak in front of everyone. To be efficient with our time this morning, I would like to try to limit these private conversations to answers to questions related to matters that are particularly personal, sensitive, or embarrassing, and that really should only be discussed with me and the parties.

Now we will begin the process of selecting the jury to hear this case. First of all, I'm going to ask, do any of you know anything about this case from any source whatsoever?

THE VENIRE: (Shakes heads side to side.)

THE COURT: Do any of you know any of the persons involved in this case, so far as you know?

THE VENIRE: (Shakes heads side to side.)

THE COURT: Do any of you know of any reason you could not sit as a juror in this case and render a verdict that's fair to both the government and the defendant and base your verdict solely according to the law and the evidence in the case?

THE VENIRE: (Shakes heads side to side.)

THE COURT: All right. I'm going to ask the government to read the names of all of their witnesses, and I'll ask the jurors to listen carefully, and if you know any person whose name is called, please raise your hand.

MR. WELSH: Thank you, Your Honor.

Good morning, everyone. Again, I'm Sean Welsh, and I am an assistant United States attorney here in the Western District. I'll take my mask off while I'm speaking here.

The following are the witnesses the government expects to possibly call in this case:

Chad Davis. I'll start with the following are employees of the Lynchburg Police Department, and those include: Chad Davis, Brandon Isner, Titus Burgess, Christopher Booth, Steven Trent, Craig Dowdy, Dennis Stump, David Goodell, Candice Ball, Matthew Knabb, and Daniel Bailey.

Does anybody know those individuals with the

Lynchburg Police Department?

Okay. Let's start here. We'll wait for the microphone here.

PROSPECTIVE JUROR MCDONALD: I'm Kathy McDonald.

MR. WELSH: Okay.

PROSPECTIVE JUROR MCDONALD: Titus Burgess and his wife are best friends with my daughter.

MR. WELSH: I'm sorry, Ms. McDonald, I have a few more follow-up questions. Is there anything about your relationship with Titus Burgess that would prevent you from serving on this jury?

PROSPECTIVE JUROR MCDONALD: I don't think so.

MR. WELSH: Is there anything about that relationship that would mean you couldn't serve impartially and consider the evidence in the case and render a fair verdict?

PROSPECTIVE JUROR MCDONALD: I don't think so.

MR. WELSH: Okay.

PROSPECTIVE JUROR REYNOLDS: Jackson Reynolds. I know Titus and his wife as well.

MR. WELSH: Okay. Same questions. Is there anything about -- first of all, how do you know Titus?

PROSPECTIVE JUROR REYNOLDS: Just friends.

MR. WELSH: Is there anything about your relationship with Titus Burgess that would prevent you from rendering a fair and impartial verdict in this case?

PROSPECTIVE JUROR REYNOLDS: No.

MR. WELSH: Any other response to the Lynchburg Police Department employees?

Okay. I have additional individuals. Those include Jacqueline Abadir. She's a special agent with the Drug Enforcement Administration. Jaimz Bowman, Brandon Hubbard, Kenneth Adgerson, Roberta Haskins, and Travis Smiley. Does anyone know those individuals?

The last set of individuals are chemists. Those are David Murariu, Thomas Simpson, Cristina Chilcot, Ashton Lesiak, Terra Baker, Daniel -- excuse me, Danielle LaVictoire, Erika Derks, and Lauren Dillon. They're all chemists either with the Virginia Department of Forensic Science or the Drug Administration. Does anyone know those individuals? All right.

THE COURT: All right. Thank you.

Mr. Anderson, would you read the names of any witnesses?

MR. ANDERSON: Yes, Your Honor. Good morning again. If it please the Court, three witnesses possibly you would hear from in the defense case. One would be Pete Sullivan. He's a private investigator out of Roanoke, Virginia. Anybody know Mr. Sullivan?

THE COURT: You may take your mask off.

MR. ANDERSON: Thank you, Your Honor. So much easier

to talk without that, and I hope understand me as well.

Pete Sullivan, Sullivan Investigations, Roanoke, Virginia.

April Callahan.

And Kenneth Christian. Anybody know Mr. Christian?

All right. Thank you, Judge.

Thank you, ladies and gentlemen.

THE COURT: Members of the jury, generally how we hold court is we try to go for about an hour and a half and then take a break for about 20 minutes, and then go another hour and a half, and then go to lunch for an hour, and then come back and do an hour and a half, a break, and then an hour and a half, and that gets us close to 5:00 o'clock.

I do not generally ever hold court past 5:00 unless all of the jurors want to finish something up. But, generally, you will not -- you can count on not having to stay past 5:00 o'clock.

But I will ask you, is there anything that would prevent any of you, any health conditions or anything that would prevent you from sitting maybe up to an hour and a half without taking a break?

All right, sir. You don't have to stand.

PROSPECTIVE JUROR DRAFT: Thank you, Your Honor. Robert Draft of the jury here. I have stenosis of the lumbar spine, and it's kind of a little bit difficult to sit in a

cramped area anywhere for a long period of time. I'm already kind of in my own bit of discomfort, if I may.

THE COURT: All right. How long do you think you can sit?

PROSPECTIVE JUROR DRAFT: Maybe, like, at least two hours tops, maybe, optimistically.

THE COURT: If you were able to, you know, stand when you wanted to, would that help you?

PROSPECTIVE JUROR DRAFT: If I was permitted the occasional stretch break, sure. I'm not trying to be obtrusive about it by any means.

THE COURT: You would be allowed to stand any time you wanted to, if you felt the need to.

PROSPECTIVE JUROR DRAFT: Thank you, Your Honor.

THE COURT: I would also ask you, do you wish to serve if selected?

PROSPECTIVE JUROR DRAFT: This is a narcotics case?

THE COURT: I didn't hear. Yes, it is.

PROSPECTIVE JUROR DRAFT: I'm very sympathetic to -- should I approach the bench? I feel like this is getting really personal.

THE COURT: I'll tell you what, you may, just we'll take that up in a minute.

PROSPECTIVE JUROR DRAFT: Thank you very kindly. Thank you.

THE COURT: Okay. Next. Anyone else?

All right. Mr. Welsh, you may ask any questions if you like.

MR. WELSH: Thank you, Your Honor.

Has anyone here ever served on a jury before? Okay. Let's start from left, my left to right.

PROSPECTIVE JUROR JOHNSON: Sheryl Johnson, a traffic case in Maryland.

MR. WELSH: When did you serve on a jury?

PROSPECTIVE JUROR JOHNSON: Maybe six or seven years ago.

MR. WELSH: Was it a criminal case or a civil case?

PROSPECTIVE JUROR JOHNSON: I think it was a civil. It was a traffic accident case.

MR. WELSH: Without discussing the result, were you able to reach a verdict in that case?

PROSPECTIVE JUROR JOHNSON: We did.

MR. WELSH: Okay. Let's see. I think --

PROSPECTIVE JUROR MCCORMICK: Kellie McCormick.

MR. WELSH: All right. Ms. McCormick, how long ago did you serve on a jury?

PROSPECTIVE JUROR MCCORMICK: Maybe three, four years ago.

MR. WELSH: And was it a criminal case or a civil case?

PROSPECTIVE JUROR MCCORMICK: I believe it was civil.

MR. WELSH: And without discussing the result, were you able to reach a verdict in that case?

PROSPECTIVE JUROR MCCORMICK: It got pleaded out.

MR. WELSH: Okay. Thank you.

Next.

PROSPECTIVE JUROR MCDONALD: Kathy McDonald. It was probably 30 years ago in Campbell County.

MR. WELSH: Okay. Do you remember if it was a criminal case or a civil case?

PROSPECTIVE JUROR MCDONALD: I had a criminal case once and a civil case once.

MR. WELSH: Okay. And in both of those cases, again without discussing the result, were you able to reach a verdict in those cases?

PROSPECTIVE JUROR MCDONALD: In one, one of the cases.

MR. WELSH: Okay. What happened with the other one? Did you not reach a verdict?

PROSPECTIVE JUROR MCDONALD: It ended up the judge had to determine.

MR. WELSH: Okay. Thank you.

Anyone else? I don't know if I saw other responses. Okay. Thank you.

Has anyone appeared in court as a witness or given

testimony before? All right.

PROSPECTIVE JUROR SELLERS: Jeff Sellers. It was a personal case for child custody.

MR. WELSH: Okay. Anyone else?

PROSPECTIVE JUROR WHITEHEAD: What was the question?

MR. WELSH: The question was whether anyone had been a witness or given testimony before in court.

Yes, sir.

PROSPECTIVE JUROR BRADY: Gordon Brady. I was involved in a case where it was a stolen vehicle involved, my vehicle was stolen.

MR. WELSH: Okay. Was it a civil case or a criminal case?

PROSPECTIVE JUROR BRADY: Criminal.

MR. WELSH: And did you provide testimony? It sounds like you testified as a witness.

PROSPECTIVE JUROR BRADY: The Court ruled in my favor that the person owed X amount of dollars to me. It's unpaid so far, but yeah, I have been.

MR. WELSH: Is there anything about that prior experience that would make it so that you wouldn't be able to serve on this jury?

PROSPECTIVE JUROR BRADY: No.

MR. WELSH: Thank you.

PROSPECTIVE JUROR ALLEN: I'm Julie Allen. I've been

in family court a few times. I was a victim in criminal court, and I've also been in civil court as a witness.

MR. WELSH: Okay. Is there anything about that experience and your experience of being in court previously that would make it so that you wouldn't be able to serve on this jury and render a fair and impartial verdict?

PROSPECTIVE JUROR ALLEN: No.

MR. WELSH: Thank you.

Any other responses to having been a witness or provided testimony?

All right. Now, has anyone ever filed a claim or lawsuit or had other litigation against the United States or its agencies, sometimes like the IRS or the Social Security Administration or anything like that? Okay, seeing no responses.

And this may be duplicative of some of the people who have already raised responses. Has anyone ever been the victim of a crime?

We already heard from Ms. Allen. Are there any other positive responses to that? And, actually, Ms. Allen, if I could ask a couple of follow-up questions.

What was the nature of the crime?

PROSPECTIVE JUROR ALLEN: There was more than one instance.

MR. WELSH: Okay.

PROSPECTIVE JUROR ALLEN: So one time someone threw a rock at my vehicle while we were traveling on Easter Sunday. That happened in Pennsylvania. We ended up going to court over that.

I've been physically assaulted by a family member and I went to court about that.

I've also had my vehicle vandalized and things stolen from my property.

MR. WELSH: Is there anything about those experiences that would impact your ability to serve on this jury?

PROSPECTIVE JUROR ALLEN: It was a negative experience. I don't know.

MR. WELSH: Well, is there anything --

PROSPECTIVE JUROR ALLEN: I think I can be fair and impartial.

MR. WELSH: Is there anything about the process or having gone through that that would make it so that you wouldn't be able to serve on the jury?

PROSPECTIVE JUROR ALLEN: No.

MR. WELSH: Okay. Thank you.

Yes, sir.

THE COURT: You don't have to stand --

PROSPECTIVE JUROR DRAFT: Thank you very much, Your Honor.

THE COURT: -- if you're uncomfortable.

PROSPECTIVE JUROR DRAFT: Robert Draft. I had my place of living broken into a couple of years ago. I was living in a different city at the time. This was over on the East Coast.

MR. WELSH: Okay. Is there anything about what happened in that case that would prevent you from serving on the jury?

PROSPECTIVE JUROR DRAFT: I had my guitar stolen and I was very sad about it, and I am feeling a little less impartial more and more. To be honest, I might have a problem. I sincerely might have a problem being impartial.

MR. WELSH: Okay. Thank you.

Any other responses to that question, whether you've been a victim of a crime?

Okay. Sort of related to that, has anyone been a witness to a crime? Yes, sir.

PROSPECTIVE JUROR DRAFT: Robert Draft again. I witnessed an assault shortly after the break-in that I mentioned.

MR. WELSH: Okay.

PROSPECTIVE JUROR DRAFT: I'm trying not to make this all about me, I promise.

MR. WELSH: We appreciate your responses.

Is there anything about that that would prevent you from serving on the jury?

PROSPECTIVE JUROR DRAFT: It was very mean and I didn't like it and I felt bad about it.

MR. WELSH: Okay. Thank you.

Now, has anyone ever been charged with a criminal offense? Seeing no responses.

Does anyone have any close friends or relatives that have been charged with a criminal offense?

Yes, ma'am.

PROSPECTIVE JUROR FROESCHL: Megan Froeschl. My brother has an assault charge. It was a misdemeanor.

MR. WELSH: Okay. Is there anything about that process that would impact your ability to serve on this jury?

PROSPECTIVE JUROR FROESCHL: No, I don't believe so.

MR. WELSH: And Mr. Draft.

PROSPECTIVE JUROR DRAFT: Robert Draft. My father has a drinking and driving assault -- not assault, a charge.

MR. WELSH: Okay. Is there anything about what he's gone through that would impact your ability to sit on the jury?

PROSPECTIVE JUROR DRAFT: Short answer, yes, probably. It was just traumatic and a whole lot of, you know, stuff to go through.

MR. WELSH: Okay. Thank you.

And, yes, sir.

PROSPECTIVE JUROR SELLERS: Jeff Sellers. I have a

son-in-law that was charged with DUI.

MR. WELSH: Okay. And is there anything about those charges that would impact your ability to serve on the jury?

PROSPECTIVE JUROR SELLERS: No.

MR. WELSH: Okay. Thank you.

Yes, sir.

PROSPECTIVE JUROR WHITEHEAD: My name is James Whitehead, and I was charged with DUI.

MR. WELSH: Just a couple of follow-up questions.

PROSPECTIVE JUROR WHITEHEAD: Okay.

MR. WELSH: In that process, did you feel like you were treated fairly?

PROSPECTIVE JUROR WHITEHEAD: Absolutely.

MR. WELSH: And is there anything about those charges that would prohibit you from serving on this jury and rendering a fair and impartial verdict?

PROSPECTIVE JUROR WHITEHEAD: No. No.

MR. WELSH: Thank you.

Okay. Yes, sir.

PROSPECTIVE JUROR DOSS: I was also charged with DUI.

MR. WELSH: Okay.

THE CLERK: What was your name, sir?

PROSPECTIVE JUROR DOSS: Steven Doss.

MR. WELSH: Did you feel like you were treated fairly during that process?

PROSPECTIVE JUROR DOSS: Yes.

MR. WELSH: And is there anything about that experience that would mean that you wouldn't be able to serve on the jury?

PROSPECTIVE JUROR DOSS: No.

MR. WELSH: Any other responses to those two questions?

Okay. So this is a criminal case where the law provides for certain punishment within the discretion of the Judge and as set by Congress. Does anyone have any religious, moral, ethical, philosophical reasons why they could not be called upon to decide the guilt or innocence of the accused?

Okay. Mr. Draft.

PROSPECTIVE JUROR DRAFT: Robert Draft. I have moral issues with the idea of deciding the fate of another individual.

MR. WELSH: Okay.

PROSPECTIVE JUROR DRAFT: Cut and dry. I'm sorry, I'm a big squishy pile of feelings.

MR. WELSH: Any other responses to that question?

Okay. The Court will give you instructions on the law at the conclusion and after the evidence has been presented and both the government and the defendant or defense counsel for the defendant make arguments then.

Is everyone here willing to abide by the instructions

and apply the law to the facts in this case? And if there's anyone who doesn't, please raise your hand.

Okay. This case involves the distribution of heroin, methamphetamine, cocaine, and cocaine base, which is also called crack. Is there anyone who believes that the distribution of those drugs should be legal or that it's wrong for it to be illegal to distribute those types of drugs?

Yes, sir.

PROSPECTIVE JUROR DRAFT: Robert Draft. Robert Draft. I believe that matters of narcotics are matters of -- I don't believe that they should be criminal. I believe it should be considered a health matter and a public service matter, and I believe that they should literally all be, at least, decriminalized to take matters like health matters out of the courtroom with respect.

MR. WELSH: Okay. Thank you. Is there anyone else that has a positive response to that question?

Is there anyone who believes that the use of those drugs, heroin, methamphetamine, cocaine, crack, should be legal? Okay. Seeing no responses.

All right. Have you or anyone close to you ever been negatively impacted by heroin, methamphetamine, crack, or cocaine, or any other drug?

Yes, sir.

PROSPECTIVE JUROR WHITEHEAD: James Whitehead.

MR. WELSH: If you would wait for the microphone.

PROSPECTIVE JUROR WHITEHEAD: Okay. James Whitehead. And I have a nephew that was doing crack cocaine, and he had a stroke.

MR. WELSH: Is there anything about that experience that would leave you either one way or another to not be able to render a fair and impartial verdict in this case?

PROSPECTIVE JUROR WHITEHEAD: I don't think so.

MR. WELSH: Okay. Thank you.

Any other responses to that question?

All right. Now, you're going to hear, I've listed in the list of possible witnesses, you're going to hear from law enforcement witnesses. Is there anyone who would not believe the testimony of a law enforcement witness just because they're employed in law enforcement?

Okay. Mr. Draft.

PROSPECTIVE JUROR DRAFT: Robert Draft, and I promise I'll keep it brief. I have trust issues with authority.

MR. WELSH: Okay. Any other responses to that question?

All right. Kind of the counterpoint to that, is there anyone who would give more credence to a law enforcement witness just because they're employed by law enforcement?

Okay. Now, you're going to hear witnesses who have received plea deals or have come to cooperation agreements

either with the government or with the Commonwealth Attorney's Office in this case. Does everyone understand that there's nothing inherently wrong or unlawful about that process, about plea bargains, about how that works? Okay. If there are, please raise your hand. I don't see any responses. Okay.

Are there any other reasons that I haven't already asked about -- defense counsel gets to ask you some questions as well, but are there any other reasons why you may not be able to serve on this jury?

PROSPECTIVE JUROR REYNOLDS: Back to the being charged, I have been charged with assault.

MR. WELSH: Okay.

PROSPECTIVE JUROR REYNOLDS: The verdict was thrown out of court. I mean, it was basic simple, but still, it's there.

MR. WELSH: I'm sorry, if you could state your name again.

PROSPECTIVE JUROR REYNOLDS: Jackson Reynolds.

MR. WELSH: And was there anything about that process? Did you feel like you were fairly treated in that process?

PROSPECTIVE JUROR REYNOLDS: Yeah.

MR. WELSH: And is there anything about that process that makes you feel like you couldn't serve on a jury?

PROSPECTIVE JUROR REYNOLDS: No.

MR. WELSH: Yes, sir.

PROSPECTIVE JUROR REYNOLDS: Andrew Washburn. I apologize, this is for an earlier question.

MR. WELSH: That's okay.

PROSPECTIVE JUROR WASHBURN: Daniel Bailey of the police, I know somebody named Daniel Bailey and he might have gone into that.

MR. WELSH: Okay.

PROSPECTIVE JUROR WASHBURN: Is there any, like, approximate age that you could give or anything?

MR. WELSH: He is about 36.

PROSPECTIVE JUROR WASHBURN: Okay. Never mind.

MR. WELSH: He's got red hair and a big bushy beard.

PROSPECTIVE JUROR WASHBURN: I do not know him. That's all.

MR. WELSH: Okay. The last question was, were there any other reasons that anyone could think of why they wouldn't be able to serve on the jury? Yes, sir.

PROSPECTIVE JUROR KNUDSON: I'm Rex Knudson, and I have a five-year-old child at the house, which my 16-year-old son stayed away from school today to watch him, because I am a single father and I have no way to -- no child care for my child.

MR. WELSH: Okay. Thank you.

Your Honor, those are all the questions I have.

THE COURT: All right. Thank you.

Mr. Anderson.

MR. ANDERSON: May I remove my mask, Your Honor?

THE COURT: Yes, sir.

MR. ANDERSON: Thank you.

Good morning again, ladies and gentlemen of the panel. As the Court told you, my name is Tony Anderson. I practice law in Roanoke, Virginia, and have for many years. Assisting me today, you've heard, is Brooks Duncan, as well as Chris Anderson. We are part of what we call Anderson Legal.

As you've heard, this is the jury selection process. You have heard it referred to as elected to this jury. And the process we're going through right now, it has a legal term; it's called voir dire, or voir dire, depending on how your accent plays out. Mine kind of comes out as voir dire. And it just means we, as lawyers both for the government and for Mr. Horsley, are going to evaluate your responses. There's no real science to it. It's just we will determine based on gut reactions, nothing more. You-all have them as jurors and people you meet. You may have formed some initial opinions, and that's kind of what both of us are doing in this matter.

So there are no right or wrong answers to these questions. It's not a test. It's more so to allow us, as the Court has told you earlier, to effectively evaluate your

election for this jury.

Now, not every juror is the perfect juror for a particular case. You're all qualified; we know that from your responses earlier. And so what we're trying to determine, if you, in your heart of hearts, hear a little bit about this case, whether you think you're the right juror to sit in judgment. And that's what we're prodding after with these questions. So they're not intended in any way to be a personal attack on any of you, but it's to probe the issues that are relevant. The government has done a very nice job in probing some of the issues they've asked about already.

And so with that understanding, what I would like to talk with you a little bit about is, first, as you know, this is a criminal case. The government has accused Mr. Horsley of being involved in a conspiracy to distribute the three narcotics that you've heard about, cocaine, heroin, and methamphetamine. And they accused him of on at least three occasions of actually making a distribution to an individual.

The fact that he's been charged, the fact that the government has accused him as he sits here today, any members of this panel presume or believe that he's guilty as he currently sits here?

You know, the backbone of our system of justice, renowned worldwide, is the presumption of innocence, and that means, even though the government has charged him, he's

presumed innocent as he sits here today. And that presumption of innocence stays with him throughout this whole proceeding until you decide otherwise.

That concept of presumption of innocence, is that a concept that you can accept and believe in? Stated another way, does anybody have any trouble with that concept?

As you sit here today, ladies and gentlemen, do any of you believe that Mr. Horsley has to present any evidence in this case to deny the allegations that the government has made against him? Would you expect Mr. Horsley to take that witness stand and testify and deny the allegations against him? Would that cause you any difficulty if he didn't do that? I see a lot of stares at me, but I'm not seeing any heads shaking yes or no.

If the Court were to instruct you that the law in the United States is that you can't even consider or comment about a defendant not testifying or taking the stand, would you be able to follow that instruction and enforce that law?

I saw a scratch of the head there. It's kind of like an auctioneer. You have to be careful if you move that up, you might be called on to buy. Was that just a head scratch?

PROSPECTIVE JUROR JOHNSON: No, I'm fine.

MR. ANDERSON: You're okay? Thank you.

You know, you've heard several times now this is a case about drugs. Are any of you situated here today, come

into this courtroom today with any type of internal prejudice you may have about drugs and how the drugs and how they've infiltrated America, Lynchburg, feel so strongly about that that it causes you to find yourself leaning in favor of the government just because they've made these charges in any way? Does anybody feel so inclined in that respect? No?

You've been asked questions about law enforcement officers, and the real question I think both the government and Mr. Horsley have for you is: Just because the fact the person takes the stand and is employed as a law enforcement officer, do you cloak that person just because of that fact, law enforcement, some may be in uniform, some may not, do you cloak them with more believability because they're law enforcement officers than you would any other witness in this case? No?

And not to necessarily point out or pick on anybody, but I think were there two jurors that identified Sergeant -- is it Burress?

MR. WELSH: Burgess.

MR. ANDERSON: -- as knowing him.

And you're Mr. Reynolds?

PROSPECTIVE JUROR REYNOLDS: Yes.

MR. ANDERSON: And Ms. McDonald?

PROSPECTIVE JUROR MCDONALD: (Nods head up and down.)

MR. ANDERSON: Now, this question is for the two of

you. And if I may start, since you're there --

PROSPECTIVE JUROR REYNOLDS: Jackson.

MR. ANDERSON: Mr. Reynolds, the fact that you know him through a relationship -- are y'all friends?

PROSPECTIVE JUROR REYNOLDS: Yes.

MR. ANDERSON: He might be a witness in this case, and you may be called upon to judge his testimony that may be different from others that you hear in this case, and, in fact, his testimony might be challenged. And I know you've said that your friendship, you think you can sit in fair judgment in determining his credibility. Because it's going to be his credibility you have to determine, okay?

If you had to conclude with your fellow jurors, if you sat as a juror among the 12 and collectively decided, "We just can't accept that testimony of the sergeant," is that going to cause you any discomfort with your friendship, seeing him on a friendly basis the next week or so down the road?

PROSPECTIVE JUROR REYNOLDS: No. I would see it from an open-minded standpoint. Because I know none of the evidence of this, and I know only him personally, not of his law enforcement career.

MR. ANDERSON: And so none of what you know about him or his career would cause you to, one, presume he's more believable than any other witness in this case, true?

PROSPECTIVE JUROR REYNOLDS: True.

MR. ANDERSON: And, two, that if you had to say, "Look, Sergeant," if you see him on the street or at the coffee shop next week, "what you were saying just didn't convince me, I just couldn't accept it," you'll be okay with that?

PROSPECTIVE JUROR REYNOLDS: I would likely not discuss it with him.

MR. ANDERSON: I respect that. But my question is, if you did, would you be comfortable doing that? If he brought it up and said, "Hey, why didn't you do what" --

PROSPECTIVE JUROR REYNOLDS: I wouldn't be comfortable doing that.

MR. ANDERSON: You have no problem with that?

PROSPECTIVE JUROR REYNOLDS: I would not be comfortable discussing that with him.

MR. ANDERSON: Is your discomfort that you wouldn't want to bring it up and talk about it, or is your discomfort that, look, it makes me have discomfort sitting as a juror to have to think about the possibility of that happening?

PROSPECTIVE JUROR REYNOLDS: It would be more along the lines of not wanting to discuss what went on in this courtroom.

MR. ANDERSON: I'm sorry.

PROSPECTIVE JUROR REYNOLDS: It would -- I wouldn't want to discuss what happened in this courtroom with him. I

mean, it's --

MR. ANDERSON: Okay. But that won't affect you as a juror, just you wouldn't want to discuss what had happened here with him --

PROSPECTIVE JUROR REYNOLDS: Correct. It should not --

MR. ANDERSON: -- or in deliberations?

PROSPECTIVE JUROR REYNOLDS: Right.

MR. ANDERSON: Fair enough?

PROSPECTIVE JUROR REYNOLDS: Fair enough.

MR. ANDERSON: Thank you, sir.

And, ma'am, those same questions that you've just heard me pose --

PROSPECTIVE JUROR MCDONALD: Uh-huh.

MR. ANDERSON: -- I want you to search your, as I said, search your heart and mind and determine how you feel about that.

PROSPECTIVE JUROR MCDONALD: I believe I could be impartial.

MR. ANDERSON: Is it your daughter that you said is friends?

PROSPECTIVE JUROR MCDONALD: Uh-huh.

MR. ANDERSON: Is she best friends with him?

PROSPECTIVE JUROR MCDONALD: Very good friends with both of them, uh-huh.

MR. ANDERSON: Is there anything about that relationship with the sergeant --

PROSPECTIVE JUROR MCDONALD: Well, again, I just know him personally. I don't know anything about his professional.

MR. ANDERSON: No, I respect that. And I want to make sure that I'm being clear. Maybe I'm not. It's quite possible. I'm told that all the time, so I get that.

But the real issue is, you know, how frequently would you see the sergeant?

PROSPECTIVE JUROR MCDONALD: Oh, I would see his wife more than him.

MR. ANDERSON: Okay. And if you saw them in a social setting -- or did they come to your house and visit or do you meet with the children and --

PROSPECTIVE JUROR MCDONALD: Just see him at my daughter's house.

MR. ANDERSON: Do y'all have outings together?

PROSPECTIVE JUROR MCDONALD: I would see him at my daughter's house, yes.

MR. ANDERSON: And if that does occur and you've sat as a juror in this case and you have, with collective jurors, found facts that were different than what he was saying or testifying to, does that cause you any -- would that, thinking down the road, cause you any discomfort about those interactions you would have with the sergeant?

PROSPECTIVE JUROR MCDONALD: No.

MR. ANDERSON: No?

PROSPECTIVE JUROR MCDONALD: No.

MR. ANDERSON: None whatsoever?

PROSPECTIVE JUROR MCDONALD: Huh-uh.

MR. ANDERSON: Thank you, ma'am.

Anyone else on the question of law enforcement?

As you've heard the Court indicate, this matter is set for four days. And are any members of this panel affected by the length of the trial such that you have employment considerations or other appointments, doctor, medical, or otherwise, that would make it uncomfortable for you to sit as a juror in a four-day proceeding?

Mr. -- yes, I see a hand on the back row.

PROSPECTIVE JUROR BRADY: Yes. Gordon Brady. I have a 19-year-old daughter that lives at home. She is expecting my first grandchild anytime now.

MR. ANDERSON: Are you the full-time caregiver?

PROSPECTIVE JUROR BRADY: No.

MR. ANDERSON: I mean, in other words, if you had to be here four days and you sat as a juror and deliberations may --

PROSPECTIVE JUROR BRADY: Other family members should be able to take care of her.

MR. ANDERSON: So you have that taken care of?

PROSPECTIVE JUROR BRADY: That's correct.

MR. ANDERSON: Thank you.

And I believe, Mr. Knudson --

PROSPECTIVE JUROR KNUDSON: Yes, sir.

MR. ANDERSON: -- you identified yourself as a single parent?

PROSPECTIVE JUROR KNUDSON: Yes. I'm a single father, yes, and I have nobody to take care of my children right now. My grandmother passed away yesterday and all my family is in Florida. I had to ask my son to stay home from school to watch my son while I came here this morning to let y'all know.

MR. ANDERSON: We're all sorry for your loss. And so it sounds like as much as you would love to do and execute --

PROSPECTIVE JUROR KNUDSON: I would like to do my duty, but I can't at this time.

MR. ANDERSON: -- your civil duty, you would like not to serve for those reasons?

PROSPECTIVE JUROR KNUDSON: (Nods head up and down.)

MR. ANDERSON: Thank you. Thank you for your responses.

I take it that -- we've heard from Mr. Draft, and I'm sorry for your back concerns, and it was lumbar, I think you said, issues. They can be quite debilitating for sure. Other than Mr. Draft, who has answered those questions for us

already in terms of the health-related issues that we look for -- I'm kind of thinking, first of all, of hearing. And I know that when we're -- in this crazy world we live in with masks, I know for me when people wear masks it's harder for me to hear what they're saying, and you can see that some this morning, asking the jurors.

But if we talk at this level, all the members in this panel, can you hear us okay? Anybody have any trouble hearing Mr. Welsh or either myself as we talk this morning?

And the witnesses you will hear from will be in this witness box. And some of you may have been witnesses before and you know that can be nervous, so we'll ask them, "Can you speak up a little bit?" and hopefully we can hear them.

But anybody have any issues with hearing what is being said, what will come from the witness stand? Is everybody okay with that, other than me?

I think the government touched on this a little. I'm going to follow up, if I may, and that's the question of what negative effects drugs can have on the world and the community. And so this question I'm posing goes to the nature of are there any members of this panel who have experienced, either personally or with family members or loved ones, the addiction process and the recovery process?

(Mr. Draft raises his hand.)

MR. ANDERSON: Maybe start with Mr. Draft.

PROSPECTIVE JUROR DRAFT: Robert Draft. My father is an alcoholic. Make of that what you will.

MR. ANDERSON: Yes. Anything about that experience, and I think you've told us earlier, but --

PROSPECTIVE JUROR DRAFT: Yeah. Oh, sorry. Are you done?

MR. ANDERSON: Yeah.

THE COURT: Excuse me, Mr. Draft. I think we're going to excuse you, so I don't think you need to answer any more questions.

MR. ANDERSON: Thank you, Your Honor.

And I thank the gentleman here.

Mr. Whitehead, I believe.

PROSPECTIVE JUROR WHITEHEAD: Yes. My name is James Whitehead, and like I mentioned, I've got a nephew that had a stroke using crack cocaine, and like I say, he's a vegetable and in a nursing home now.

MR. ANDERSON: Has he recovered?

PROSPECTIVE JUROR WHITEHEAD: Huh?

MR. ANDERSON: Has he been through recovery?

PROSPECTIVE JUROR WHITEHEAD: No, he's in a nursing home.

MR. ANDERSON: He's still using, pretty much?

PROSPECTIVE JUROR WHITEHEAD: Is he using?

MR. ANDERSON: Yes.

PROSPECTIVE JUROR WHITEHEAD: No, he's in the hospital. He had a stroke.

MR. ANDERSON: Anything about having watched that or being associated with it you find yourself indifferent to the case involving the sale or the distribution of crack cocaine?

PROSPECTIVE JUROR WHITEHEAD: It's hard for me to answer that.

MR. ANDERSON: I'm sorry.

PROSPECTIVE JUROR WHITEHEAD: It is hard for me to answer that.

MR. ANDERSON: I understand. It's a difficult --

PROSPECTIVE JUROR WHITEHEAD: Difficult, very difficult.

MR. ANDERSON: -- difficult setting.

PROSPECTIVE JUROR WHITEHEAD: Like I said, my nephew is laying over there now like a vegetable.

MR. ANDERSON: Mr. Whitehead, I personally understand the concern and the attachment that goes with a family member that goes through that struggle.

PROSPECTIVE JUROR WHITEHEAD: Thank you.

MR. ANDERSON: And in searching your soul, I appreciate your response of sitting in -- in sitting in judgment in a case where it's challenging the evidence as to whether or not someone actually is accused of being responsible of putting crack cocaine, it might be alleged,

into the streets, that could affect or may have affected someone like that. It makes it difficult for you to sit and hear that case. As much as you would like to want to be fair, do you find yourself a little --

PROSPECTIVE JUROR WHITEHEAD: I think so, yes.

MR. ANDERSON: -- predisposed to not wanting to sit on that case?

PROSPECTIVE JUROR WHITEHEAD: Yes.

MR. ANDERSON: Thank you so much, Mr. Whitehead.

THE COURT: Members of the jury, you understand the defendant has pled not guilty, that he's not guilty of this offense. And your job will be to determine whether he be guilty or not guilty after you've heard all the law and the evidence. You will not have to fix the punishment that -- if he's found guilty, you will not decide punishment. That's decided by the Court.

So, Mr. Whitehead, could you serve as a juror in the case and render a verdict fair to both the defendant and the government --

PROSPECTIVE JUROR WHITEHEAD: Sure.

THE COURT: -- and try the case solely according to the law and the evidence you hear in court?

PROSPECTIVE JUROR WHITEHEAD: Yes.

THE COURT: All right.

PROSPECTIVE JUROR WHITEHEAD: Yeah, I feel like I

could do that, yes.

THE COURT: Okay.

MR. ANDERSON: May I return, please, Your Honor? I think, Mr. Brady, I want to make sure that I understand correctly. Is it that you have a daughter that's at home, who's expecting at any time?

PROSPECTIVE JUROR BRADY: That's correct.

MR. ANDERSON: But someone is there to help with that?

PROSPECTIVE JUROR BRADY: Right. I have family around and very aware of the situation.

MR. ANDERSON: Is this your first grandchild?

PROSPECTIVE JUROR BRADY: It is.

MR. ANDERSON: And if you got -- I mean, do you really think you want to serve or be on this jury, if you get a call that she's gone into labor, you need to go, and your attention needs to be directed to the evidence and the case? I'm not trying to make you feel bad. I'm trying to help you, quite frankly.

PROSPECTIVE JUROR BRADY: Being here would not be my first choice. It would be with my daughter to take care of my family. That would be my first choice. If the Court needs me here, I will be here and my family will take care of my daughter.

MR. ANDERSON: Extremely understood and respected.

Thank you so much.

PROSPECTIVE JUROR BRADY: Going back to another question. I am hearing impaired. I wear a hearing aid here. But your question was if you spoke at a certain level that you were if I could hear. If you speak lower than that, I'm going to miss something.

MR. ANDERSON: Thank you, sir.

THE COURT: All right.

MR. ANDERSON: And the last area, kind of just one follow-up, and that is: Are there any members of the panel who have any close friends or family that are employed by law enforcement in any way? And by law enforcement I mean police officers, sheriffs' departments, prosecutors' offices, victim witness coordinators.

Yes, ma'am. Maybe start with you.

PROSPECTIVE JUROR FROESCHL: Megan Froeschl. My father is a police officer with Vinton PD out of Roanoke.

MR. ANDERSON: Again, that just goes to the question we earlier developed, which is you're not going to feel more compelled to listen to a police officer or judge them any different than you would --

PROSPECTIVE JUROR FROESCHL: No, I don't think it will affect my ability to be impartial.

MR. ANDERSON: Thank you, ma'am.

All right. Who else do we have? I'm sorry, on the

back row.

PROSPECTIVE JUROR DOSS: Yes, Steve Doss. My brother's son-in-law, he's a game warden in Bedford County; that's it.

MR. ANDERSON: In Bedford County?

PROSPECTIVE JUROR DOSS: Yes, sir.

MR. ANDERSON: Thank you, sir.

Yes.

PROSPECTIVE JUROR RAMSEY: Jennifer Ramsey. I have an uncle that works at a prison; I'm not sure which one or which county. But it will not affect my ability to -- you know, I won't be biased.

MR. ANDERSON: Thank you very much.

And I think Ms. McDonald?

PROSPECTIVE JUROR MCDONALD: Yes. Kathy McDonald. My son-in-law is a former Lynchburg police officer, and I know several police officers on the force. My nephew is currently in the police academy to be on Bedford City Police.

MR. ANDERSON: And your son-in-law, where is he a police officer?

PROSPECTIVE JUROR MCDONALD: Well, he was with Lynchburg City Police.

MR. ANDERSON: Is he currently employed?

PROSPECTIVE JUROR MCDONALD: He's not currently employed, but he's a former.

MR. ANDERSON: Is he married to your daughter? That's the friend of --

PROSPECTIVE JUROR MCDONALD: Yes.

MR. ANDERSON: That's how you know that relationship?

PROSPECTIVE JUROR MCDONALD: Yes.

MR. ANDERSON: Thank you.

PROSPECTIVE JUROR WASHBURN: Andrew Washburn. We have a family friend whose dad is an officer in Bedford County Public Schools.

MR. ANDERSON: Do you know which department he's with?

PROSPECTIVE JUROR WASHBURN: I'm not sure. But Bedford County.

MR. ANDERSON: Not Lynchburg?

PROSPECTIVE JUROR WASHBURN: No.

MR. ANDERSON: Okay. Thank you.

And I think so all of you understand that question and the reason for that question is right to the issue I think you've all answered already that: Is your friendship, your relationship with law enforcement not going to cause you to believe law enforcement more than you would any other person? Fair statement? Everybody agree with that?

And then the last area that I will cover, unless they tell me I've forgotten something, with the Court's permission, is the notion that the government asked you about plea

bargains and your view of those. You'll be told at the end of the case what the law is with respect to that.

As you sit here today, you may hear testimony, you may hear evidence from people who are testifying in return for what they perceive as a promise of leniency. Anybody have any problem with that? Is that okay? Does it affect you one way or the other? Will you use that to judge that person's credibility if the Court tells you that's okay, that's something you can do? Everybody okay with that? Give me a nod or a yes or a no. We're all good with that?

Thank you, Your Honor. That's all I have.

Thank you, ladies and gentlemen.

THE COURT: I'll ask counsel to approach.

Can they sit over here, I guess?

THE REPORTER: As long as he takes the microphone over there, it should be good.

(Bench conference on the record with all counsel present.)

THE COURT: I struck Mr. Draft, hearing no objection to that. The father that has the kid at home, I don't think -- I mean, he has a legitimate reason to be disqualified. It's Knudson and Draft.

Anyone else for cause?

MR. ANDERSON: Your Honor, I would say that Mr. Brady --

THE CLERK: Judy has to hear you.

THE REPORTER: I can't hear you.

MR. ANDERSON: Mr. Brady, his daughter is pregnant. I mean, he's honorable and he wants to do his duty --

THE REPORTER: I'm sorry.

THE COURT: But I don't think he's disqualified.

THE CLERK: Judy can't hear. Judy can't hear.

MR. ANDERSON: Can you hear me now, Judy?

THE REPORTER: I can.

MR. ANDERSON: I was saying I was suggesting Mr. Brady should be struck for cause given his health hardship and being at home. And I think the Court is overruling that.

MR. WELSH: There's obviously a chance that he could, you know, that she could go into labor, but --

THE COURT: But there's other people who can take care of his situation. He can go to see the baby when we're through.

MR. ANDERSON: Okay.

THE COURT: All right. Anybody else?

MR. ANDERSON: Yes, sir. I would move to strike Mr. Whitehead for cause. His nephew is recovering. And the Court's rehabilitation, with all due respect, was leading him to say --

THE COURT: What did he say that disqualified him, though?

MR. ANDERSON: He said it would be hard for him to sit in judgment. It would be difficult given the fact that his nephew had been addicted to and using crack cocaine.

THE COURT: Well, he didn't say he couldn't be fair. He just said it would be hard to sit here.

MR. WELSH: I think the Court's follow-up is that he could be fair and he responded positively to that. And initially those statements --

MR. ANDERSON: He did say in response to the Court's rehabilitation that he could be fair. But he stated that it would be hard for him and difficult for him to judge the case. He wants to think he could be fair, and he would, he would try to be, but that is such of a magnitude with him involving a drug that's under alleged consideration in the indictment that we think he's impaired and should be struck for cause.

MR. WELSH: I don't think it causes him to be fair -- or I think he indicated he could be fair and impartial.

THE COURT: I think he's indicated he could be fair, and I think he's been straightforward.

MR. WELSH: I don't see any reason for a cause to strike.

THE COURT: I'll deny that strike.

Anything else?

MR. ANDERSON: One minute, please.

THE COURT: Do you have any?

MR. WELSH: I don't have any others.
THE CLERK: We just have the two, right?
THE COURT: Huh?
THE CLERK: Just the two?
THE COURT: Yeah.
MR. ANDERSON: And the last challenge for cause would be with Ms. McDonald. Her daughter-in-law knows one of the sergeants and is good friends with the children. But the son-in-law used to be employed with the Lynchburg Police Department, and they'll be critical of the department. The officers are critical witnesses in this case. While she said she could set that aside, we think that the inherent prejudices that attach to that are such that she could be struck for cause.
MR. WELSH: I think she repeatedly said that she would be fair and impartial and there wouldn't be any count to that.
THE COURT: Right.
MR. WELSH: I don't think there's any reason for cause to strike.
THE COURT: Yeah, I think she said that she could be fair and impartial, so I'll deny that strike.
MR. ANDERSON: I believe that's all the strikes we have.
MR. WELSH: And I have nothing further, Your Honor.

THE COURT: All right.

THE CLERK: Remember to mark those on your random list, those two, okay?

(End of bench conference.)

THE COURT: You may proceed.

THE CLERK: Okay, ladies and gentlemen, we'll now begin the jury striking process. So this morning you may have been referred to as Juror Number 1 if you were first in line alphabetically, and all the way down the line. Right now everyone is in random order. So if we refer to Juror Number 1, it will no longer be Ms. Allen. So whatever I say, Jurors Number 1, 2, 3, it's no longer the number that you were referred to this morning.

Are you-all ready, Mr. Anderson?

MR. ANDERSON: Yes, Madam Clerk, we are.

THE CLERK: All right. Going off the random list, Government, Juror Number 1 pass or challenge?

MR. WELSH: Pass.

THE CLERK: Defense, Juror Number 1, random list, pass or challenge?

MR. ANDERSON: Pass.

THE CLERK: Defense, Juror Number 2 on the random list, pass or challenge? It would be defendant's, Juror Number 2.

MR. ANDERSON: On the random list?

THE CLERK: Yes, sir.

MR. ANDERSON: Pass.

THE CLERK: Government, Juror Number 2, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Thank you.

It goes back to the government. Juror Number 3, pass or challenge?

MR. WELSH: Pass.

MR. ANDERSON: I'm sorry, Madam Clerk, are we on Juror Number 3?

THE CLERK: Number 3 on the random list, yes. Do you need to come up?

MR. ANDERSON: Pass.

THE CLERK: Juror Number 4, random list, and this goes to the defendants, pass or challenge?

MR. ANDERSON: Pass.

THE CLERK: Government, Juror Number 4?

MR. WELSH: Challenge.

THE CLERK: Juror Number 5, Government, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Defense, Juror Number 5?

MR. ANDERSON: Pass.

THE CLERK: Defendant, Juror Number 6, pass or

challenge?

MR. ANDERSON: Challenge.

THE CLERK: Moving down to Juror Number 8 on the random list, Government, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Defendant, pass or challenge Juror Number 8?

MR. ANDERSON: Challenge.

THE CLERK: Challenge?

MR. ANDERSON: Challenge.

THE CLERK: Thank you.

Defendant, Juror Number 9, pass or challenge?

MR. ANDERSON: Pass.

THE CLERK: Government, Juror Number 9, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Government, Juror Number 10, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Defense, Juror Number 10, pass or challenge?

MR. ANDERSON: Pass.

THE CLERK: Defense, Juror Number 11, pass or challenge?

MR. ANDERSON: Challenge.

THE CLERK: So we go to the government with Juror Number 12, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Defense, Juror Number 12, pass or challenge?

MR. ANDERSON: Pass.

THE CLERK: Juror Number 13, Defendant, pass or challenge?

MR. ANDERSON: Challenge.

THE CLERK: Government, Juror Number 14, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Defendant, Juror Number 14, pass or challenge?

MR. ANDERSON: Juror 14?

THE CLERK: Yes, sir.

MR. ANDERSON: Pass.

THE CLERK: We'll go back to the defendant for Juror Number 15, pass or challenge?

MR. ANDERSON: Challenge.

THE CLERK: So we go to the government with Juror Number 17, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Defendant, Juror Number 17, pass or challenge?

MR. ANDERSON: Challenge.

THE CLERK: Okay. Then we go to the defendant again, Lauren -- I'm sorry, excuse me. That's not right.

Random Juror 18, pass or challenge?

MR. ANDERSON: 18, right, Madam Clerk?

THE CLERK: Yes.

MR. ANDERSON: Pass.

THE CLERK: Defense, Juror Number 18?

MR. WELSH: Pass.

THE CLERK: Government, I mean.

We go to the government for Juror Number 19, pass or challenge?

MR. WELSH: Pass.

THE CLERK: Defendant, Juror Number 19?

MR. ANDERSON: Pass.

THE COURT: Carmen, I need to see the lawyers before you --

THE CLERK: Okay. I'm done.

THE COURT: I'll ask counsel to approach.

(Bench conference on the record with all counsel present.)

THE COURT: Will there be any *Batson* issue so far? I hate to keep the African-American jurors that were stricken. I don't know if you struck any.

MR. WELSH: I don't believe -- no.

MR. ANDERSON: There's no -- not in this panel, Your Honor.

THE COURT: Okay. Thank you.

(End of bench conference.)

THE CLERK: Ladies and gentlemen, I will now call the names of the jurors who are to serve in this case. As your names are called, please stand and remain in the courtroom until directed by the Judge. Those whose names are not called should remain seated until excused by the Court.

We have Julie Richardson Allen, Beth Wingfield Bell, Lauren Elizabeth Davis, Steven Chester Doss, Sheryl Renee Johnson, Cynthia Mae Ramsey, Jennifer Marie Ramsey, Jackson Alexander Reynolds, Jeffrey Ross Sellers, Andrew Devon Washburn.

THE COURT: All right. You jurors I'm going to ask to take a seat and remain where you are. Then I'll ask all the other jurors to rise. If your name was not called -- okay, I'm going to ask you-all to file out and come down. I'm going to excuse you. We want to be sure that the names that were called are in the jury box.

(Venire members exit the courtroom.)

THE COURT: All right. Because of the COVID situation, we could only have so many jurors in the courtroom at one time, so we have different -- had to come in with two panels. You-all have been selected to serve on the jury. I'm

going to excuse you at this time until 1:30. I hope we'll be ready to start the trial at that time. So when you -- you'll be excused, you can go to lunch or wherever, but come back by 1:30 and go to the assembly room that you were in, reported to this morning.

I will also ask you not to discuss the case with anyone, don't allow anyone to discuss it with you, don't remain within hearing of anyone discussing the case.

So at this time I'm going to let you step out and leave and come back at 1:30.

(Jury out at 11:30 a.m.)

THE COURT: What time was the next panel?

THE CLERK: They're ready, and I have the paperwork to distribute.

THE COURT: I think we probably ought to take a little break and bring them up. Take about ten minutes.

(Recess taken from 11:31 a.m. until 11:48 a.m.)

THE COURT: You may have a seat. Thank you for being here.

THE CLERK: Ladies and gentlemen, as your names are called, please answer and announce your presence.

Daniel Roy Birch.

PROSPECTIVE JUROR BIRCH: Yes, ma'am.

THE CLERK: Lisa Clark Burstein.

PROSPECTIVE JUROR BURSTEIN: Here.

THE CLERK: Joseph Edward Cline.
PROSPECTIVE JUROR CLINE: Here.
THE CLERK: Halley Conde.
PROSPECTIVE JUROR CONDE: Here.
THE CLERK: William Lynn Faber, Jr.
PROSPECTIVE JUROR FABER: Here.
THE CLERK: Regina Suzette Ferrentino.
PROSPECTIVE JUROR FERRENTINO: Here.
THE CLERK: Brian David Finley.
PROSPECTIVE JUROR FINLEY: Present.
THE CLERK: Tammy Wynette Franklin.
PROSPECTIVE JUROR FRANKLIN: Here.
THE CLERK: Jessi Jared Glauser.
PROSPECTIVE JUROR GLAUSER: Here.
THE CLERK: Kristin Leigh Handy.
PROSPECTIVE JUROR HANDY: Here.
THE CLERK: Garrett Lee Harmon.
PROSPECTIVE JUROR HARMON: Present.
THE CLERK: Carrie Liane Johnson.
PROSPECTIVE JUROR JOHNSON: Here.
THE CLERK: Jacqueline Sue Kelley.
PROSPECTIVE JUROR KELLEY: Present.
THE CLERK: David Charles Kizina.
PROSPECTIVE JUROR KIZINA: Here.
THE CLERK: Dennis Wayne LaPrade.

PROSPECTIVE JUROR LAPRADE: Here.

THE CLERK: Christian Scott Logwood.

PROSPECTIVE JUROR LOGWOOD: Here.

THE CLERK: Claudia Harper Mann.

PROSPECTIVE JUROR MANN: Here.

THE CLERK: James Eldridge Richardson, IV.

PROSPECTIVE JUROR RICHARDSON: Present.

THE CLERK: Jessica Lynn Snowman.

PROSPECTIVE JUROR SNOWMAN: Here.

THE CLERK: Mary-Catherine Steigerwald.

PROSPECTIVE JUROR STEIGERWALD: Here.

THE CLERK: Ellen Wheeler.

PROSPECTIVE JUROR WHEELER: Here.

THE CLERK: Ladies and gentlemen, please stand and raise your right hand to be sworn.

(Venire is sworn.)

THE CLERK: Thank you. You may be seated.

Ladies and gentlemen, in order to serve as a juror in this court, you must be a citizen of the United States who has attained the age of 18 years and has resided in the Western District of Virginia for one year. You must not be under charge or have been convicted in any court, state or federal, of a crime punishable by imprisonment for a period of more than one year unless your civil rights have been restored. You must be able to read, write, and understand the English

language and must be able both physically and mentally of rendering efficient jury service.

Do you and each of you qualify on these grounds? You do?

THE VENIRE: (Responds affirmatively.)

THE CLERK: Ladies and gentlemen, I will now ask you several questions concerning the case which is to be tried today for the purpose of ascertaining whether you can hear the facts fairly and impartially and render a just verdict.

The plaintiff in this case is the United States of America. The plaintiff is represented by Sean M. Welsh, an assistant United States attorney with the United States Attorney's Office in Charlottesville, Virginia.

The defendant in this case is Quentin Lowell Horsley.

Stand.

The defendant is represented by Anthony F. Anderson and Brooks A. Duncan of Anderson Legal law office in Roanoke, Virginia.

The purpose of my mentioning this is to ask each of you whether you are related by blood or marriage to any of the parties you have just been introduced to in this action. If you are, please state so to the Judge. You are not?

Thank you.

Do you know of any reason why you cannot hear the facts of this case fairly and impartially and render a just

verdict?

In a moment the Judge will ask you some additional questions, as will the attorneys, some of which will require an individual response. We ask that you please raise your hand and wait for the court security officer to bring you the microphone before you speak so the court reporter can hear everything that is being said. In addition, when you speak, please first state your first and last name for the record.

And I'll turn it over to Your Honor for further questions.

THE COURT: Thank you.

Welcome, ladies and gentlemen. Thank you for being here.

Before we begin the process of jury selection, I first wish to give you a brief overview of some of the steps the Court has taken and is taking to minimize risk of spread of COVID-19.

First, the Court will encourage everyone in the courthouse to wear a mask and socially distance whenever possible, whether vaccinated or unvaccinated.

Second, the Court will order all persons in the courtroom to wear a mask, except counsel when they are speaking or when a witness is testifying.

The Court will also order everyone in the courtroom to practice social distancing, except counsel, litigants, and

court staff, and the jury, of course, will have a difficult time too, and as otherwise directed by the court staff.

Third, the Court has specifically ordered that all litigants, lawyers, witnesses, and court staff in this case attest before coming to the courthouse that they're either vaccinated or have tested negative within three days of their appearance. If there are any witnesses who can't meet these rules, they would testify by Zoom.

And lastly, especially for the jurors, the Court will have all jurors, of which the Court expects there will be 14, to be masked at all times while seated in the jury box. While the Court has not excluded unvaccinated prospective jurors, the Court will require that all jurors, vaccinated or not, comply with all of the aforementioned rules.

One matter before we begin the process of jury selection. I wish to give you a general overview of this case so that you know what it is about and can better answer questions from the attorneys.

The case is scheduled to last four days. Now, this is a criminal trial. The Court has -- correction, the government has charged the defendant, Mr. Horsley, with conspiring to distribute and possess with the intent to distribute controlled substances and distributing controlled substances. If you are selected to serve on the jury, I will explain these charges to you in detail.

Soon I'm going to ask you some specific questions about your qualifications to serve as jurors in this case specifically. This process of questioning jurors is referred to as voir dire. There are several reasons for these questions. First, it may be that, although otherwise qualified, some of you may not be eligible to sit on this particular case for a variety of reasons. We need to ask questions to determine that.

Also, under the rules that govern jury selection in this court, the parties play a role in choosing the jury that is to try their case. That is why we have more of you here than we really need to sit on the jury. Under the rules, the parties are entitled to exercise strikes to eliminate persons from the jury panel, and then the remaining jurors will hear the case. The parties need to know about you in order to make intelligent decisions about who to strike.

As I said before, the Court, clerk, and all counsel -- if the Court, clerk, or counsel ask you a question and you have a response, any response, please raise your hand and you will be called on. Do not feel awkward about raising your hand and letting us know your response. It is vital that you do so.

When you indicate that you want to respond to a question, the lawyer will ask you to identify yourself by name, and there may be some follow-up questions. Also, if you

feel that your answer to any question is particularly personal and you do not want to answer in front of everyone, you may ask to speak with me and the attorneys privately.

I would ask, however, that you not feel awkward or embarrassed about answering routine questions even if it involves having to speak in front of everyone. To be efficient with our time this morning, I would like to try to limit these private conversations to answers to questions relating to matters that are particularly personal, sensitive, or embarrassing and should really only be discussed with me and the parties.

Now we will begin the process of selecting a jury to hear the case. The clerk previously introduced you to the parties and their attorneys in this matter. Now seeing them in person, do you recognize them or otherwise realize that you know them, that is, any of the parties to the case or any of the lawyers? If so, please raise your hand. No one raises.

Have any of you been represented by any of the attorneys in the case?

I will ask counsel for the government to read the names of their witnesses, and they will -- I'll ask you to listen to the names, and if you know anyone, please raise your hand.

MR. WELSH: Thank you, Your Honor. Again, to reintroduce myself, I'm Sean Welsh. I'm an assistant United

States attorney here in the Western District of Virginia. I just want to introduce you to people you might see up at the table with me.

This is Mary Vogt. She's a litigation specialist with our office. This is Annette Cox. She's a victim witness specialist with our office. And I also have Gina Palmero. She's a paralegal with our office.

Does anyone know those individuals that are up here at the table? Seeing no responses.

The government's case anticipates calling the following potential witnesses. The following witnesses are employees of the Lynchburg Police Department or officers and detectives at the Lynchburg Police Department. Those include Chad Davis, Brandon Isner, Titus Burgess, Christopher Booth, Steven Trent, Craig Dowdy, David Goodell, Candice Ball, Matthew Knabb, and Daniel Bailey.

Does anyone know those individuals at the Lynchburg Police Department?

Yes, sir.

PROSPECTIVE JUROR LAPRADE: Dennis LaPrade. I know Chad Davis. We've gone to a couple of Virginia Tech football games together.

MR. WELSH: Are you guys friends?

PROSPECTIVE JUROR LAPRADE: He's a friend of one of my friends. Just an acquaintance.

MR. WELSH: How long have you known him?

PROSPECTIVE JUROR LAPRADE: Probably four years.

MR. WELSH: Is there anything about the nature of your relationship with him that would impact your ability to serve as an impartial juror?

PROSPECTIVE JUROR LAPRADE: Not that I'm aware of.

MR. WELSH: Thank you.

Anyone else know that set of names, Lynchburg Police Department employees?

So the government also expects to call Jacqueline Abadir with the Drug Enforcement Administration, Dennis Stump with the Blue Ridge Jail Authority. Does anyone know those two individuals?

Okay. Then the government expects to call the following citizens or lay witnesses: Those would be Jaimz Bowman, Brandon Hubbard, Kenneth Adgerson, Roberta Haskins, and Travis Smiley. They're generally in the Lynchburg area.

Does anyone know those individuals? Seeing no responses.

The government may call or you may hear testimony related to several chemists. Those are David Murariu, Thomas Simpson, Cristina Chilcot, Ashton Lesiak, Terra Baker, Danielle LaVictoire, Erika Derks, and Laura Dillon.

Does anybody recognize those names or know those individuals? Seeing no responses. Thank you.

THE COURT: All right. I'll ask Mr. Anderson.

MR. ANDERSON: Thank you, Your Honor.

Good morning, ladies and gentlemen. Witnesses that may be called by the defense are Pete Sullivan of Sullivan Investigations, April Callahan, and Kenneth Christian.

Does anybody know any of those individuals?

Thank you, Judge.

THE COURT: All right.

Members of the jury, we generally conduct the trial this way: In the morning, we start promptly at 9:30, we go for about an hour and a half and take a break, and then we go another hour and a half and we take an hour for lunch and then repeat that in the afternoon, probably an hour and a half of testimony, then a break, and then I always leave by 5:00 o'clock. That's my goal, and you can pretty much count on not having to stay past 5:00, unless all of you want to stay to finish something, maybe finish the trial or something like that and you don't think it's too long. But it will be up to you whether you stay past 5:00 o'clock or not. So you can count on telling your family you'll be home by then.

Now, is there anything -- do any of you have any physical problem that would prevent you from sitting here seeing and hearing the testimony and maybe sitting for as much as an hour and a half over the next four days?

Yes, sir.

PROSPECTIVE JUROR LOGWOOD: Chris Logwood, and I'm partially deaf.

THE COURT: But you would have a problem, you think, listening --

PROSPECTIVE JUROR LOGWOOD: Would or would not?

THE COURT: -- to the evidence?

PROSPECTIVE JUROR LOGWOOD: Probably because I'm having a hard time understanding just about what everyone has said already.

THE COURT: Okay. If there's no objection, I'm going to excuse him. So you can leave now and not have to answer any other questions.

PROSPECTIVE JUROR LOGWOOD: What did he say?

THE MARSHAL: He said you are dismissed.

THE COURT: Thank you for being here.

All right. Is there anyone else who has any physical problem that might prevent you from sitting here and trying the case during this week?

PROSPECTIVE JUROR KIZINA: I'm Dave Kizina, and I work third shift, so it's kind of hard to stay awake.

THE COURT: You work for?

THE CLERK: He works third shift.

THE COURT: Oh. I'm sorry. So you get off just before you come to court?

PROSPECTIVE JUROR KIZINA: I get off at 7:00 o'clock.

THE COURT: All right. What happens if you have to serve on the jury?

PROSPECTIVE JUROR KIZINA: It's kind of hard to stay awake until 5:00 o'clock.

THE COURT: Could you -- I mean, your employer would not have to -- cannot make you stay up that late if you're going to be on the jury.

PROSPECTIVE JUROR KIZINA: I didn't understand the question.

THE COURT: Well, if you're serving on the jury, your employer may not require you to stay up all night before you serve.

All right. We understand your situation.

Are any of you sensible to any bias or prejudice against any party to the case, that is, the government or the defendant? Do you have any -- are you aware of any prejudice you might have against either in the case?

Do any of you know anything about the case already from any source whatsoever?

As you were told, this is a drug case and the events allegedly occurred from August 2017 to about February of 2019. If you know anything about the case from any source whatsoever, please raise your hand.

All right. I'll ask the government if they have any questions.

MR. WELSH: Thank you, Your Honor.

Okay. Good afternoon now. I'm going to ask some questions, and like the Judge said, if at any time you want to come up to the bench and talk about something in private, we can do that; that's no problem.

The first question is: Has anyone here ever served on a jury before? Let's start right here.

PROSPECTIVE JUROR KIZINA: My name is Dave Kizina.

MR. WELSH: All right, Mr. Kizina, how long ago did you serve on a jury?

PROSPECTIVE JUROR KIZINA: Probably about ten years.

MR. WELSH: Was it a criminal case or a civil case?

PROSPECTIVE JUROR KIZINA: It was a criminal case.

MR. WELSH: And without discussing what the result of it was, as a jury were you able to find a verdict?

PROSPECTIVE JUROR KIZINA: Yes.

MR. WELSH: Okay. And I think we had another response over here.

PROSPECTIVE JUROR MANN: My name is Claudia Mann.

MR. WELSH: Okay. And how long ago did you serve on a jury, Ms. Mann?

PROSPECTIVE JUROR MANN: I served twice. In 2002, I was on a federal grand jury in Alexandria, Virginia. And then, I don't know, six years ago, five years ago, I was on the jury for a civil case.

MR. WELSH: Okay. Was that in state court or federal court?

PROSPECTIVE JUROR MANN: I don't remember. I think it was state court.

MR. WELSH: And when you served on the civil jury, again without discussing the result of it, was the jury able to find a verdict or were they unanimous?

PROSPECTIVE JUROR MANN: Oh, yes.

MR. WELSH: Okay. Any other responses to that?

All right. Is anyone here either an attorney or have legal training or have someone close to them who's an attorney or has legal training?

Yes, sir.

PROSPECTIVE JUROR RICHARDSON: James Richardson. A few of my friends are attorneys.

MR. WELSH: Okay. Is there anything about what you discuss with your friends, that you've learned about the law or procedure or anything else like that, that would impact your ability to be a juror?

PROSPECTIVE JUROR RICHARDSON: No.

MR. WELSH: Any other responses to that?

Has anyone appeared in court as a witness or provided testimony before?

PROSPECTIVE JUROR WHEELER: Ellen Wheeler.

MR. WELSH: And in what capacity were you a witness

or provided testimony?

PROSPECTIVE JUROR WHEELER: I was a witness -- or I've been summonsed to court several times. I'm a community victim advocate.

MR. WELSH: Okay. And where are you a community victim advocate?

PROSPECTIVE JUROR WHEELER: In Rockbridge County.

MR. WELSH: Okay. Is there anything about being in that position that would impact your ability to sit impartially on this jury?

PROSPECTIVE JUROR WHEELER: No.

MR. WELSH: Any other responses to that, to be a witness or have provided testimony before?

Okay. Has anybody ever filed a claim or lawsuit or other litigation against the United States or its agencies, like the IRS or the Social Security Administration or anything like that? All right, seeing no responses.

Now, has anyone ever been the victim of a crime?

PROSPECTIVE JUROR MANN: To be a victim of a crime, if somebody broke into your car and stole everything, is that a victim of a crime?

MR. WELSH: Sure.

PROSPECTIVE JUROR MANN: Claudia Mann, yes.

MR. WELSH: When did that occur?

PROSPECTIVE JUROR MANN: About 1982.

MR. WELSH: Is there anything about that process -- did you feel like you were treated fairly? Did you get involved with law enforcement in that process?

PROSPECTIVE JUROR MANN: I don't think we did, no.

MR. WELSH: Is there anything about that experience that would impact your ability to sit on this jury --

PROSPECTIVE JUROR MANN: No.

MR. WELSH: -- and fairly view the evidence?

PROSPECTIVE JUROR MANN: No.

MR. WELSH: Thank you.

Any other responses to that? Yes, ma'am.

PROSPECTIVE JUROR CONDE: I'm Halley Conde. I had my wallet stolen a couple of years ago.

MR. WELSH: Okay. Did you get law enforcement involved?

PROSPECTIVE JUROR CONDE: I reported it to the police department here in Lynchburg.

MR. WELSH: Is there anything about that experience or did you feel like you were treated fairly when you reported that and everything?

PROSPECTIVE JUROR CONDE: Absolutely.

MR. WELSH: Is there anything about that experience that would impact your ability to sit on this jury and review the evidence?

PROSPECTIVE JUROR CONDE: No, not at all.

MR. WELSH: Any other responses to that one?
Has anyone ever been -- this is related to that. Has anyone ever been a witness to a crime? Yes.
PROSPECTIVE JUROR WHEELER: Ellen Wheeler.
MR. WELSH: And what were you a witness to?
PROSPECTIVE JUROR WHEELER: There have been several mini crimes, but I've been witness to people being assaulted, physically assaulted, and overdoses.
MR. WELSH: Okay. Is there anything about that experience, having been a witness to a crime, that would make it so you couldn't sit on this jury and impartially review the evidence?
PROSPECTIVE JUROR WHEELER: No.
MR. WELSH: Thank you.
Any other responses to that, a witness to a crime?
THE CLERK: We've got one.
MR. WELSH: Sorry.
PROSPECTIVE JUROR CONDE: I'm Halley Conde again. My -- I'm a teacher and I've witnessed my students committing crimes, unfortunately. Assault, a couple of fights.
MR. WELSH: Okay. Is there anything about that experience that you wouldn't be able to sit on the jury?
PROSPECTIVE JUROR CONDE: No.
MR. WELSH: Thank you.
Okay. Has anyone here ever been charged with a

criminal offense? Seeing no responses. Sorry.

PROSPECTIVE JUROR FRANKLIN: Tammy Franklin.

MR. WELSH: And what were you charged with, Ms. Franklin?

PROSPECTIVE JUROR FRANKLIN: When I was younger, like 30 years ago, I got charged with refusal of a Breathalyzer.

MR. WELSH: Okay.

PROSPECTIVE JUROR FRANKLIN: And charged with possession of marijuana.

MR. WELSH: Okay.

PROSPECTIVE JUROR FRANKLIN: Speeding tickets.

MR. WELSH: Okay. Speeding tickets wouldn't necessarily be a criminal offense unless it was really fast. Was there anything about the charges you faced that you felt -- did you feel like you were treated fairly in that process?

PROSPECTIVE JUROR FRANKLIN: Yes. The possession was dropped because it was not mine. And it was a DUI dropped to a refusal, and I got a restricted license because I wasn't driving.

MR. WELSH: Okay.

PROSPECTIVE JUROR FRANKLIN: I feel like I was treated fairly.

MR. WELSH: Okay. Is there anything about that process that would make you feel like you couldn't impartially

sit on this jury and consider the evidence in this case?

PROSPECTIVE JUROR FRANKLIN: No, sir.

MR. WELSH: Thank you.

Any other response to that, charged with a criminal offense?

Okay. Does anybody have any close friends or relatives who have been charged with a criminal offense for which you're aware of and have knowledgeable of? Let's start -- let's go, I believe, here.

PROSPECTIVE JUROR FERRENTINO: Regina Ferrentino. Relative-wise there is some drug possession, some assault and battery on another person.

MR. WELSH: Okay. Who was that? Was that a family member or close friend?

PROSPECTIVE JUROR FERRENTINO: Two were family members and one was a close friend.

MR. WELSH: Okay.

PROSPECTIVE JUROR FERRENTINO: Well, not necessarily close friend, but I did know them pretty well.

MR. WELSH: From talking with those individuals, did you feel like they were treated fairly in that process?

PROSPECTIVE JUROR FERRENTINO: They were.

MR. WELSH: And is there anything about that experience that would impact your ability to sit and fairly judge the evidence in this case?

PROSPECTIVE JUROR FERRENTINO: No.

MR. WELSH: Thank you.

I think Ms. Conde here.

PROSPECTIVE JUROR CONDE: Halley Conde. I have a family member who was charged with possession of drugs and also manslaughter.

MR. WELSH: Okay. Did you feel like they were treated fairly in the system and in the charges?

PROSPECTIVE JUROR CONDE: Yes.

MR. WELSH: Is there anything about that experience that would make you feel like you couldn't sit on the jury and impartially hear the evidence?

PROSPECTIVE JUROR CONDE: No.

MR. WELSH: I think we've got maybe one or two over here.

PROSPECTIVE JUROR SNOWMAN: Jessica Snowman. I've had two family members who have been caught drinking under the influence while driving.

MR. WELSH: Okay.

PROSPECTIVE JUROR SNOWMAN: This was so long ago. One was like over a decade ago, and the other one happened before I was born, so I don't remember much about it, to be honest.

MR. WELSH: Still, is there anything about that experience, or did you think that they were treated fairly as

a part of that process?

PROSPECTIVE JUROR SNOWMAN: Yeah.

MR. WELSH: And is there anything about that experience that would make you feel like you couldn't sit impartially on this jury?

PROSPECTIVE JUROR SNOWMAN: No.

MR. WELSH: Any other --

PROSPECTIVE JUROR RICHARDSON: James Richardson. I have relatives that have been charged with drugs, drug charges.

MR. WELSH: Okay. And did you feel like they were treated fairly in that process?

PROSPECTIVE JUROR RICHARDSON: Yes.

MR. WELSH: Is there anything about that experience that would make you feel like you couldn't sit impartially on this jury?

PROSPECTIVE JUROR RICHARDSON: No.

MR. WELSH: Thank you.

PROSPECTIVE JUROR KELLEY: Jacqueline Kelley. My son had a DUI like three years ago.

MR. WELSH: Okay. And do you feel like he was treated fairly in that process?

PROSPECTIVE JUROR KELLEY: Oh, yeah.

MR. WELSH: And is there anything about that experience that would make you feel like you couldn't

impartially sit on this jury?

PROSPECTIVE JUROR KELLEY: No.

MR. WELSH: Thank you.

Any other responses to that?

Okay. So this is a criminal case where the law provides for certain punishment that's within the discretion of the Judge and with laws established by Congress.

Does anyone have any religious, moral, ethical, philosophical reasons they couldn't be called upon to decide guilt in this case, the guilt of the accused? Okay. Seeing no responses.

Does anyone have any family or close friends that are employed by law enforcement?

All right. Let's start here.

PROSPECTIVE JUROR FINLEY: Brian Finley. A friend of mine is a deputy.

MR. WELSH: Okay. Where at?

PROSPECTIVE JUROR FINLEY: Bedford County.

MR. WELSH: How close of a friend?

PROSPECTIVE JUROR FINLEY: Pretty close.

MR. WELSH: Is there anything about that relationship that would impact your ability to sit on the jury?

PROSPECTIVE JUROR FINLEY: No, sir.

MR. WELSH: Thank you. I think --

PROSPECTIVE JUROR FRANKLIN: Tammy Franklin.

MR. WELSH: Hi, Ms. Franklin.

PROSPECTIVE JUROR FRANKLIN: The sheriff that just retired in Appomattox, Sheriff Letterman, he is a good friend of ours. And then there's another deputy sheriff, Sams, is also a good friend of ours because our children went to school together.

MR. WELSH: Okay. Is there anything about that relationship that would impact your ability to impartially sit on the jury?

PROSPECTIVE JUROR FRANKLIN: No, sir.

MR. WELSH: Thank you.

PROSPECTIVE JUROR GLAUSER: Jessi Glauser. I have several friends that are either past students of mine at a local university and/or friends at our church and within the departments that are in Appomattox, Campbell, and Northern Virginia, as well as Florida from past students.

MR. WELSH: Are those people that you're close friends with and keep in close contact with?

PROSPECTIVE JUROR GLAUSER: The students, yes. I talk to them every couple months, if I haven't seen them recently. My neighbor is one in Campbell County. And then another individual that I'm close with at our church is in the sheriff's department at Appomattox.

MR. WELSH: Is there anything about your relationships there that would impact your ability to

impartially sit on the jury?

PROSPECTIVE JUROR GLAUSER: No, sir.

MR. WELSH: Thank you.

PROSPECTIVE JUROR WHEELER: Ellen Wheeler. My brother is a deputy.

MR. WELSH: Okay. Where at?

PROSPECTIVE JUROR WHEELER: Snohomish County, Washington State.

MR. WELSH: And is there anything about your relationship to your brother being in law enforcement that would impact your ability to impartially sit on the jury?

PROSPECTIVE JUROR WHEELER: No.

MR. WELSH: Thank you.

Any other responses to that, family in law enforcement?

Now, the Court will provide instructions on the law at the conclusion of all the evidence and after argument by the attorneys in the case. Does everyone understand that, or will you agree to abide by the instructions and apply the law to the facts of this case? Is there anyone who says, "I can't do that"? Please indicate now. All right. Thank you.

This case involves the distribution of heroin, methamphetamine, cocaine, and cocaine base, which is also called crack. Does anyone believe that the distribution of those drugs should be legal? Okay. Seeing no responses.

Does anyone believe that the use of those drugs should be legal? Seeing no responses.

Have you or anyone close to you been negatively impacted by heroin, methamphetamine, cocaine, cocaine base, or another controlled substance? Yes, sir.

PROSPECTIVE JUROR RICHARDSON: James Richardson. I have a cousin, she's passed now, that was strung out on crack.

MR. WELSH: I'm sorry to hear that. Was that as a result of crack, or an unrelated passing?

PROSPECTIVE JUROR RICHARDSON: Yes and no.

MR. WELSH: Okay. Is there anything about having that family member who had that experience that would make it so that you couldn't impartially sit and consider the evidence in this case?

PROSPECTIVE JUROR RICHARDSON: No.

MR. WELSH: Thank you.

PROSPECTIVE JUROR CONDE: I'm Halley Conde. My younger sister dealt with some negative consequences because her ex-boyfriend is a heroin addict.

MR. WELSH: Okay. Is there anything about that experience that would make you feel like you couldn't impartially sit and consider the evidence in this case?

PROSPECTIVE JUROR CONDE: No.

MR. WELSH: Thank you.

PROSPECTIVE JUROR FERRENTINO: Regina Ferrentino. I

had an ex that died of a drug overdose, and, no, it would not affect my decision.

MR. WELSH: Do you know, I'm sorry to ask, what type of drug?

PROSPECTIVE JUROR FERRENTINO: I believe it was crack cocaine.

MR. WELSH: Thank you.

PROSPECTIVE JUROR FINLEY: Brian Finley. I had a very close childhood friend whose life was ruined by crack cocaine.

MR. WELSH: Would that impact your ability to fairly consider the evidence in this case?

PROSPECTIVE JUROR FINLEY: I don't think so.

MR. WELSH: Thank you.

Any other responses to that question? Yes, sir.

PROSPECTIVE JUROR KIZINA: Dave Kizina. And I had a stepson that died of a heroin overdose.

MR. WELSH: Okay. I'm sorry to ask, but about how long ago was that?

PROSPECTIVE JUROR KIZINA: Probably about maybe four years ago, five years ago.

MR. WELSH: Okay. Is there anything about that experience that would make you feel like you couldn't impartially sit and evaluate the evidence in this case?

PROSPECTIVE JUROR KIZINA: I'm not real sure.

MR. WELSH: Okay. All right. Any other responses to that question?

All right. Is there anyone who would not believe the testimony of law enforcement just because they're employed by law enforcement? Again, this case concerns law enforcement in the Lynchburg Police Department and the Drug Enforcement Administration. Is there anyone who would think that you wouldn't believe that testimony because they're employed by law enforcement? Okay. Seeing no responses to that.

On the flip side of that, is there anyone who would give more credence to a witness just because they're employed by law enforcement? All right. Seeing no responses to that.

You're going to hear about witnesses who have a plea deal or agreement with either the United States government or the Commonwealth Attorney's Office, the prosecutor for the state. Do you understand that there's nothing inherently wrong or unlawful about those types of agreements to have a plea, or what's called a plea bargain, or have that built into pending criminal charges? If there's anyone who thinks that that's just completely wrong, now would be the time to indicate that.

Okay. Now, are there any other reasons why you feel that you wouldn't be able to sit on the jury either for bias for one side or the other, prejudice, or some of the other questions that the Judge has asked you?

All right. Seeing no responses, thank you.

THE COURT: All right, Mr. Anderson.

MR. ANDERSON: Thank you, Your Honor. If it please the Court. May I remove my mask?

And good afternoon, ladies and gentlemen of the panel. It's nice to see everyone today.

This process that you heard we're going through today with jury selection or the jury election process is such that there are no right or wrong answers you can give to any of these questions.

I know it sounds like both the government and myself may be asking questions that pry into issues that you may think are personal, but we need those responses in some way to evaluate in an unscientific approach whether you are the right juror for this case. Not every case is the right case for every juror, and that's what we're trying to get at.

This process is essentially called a -- the legal term is voir dire or voir dire [pronouncing], and my accent lends me to pronounce it voir dire. It's probably not the right way, but that's the way I say it.

So keeping in mind there are no right or wrong answers when we start this process, if you'll just raise your hand if you have a response to it, then we'll continue the way we have so far with you answering the questions.

So as you've heard, my name is Tony Anderson. Along

with Brooks Duncan and Chris Anderson, we represent Quentin Horsley. We practice in Roanoke. That's where we're headquartered, but we cover most of the state of Virginia. We trade under the firm name of Anderson Legal. It's our privilege to be here today representing Mr. Horsley.

The allegations you've heard about are clearly that, an allegation, a charge that alleges Mr. Horsley was involved with distribution of illegal substances and conspiracy to do that. You've heard them call it cocaine, crack cocaine, methamphetamine, and heroin. Those are the nature of the charges. If you sit as a juror in this case, you will hear about them.

Having known just that little bit about the allegation, do any of you find yourself situated as you are right now believing that Mr. Horsley must be guilty because he's been charged by the United States? Does anybody feel that way?

I see a lot of faces looking at me. I don't see much responses by the shake of a head yes or a shake of the head no. Now I'm seeing some shaking. That's good.

Stated another way, you know, the bedrock or one of the backbone bedrocks of our system of justice is what's called the presumption of innocence. And that means that anyone who's accused in the United States is presumed to be innocent of that charge until you, the jury, say otherwise

based on proof beyond a reasonable doubt.

Do you understand that crucible of our system of presumption of innocence and the burden of proof? Does anybody have any problem with that as a judicial concept? Your oath as jurors say you will follow that. Can each of you follow that and accept it? Now we're getting some head shakes. That's good.

You've heard me say the burden of proof. The burden of proof in a criminal case is proof beyond a reasonable doubt. The Court will instruct you about that later on at the end of the case. Do any of you feel or have a view that that burden that's placed on the government to prove their allegations beyond a reasonable doubt is too heavy or too much of a burden and it should be less? Anybody feel that way?

The government has questioned you about law enforcement. And both the government and Mr. Horsley, we question on those issues because we all -- we all believe in our law enforcement and know that they do good. But the real crux of the question, regardless of how you phrase it, is what both the United States and Mr. Horsley want to know is, just because someone may be a police officer, someone may be associated with law enforcement, if they take the witness stand and they testify, would you automatically give their statements more believability, more credibility just because of the fact that they're a police officer wearing a uniform,

more or less than you would any other witness in the case? That's the question. You've had a variation of that question asked a couple of different ways.

That's the real issue: Are you going to believe police officers just because they're, in fact, police officers? Is everybody okay with that? The answer is, "No, we won't. We'll listen to everybody, judge them fairly, follow the law, listen to what the Court tells us." It gives us instincts and some recommendations about how you judge credibility. You'll follow that? Each of you can do that, right?

Now, I know that we have several members of this panel who have indicated that they either have as family members or close friends people who work within law enforcement, right? We had some hands up about that. And each of you have said nothing about that connection you may have with a particular law enforcement officer would prohibit you or cause you to feel indifferent about sitting as a juror in this case; is that right? Everybody okay with that?

The Court has told you we expect the case to last about four days. He has given you the schedule. Anybody have any personal issues with being here for four days, employment related or health related, you have a real critical appointment you may have made that you feel like you can't miss? We have a couple of people. We'll come right down and

talk to you.

PROSPECTIVE JUROR KELLEY: Jacqueline Kelley. I am the HR coordinator and payroll coordinator at a health care facility, and I'm in charge of over 100 nurses, making sure that they are paid and that their employment is secure, and hiring and onboarding and so on and so forth. It's been a little bit of a predicament.

MR. ANDERSON: Is there anyone there, ma'am, who can help do what you do? I mean, I know --

PROSPECTIVE JUROR KELLEY: I have one person that is actually doing payroll today, but as far as hiring nursing staff, which is very difficult right now, I'm the only one that can get them on board and do their orientation and get them hired at the facility. We're not a large facility.

MR. ANDERSON: Is it such, ma'am, that this business would --

PROSPECTIVE JUROR KELLEY: No. It just makes it very difficult for the people that I work with.

MR. ANDERSON: And other than -- and we all understand and sympathize and recognize the inconvenience. But am I understanding correctly that even if you were here for four days, you have people who can cover for you and it won't affect this business, it won't tank it?

PROSPECTIVE JUROR KELLEY: It won't tank it. It's going to make my life really difficult when I get back, but I

will survive, of course.

MR. ANDERSON: Thank you for sharing that. I know it's an inconvenience.

PROSPECTIVE JUROR JOHNSON: I'm Carrie Johnson. I'm a 4th grade teacher at a small school and it's just hard finding subs. We do have some, but none that are qualified to take over the whole class for a long period of time.

MR. ANDERSON: In terms of a hardship, I'll use that word, does it create a hardship for you and your --

PROSPECTIVE JUROR JOHNSON: It does because --

MR. ANDERSON: -- your job there?

PROSPECTIVE JUROR JOHNSON: It does just because I'm the only teacher that's teaching that grade. I have a co-teacher, but she can't take on all the kids. There's just two classes and we don't have subs that are qualified as teachers to take on the class for a week and actually keep them learning.

MR. ANDERSON: And would it cause some detriment to the students that you're responsible for if you are away from them for four days?

PROSPECTIVE JUROR JOHNSON: Well, they're not learning. So just giving them work to do nothing, it's kind of hard. Like, the subs are not qualified to teach my classes.

MR. ANDERSON: It's hard to find that

qualification --

PROSPECTIVE JUROR JOHNSON: It is.

MR. ANDERSON: -- to provide that quality of education.

PROSPECTIVE JUROR JOHNSON: It is, yeah.

MR. ANDERSON: If you were a juror in this case, would you be able to devote your attention fully to the evidence that comes in?

PROSPECTIVE JUROR JOHNSON: I would try. If I'm here, I will try. But I also have to create a huge plan for whoever comes in, so I'm going to have to go at night, get it ready for the next day to try to get someone to cover. It just makes it very difficult.

MR. ANDERSON: Thank you so much.

Anyone else?

So in terms of health-related issues, typically the volume that you will hear when people speak in this courtroom, what you heard from Mr. Welsh and myself already and the Court -- we're speaking without masks, so that helps a little. I know masks sometimes impairs one's hearing ability. But specifically with hearing, the way we're talking and conversing now, has anybody had any difficulty hearing us?

Yes, ma'am.

PROSPECTIVE JUROR MANN: I have trouble hearing the Judge, understanding his words. I have to really concentrate

to hear him. My name is Claudia Mann. I really have to concentrate to hear the Judge; and if you're not facing me, I have trouble understanding the words. I have to do subtitles when I watch TV. So if I'm going to be facing you more, or your back is not to me, then I'll be able to discern the words better.

MR. ANDERSON: If you were a juror, you would likely be sitting in that box, and the witnesses would be testifying from this witness stand -- if you can see this box here, this chair -- and they would be facing you. Do you think that would help you hear?

PROSPECTIVE JUROR MANN: That would be fine.

MR. ANDERSON: It's a nerve-racking experience to be in a courtroom. Even Mr. Welsh and I are nervous, and, well, I've been doing it for a long, long time, but I still get nervous. So people get in here, there's a little nervousness when they get on that stand and it may reflect in a low speech pattern. And we'll try to get them to modulate that.

At a range about like this, are you hearing it okay?

PROSPECTIVE JUROR MANN: Yes.

MR. ANDERSON: And I understand the Judge is farther away than us.

THE COURT: The witnesses will be speaking into the microphone, and so should counsel.

PROSPECTIVE JUROR MANN: I'm sorry, I didn't catch

the last two words. I didn't catch the last two words you said.

THE COURT: I said the witnesses will be at a microphone, and lawyers will be speaking at a microphone also.

PROSPECTIVE JUROR MANN: Okay.

THE COURT: I think Mr. Anderson now is away from the microphone --

PROSPECTIVE JUROR MANN: Okay.

THE COURT: -- and is not projecting.

MR. ANDERSON: Your Honor, I said I got nervous and moved away from the microphone. I kind of move away a little bit.

THE COURT: You can use the one at the desk if you like.

MR. ANDERSON: Thank you, Judge.

When we speak through the microphones, you can hear us a little better.

PROSPECTIVE JUROR MANN: Like I said, it's mostly the Judge. I can't understand the Judge very well.

MR. ANDERSON: Well, Mr. Welsh and I are not going to say anything about the Judge; I promise you that.

PROSPECTIVE JUROR MANN: Okay.

MR. ANDERSON: Thank you.

If you sit as a juror on the case, you will -- at the end of the evidence the Court will give you the instructions

of law. I know this sounds like second nature, second nature for us because we do it so frequently. But, essentially, you'll be called upon to listen to the evidence, the exhibits that are admitted into evidence, and reasonable inferences that can be drawn from those items of evidence. And then the Judge will instruct you as to what the law is of the case, and you apply whatever facts you find them to be to that law. You've heard some reference made to that already this morning.

The defendant is never required to present evidence at all, and that's one of the instructions we expect you would hear from the Court. So my question is, as you come in and sit here today, do any of you, as you sit here, expect that Mr. Horsley would present evidence to deny the allegations that are made against him? And if he didn't, would you hold it against him?

And so with that, you know, as part of our system of justice, and we expect you will be instructed as such by the Court, that if Mr. Horsley didn't take the stand and testify -- he doesn't have to. He's not required to, and if he didn't, if he exercised his right and option, would you hold that against him in any way at all?

And the last area I will cover the government touched on, so I won't beat this with a broom so much. But I know some of the members in the panel have identified friends, loved ones, close people -- people who are close to them as

having experienced bad episodes with drugs, either addiction, God forbid, or worse.

Anything about those personal experiences cause any of you, as you search your conscience in deciding this issue that I'm about to ask, any of that dredge up any notion that you couldn't sit as a fair juror in this case? Anything about the experience that would prohibit you from exercising your fair, free will and base your verdict solely on what you hear from the witness stand, the admitted exhibits, all given to you, and the reasonable inferences that you can draw from them? Everybody okay with that? I know we've had some unpleasant experiences; we're all very sympathetic to that. But setting those aside, do each of you feel you could sit as a juror in this case?

I think that's all I have. Your Honor, that's all the questions I have for the panel.

THE COURT: I'll ask counsel to approach again.

(Bench conference on the record with all counsel present.)

THE COURT: Any for cause?

MR. ANDERSON: Judge --

THE REPORTER: I'm sorry, I can't hear.

MR. ANDERSON: I said I don't think I have any strikes for cause. We might include a hardship on the teacher.

THE COURT: What about that lady, Mann, who said she had some trouble hearing?

MR. ANDERSON: Yeah, I would be okay with her being struck.

THE COURT: Are you okay with her, or do you want to strike her?

MR. ANDERSON: We can strike her. I think her hearing is an issue.

THE COURT: I will strike her.

The guy on the back row -- well, the guy that has to work all night.

MR. WELSH: Kizina.

MR. ANDERSON: I have no trouble with him being struck for hardship.

THE COURT: He's the last one anyway on the random list.

MR. ANDERSON: And the young lady who is the teacher.

THE COURT: Yeah, the teacher.

MR. WELSH: Carrie Johnson.

THE COURT: She's way down too.

THE CLERK: What about the HR person?

MR. WELSH: I'm not sure that hers really reached the level of --

MR. ANDERSON: Is she far down on the list?

THE COURT: Ms. Johnson is way down.

MR. WELSH: She's only 10.

THE COURT: Ms. Johnson, I have 17.

THE CLERK: On the random list.

MR. WELSH: We're talking about Jacqueline Kelley. She's number 10, Judge.

MR. ANDERSON: She's the lead in HR. She said no one could do it.

THE COURT: Generally, I let those people dealing with health care off.

MR. WELSH: Yeah, that would be fine.

THE COURT: All right. Anybody else?

MR. ANDERSON: That's all we have, Judge.

MR. WELSH: We have none.

THE COURT: Have we got everybody? Be sure.

(Discussion off the record between counsel and the clerk.)

THE CLERK: That's five total.

THE COURT: Now, are we agreed that we need two more jurors?

MR. ANDERSON: Yes.

THE COURT: When we get those two, then we'll go to the alternate list and each will have one more strike, correct?

MR. WELSH: Yes, sir. Thank you.

(End of bench conference.)

THE CLERK: Ladies and gentlemen, we'll begin the striking process now. Just so you know, if you were referred to as Juror Number 1 based on your last name being first in the alphabet, for example, you won't be Juror Number 1 when I call out these numbers. Everything is on a randomized list, so pay no mind to the numbers I mention.

On the random list, Government, Juror Number 1, pass or challenge?

MR. WELSH: Pass.

MR. ANDERSON: Challenge.

THE CLERK: Challenge. Thank you.

And Juror Number 2, Defendant, pass or challenge?

MR. ANDERSON: Pass.

THE CLERK: Government, Juror Number 3, pass or challenge?

MR. WELSH: I'm not sure you asked Juror Number 2, but the government passes on Juror Number 2.

THE CLERK: I'm showing that we're on three.

MR. WELSH: I'm sorry, I thought that the defendant had passed on Juror Number 2, but the government had not.

THE CLERK: Right, Number 3. Yes, I'm sorry.

MR. WELSH: The government passes.

THE CLERK: Thank you.

Defendant, Juror Number 3, pass or challenge?

MR. ANDERSON: Pass.

THE CLERK: Pass.

And you both have one strike remaining.

Go to Juror Number 5, Defendant, pass or challenge?

MR. ANDERSON: Pass.

THE CLERK: Government, Juror Number 5?

MR. WELSH: Pass.

THE CLERK: Go to the government for Juror Number 6, pass or challenge?

MR. WELSH: Pass.

THE COURT: To the defendant, Juror Number 6?

MR. ANDERSON: Excuse me, Madam Clerk, are we at Juror 6?

THE CLERK: I'm sorry?

MR. ANDERSON: Are we at Juror 6?

THE CLERK: Yes, on the random list.

MR. ANDERSON: Challenge.

THE CLERK: You said challenge; is that correct?

MR. ANDERSON: Yes.

THE CLERK: Thank you.

So we go to the defendant with Juror Number 7. I guess it's a pass because you're out of your challenges.

MR. ANDERSON: We have to pass. Yes.

THE CLERK: And the government, Juror Number 7?

MR. WELSH: Pass.

THE COURT: Counsel, do you need --

MR. ANDERSON: I don't believe Mr. Horsley would need to have any additional comments. I don't know about the government.

MR. WELSH: Nothing from the government, Your Honor.

THE CLERK: Ladies and gentlemen, I will now call the names of the jurors who are to serve in this case. As your names are called, please stand and remain in the courtroom until directed by the Judge. Those whose names are not called should remain seated until excused by the Court.

Lisa Clark Burstein, Regina Suzette Ferrentino, Tammy Wynette Franklin, and Garrett Lee Harmon.

THE COURT: I'm going to ask all you jurors to sit down. Those whose names were called remain seated, and the other jurors stand. If your name was not called, stand and step out front, if you will.

We had a panel this morning and we selected more jurors from that panel than we normally would expect, so that left only this panel, a lesser number to be selected for this panel. Okay. All right.

Thank you all for being here. It was necessary that you be here in order to pick the jury. And you've performed a great service for your community by being here. So thank you, and you're excused at this time.

(Venire leaves the courtroom.)

THE COURT: I told the other jurors to return at

1:30. If we excuse everyone until 1:45, do you think you can get something to eat and get back by then? What we'll do is we will recess until 1:45. And the jurors, when you come back, report to the assembly room on Floor A that you came into this morning.

Do not discuss the case with anyone, but do not allow anyone to discuss it with you, and do not remain within hearing of anyone discussing the case. Come back and go directly to the assembly room when you get back.

(Recess taken from 1:05 p.m. until 1:52 p.m.)

THE COURT: You may be seated. I'll ask the clerk to swear the jury.

THE CLERK: I'm sorry, I'll have to ask you to stand again to be sworn. Please raise your right hand.

(Jury is sworn.)

THE COURT: Members of the jury, I'm going to give you a preliminary instruction before we hear from the lawyers.

As is true in all federal criminal cases, this case has been brought by the United States Government. During the trial, you may hear the United States be referred to as the government or the prosecution. The individual handling this case for the United States is Mr. Welsh. You may hear Mr. Welsh also referred to as the assistant United States attorney or simply the AUSA.

The other party is the defendant, Quentin Lowell

Horsley, he is represented by Mr. Anderson and Mr. Duncan.

As you may know, this is the United States District Court for the Western District of Virginia. As the presiding Judge, it is my responsibility to act as sort of a referee. This includes ruling on legal issues and instructing you on the law which applies to this case.

It will be your duty to find from the evidence what the facts are. You and you alone will be judges of the facts. You will then have to apply to those facts the law as the Court will give it to you. You must follow that law whether you agree with it or not.

Nothing I may say during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be. As you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind.

First, the defendant is presumed innocent until proven guilty. The indictment against the defendant, brought by the government, is only an accusation, nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence, or to testify. Because the defendant has the right to remain

silent, the law prohibits you from arriving at your verdict by considering that the defendant may not have testified.

Third, the government must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later. But bear in mind in this respect a criminal case is different from a civil case.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that the Court may instruct you to find. Certain things are not evidence and must not be considered by you. I will list them for you now.

One: Statements, arguments, and questions by the lawyers are not evidence.

Two: Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or the Court's ruling on it. If the objection is sustained, ignore the question; if it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.

Anything you may have seen or heard outside of the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact, such as the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you may consider both kinds of evidence.

As judges of the facts, it will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. This part of the jury's responsibility is referred to as determining the credibility of the witnesses.

Among the factors you may properly consider in deciding whether a particular witness is credible or believable, are:

One: Whether the witness has any motive or reason for being either truthful or untruthful;

Two: Any interest the witness may have in the outcome of the case;

Three: Whether there is any appearance or indication

of bias or prejudice in the witness's conduct or testimony;

Four: The extent to which other evidence supports or contradicts the testimony;

Five: Whether the witness is likely to recall or have knowledge about the facts about which he or she is testifying.

The defendant in this case faces four counts, or charges. In the first count, the government has charged him with conspiracy to distribute and possession with intent to distribute methamphetamine, cocaine hydrochloride, heroin, and cocaine base. In three counts he's charged with distributing cocaine hydrochloride on three separate, multiple dates.

At the conclusion of the case, I will give you instructions detailing the precise elements that the government must prove for each of the alleged offenses. I only provide you with the preliminary information now to guide you in understanding the evidence that will be presented. It is not evidence and should not be treated by you as such.

Now a few words about your conduct as jurors. First, I instruct you that during the trial you are not to discuss the case with anyone or permit anyone to discuss it with you. This includes your family, friends, and those with whom you work, as well as your fellow jurors. Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk to anyone about this case.

Second, do not read or listen to anything relating to this case in any way. If anyone should try to talk to you about the case, bring it to the Court's attention promptly.

Third, do not try to do any research or make any investigation about the case on your own.

And finally, do not form any opinion until all the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

If you wish, you may take notes, but if you do, leave them in the jury room when you leave at night. And remember that they are for your own personal use.

Now, I know that many of you use cell phones, the Internet, and other tools of technology. You must not talk to anyone at any time about this case or use these tools to communicate electronically with anyone about the case. As I said, this includes your family and friends.

You may not communicate with anyone about the case through any means, including your cell phone, through e-mail, text messaging or on Snapchat or Twitter or through any blog or website, including Facebook, Google, LinkedIn or YouTube. You may not use any similar technology or social media, even if I have not specifically mentioned it here.

I expect that you will inform me as soon as you become aware of another juror's violation of these instructions. A juror who violates these restrictions

jeopardizes the fairness of these proceedings and a mistrial could result which would require the entire trial process to start over.

The trial will begin in a few minutes.

First, the government will make an opening statement, which is simply an outline to help you understand the evidence as it comes in. Next, the defendant's attorney may but does not have to make an opening statement. Opening statements are neither evidence nor arguments.

The government will then present its witnesses and counsel for the defendant may cross-examine them. Following the government's case, the defendant may, if he wishes, present evidence whom the government may cross-examine.

After all the evidence is in, I will instruct you on the law, then the attorneys will present their closing arguments to summarize and interpret the evidence for you. After that, you will retire to deliberate on your verdict.

All right. Counsel for the government, may proceed.

MR. WELSH: In the early morning hours of February 11th of 2019, officers and detectives of the Lynchburg Police Department arrived at 1639 Blackburn Street here in the city. They came with a search warrant, knocked on the door, and announced their presence. And when they came inside, they were met by Roberta Haskins and her family. Haskins led detectives and officers to a bedroom in the house

where they located a closet. Officers looked into the closet, reached up inside into a panel that was obscured from view and found a duffel bag, and inside that duffel bag found 3 kilograms of methamphetamine shaped like a brick, wrapped in plastic and concealed in the bag, nearly 2 kilograms of cocaine, about the same size, and nearly a kilogram of heroin in a Tupperware container.

Taken together, the drugs had a value of over $1 million.

This was the takedown by the Lynchburg Police Department of the drug-trafficking organization that was headed by the defendant, Quentin Lowell Horsley. At the same time law enforcement was at 1639 Blackburn Street, they were about 4 miles across town at 1009 Misty Mountain Road, Apartment 1212. This was the residence of the defendant and another female.

Inside, law enforcement found personal effects of Quentin Horsley, a money counter, several phones, and a drug ledger labeled "Gotta Get Every Dollar," which listed 17 customers who owed Horsley money. It had an accounting of supplies of heroin, methamphetamine, and cocaine, and importantly, it listed one of those customers as an individual named Kenny, who owed Horsley $55,000.

At the same time, officers were back across town at 614-A Euclid Avenue here in the city. This was the home of

Kenneth Adgerson, Horsley's right-hand man. Adgerson was home and taken into custody on state charges. And law enforcement found 4 ounces of crack cocaine, or cocaine base, found in a butter container in the fridge, $75,000 in cash, and a handgun in a couch. Other officers arrived and found a car that had been used by Adgerson, a Monte Carlo. They obtained a search warrant for that car, and in the trunk found another half of a kilogram, or about 18- to $19,000 worth of cocaine, and an AR-style rifle.

At the same time, officers with the United States Marshals Service and the Drug Enforcement Administration were in Maryland, at the MGM Casino in National Harbor, Maryland, and they arrested the defendant in a hotel room, and by his side found $3,500 in cash and a cell phone, and then found a Jaguar vehicle used by the defendant in valet parking, where they found in the trunk another phone, high-end jewelry, and $20,000 in cash.

February 11th, 2019, was the end of the active investigation into Horsley and his organization. But that investigation began in 2017. In 2017, law enforcement encountered Brandon Hubbard with a half ounce of cocaine. Brandon became a confidential informant for the Lynchburg Police Department.

In exchange for the possibility that he wouldn't be charged, Brandon agreed to purchase drugs from Horsley, at the

direction of law enforcement, in what law enforcement calls a controlled purchase. It's controlled because law enforcement would provide the money, would monitor the setup of the transaction, would monitor the transaction while it would happen, watching Brandon's movements and when he was done take possession of whatever he obtained, and send it off for testing.

Brandon did this on five occasions from Horsley. On August 18th, 2017, at a Hardee's on Langhorne Road, he purchased half an ounce of cocaine. On August 29th of 2017, he went to the same location and purchased half an ounce of cocaine. On September 15th, he went to the same location and purchased half an ounce of cocaine. On December 9th of 2017, he went to the Greenbrier Apartments and purchased an ounce of cocaine. And on December 29th of 2017, he went to the Sunoco station on 12th Street and purchased an ounce of cocaine from the defendant, that was monitored by law enforcement. On three of those occasions, Brandon had called a number that was later found in the phone and was the phone that Horsley had possessed at Misty Mountain Road.

Lynchburg Police Department developed a second informant, an individual named Jaimz Bowman. On November 1st of 2018, they did the same thing and they purchased an ounce of cocaine from the defendant at TGI Fridays. And when they tried to do it again on January 24th of 2019, Horsley referred

Bowman to Kenneth Adgerson, his right-hand man.

Over that same period, law enforcement was conducting controlled purchases from Adgerson as well. And following the events of February 11th of 2019, Horsley and Adgerson were indicted. And Adgerson ended up pleading guilty, and he, as part of his agreement, agreed to cooperate with law enforcement, with the opportunity to provide truthful testimony in exchange for a potential motion for substantial assistance, or what the government would pass that could potentially reduce his ultimate sentence.

You will hear from Adgerson and he will testify about his involvement with Quentin Horsley, about how their relationship began, about how their relationship evolved, up until it ended on February 11th of 2019. You will hear from the man who was closest to the defendant, the person who the defendant confided to about his drug-trafficking organization and who exchanged hundreds of text messages between them, which we will examine here in court.

Adgerson will tell you that in early 2017 he was a cocaine dealer and Quentin Horsley approached him with a cheaper source of cocaine. And from that point, Adgerson scaled up, buying 2 ounces of cocaine a week to 4 ounces of cocaine a week to 9 ounces of cocaine a week until Christmas of 2017 when he purchased his first kilogram of cocaine.

Adgerson used Roberta Haskins, who I mentioned

earlier, as his driver, taking him from deal to deal all across the city, selling cocaine to people.

And then in 2018, Adgerson's relationship with the defendant changed. Quentin Horsley started referring people to Kenneth Adgerson. He had mentioned that he was spooked in some way and started having Adgerson store his drugs for him.

Quentin Horsley also developed a new source of supply, a Hispanic male out of Atlanta, and the supplier would deliver to hotels in Lynchburg, and the defendant would go to pick them up and then started having Adgerson go to pick up these duffel bags of cocaine.

And then at some point in 2018 that changed over to include heroin and methamphetamine. Adgerson was picking up the duffel bags of cocaine and storing it. And then he got the idea to start storing it at Haskins' house so he didn't have to keep it at his own place.

So the same drugs that were found on February 11th of 2019 at 1639 Blackburn Street had been picked up by Kenneth Adgerson and placed in Roberta's house, and had been done so at the direction of Quentin Horsley and as part of the organization that they built together.

You'll also hear another view of the conspiracy from an individual named Travis Smiley. He was another distributor under Quentin Horsley, and he was buying cocaine from Horsley in 2017, and that picked up in 2018 until things started to

trail off. And he will also tell you that he was offered methamphetamine and heroin by the defendant.

In addition to the people who worked directly for Horsley, documents found at his home, recordings of him during the controlled purchases, you'll see the defendant's own text messages. Law enforcement accessed messages across three different phones found as part of those search warrants, and multiple conversations engaging in the sale of controlled substances, including to Adgerson, asking, quote, "You know anybody that does ice?" Ice is another term for methamphetamine.

Horsley mentions that it costs between 700 and $800 a zip. You'll learn that a zip is an ounce of a quantity. He is then talking about his supplier and he says, "He got the heroin too, 50,000 a brick." A brick is a kilogram of a quantity of narcotics.

He has conversations with another individual where he commissions the building of a kilogram press. That's something that drug traffickers use to press a kilogram of cocaine to make it into that brick shape that becomes the kilogram. He gives the dimensions, says it needs to be 4 inches by 8 inches by one and a half inches, which is the size of a kilogram of cocaine. He says, "One brick is what I need."

And in another conversation he asks for scorpion

joints, talking about how kilograms are stamped, and one of the kilograms seized from the Blackburn house, you'll see a picture of a scorpion imprinted into the kilogram of cocaine.

And then in another conversation, he says, "This city ain't playing; I'm the plug." Plug is a term for source of supply that is used by people in drug-trafficking organizations.

At the end of this case, the Judge will instruct you as to the law, and I ask you to take into consideration the defendant's text messages at face value, and consider the other evidence in the case, and at the end of the case, I will come back to you and ask you to find the defendant guilty of conspiracy to distribute narcotics and distribution on three separate occasions. Thank you.

THE COURT: Mr. Anderson.

MR. ANDERSON: Thank you, Your Honor. If it please the Court.

Good afternoon again, ladies and gentlemen now of the jury. You will hear the evidence in this case. The evidence comes from that witness stand behind me, the exhibits that are admitted into evidence, and the reasonable inferences you can draw from them. We expect the Court has instructed you to that some already, but at the end of the case as well.

And the Court read you a really important instruction, I suggest to you, early on, just moments ago,

when he gave you a list of items to consider when you are evaluating and judging the credibility of the witnesses in this case. Okay? Because I'm going to suggest to you that you pay particular attention, as the government has outlined for you who they expect their witnesses to be and what they expect them to say. I want you to evaluate why they're saying them, when they said them, and how it changed.

Now, you will hear evidence in this case that would suggest to you that Mr. Horsley is involved and had been involved with the sale of some cocaine. In fact, you will hear some evidence of some actual distributions that were made. But pay particular attention as to those, what's alleged as to their quantities; pay particular attention as to how many times they occurred; and most importantly, most importantly, pay attention to when this case shifted. When I say "shifted," I mean in the words of and the actions of the individuals that were running this investigation and the individuals that were involved in this investigation.

The government would suggest to you by their evidence that that happened on February the 11th of 2019, when they -- you will hear the term simultaneous search warrants, when they executed those. And they've directed you to the attention of Mrs. Haskins. And pay attention to what her testimony is and what she says, and whom she says the items in the duffel bag belonged to.

We suggest to you and submit to you when you evaluate the evidence you will not find evidence of Mr. Horsley being involved with trafficking of heroin. You will not find evidence that Mr. Haskins -- that Mr. Horsley was involved with the distribution of methamphetamine.

Have you heard the old expression make a mountain -- make a molehill out of a mountain? Anybody ever heard that? Watch this case. Watch the evidence as it comes in. Watch who builds that molehill to a mountain. Watch the witnesses, scrutinize them, listen to what they say about their own involvement and about whom they place the blame on.

The Court has asked you and instructed you in its preliminary instructions to keep an open mind. It's only natural for us when we hear things -- we talked about this earlier in the jury selection process. It's only natural as humans, as we are, sometimes we will make and form first impressions. It's hard to kind of not get wed to that position. It's hard to do.

As a juror, I would submit to you and would request that you do that in this case, don't jump to a conclusion. In the words of the instruction, keep an open mind, wait until all the evidence is in for your consideration and then look at and pay attention to what the law is and how the Court gives you that law and instructs that to you.

I'm not going to go line by line at this stage of the

proceeding. There will be a time for that. It's not now. But I'm going to go through with you line by line at a certain time what each one of these witnesses say, when they say it, and how they do it and how it's connected, how it's connected, how the government would suggest that it's connected to Mr. Horsley.

There's a drug conspiracy that existed, but it was not between Mr. Horsley and Mr. Adgerson. It was between Mr. Adgerson and Mr. Smiley. We're going to present evidence for you, through the witnesses that will take that stand, to establish that to your satisfaction.

You're going to hear from Mrs. Haskins, who had a relationship with Mr. Adgerson. Starts out as though she is a driver for Mr. Adgerson. You're going to hear about that. You're going to hear how it developed to more than being a driver, but allowing her residence to be used not by Mr. Horsley but by Kenneth Adgerson. You're going to hear her own words, I suspect, that when on those early morning hours of February the 11th of 2019, when they came to execute the search warrant at her residence, "I know why you're here. I'll show you where it is. What I'm about to tell could put someone -- could put someone away for life." And the evidence that you will hear will be that person she named is Kenny Adgerson.

Make no mistake, I'm not trying to suggest to you,

and our evidence and our case will not be to you that Mr. Horsley didn't have some involvement with the sale of cocaine. You're going to hear about that. But at the end of the case, you're going to be called upon to judge, you're going to be called upon to decide what role he played in his sales of cocaine. You'll be called upon to decide what quantities he sold of cocaine. And we submit there will be some evidence for you to reach those conclusions.

But to try to build what starts here into what the government will have you believe comes here on the back and strength of witnesses who are selling their testimony to establish their own freedom and their own exclusion from being here will not support, will not support beyond a reasonable doubt the notion, the fact that Mr. Horsley was involved in a multi-level scheme to distribute heroin and methamphetamine.

In every criminal case -- maybe every is a stretch. In most criminal cases individuals take this witness stand and they tell a story, and you will have to receive that story and decide what credibility you attach to that.

I suggest to you that when you hear this evidence, when you measure it against the level of common sense, when you measure it against the level of who's got to gain from what's being said, and you measure it at a level as what does that evidence that underlies it, what does it really establish and prove, you'll be convinced and you will conclude that

Mr. Horsley was not involved in this mountain of what Mr. Adgerson, what Mr. Smiley, what Mrs. Haskins had put together in a short time frame, in a short time frame. Because the government has alleged in their facts to you what started in or about '17, in a short time frame from a period of November of '18 to February of 2019, in that three months, little over three-month period, that Mr. Horsley was involved in that escalation will be something I suggest you will scrutinize thoroughly in this evidence, and as such, you will conclude that the government has not established their case beyond a reasonable doubt as it relates to distribution of heroin and methamphetamine. And we will ask you at the end of the case to so find and to return that as your verdict. Thank you.

THE COURT: All right. You may call your first witness.

MR. WELSH: The government calls Detective Chad Davis.

THE CLERK: Please raise your right hand and be sworn.

CHAD T. DAVIS, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon.

A How are you doing?

Q You can take your mask down as you're testifying. Could you please state and spell your name for the record?
A Chad, C-H-A-D, T. Davis, D-A-V-I-S.
Q And how are you employed?
A I'm a detective with the Lynchburg Police Department.
Q How long have you been with the Lynchburg Police Department?
A For 21 years in May.
Q And what do your duties currently include?
A I'm a criminal investigator for the Lynchburg Police Department.
Q And I may refer you back to February of 2019. What was your position with the Lynchburg Police Department then?
A I was a detective also then.
Q Okay. Specifically, what were you doing on February 11th of 2019?
A I was assisting the Narcotics Unit and the Tactical Unit with a search warrant at a location.
Q Where was that at?
A It was at 1639 Blackburn Street here in the city of Lynchburg.
Q And what was your role at the search warrant at 1639 Blackburn Street?
A To assist Detective Trent and be the recorder for and photographer for the collection of any evidence that was

collected.

Q Have you previously reviewed Government's Exhibits 1 through 17?

A Yes, sir.

MR. WELSH: If we could bring up 1 through 17 and show just the witness.

Your Honor, I think both counsel agree to ask for a rule on witnesses in the courtroom, if there are any witnesses who would otherwise testify, with the exception I think of the case agent, which I think defense counsel would agree to.

THE COURT: Are there any witnesses in the courtroom who have been summonsed to testify?

MR. ANDERSON: No.

MR. WELSH: Thank you, Your Honor.

MR. ANDERSON: But we would ask, Your Honor, we don't think there are any in, but we would ask to invoke the rule, both the government and the defendant.

THE COURT: All right.

MR. ANDERSON: Thank you.

MR. WELSH: Thank you, Your Honor.

BY MR. WELSH:

Q As you're looking at these and going through these, what are these pictures of?

A Blank.

Q That's a problem.

A Gotcha.
Q You've previously reviewed Government's Exhibits 1 through 17; is that correct?
A Yes, sir.
Q And what are they pictures of?
A The items that were located at 1639 Blackburn Street.
Q And who took those pictures?
A I took those pictures.
Q And are they fair and accurate depictions of the scene that day?
A Yes, sir.
MR. WELSH: Your Honor, I would move to admit Government's 1 through 17 into evidence.
MR. ANDERSON: No objection.
THE COURT: No objection. They will be admitted.
(Government's Exhibit Numbers 1 though 17 were received.)
MR. WELSH: If we could go to Government's Exhibit 1 and display that for the jury. There we go.
BY MR. WELSH:
Q Okay. Can you walk us through what Government's Exhibit 1 is?
A This is the front portion of the house at 1639 Blackburn Street.
Q Okay. And let's go to Government's Exhibit 2. What's this a picture of?

A That's the closet in what would be considered the master bedroom where I was taken to.
Q Let's go to Government's Exhibit 3. What is that a picture of?
A As I approached the closet, as you saw the hanging clothes, you had to actually look up because the shelf was higher up in the closet, and that's where I observed duffel bags.
Q Okay. And now Government's Exhibit 4, what is that a picture of?
A That's the blue duffel bag that was on top of the one shelf.
Q If we go to Government's Exhibit 5, what is this a picture of?
A That's a shoebox and packaging material that's inside of the blue duffel bag.
Q Let's go to Government's Exhibit 6.
A That's various packaging material and some narcotics inside of the shoebox.
Q Okay. Let's go to Government's Exhibit 7.
A It's a little bit better photo of, once it was pulled from the bag, of the narcotics and packaging material inside of the shoebox.
Q Let's go to Government's Exhibit 8.
A After the packaging material was removed, we found more

narcotics under the packaging material.
Q Government's Exhibit 9?
A It was also inside of the shoebox.
Q Government's Exhibit 10?
A Packaging material.
Q Government's Exhibit 11?
A Two scales inside of the blue bag.
Q Government's Exhibit 12?
A It was -- I think it was 11 individual baggies of -- inside of the ziplock bag.
Q Government's Exhibit 13?
A Various torn packaging material.
Q Government's Exhibit 14?
A Just the -- what was left after the shoebox and other materials were removed from the blue bag.
Q Government's Exhibit 15?
A It's the other bag that was located on the shelf inside of the closet.
Q All right. Government's Exhibit 16?
A That's a photo inside of the black bag which is inside of the blue and gray bag that was found.
Q Government's Exhibit 17?
A That was inside of the blue and gray -- black and gray backpack that was inside the closet. It's three plastic containers containing narcotic materials that were vacuum

sealed.
Q Okay.
MR. WELSH: I have no further questions for this witness, Your Honor.
THE COURT: All right. You may cross-examine.

CROSS-EXAMINATION

BY MR. ANDERSON:
Q Detective, good afternoon.
A How are you, sir?
Q When you were at this residence on Blackburn on February the 11th of 2019, you assisted in the execution of the search warrant, your role was to photograph and be the recorder of items that were seized?
A Yes, sir.
Q And that's what you've shown to the jury as items Government's Exhibits 1 through 17?
A Correct.
Q And when you were there, did you also encounter an individual by the name of Roberta Robin Haskins?
A Yes, sir.
Q And you developed -- is it fair to say she developed a comfort level with you to make statements with you?
A Correct.
Q And did she -- were you aware that later in that day as well, when she was at the Lynchburg Police Department,

Ms. Haskins was going to make statements against her interest? You were present when that happened?

A Not at the police department, no, sir. I was just present there on Blackburn Street.

Q I'm sorry?

A I was just present there on Blackburn Street.

Q On Blackburn?

A Yes, sir.

Q Were you ever present there at the location when she was interviewed by Detective Booth and Detective Trent?

A No, I was not.

Q Did she ever refer to you -- are you aware of whether or not she ever referred to you as her favorite agent?

MR. WELSH: I'm going to object to hearsay.

MR. ANDERSON: I can withdraw it or save it.

THE COURT: Overruled. Go ahead.

MR. ANDERSON: I'll withdraw it for now, Judge.

THE COURT: All right.

MR. ANDERSON: And then so that would be all the questions that I would have regarding his role as photographer at this instance, but would reserve the right to recall, please.

THE COURT: All right.

MR. WELSH: I have no further questions, Your Honor.

THE COURT: Thank you, Officer. You may step down.

Next witness.

MR. WELSH: The government calls Brandon Isner.

THE CLERK: Please raise your right hand and be sworn. Over here.

THE WITNESS: I'm sorry.

BRANDON ISNER, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK: Thank you. You may be seated.

BY MR. WELSH:

Q All right. Good afternoon.

A Hi.

Q Would you please state and spell your name for the record?

A It's Brandon Isner. I-S-N-E-R. First name is Brandon. B-R-A-N-D-O-N.

Q And how are you employed?

A A sergeant with the Lynchburg Police Department.

Q How long have you been with the Lynchburg Police Department?

A About 11 years.

Q And did you assist in the investigation of Quentin Horsley?

A I did.

Q And how did you assist?

A I assisted with a search warrant.

Q Okay. And where was that at?
A It was at 1009 Misty Mountain Road, Apartment 1212.
Q And when was that?
A It was February 11th, 2019.
Q And what was your role during the search warrant?
A I was the recorder, so any evidence in the apartment, I documented where it was found and collected it.
Q Can you generally describe what type of location 1009 Misty Mountain Road is?
A It was a two-bedroom apartment.
Q Have you previously reviewed Government's Exhibits 18, 19, 20, 21, 148, and 149?
A Yes, sir.
MR. WELSH: If we could bring those up just for the witness.
BY MR. WELSH:
Q What are these exhibits?
A They're the items located in the apartment.
Q Okay.
A The pictures of the items that were located, yeah.
Q Who took these photos?
A I did.
Q And are they fair and accurate representations of what you saw on that day?
A Yes, sir.

MR. WELSH: Your Honor, I would move to admit Government's Exhibits 18, 19, 20, 21, 148, and 149.

THE COURT: It will be admitted.

(Government's Exhibit Numbers 18, 19, 20, 21, 148, and 149 were received.)

MR. WELSH: Let's go to Government's Exhibit 19 and publish for the jury.

BY MR. WELSH:

Q Okay. What is this a document -- what is this?

A It's a bill.

Q Okay.

MR. WELSH: Can we zoom in sort of at the top where it says "sale"? It's a little small on the screen.

BY MR. WELSH:

Q Okay. And in whose name is the bill?

A Quentin Horsley.

Q And what's the address that's listed?

A 1009 Misty Mountain Road, Apartment 1212.

MR. WELSH: Can we go to Government's Exhibit 20.

BY MR. WELSH:

Q All right. What is this exhibit?

A It's a -- it's a picture of a photograph in a frame.

MR. WELSH: Okay. Can we go to Government's Exhibit 148?

BY MR. WELSH:

Q What is this a picture of?
A It's a picture of the closet in the master bedroom.
Q Let's go to Government's Exhibit 149. What is this a picture of?
A It's a picture of a little statue, a little figurine.
Q Okay. Let's go to Government's Exhibit 18. What is this a picture of?
A It's a picture of a piece of notebook paper.
Q Where did you find this?
A This was on the bar in the kitchen area.
Q And what's the title of the document here?
MR. WELSH: You can maybe even zoom in even further.
MR. ANDERSON: I'm going to object to the form of the characterization of the question as "What's the title?" He can ask him what it says, but I don't see where it's described as a title.
MR. WELSH: That's fine.
BY MR. WELSH:
Q What does it say at the top of the document?
A It says, "Gotta Get Every Dollar."
Q And now let's go to Government's Exhibit 21. And what is this a picture of?
A It's five cell phones.
Q All right. And where did you find these?
A This was in the closet.

Q And what did you do with these items after finding them?
A I packaged them and placed them into evidence.
Q How did you place them into evidence?
A So I packaged all five of them together in one evidence bag and submitted them.
Q Okay. And what did you do with the evidence after that?
A I maintained it in my possession until I got to the police department and was able to put it into our evidence system.
Q Can you explain how the evidence system locker works?
A Yeah. So I put it into an evidence bag, I seal it and initial on the tape so it can't be tampered with, and then I put it into a locker that locks from my side so that only the evidence clerks can get into it from the other side.
Q Did you label the item?
A Yes, sir. Yes, sir. Sorry.
Q What was it labeled?
A It would have been labeled with the case number, my name, the item number. I think in general that -- there might have been something else on it. I don't recall.
Q What were the phones labeled as?
A The item number would have been -- I believe it was -- let me double-check. It was Item 18.
Q Okay. So now I'm going to show you Government's Exhibit 150, which is a physical exhibit.

MR. WELSH: Your Honor, permission to approach the witness.

THE COURT: You may.

BY MR. WELSH:

Q I'm handing you Government's Exhibit 150. Do you recognize this?
A Yes, sir.
Q What is it?
A This is that scrap of paper, the little notebook paper.
Q Is this the same, the same item that you were previously talking about?
A Yes, sir.
Q And when you found that item, what did you do with it?
A I collected it and put it in this bag.
Q And how do you know that that's the same item that you seized on that day?
A It's got my initials on the tape and it's got my name on the back.
Q And is it in the same condition that you seized it that day?
A Yes, sir.

MR. WELSH: Your Honor, I would move to admit Government's Exhibit 150.

THE COURT: It will be admitted.

(Government's Exhibit Number 150 was received.)

BY MR. WELSH:
Q I'm going to show you Government's Exhibit 158. Do you recognize Government's Exhibit 158?
A Yes, sir.
Q And what is it?
A It's a money counter.
Q Okay. And where did -- how did you come across Government's Exhibit 158?
A It was in the closet of the second bedroom in the apartment.
Q And is it in the same condition that you saw it on that day?
A Yes, sir, I believe so.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 158.
THE COURT: It will be admitted.
(Government's Exhibit Number 158 was received.)
MR. WELSH: Your Honor, I'm going to approach and retrieve the physical items.
THE COURT: You may.
BY MR. WELSH:
Q I'm going to show you Government's Exhibit 157. I'm showing you Government's Exhibit 157. Do you recognize that?
A Yes, sir.
Q What is that?

A It's an invoice from Berglund.
Q And when did you come across that?
A During the search warrant.
Q And where did you find it within the house?
A This one would have been in the kitchen drawer, one of the drawers in the kitchen.
Q And how do you know it's the same thing that you found on that day?
A It's in the bag that I put it in. It's got my initials on the tape, and my name is on the back.
Q And is it in the same condition as you seized it that day?
A Yes, sir.

MR. WELSH: Your Honor, I would move to admit Government's Exhibit's 157.

THE COURT: It will be admitted.

(Government's Exhibit Number 157 was received.)

MR. WELSH: Your Honor, I have no further questions for this witness.

THE COURT: All right.

CROSS-EXAMINATION

MR. ANDERSON: Only very briefly, if you please, Your Honor.

BY MR. ANDERSON:

Q Good afternoon, Detective. With respect to item

Government's Exhibit 150, it was the sheet of paper I understood you to say you found on the counter?
A Yes, sir.
Q When you were there as the recorder. Did you ever find any other spiral notebook --
A I don't recall.
Q -- at the residence, that you recorded? Don't recall?
A Not that I recorded. Not that I seized, no, sir.
MR. ANDERSON: Thank you. That's all.
THE COURT: All right. Thank you, sir. You may step down.
You may call --
MR. WELSH: The government calls Titus Burgess.
THE CLERK: Please raise your right hand.
TITUS BURGESS, GOVERNMENT'S WITNESS, SWORN
DIRECT EXAMINATION
THE CLERK: Thank you. You may be seated.
THE WITNESS: Thank you.
BY MR. WELSH:
Q Good afternoon.
A Hey, how are you?
Q Could you please state and spell your name for the record?
A Yes. My name is Titus Burgess. T-I-T-U-S, B-U-R-G-E-S-S.

Q And how are you employed?
A I'm a sergeant with the Lynchburg Police Department.
Q And what was your position back in February of 2019?
A February 2019 I was a detective assigned to the Intelligence Unit with the Lynchburg Police Department.
Q And what did your duties include in that position?
A We're an assist unit for the police department. We fall under special investigations, which has two branches. So you have vice narcotics and you have intelligence as well.
Q And how long have you been with the Lynchburg Police Department?
A I'm coming up on 13 years.
Q I want to draw your attention to February 11th of 2019. What were you doing on that date?
A I was a detective assigned to the Intelligence Unit and I was helping with multiple search warrants that morning due to an ongoing drug investigation.
Q Okay. Where was one of the locations where you were involved in?
A It was 614 Euclid Avenue, Apartment A.
Q And what was your role at 614-A Euclid Avenue?
A So I executed the search warrant at that address on Euclid, and also was the recorder. So I had to seize all the evidence and, you know, take everything back to the police department.

Q Okay. Can you walk us through what kind of residence that is?
A So it's a multifamily dwelling. You know, it's a big house that had been divided up into multiple different apartments.
Q And what did you find during the search of 614-A Euclid Avenue?
A We seized phones, documents, large amounts of money, ounces of cocaine, vehicles, there was a lot of stuff that we seized on that search warrant.
Q I'm going to refer you to -- or you've previously reviewed Government's Exhibits 22 through 25; is that correct?
A Yes, sir, I have.
MR. WELSH: If we could show those just to the witness.
BY MR. WELSH:
Q Do you recognize these exhibits?
A I do.
Q What are they?
A The first one -- they're kind of going kind of fast, but the first one is a --
Q We'll walk through them, but how were these pictures taken?
A I took those photos.
Q And are they fair and accurate depictions of what

occurred on February 11th, 2019?
A Yes, sir, they are.
MR. WELSH: Your Honor, I would move to admit Government's Exhibits 22 through 25.
THE COURT: It will be admitted.
(Government's Exhibit Numbers 22 through 25 were received.)
BY MR. WELSH:
Q Let's start with Government's Exhibit 22.
A Okay.
Q What is this a picture of?
A This was a Blue Bonnet butter container that was actually located inside of the refrigerator inside of that apartment.
Q Let's go to Government's Exhibit 23.
A So I had pulled out that Blue Bonnet container, opened up the lid on that, and inside of it was this scale here that had cocaine residue on it, and underneath that scale there was two bags of cocaine, roughly about 2 ounces per bag.
Q Who did you encounter at 614-A Euclid Avenue?
A There were four people there inside the apartment, you know, once we made entry and made the scene secure. Kenneth Adgerson was our target at that location.
Q Let's go to Government's Exhibit 24. What is this a picture of?
A There was a drawer in the same kitchen where the

refrigerator was. There was a drawer on the far left-hand side that just had, you know, a pretty decent amount of cash, so obviously, you know, we took a picture of that and seized that cash as well.
Q And Government's Exhibit 25.
A So once you get past the kitchen, you go down a long hallway. There was a black storage rack in the back of that hallway that had this safe. We got, you know, the combination to the safe and had it unlocked. There was over $70,000 cash just in this safe.
MR. WELSH: No further questions, Your Honor.

CROSS-EXAMINATION

BY MR. ANDERSON:
Q Sergeant, is your only role in this scope of this investigation, I'm not trying to minimize it, but your role was to act as the recorder for the items seized pursuant to a search warrant at Euclid Street that morning on February the 11th, 2019?
A Yes, sir, that's correct.
MR. ANDERSON: Thank you. That's all.
THE COURT: You may step down. Thank you.
Call the next witness.
MR. WELSH: The government calls Jacqueline Abadir.
THE CLERK: Please raise your right hand and be sworn.

JACQUELINE ABADIR, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

THE CLERK: You may be seated. And you can remove your mask.

BY MR. WELSH:

Q Good afternoon.

A Hi, good afternoon.

Q Could you please state and spell your name for the record?

A Sure. Jacqueline Abadir, Special Agent.

Q And if you could spell that for the record?

A Sure. J-A-C-Q-U-E-L-I-N-E. Abadir, A-B-A-D-I-R.

Q And you've already stated that you're a special agent. Who are you a special agent with?

A With the DEA.

Q And how long have you been with the DEA?

A Been with the DEA since 2008.

Q How did you first start at the DEA?

A I was an intel analyst and then became a special agent in 2017.

Q What are your duties as a special agent?

A My duties are investigating criminal drug-trafficking organizations.

Q And where are you based out of?

A I'm based out of D.C.

Q And how did you become involved in this case?
A TFO Bailey on the evening of February 10th, 2019, called me and said that he had an arrest warrant for a Mr. Quentin Horsley.
Q Okay. And what did you do after receiving that call?
A After receiving the call -- also, TFO Bailey said that he was located at the MGM. The next morning I arrived at the MGM. Mr. Horsley had been placed under arrest by the U.S. Marshals who were there. I arrived in the hotel room where Mr. Horsley was at approximately 6:30 a.m.
Q And what did you observe when you came into the hotel room?
A When I came into the hotel room, I saw phones and cash and a, like, Louis Vuitton bag.
Q And who was inside the hotel room?
A Inside the hotel room was Mr. Horsley and another female.
Q All right. Do you see Mr. Horsley in the courtroom today?
A Yes, I do.
Q Could you point him out for the Court, like something he's wearing?
A He is in a white shirt with a tie.

MR. WELSH: Your Honor, I would ask the Court to note the identification.

THE COURT: It will be admitted.

BY MR. WELSH:
Q So where were the phones located in the room?
A There was a phone adjacent to the foot of the bed, on a small table, and there was also another phone on the nightstand.
Q I'm going to show you Government's Exhibit 83. What is Government's Exhibit 83?
A Yes, this is the iPhone.
Q And is that one of the phones that you found that day in the hotel room?
A Yes, sir.
Q How do you know it's that same phone?
A Because it's labeled so the -- this is our self-sealing evidence envelope, and the numbers correlate to the numbers that were in the DEA report, and it's also signed by myself and labeled N2, as it would have in the DEA report.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 83.

THE COURT: It will be admitted.

(Government's Exhibit Number 83 was received.)

BY MR. WELSH:
Q What else did you find in the hotel room?
A And then I also found cash, in open view, bundled up in the Louis Vuitton bag.
Q I'm going to show you Government's Exhibit 26. What is

Government's Exhibit 26?
A It's the cash that I observed bundled up in rubber bands.
Q And is that an accurate depiction of what you saw that day?
A Yes, sir, it is.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 26.
THE COURT: It will be admitted.
(Government's Exhibit Number 26 was received.)
BY MR. WELSH:
Q What did you do after making the arrest?
A Right after making the arrest, I went down to the valet parking, because TFO Bailey said that there was also a search and seizure warrant for the Jag, a black Jaguar that Mr. Horsley had driven.
So I went down to the valet, asked for the keys, and the Jag was parked in a garage, and I went in, unlocked the Jag and in the trunk were the additional cash in a blue plastic bag and some jewelry.
Q I'm going to show you Government's Exhibit 27. And what is this a picture of?
A This picture is of the cash that I observed in the trunk, in the blue plastic bag.
Q And is it a fair and accurate depiction of what you saw that day?

A Yes, it is.

MR. WELSH: Your Honor, I move to admit Government's Exhibit 27.

THE COURT: It will be admitted.

(Government's Exhibit Number 27 was received.)

MR. WELSH: If we could publish to the jury.

BY MR. WELSH:

Q Did you later find -- how much cash was this?

A Right. So I had asked the U.S. Marshal to bring Mr. Horsley to the vehicle, which he did, and at which point I told Mr. Horsley that I would be seizing this cash as well. Then Mr. Horsley stated that this cash was an inheritance from a family member.

Q Did he indicate how much it was?

A He said that it was $20,000.

Q Okay. Let me show you Government's Exhibit 28. What is this a picture of?

A This is the picture of the jewelry that was also located in the trunk of the Jag.

Q And is that a fair and accurate depiction of what you saw that day?

A Yes, it is.

MR. WELSH: Your Honor, I would move to admit Government's Exhibit 28.

THE COURT: It will be admitted.

(Government's Exhibit Number 28 was received.)
BY MR. WELSH:
Q Finally, did you find anything else during your search of the vehicle?
A Yes. There were also phones located in the vehicle.
Q I'm going to show you Government's Exhibit 90. Do you recognize Government's Exhibit 90?
A Yes, I do.
Q And what is it?
A It's a black Samsung phone.
Q And where did you first encounter Government's Exhibit 90?
A This phone was found in the front of the car, in the driver's side.
Q And how do you know that's the same phone that you found that day?
A Because also the self-sealing evidence bag is labeled with a number and that number correlates with my DEA report. And I also signed this bag as well.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 90 into evidence.
THE COURT: It will be admitted. Is it on the screen?
MR. WELSH: It's a physical exhibit, Your Honor. It's in a bag.

(Government's Exhibit Number 90 was received.)

BY MR. WELSH:

Q What did you do with Government's Exhibits 83 and 90 after putting them into their respective bags?

A So after putting the phones in the bags, I went ahead and -- we have a witness that needs to sign for the bags, so then those phones got stored away in our evidence lockers. And then at which point I FedExed those phones to TFO Bailey.

MR. WELSH: I'm going to retrieve the physical exhibit, Your Honor. And I have no further questions for this witness, Your Honor.

THE COURT: Any redirect -- any cross?

CROSS-EXAMINATION

BY MR. ANDERSON:

Q Good afternoon, Special Agent. Just a couple of small questions. I understood you to say when you arrived the marshals, U.S. Marshals, already had Mr. Horsley in custody?

A Yes, sir, they did.

Q And this was at -- your arrival was at a hotel room?

A Yes, sir, it was.

Q And where was this hotel room located?

A It was located at the MGM. It's the MGM in Oxon Hill, Maryland.

Q And the MGM, is that a casino, hotel/casino?

A Yes, sir, it is.

Q And were you aware that the marshals had arrested or had taken Mr. Horsley into custody in another area of the MGM?
A The marshals were still located in the hotel room.
Q I know they were still there when you arrived, but you don't know where they actually physically took him into custody?
A No, I don't.
MR. ANDERSON: Thank you. That's all.
MR. WELSH: Briefly, Your Honor.
REDIRECT EXAMINATION
BY MR. WELSH:
Q When you came into the hotel room, how was the defendant dressed?
A He was -- he did not have a shirt on and that's what I remember at that time. And he had some pants on.
MR. WELSH: Okay. Thank you.
THE COURT: All right. Thank you. You may be excused.
MR. WELSH: Your Honor, the government calls -- this next witness will be a lengthy witness, and so I'll defer to the Court if now is an appropriate time for a break or not. Or else we can stop in the middle of his testimony. That would also be fine.
THE COURT: Well, call him. Let's go a few minutes.
MR. WELSH: The government calls Christopher Booth.

THE CLERK: Please raise your right hand.

CHRISTOPHER BOOTH, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon.

A Hello.

Q You can take down your mask as you're testifying. Could you please state and spell your name for the record?

A It's Christopher Booth. C-H-R-I-S-T-O-P-H-E-R. Booth, B-O-O-T-H.

Q And how are you employed?

A I work with the Lynchburg City Police Department.

Q How long have you been with the Lynchburg Police Department?

A Since January 2008.

Q What is your current position?

A My current position is a sergeant in the Lynchburg Criminal Investigations Division.

Q Between 2017 and 2019, what was your position then?

A I was a detective in the Vice Narcotics Unit.

Q What did your duties include in that position?

A I was a detective. I worked various types of cases mainly dealing with narcotics.

Q And what was your role in the investigation of Quentin Horsley?

A I was one of the case agents that worked on the investigation.
Q Have you met Quentin Horsley?
A I have.
Q Do you see him in the courtroom today?
A Yes, he's the defendant.
Q Have you spoken with the defendant?
A Yes, I have before, yes.
Q Have you listened to recordings of him?
A Yes.
Q Would you recognize his voice in a recording?
A Yes.
Q So I want to talk to you about controlled purchases. Are you familiar with the term "controlled purchase"?
A I am.
Q What is a controlled purchase?
A A controlled purchase is typically where a confidential, reliable informant or an undercover officer will make a purchase of -- typically it's narcotics, but it can be anything as far as firearms or any other illegal substance. But, typically, they will purchase that from an individual in reference to prosecuting, having a case prosecuted.
Q What makes it a controlled purchase?
A The control is we have other law enforcement detectives and officers that are monitoring the situation as it -- as the

controlled buy happens. While it's monitored, we can make adjustments. If something is going a different way that we don't want, we have the ability to contact the confidential informant or the officer and change directions. We control a lot of the directions.
Q Have you personally been involved in conducting controlled purchases?
A Yes.
Q Approximately how many?
A I've been involved in over a hundred controlled purchases.
Q Let's walk through how a controlled purchase actually works. How does this begin?
A Typically with a confidential informant, typically we will meet the informant, debrief the informant, find out who the informant can deal with as far as who the suspects they have are, what they can purchase from that individual. Once we have determined who they can deal with and what they can purchase, we will set up a controlled purchase or a controlled buy. And, typically, the way we like for that to work is we will make a controlled phone call to the target and record the phone call, if possible. Then at that time --
Q Let me stop you. What do you explain to the person who has agreed to become an informant when they first come to you?
A I'm sorry?

Q Yeah. What do you explain to them? What do you tell them about this process?
A Typically, we explain to them how the process actually works. Whether they're working for consideration or money, we explain to them how that process works. We also explain to them as far as different safety measures that we take. If they get into any kind of trouble, we give them things to say to notify us if they need any assistance. So that's another aspect of it being a controlled purchase.
Q Are there certain rules that you set out for the informant?
A Yes. There is a list of rules we do go over with the informant on what they can and can't do. Mainly one of the most important rules is they cannot lie or provide false information.
Q So what would happen if the informant lied or provided false information?
A They would be fired and they would not be used as an informant.
Q So I cut you off. So after you've explained all that to them, what is the next step with the informant?
A Typically, once we've explained to them, found out exactly the individuals that they can purchase from, we will try to set up a controlled buy. And that process entails, typically, we'll meet with the CI or informant. And once we

have met with the informant, we will have -- typically have the informant make a phone call to the target and have them set up -- typically, in the phone call we like for them to give a location where they're going to meet, how much we're going to spend and what exactly we're going to buy. Sometimes that doesn't always happen, but that's what we try to have in the conversation.

Once that is set up and once the deal is set up, we will have -- if possible, we'll have other detectives go to that area to set up to try to do surveillance, and then we will, once we're ready, we will send the informant to make the purchase.

Q And when that informant makes the call, are you present for that?

A Yes. Typically, yes. A detective -- sometimes all the phone calls are not recorded, but, typically, a detective will always be with the informant.

Q And does law enforcement take any measures to record that call?

A Yes.

Q And so what happens after the call is made?

A After the call is made, we will search the CI, or the informant, to make sure that they have no money or contraband on them. If they do have money, we hold the money. So the only money they would have is the money that we provide. If

they have a vehicle, we search the vehicle to also verify that there's no money or contraband inside the vehicle, because we want, when the informant leaves to go do the controlled purchase, we want the only money that they have to be the money that we provided, and we want to verify that they have no other contraband in the vehicle.
Q Do you do anything to document the money that you give them?
A Yes, we typically take a photograph of the money.
Q And why do you do that?
A It's to show the denominations that we provide, whether it's hundreds, fifties, twenties, tens, fives. And also to try and document the serial numbers on the money.
Q Okay. What else do you do in this stage?
A Once they have been searched and there's no money or contraband, we will provide them a designated amount of U.S. currency to complete the deal.
Q Okay. Do you provide the informant with anything else?
A Yes. We provide them with a live wire and an audio/video recording device. The live wire is used so we can monitor the controlled purchase remotely without having to be right there with the informant. We listen to the live wire.
Q Yeah, can you explain what a live wire means?
A Live wire is we give the informant a device and with that device, once it's activated, we can then monitor what's being

said. We don't have a visual from the wire, but we do have where we can listen live to exactly what's happening. That's for evidentiary purposes and also for safety reasons. That's so we can monitor in case something happens with the informant, that we can assist them if needed.
Q Okay. And can you describe what type of recording device you provide them?
A The recording device is typically going to be, is typically going to have video and audio. That device we would have to download later to watch.
Q Okay. So what happens after you provide those things to the informant?
A They would -- once the live wire and audio video is provided and the U.S. currency, that's when they would make their way to wherever the deal was going to take place.
Q Okay. And what is law enforcement doing at that point?
A We try to follow behind. If they're driving -- if the informant is driving, we will do our best to stay behind the informant, to observe, to verify that they go directly to the meet location. That way they don't make any stops or anything like that.

And then once they make it to the meet location, we will try to park in the area and attempt to be able to visually observe the controlled purchase.
Q And what are you doing with the live wire at that stage?

A The live wire would be playing in the vehicle that the detective is in so they can monitor it. It would be active before we left. The live wire and the video would be active before the confidential informant left our lead location.
Q And what do you do once the informant meets with whoever they're supposed to meet with?
A While they're meeting with them, we would stay in the area and monitor live wire and attempt to be in a position to be able to do surveillance and observe.
Q Okay. And what happens after the meeting?
A Once the meeting is done, the confidential informant -- which is also one thing I left out. The informant, they're instructed on -- most of the time they're instructed on where to go after the buy. Sometimes they're told to give us a call and we'll instruct them on where to go. But, typically, it's a designated meet location, and they will drive directly back to that meet location.
Q And what happens when the informant arrives back?
A Once the informant arrives back, they hand over any narcotics that they purchased; any money that was not spent they provide back to us; and we also retrieve the live wire and audio/video recording devices. And once we've retrieved all that, we will search the CI once -- or informant once again to verify that there's no other U.S. currency or contraband on their person. If they're in a vehicle, we will

search that again as well and verify that there is no U.S. currency or contraband in the vehicle.

Q What do you do after taking those steps?

A Once that's complete, we will have the confidential informant basically tell us what happened. We'll do a debrief with them and have them advise us what happened. We will also have -- on certain cases, we will have the other detectives, if we have them doing surveillance, we will have them sometimes follow the suspect.

Q What do you do with the recording device when the informant returns?

A Once that's returned, we will download video, audio/video from the recording devices, and that will be saved in the case file.

Q And what do you do with the substance that the informant provides you?

A The substance would be kept in my possession until -- if it's my case, the substance would be kept in my possession until entered into Lynchburg Police property and evidence. When we enter it into the Lynchburg Police property and evidence, we package the substance to be sent certified mail to the state lab.

Q And the controlled purchases that you've been involved in, have you used a recording device in those purchases?

A Yes.

Q And did the recordings produce a reliable result of what occurred and the transactions you conducted?
A Yes, based on my review.
Q Do you know an individual named Brandon Hubbard?
A I do.
Q How do you know Mr. Hubbard?
A Mr. Hubbard is a confidential, reliable informant.
Q How did you refer to Mr. Hubbard?
A As Tumbler. That was his CRI code name.
Q And why was Hubbard acting as an informant?
A He was working for consideration on charges.
Q And how was Hubbard encountered about those pending charges?
A The Vice Narcotics Unit was attempting to serve a warrant on another wanted individual for a narcotics violation; during that interaction, Hubbard was encountered; and during the interaction, cocaine was located; and we debriefed Hubbard and spoke with him and he agreed to work for consideration.
Q Okay. And after Hubbard agreed, what steps did you take to further that -- his status as an informant?
A When we meet with a potential informant, or in that case it was the very same night that we were debriefing him, typically, what we'll do if they're facing a felony charge, we will contact -- typically, we will contact the Commonwealth attorney to get approval for that informant to not be charged.

And we will, if the Commonwealth attorney agrees for us not to charge them, we still write an e-mail or memo to the Commonwealth attorney advising what the -- what the confidential informant, what information they can provide and what they can do. And the Commonwealth attorney then makes the decision, in this situation, to allow him to work for consideration.

Q What did the Commonwealth attorney do in this case?

A They allowed him to work for consideration.

Q And did you explain to Hubbard the conditions of being an informant?

A Yes, he was read the Lynchburg Police Department rules for an informant.

Q I'm going to show you Government's Exhibit 151. What is this?

A This is a summary of controlled drug purchases that were made with confidential informants on Mr. Horsley.

Q And did you assist in the preparation of this?

A Yes.

Q And where does this information come from?

A This information comes from my reports from the controlled drug purchases.

Q Does it comport with your recollection of events on these different dates?

A Yes.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 151 as a summary exhibit pursuant to Rule 1006.

THE COURT: Without objection, it will be admitted.

(Government's Exhibit Number 151 was received.)

MR. WELSH: If you could publish this to the jury.

BY MR. WELSH:

Q So what are the -- can you walk us through the categories of information here?

A On the date category, that is the date the controlled drug purchase occurred.

The number called would be a number that the confidential, reliable informant provided for Mr. Horsley. And on one of these is actually Mr. Adgerson.

The location, that would be the location that the controlled drug purchase actually occurred.

The vehicle would be the vehicle that Mr. Horsley arrived in or was involved with the controlled drug purchase.

The amount paid would be the amount paid for the narcotics. And on, it looks like, two of these, that there was a debt that was paid as well that they owed Mr. Horsley.

Q What about the substance obtained and the laboratory result?

A The item number would be the item that I -- or the number that I packaged the substance as, which would be Item Number

1.

The case number is a generated case number for each incident. The case number is obtained through our dispatch. It's only one case number for each incident.

Q Okay.

A And as far as the laboratory results, that would be the amount that came -- the state lab advised the amount, which as an example on the first one, 10.92 grams.

THE COURT: We'll take a recess now for about 20 minutes. Let the jury go on.

(Recess taken from 3:20 p.m. until 3:39 p.m.)

THE COURT: All right. Ready to recall the jury?

MR. WELSH: We are, Your Honor.

MR. ANDERSON: We are, Your Honor.

THE COURT: Recall the jury.

Wait. Wait. I'm sorry. I didn't realize -- all right, I guess we're ready.

(Jury in at 3:40 p.m.)

THE COURT: All right. You may be seated and we'll resume.

MR. WELSH: Thank you, Your Honor.

If you could bring up Government's Exhibit 151.

BY MR. WELSH:

Q Detective Booth, I want to ask you about August 18th of 2017. Can you describe what happened on that date?

A On August 18th, 2017, a controlled drug purchase was conducted on that date.
Q Who was acting as the informant for that drug purchase?
A That would be CRI Tumbler, which would be Mr. Hubbard.
Q And did you perform the controlled purchase in the manner that you've described how law enforcement does a controlled purchase?
A Yes.
Q What happened initially?
A Initially, a phone call was placed to a number the confidential informant provided for Mr. Horsley.
Q What numbers did he identify?
A He identified two numbers. One of them was (434)609-4533. The other number was (434)444-7305.
Q And what happened after he provided the number to you?
A At that time I showed the confidential informant, which was Mr. Hubbard, a photo lineup.
Q And what happened when you showed him the lineup?
A During the lineup, six photographs, five random individuals, and one photograph was Quentin Lowell Horsley, the confidential informant went through the photographs and he identified the suspect in this investigation as being Quentin Horsley. He signed that photograph.
Q Okay. What happened after that identification?
A After the identification, he made a recorded phone call.

Q Were you present for the call?
A I was.
Q What kind of recording device did you use?
A I believe it was my cell phone.
Q And had you used this device before?
A Yes.
Q And have you previously reviewed Government's Exhibit 29?
A Yes.
Q And what is Government's Exhibit 29?
A I believe it's the phone call.
Q Who is involved in the phone call?
A The confidential informant, which was Mr. Hubbard, and Mr. Horsley.
Q And what number was called?
A It was the (434)609-4533 number.
Q And was it a true and accurate representation of the call that you were present for?
A Yes.
MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 29.
THE COURT: It will be admitted without objection.
(Government's Exhibit Number 29 was received.)
BY MR. WELSH:
Q Now, have you taken a look at Government's Exhibit 29A?
MR. WELSH: And I will, with the Court's permission,

approach the witness.

THE COURT: You may.

A Yes.

BY MR. WELSH:

Q Now, have you previously reviewed Government's Exhibit 29A?

A Yes.

Q And what is it?

A That is a transcript of the phone call.

Q And have you previously reviewed Government's Exhibit 29B?

A Which would be the phone call, I believe? Yes, the phone call.

Q And is that the transcript matching with the recording of the call?

A Yes, to the best of my knowledge.

MR. WELSH: Your Honor, I would seek to use Government's Exhibit 29B as a demonstrative aid for purposes of the jury. It is a transcript linked with the recorded phone call.

THE COURT: All right. Are you going to play the phone call?

MR. WELSH: Yes, Your Honor.

MR. ANDERSON: And so I understand, you say you have a transcript of that?

MR. WELSH: Correct.

MR. ANDERSON: And you want to use the transcript as demonstrative?

MR. WELSH: That's correct.

MR. ANDERSON: But the exhibit will be the recording?

MR. WELSH: Yes, Exhibit 29 has been admitted.

MR. ANDERSON: Okay.

THE COURT: Members of the jury, you will hear the recording of the phone call. What is on the phone call is what the evidence is. The transcript was prepared by I guess the officer who listened to it, and that's what he -- and his interpretation of what was said is in the transcript.

The evidence you are to consider is the phone call itself. If you disagree with what the transcript says, the phone -- what you hear on the phone call is what counts, not the transcript. The transcript is just an aid to help you follow the conversation.

MR. WELSH: Thank you, Your Honor.

Can we please play Government's Exhibit 29B.

(Audio recording is played.)

BY MR. WELSH:

Q Was that a recording of the call that you were present when it was placed?

A Yes.

MR. WELSH: The Court's indulgence, Your Honor.

Your Honor, perhaps I would ask the clerk to turn the volume down on the recording. I think that that's interfering with some of what's being played over the loud speaker.

THE CLERK: We can try it.

(Audio recording is played again.)

MR. WELSH: Your Honor --

BY MR. WELSH:

Q What happened next after making that initial call?

A After the initial call, there was a second call made --

Q Okay.

A -- approximately 45 minutes later.

Q And have you previously reviewed Government's Exhibit 30?

A That would be the second phone call?

Q I'm going to hand you 30, 30A, and 30B. Have you previously reviewed those?

A Yes.

Q And what is that a recording of?

A This should be -- the transcript shows the recording of the second phone call.

Q And did you review that transcript of the phone call?

A Yes.

Q And does that reflect the conversation that occurs in that recording?

A Yes. The best of my recollection, yes.

Q And were you present for that second phone call?

A I was.
Q And is it a true and accurate representation of the phone call you were present for?
A Yes.
MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 30 and use 30B for demonstrative purposes.
THE COURT: All right. It will be admitted.
(Government's Exhibit Number 30 was received.)
MR. WELSH: Seek to publish Government's 30B to the jury.
THE COURT: The same instruction applies here. It's what you hear on the phone call, not what's on the transcript that counts.
(Audio recording is played.)
BY MR. WELSH:
Q So in this call who suggests going to the Hardee's?
A Mr. Horsley.
Q After making those calls, what happened next?
A Once those calls were made, the CRI would have been -- he was searched and his vehicle was searched. No money or contraband was located. The CRI was then provided $550 for the controlled drug purchase, and $550 for a debt that was owed.
MR. WELSH: Actually if we could bring up

Government's Exhibit 151.

BY MR. WELSH:

Q And after providing the informant with the cash, what did you do next?

A He was provided with a live wire and audio and video recording device.

Q And have you used that recording device in the past?

A Yes, I have.

Q Did it accurately reflect what had transpired in the past?

A Yes, sir.

Q And does the video surveillance system produce an accurate result?

A Yes.

Q What did you observe after providing those things to the informant?

A At that time, the confidential informant drove directly to Hardee's on Langhorne Road. The confidential informant parked in the parking lot. Once the CRI -- once they arrived, they contacted Horsley and advised that they were there. I was able to hear over the live wire. I parked in the area and did surveillance, and I was able to see the CRI in the parking lot. I then saw -- observed a black Nissan Maxima pull into the parking lot and I observed the CRI get out of their vehicle and into the black Nissan Maxima. I could hear that

there was a brief conversation, and at that time the deal was complete and the CRI left the area and went back to our meet location.

Q You keep saying "CRI." I just want to be clear for the jury, what does that mean?

A I'm sorry. It's a confidential, reliable informant.

Q And specifically which confidential, reliable informant are you referring to?

A That would be Brandon Hubbard.

Q Just making sure.

A Sorry about that.

Q And what happened after you observed the informant leave?

A Once the informant leaves, we follow behind the informant and met the informant back at our meet location.

Q Okay. And what happened when he arrived back at the meet location?

A We retrieved the narcotics and they stayed in my possession. Also, the CRI was searched and the vehicle was searched again to verify that there was no narcotics or U.S. currency on Mr. Hubbard.

Q And did he have any narcotics or other substance after, when you searched him?

A No.

Q I'm going to show you Government's Exhibit 119. I'm showing you Government's Exhibit 119. If you could just open

up that envelope. What is Government's Exhibit 119?
A This would be the evidence that was seized from that case, that was provided to me by Mr. Hubbard from the controlled drug purchase.
Q And how do you know it's the substance that you obtained on August 18th of 2017?
A I packaged this. These are my initials on the top for the label, and this is also my writing, where I labeled it as the date, the CC number, which is the number that the Lynchburg Police provides to all investigations, my name, and which item number it is.
Q And what did you do with the substance after you obtained it and put it in that bag?
A This would have been -- it was packaged just like it is now and then it was packaged to be in an envelope similar to one like this, and would be packaged and sent to the state lab, certified mail.
Q Can you kind of --
MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 119.
THE COURT: It will be admitted.
(Government's Exhibit Number 119 was received.)
BY MR. WELSH:
Q Can you kind of hold it up and sort of show -- or can you describe what kind of substance that is that's contained

inside there?
A It's an off-white chunky substance, very hard to see right here because of the way it's packaged.
Q Okay. Thank you. I will take that back.
Okay. I'm going to show you Government's Exhibits 31, 32, 32A, and 32B. Have you previously reviewed these exhibits?
A Yes. This is the controlled drug purchase video.
Q Okay. It's the recording of it?
A Yes.
Q And when was it made?
A That would have been made on the date of the purchase, which was August 18th, 2017.
Q And how did you receive it? How did you capture it?
A From the -- it would have been downloaded from the live wire audio/video recording devices.
Q And have you reviewed it?
A Yes, I have.
Q And how did it compare with what you listened to on your live wire and your observations that day?
A It was an accurate depiction.
MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 31.
THE COURT: It will be admitted.
(Government's Exhibit Number 31 was received.)

BY MR. WELSH:

Q Now, have you previously reviewed Government's Exhibit 32?

A Yes. I believe that's the transcribed version.

Q Is that --

A Or the one with the clips.

Q Does that contain portions?

A Yes.

Q Clips of Government's Exhibit 31?

A Yes.

Q And is it the same, just portions of Government's Exhibit 31?

A Yes.

MR. WELSH: Your Honor, I would move to admit Government's Exhibit's 32.

THE COURT: It will be admitted.

(Government's Exhibit Number 32 was received.)

BY MR. WELSH:

Q And have you reviewed the transcripts that are contained in 32A and then matched with the audio in 32B?

A Yes.

MR. WELSH: Your Honor, I would seek to publish those as demonstratives.

THE COURT: Is this static or whatever we're hearing, was that on the original call?

MR. WELSH: Your Honor, it sounded like the second recording was better. It doesn't sound like it's quite coming across as well as I think it does. I think it sounds much worse on this system, and I'm not sure of the solution for that.

THE COURT: Well, are you feeding it through some other device to the microphones or something?

MR. WELSH: No, Your Honor. It is coming from the laptop into the PA system here in the courtroom, and I think that's adding some feedback to it.

THE COURT: Well, maybe if we just played it that would -- straight up, everybody could hear it better.

MR. WELSH: I think that would, Your Honor. Perhaps we can just play it from here without running it through the PA system? Is that possible?

MS. VOGT: No.

MR. WELSH: I think we may have a solution, Your Honor. I think it sounds like some of the levels on the volume maybe had made it worse, and that's why the second one was a little better. And I think we maybe have this figured out. With the Court's permission, I would seek to publish 32B.

THE COURT: Okay.

(Audio recording is played.)

MR. WELSH: So if we could pause that.

BY MR. WELSH:
Q So who's speaking in that portion?
A That would be me.
(Audio recording is played.)
MR. WELSH: Pause it briefly.
BY MR. WELSH:
Q So, again, that was the same clip we listened to before, correct?
A Yes.
MR. WELSH: And if we could proceed.
(Audio recording is played.)
MR. WELSH: If we could pause it briefly.
BY MR. WELSH:
Q So as the transcripts are linked up, the green text is Horsley, correct?
A Yes.
Q And the yellow text would be Hubbard; is that right?
A Yes.
Q All right.
(Audio recording is played.)
BY MR. WELSH:
Q So that was obtained during the controlled purchase on August 18th of 2017, correct?
A Yes, that was clips from the original video.
MR. WELSH: Let's go back to Government's Exhibit

151. And, actually, let's show the witness Government's Exhibit 33.

BY MR. WELSH:

Q Do you recognize this?

A Yes.

Q What is this a picture of?

A That's a picture of the substance that was obtained during a controlled drug purchase.

Q Is that a fair and accurate representation of what was obtained on August 18th of 2017?

A Yes.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 33.

THE COURT: It will be admitted.

(Government's Exhibit Number 33 was received.)

MR. WELSH: If we could show that for the jury.

BY MR. WELSH:

Q Is this what's inside of Government's Exhibit 119 here?

A Yes.

Q All right. And are you familiar with what that substance is?

A Yes.

Q What is it?

A Cocaine.

Q Okay. Now, if we could go to Government's Exhibit 151.

Okay. When was the next controlled purchase that took place in this case?
A The next one would be on August 29th, 2017.
Q And what happened on that date?
A Again, I met with Mr. Hubbard to make a controlled drug purchase from Mr. Horsley of a half ounce of cocaine.
Q And did you perform the controlled purchase in the same manner that you've described before?
A I did.
Q And what was the initial step of that controlled purchase?
A It was making a recorded phone call.
Q Now, have you previously reviewed Government's Exhibits 34, 34A, and 34B?
A Yes.
Q And what are those?
A It is the phone call, or recorded phone call, a transcript and recorded phone call with the transcript, transcription.
Q Were you present for that phone call?
A I was.
Q And is that recording contained in Government's Exhibit 34 a fair and accurate depiction of the phone call you heard on that day?
A Yes.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 34 and then publish 34B, which is the transcript referenced by the witness.

THE COURT: It will be admitted.

(Government's Exhibit Number 34 was received.)

MR. WELSH: If we could publish that for the jury.

(Audio recording is played.)

BY MR. WELSH:

Q Okay. So who's the person who says, "Come to the Hardee's"?

A That was Mr. Horsley.

Q What happened after you had the informant make the controlled call?

A Once the controlled call was made, the confidential informant, which was Mr. Hubbard, was searched and no contraband was located on him. And the vehicle that Mr. Hubbard was in was also searched and no money or contraband was located in the vehicle. The CRI was then provided with $550 of documented U.S. currency and equipped with a live wire and audio/video recording device.

MR. WELSH: Actually, if we could bring up Government's Exhibit 151.

BY MR. WELSH:

Q Okay. And what happened after Hubbard was provided with a recording device and after he was searched as you've

described?
A He left our -- we all left our meet location and he drove directly to Hardee's on Langhorne Road, and we parked in the area and listened to the live wire.
Q And what did you observe when you arrived in that area?
A The informant, Mr. Hubbard, arrived and pulled aside Horsley, who was already parked, parked -- Hubbard pulled in beside a Nissan Maxima bearing the same registration that was on the previous buy. Once he arrived, he got out of his vehicle and I believe -- actually, on this one, the male was already in the black Maxima, so the confidential informant waited, the male exited the passenger's side of the black Maxima, the CRI then backed into the parking space and got into the vehicle with -- into the black Maxima.
Q I'm sorry. Could you describe that again? So what happened after you observed the informant arrive at the Hardee's?
A I observed the CRI pull into the parking lot, I observed a male get out of a black Maxima that was already parked there. Once the male was out of the black Maxima, I observed the CRI get into the black Maxima.
Q When that male exited the black Maxima, were you able to identify who that person was?
A No.
Q That was just an unknown person?

A Yes.
Q And where did he exit the vehicle from? What part of the vehicle?
A That male was in the passenger's side of the vehicle. Horsley was observed getting out of the driver's side of the vehicle and to walk into Hardee's.
Q So did you observe Horsley walking out of the vehicle?
A Yes, that particular incident, I observed Horsley.
Q So you observed Horsley walking out of the Nissan Maxima?
A Yes, and go into Hardee's.
Q Then what did the CI do --
A He got into the vehicle with -- he got into the vehicle with Horsley. Hubbard got into the passenger's side of the vehicle with Horsley.
Q Okay. And what happened after that?
A There was a brief conversation and the deal was complete.
Q Okay. And what happened next?
A Once the deal was complete, the CRI left, which was Mr. Hubbard, left the parking lot and drove directly back to our meet location.
Q And what happened when he arrived back at the meet location?
A I retrieved the live wire and audio/video recording device, and the CRI handed over to me -- Mr. Hubbard handed over to me a napkin containing a baggie of off-white chunky

substance.
Q I'm going to show you Government's Exhibit 37. All right, do you recognize this?
A Yes. That's the napkin with the baggie of suspected cocaine.
Q Is that a fair and accurate depiction of what you had received that day?
A Yes.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 37.
THE COURT: It will be admitted.
(Government's Exhibit Number 37 was received.)
BY MR. WELSH:
Q So, again, what was -- what is this that you received?
A This is a napkin, and inside of that napkin is a baggie of off-white chunky substance, which is cocaine.
MR. WELSH: Can we show the witness Government's Exhibit 38?
BY MR. WELSH:
Q And what is this a picture of?
A This is a picture of the baggie of off-white chunky substance, cocaine, that was inside of the napkin.
Q Okay. And is it a fair and accurate depiction of what was inside of that?
A Yes, sir.

MR. WELSH: I would move to admit Government's Exhibit 38, Your Honor.

THE COURT: It will be admitted.

(Government's Exhibit Number 38 was received.)

MR. WELSH: Thank you. If we could publish.

BY MR. WELSH:

Q Where was this in what you -- the informant had provided you?

A I'm sorry?

Q Where was this? How did you obtain this bag?

A That was -- it was in a napkin.

Q Okay.

A Like, this was -- the substance, the baggie that you see was wrapped in the napkin.

Q So this was inside the napkin shown in Government's Exhibit 37?

A Yes, the previous photograph.

Q I'm going to show you Exhibit 121.

A Open it?

Q Yes. If you could open Government's Exhibit 121. And what is this?

A This is the baggie of off-white chunky substance, inside of a baggie, as well as the napkin.

Q And is that the substance that you obtained that day on August 29th of 2017?

A Yes.
Q And how do you know that's the same substance?
A My signature is on top of the bag, and this is also the date, which was 8/29/2017, and the correct CC number, which is our agency case number.
Q And what did you do after packaging that substance?
A This would have been entered into Lynchburg Police property and evidence to be sent to the lab certified mail.
MR. WELSH: I move to admit Government's Exhibit 121.
THE COURT: It will be admitted.
(Government's Exhibit Number 121 was received.)
BY MR. WELSH:
Q Now I'm going to show you Government's Exhibits 35, 36, 36A and 36B. Have you previously reviewed these?
A Yes.
Q And what is Government's Exhibit 35?
A That would be the full video.
Q Okay. And was that -- when was that obtained?
A That would have been obtained on August 29th, 2017.
Q Was that in the same manner that you previously described using the recording device?
A Yes.
Q And what's Government's Exhibit 36?
A That would be the clips from the original video.
Q And what about 36A?

A That would be the clips from the original video with transcription.
Q Okay. And 36B?
A That would be a transcription of what's on the video.
Q And is the transcription your -- do you agree with how that matches up with the recording?
A Yes.
Q Okay.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibits 35, 36, and then use 36A and B as demonstratives.

THE COURT: All right. They will be admitted.

(Government's Exhibit Numbers 35 and 36 were received.)

MR. WELSH: If we could please show Government's Exhibit 36B -- or 36A. Excuse me.

(Audio recording is played.)

BY MR. WELSH:
Q Is that your voice there describing that?
A Yes.

MR. WELSH: Play the next part.

(Audio recording is played.)

THE COURT: The jurors may want to get a bottle of water or something.

BY MR. WELSH:
Q Is the timestamp on this recording accurate?

A No.

Q Is there any particular reason for that?

A Typically, well, the recording devices that we used a lot of times, that even if we do set them, they change regularly. So the way we verify the time on the recording is we -- that first part you saw me give what we call a preamble, basically, I will tell the date, the time, what confidential informant I'm with, which in that case it was Tumbler, which is Mr. Hubbard, and then I will give a brief description of what we're going to do, like going to buy $550, basically what we're going to purchase.

Q So even though this says August 30th of 2017, the transaction actually occurred on August 29th?

A Yes, sir.

Q I just wanted to be clear.

MR. WELSH: If we could continue with the clip.

(Audio recording is played.)

BY MR. WELSH:

Q Okay. So does that conclude the transaction on August 29th of 2017?

A Yes, sir.

MR. WELSH: If we could pull up Government's Exhibit 151 again.

BY MR. WELSH:

Q All right. When was the next transaction that occurred?

A September 15th, 2017.
Q And what happened on that date?
A Met with a confidential, reliable informant, which would be Tumbler, which is Brandon Hubbard, to make a controlled drug purchase from Quentin Horsley.
Q Did you perform the controlled purchase in the manner you previously described?
A I did.
Q And what happened during the purchase? How is that set up and how did that proceed?
A In this case Hubbard had advised me that they had already been in contact with Horsley over the phone, and they provided me a phone number that they had for Horsley, and they advised that the deal would take place at Hardee's on Longhorne Road, which is the same as the first two transactions.
Q What was the number that Hubbard had provided?
A (434)444-7305.
Q And what happened next?
A The CRI would have been searched and the CRI's vehicle would have been searched, and no contraband or money was located, and they were provided $550 of documented U.S. currency.
Q What did you observe next?
A We left our meet location and the CRI, which is Mr. Hubbard, drove directly to Hardee's on Langhorne Road.

And the CRI parked -- Hubbard parked in the parking lot, and I parked in the area, and I was able to observe the CRI in the parking lot.

I saw the CRI walk into Hardee's. The CRI exited the store and got back into their vehicle; it was approximately one minute. I then observed a white two-door Infiniti pull into the parking lot, and the CRI, which was Mr. Hubbard, exited their vehicle and entered the front passenger's seat of the Infiniti. There was a brief conversation and the deal was complete at that time.

Q Okay. And what did you observe next?

A Once the deal was -- Horsley -- the CRI left his vehicle, got into his, the CRI left. Detective Dowdy was able to observe into the white Infiniti, and observed Mr. Horsley and was able to identify him and advised me.

Q Okay. And what did you observe next?

A I met back with the CRI and retrieved the audio/video recordings and the controlled substance.

Q Now I'm going to show you Government's Exhibit 44. What is this a picture of?

A The controlled substance that was purchased from Mr. Horsley during a controlled buy.

Q And is that a fair and accurate depiction of what you received from the informant that day?

A Yes.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 44.

THE COURT: It will be admitted.

(Government's Exhibit Number 44 was received.)

BY MR. WELSH:

Q I will show you Government's Exhibit 123. If you could open up that envelope.

A (Witness complies.)

Q Okay. What is Government's Exhibit 123?

A This would be a baggie of off-white chunky substance packaged.

Q Okay. And when did you receive that?

A That would have been on September 15th, 2017.

Q And how do you know that?

A I have the date listed on this, my initials are also at the top, and I have the Lynchburg Police Department case number.

Q Okay.

MR. WELSH: Your Honor, I seek to admit Government's Exhibit 123.

THE COURT: It will be admitted.

(Government's Exhibit Number 123 was received.)

BY MR. WELSH:

Q Now I'm going to show you Government's Exhibits 39, 40, 40A, 40B. Have you previously reviewed these?

A Yes.
Q What is Government's Exhibit 39?
A That would be the full recording.
Q And what is Government's Exhibit 40?
A That would be the clips from the original recording.
Q What about 40A?
A 40A would be the clips with transcription.
Q And what about 40B?
A That's the transcription.
Q And are those all in the same manner that you previously described in the way that you received them?
A Yes.
Q Did you receive them on September 15th, 2017?
A Yes.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibits 39 and 40 and then display Government's Exhibit 40A.

THE COURT: All right. It will be admitted.

(Government's Exhibit Numbers 39 and 40 were received.)

(Audio recording is played.)

BY MR. WELSH:
Q Again, is that you?
A Yes, sir.

(Audio recording is resumed.)

BY MR. WELSH:
Q Now I'm going to show you Government's Exhibits 41 and 42. If you take a look at those, where are these pictures from?
A These are screenshots from the video that we just watched.
Q Are they accurate depictions of the video?
A Yes.
MR. WELSH: Your Honor, I move to admit Government's Exhibits 41 and 42.
THE COURT: It will be admitted.
(Government's Exhibit Numbers 41 and 42 were received.)
MR. WELSH: If we could go to 41 and show that for the jury.
BY MR. WELSH:
Q So, again, where's this picture come from?
A This is a screenshot from the video that was just played.
MR. WELSH: And let's go to 42.
BY MR. WELSH:
Q And so this was from the video received by -- received by you from Brandon Hubbard after he completed the purchase?
A Yes.
Q Let's go to Government's Exhibit 151. All right, when was the next controlled purchase that took place in this case?
A December 7th, 2017.

Q And what transpired on December 7th of 2017?
A I met with a confidential, reliable informant in reference to making a controlled drug purchase of, in this case, one ounce of cocaine from Mr. Horsley.
Q Okay. And who is the informant that was involved in this purchase?
A It would be Brandon Hubbard.
Q And did you perform the controlled purchase in the same manner that you described?
A Yes.
Q Let's walk through what happened during this purchase.
A In this purchase, the confidential, reliable informant made a phone call to (434)444-7305 to set up the transaction.
Q Okay. And what happened after the phone call?
A They would -- it was determined to meet at Greenbrier Apartments, which is 1812 Rivermont Avenue.
Q Okay. Is that here in the city of Lynchburg?
A It is.
Q And is that in the Western District of Virginia?
A Yes.
Q And, all right, what happened next? What did you observe next?
A The CRI, of course, was searched and provided the money. The CRI was provided $1,200 because we were not -- we didn't get the actual determination of how much it was going to cost.

They left our meet location and drove directly to the Greenbrier Apartments. Once they got to the apartments, they looped around the apartments and it was a conversation of where to pull in. The CRI pulled into the first entrance. The apartment numbers on that one where they parked were 69 through 79. I observed a white SUV that had Connecticut plates on it. It was also parked on the same side in front of the same building.
Q What did you observe next?
A I was able to hear the CRI -- or Mr. Hubbard meet with a male. I was also able to hear that the male advised that they had to go to a VASAP meeting at 5:30, or 1730. There was a brief conversation and the deal was complete at that time. The CRI drove after that, they drove directly back to the meet location.
Q Okay. And what did you observe next?
A I observed a male matching Horsley's description enter the above vehicle, which was -- above-mentioned vehicle, which was the Connecticut plate -- or Tahoe with Connecticut plates, Chevrolet SUV, and they left the parking lot.
Q Okay. And what did you do next?
A I went back to the meet location.
Q All right. And what did you do when you got back to the meet location?
A Detective Trent had met back -- Detective Trent and Stump

had met back with the CRI before I was able to get there. And Trent received the controlled substance and he gave it over to me.

Q Okay.

A The CRI was searched again and no money or contraband was located. The CRI did provide back $50 of the money because they only paid $1,150.

Q Can I show you Government's Exhibit 47? What is this a picture of?

A It's a baggie of controlled substance that was purchased and received.

Q Is this the substance that was purchased on that date?

A Yes, on December 7th, 2017.

Q Is it a fair and accurate depiction of what you saw on that date?

A Yes.

MR. WELSH: Your Honor, I move to admit Government's Exhibit 47.

THE COURT: It will be admitted.

(Government's Exhibit Number 47 was received.)

MR. WELSH: If we could publish to the jury.

BY MR. WELSH:

Q I'm going to show you Government's Exhibit 125. Do you recognize that?

A Yes. It is the packaged cocaine from the photographs.

Q How do you know that it's the same item?
A My signature is at the top, it has the same -- the same date and the same Lynchburg Police Department case number.
Q Okay.
A And item number.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 125.
THE COURT: It will be admitted.
(Government's Exhibit Number 125 was received.)
BY MR. WELSH:
Q Let me show you Government's Exhibits 45, 46, 46A and 46B. What are these exhibits?
A Exhibit 45 would be the full video from the live audio/video recording device. 46 would be the clips from the full video. 46A would be the clips as well as a transcription. And then 46B is the transcription.
Q And are those the videos from December 7th, 2017?
A Yes.
MR. WELSH: Your Honor, I would move to admit Government's Exhibits 45, 46, and then publish 46B.
THE COURT: It will be admitted.
(Government's Exhibit Numbers 45 and 46 were received.)
(Video is played.)
MR. WELSH: If we could pause it for a second.
BY MR. WELSH:

Q When you said on there "hard or soft," what does that mean?
A Hard or soft would be I was asking if it was going to be crack cocaine or powder cocaine.
Q And then you described, and you talked about asking for help. What were you instructing the informant on with that?
A The informant on this particular buy was not -- didn't want to go to the area, the Rivermont area. He was more fearful in that area, and based on his fear of that, I was reiterating -- he had already been told this prior, but just reiterating that, "If you have any problems, you say, 'Help. Help. Help,' and we will be there." We're in the area.
MR. WELSH: Okay. If we could continue with the exhibit.
(Audio recording is played.)
BY MR. WELSH:
Q Is that the conversation that transpired on December 7th of 2017?
A Yes, sir.
MR. WELSH: If we could bring up Government's Exhibit 151.
BY MR. WELSH:
Q When was the next transaction that occurred?
A December 29th, 2017.
Q And what happened on that date?

A I met with Brandon Hubbard, the confidential, reliable informant in reference to making a controlled drug purchase of cocaine from Quentin Horsley for $1,150.
Q What happened when you met with Hubbard?
A The CRI made a recorded phone call to Horsley.
Q To what number did the informant call?
A It was (434)444-7305.
Q I'm going to show you Government's Exhibits 48, 48A, 48B. Have you previously reviewed these?
A Yes.
Q And what's Government's Exhibit 48?
A 48 is going to be the phone call.
Q What about 48A?
A That's the transcription.
Q And 48B?
A Phone call with the transcription.
Q When did that phone call occur?
A It occurred on December 29th, 2017.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 48 and then display for the jury as a demonstrative Exhibit 48B.

THE COURT: It will be admitted.

(Government's Exhibit Number 48 was received.)

(Audio recording is played.)

MR. WELSH: Pause for a second.

BY MR. WELSH:
Q So the person responding there is saying, "Yeah, at the Chevron." Who is that?
A The person responding would be Horsley, who stayed at the Chevron.
MR. WELSH: Okay. If we could continue.
(Audio recording resumed.)
BY MR. WELSH:
Q Okay. So what happened after making this recorded phone call?
A We followed -- well, the CRI would have been searched and provided with the audio/video recording device, as well as a live wire, and provided the money, documented U.S. currency, which was $1,150.
MR. WELSH: If we could bring up Government's Exhibit 151 just for reference.
BY MR. WELSH:
Q What did you observe on December 29th after making the recorded call?
A After the recorded phone call and the CRI was provided money, we left our meet location and I followed directly behind the CRI to the area or intersection of 12th Street and Fort Avenue, Hubbard did not pull into the Marathon and he drove straight across and continued on to Wadsworth and then ended up turning around and driving back towards 12th Street.

I was able to observe a white SUV that was behind the CRI, which was Hubbard, and I could hear over -- I could hear a phone call over the live wire, and hear them talking on the phone. And they pulled into the lot of Sunoco on 12th Street.
Q What did you see after seeing Hubbard pull into the Sunoco?
A Hubbard pulled in and pulled on the side of the building, and I observed a white GMC SUV parked beside the informant. The CRI met with a male in the SUV and there was a brief conversation and the deal was complete after that.
Q Okay. And what happened after that?
A The CRI, which was Hubbard, drove directly back to our meet location, and I met back with them and retrieved the live wire and audio and video recording devices.
Q I'm going to show you Government's Exhibit 51. Do you recognize this?
A Yes. It was the substance from the controlled drug purchase on this date, December 29th, 2017.
Q Is it a fair and accurate depiction of the substance you obtained?
A Yes.
MR. WELSH: Your Honor, I move to admit Government's Exhibit 51.
THE COURT: It will be admitted.
(Government's Exhibit Number 51 was received.)

BY MR. WELSH:
Q Now I'm going to show you Government's Exhibit 127. If you would take a look at that. What is Government's Exhibit 127?
A It is the baggie of controlled substance.
Q Okay. How do you know -- or when did you obtain that?
A That was obtained on December 29th, 2017, from the controlled drug purchase.
Q How do you know it's the same substance you obtained that day?
A It has my signature at the top as well as the date and the Lynchburg Police Department case number.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 127.
THE COURT: It will be admitted.
(Government's Exhibit Number 127 was received.)
BY MR. WELSH:
Q All right. Now I'm going to show you Government's Exhibits 49, 50, 50A, and 50B. Now, have you previously reviewed these?
A I'm sorry?
Q Sorry. Have you previously reviewed these?
A Yes.
Q And what is Government's Exhibit 49?
A 49 would be the full video from December 29th, 2017.

Q And what is Exhibit 50?
A That would be the clips from the full video.
Q What about 50A?
A The clips that have -- that are transcribed.
Q And what about 50B?
A That is the transcription.
Q Are these the same recordings that you received after the controlled purchase on that date?
A Yes, sir.
Q Are they a fair and accurate depiction of what occurred on that day?
A Yes.

MR. WELSH: Your Honor, I would seek to move in Government's Exhibits 49, 50, and then display 50B for the jury.

THE COURT: It will be admitted.

(Government's Exhibit Numbers 49 and 50 were received.)

(Audio recording is played.)

MR. WELSH: If we could pause this for a second.

BY MR. WELSH:
Q What's the discussion going back and forth here?
A That discussion is about the vehicle that he's in and basically just verifying that it was him that day.
Q If we could continue.
A Based on my understanding.

(Audio recording is resumed.)

BY MR. WELSH:

Q So who's the person there that's saying, "Going to Charlotte"?

A That would be Mr. Horsley.

Q Okay. So now at some point --

MR. WELSH: If we could bring up Government's Exhibit 151.

BY MR. WELSH:

Q Now, is that the final purchase conducted using Brandon Hubbard?

A Yes, December 29th, 2017, was.

Q Now, did you end up developing a second informant in this case?

A Yes.

Q And who is that?

A It was an individual I knew as CRI Biggs [phonetic].

Q Okay. And do you know his real name?

A Not right off the top of my head right this second. I'm sorry.

Q That's fine. You referred to him as?

A CRI Biggs.

Q Okay. And on what date did -- well, tell me about how you approached CRI Biggs and used him in controlled purchases.

A CRI Biggs was a confidential, reliable informant for --

that worked with Detective Trent regularly. He -- while with Detective Trent and Biggs, he expressed that he could purchase cocaine from Quentin Horsley.
Q Okay. And when did you meet with Informant Biggs?
A I met with Informant Biggs on November 1st, 2018, to make a controlled drug purchase.
Q And what happened on that date?
A On that date, it was one ounce of cocaine purchased, and $300 towards a debt that he had was paid.
Q Let's walk through it first. Did you perform that in the same way you -- perform the controlled purchases that were previously discussed?
A Yes.
Q And what was the first step when you met with informant Biggs?
A He provided a phone number and he made a recorded phone call.
Q What was the phone number he provided?
A That one would be (434)420-6673.
Q And were you present for the phone call that was made?
A I was.
Q And I'm going to show you Government's Exhibits 42 [sic], 42A [sic] and 42B [sic]. Have you previously reviewed these?
A Yes.
Q Okay. What are these recordings of?

A Of the phone call, the recorded phone call.
Q And are they a fair and accurate depiction of the phone call that you listened to on that date?
A Yes, sir.
Q And what's Government's Exhibit 52A?
A That's a transcript of the phone call.
Q Okay. And what about 52B?
A That's the phone call with the transcription.

MR. WELSH: Your Honor, I would move to admit Government's Exhibit 52 and publish it to the jury.

THE COURT: It will be admitted and you can publish.

(Government's Exhibit Number 52 was received.)

MR. WELSH: If we could pull that up.

(Audio recording is played.)

MR. WELSH: Pause it.

BY MR. WELSH:
Q So who's the person who was just saying, "Chillin', bro"?
A The one saying that's saying, "I'm on Fort Ave," is the CRI Biggs.
Q And who's the person responding to him?
A That would be Horsley.
Q All right.

MR. WELSH: Okay. If you can continue.

(Audio recording is resumed.)

BY MR. WELSH:

Q Could we walk through your observations of what transpired after making that recorded call?
A Yes. The CRI would have been searched as well as their vehicle. They would have been provided with $1,200, plus $300 for the debt that was owed, which would be a total of $1,500. At that time, once they were provided the money, they drove directly to TGI Fridays on Timberlake Road. I parked in the area and listened to the live wire as the deal took place.
Q You mentioned a debt owed. What do you mean by that?
A A debt owed, the confidential informant owed Mr. Horsley a debt. I believe it was -- I would have to refer back. I believe it was -- owed Horsley $1,200. I advised the CRI that I would pay $300 towards that debt during this controlled purchase.
Q Okay. So what happened when you were in the area of TGI Fridays?
A I listened to the live wire as the deal took place. I was able to hear when they spoke with Horsley over the phone. And then CRI Biggs contacted me and advised Horsley was about five minutes out.
Q And what happened next?
A Once the deal was complete, there was a conversation between -- I was able to hear over the live wire a conversation between CRI Biggs and Horsley. And once the deal was complete, the CRI drove back to our meet location.

Q Okay. And what happened after the informant arrived at the meet location?
A I retrieved the live wire and audio/video recording device; Biggs handed over to me a baggie containing a white chunky substance, which was cocaine; and then the CRI was searched and no money or contraband; and CRI's vehicle was searched as well.
Q Let me show you Government's Exhibit 129. Take a look at that. What is Government's Exhibit 129?
A Off-white chunky substance that is cocaine.
Q And when did you obtain that?
A That would have been on November 1st, 2018.
Q All right. How do you know it's the same substance that you obtained on that date?
A It has the date as well as the Lynchburg Police Department case number and my initials are on the top.
Q Okay.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 129.

THE COURT: All right. It will be admitted. And it's time to stop, I think.

(Government's Exhibit Number 129 was received.)

THE COURT: Members of the jury, we'll recess now. Tomorrow will be the only day, but we have something that has to be taken care of early in the morning, and so we're going

to start tomorrow at noon, 12:00 o'clock noon, and I ask you to have had lunch before you come, and we'll go on from noon until 5:00 o'clock. I'm sorry about the problem we have in the morning, but we will start at noon.

During the overnight, do not discuss the case with anyone, do not allow anyone to discuss it with you, do not remain within hearing of anyone discussing it, and, of course, do not do any research or anything concerning the case.

You may now retire, but go back to the jury room this way, and you will be excused for the evening.

(Court recessed at 4:58 p.m.)

CERTIFICATE

I, Judy K. Webb, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Judy K. Webb Date: 2/25/2023