UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

************************************************************

UNITED STATES OF AMERICA, Plaintiff,
vs.
QUENTIN LOWELL HORSLEY, Defendant.

CRIMINAL CASE NO.: 6:19CR13
MARCH 23, 2022, 12:00 P.M.
LYNCHBURG, VIRGINIA
JURY TRIAL, DAY 2
APPEAL NO.: 22-4671

Before:
HONORABLE NORMAN K. MOON
UNITED STATES DISTRICT JUDGE
WESTERN DISTRICT OF VIRGINIA

************************************************************

APPEARANCES:

For the Government:

SEAN MICHAEL WELSH, ESQUIRE
United States Attorneys Office
Western District of Virginia
255 West Main Street, Room 130
Charlottesville, VA 22902
434-293-4283

For the Defendant:

ANTHONY FRANKLIN ANDERSON, ESQUIRE
BROOKS ALEXANDER DUNCAN, ESQUIRE
Anderson Legal
P.O. Box 1525
Roanoke, VA 24007
540-982-1525

Court Reporter: Lisa M. Blair, RPR, RMR, CRR, FOCR
255 West Main Street, Suite 304
Charlottesville, Virginia 22902
434.296.9284

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT PRODUCED BY COMPUTER.

INDEX OF WITNESSES


| WITNESSES ON BEHALF OF THE GOVERNMENT: | PAGE |
|---|---|
| CHRISTOPHER BOOTH (Continued) | |
| Direct Examination by Mr. Welsh | 6 |
| Cross-Examination by Mr. Anderson | 15 |
| CRAIG DOWDY | |
| Direct Examination by Mr. Welsh | 31 |
| Cross-Examination by Mr. Anderson | 34 |
| STEVEN TRENT | |
| Direct Examination by Mr. Welsh | 35 |
| BRANDON HUBBARD | |
| Direct Examination by Mr. Welsh | 55 |
| Cross-Examination by Mr. Anderson | 58 |
| DAVID GOODELL | |
| Direct Examination by Mr. Welsh | 60 |
| Voir Dire by Mr. Anderson | 62 |
| Further Direct Examination by Mr. Welsh | 63 |
| Cross-Examination by Mr. Anderson | 78 |
| CANDICE BALL | |
| Direct Examination by Mr. Welsh | 79 |
| KENNETH ADGERSON | |
| Direct Examination by Mr. Welsh | 89 |

INDEX OF EXHIBITS

EXHIBITS ON BEHALF OF THE GOVERNMENT:


| EXHIBIT: | Marked | Received |
|---|---|---|
| 152 | 7 | 7 |
| 69 | 9 | 9 |
| 68 | 11 | 11 |
| 104 | 39 | 40 |
| 106 | 39 | 40 |
| 108 | 39 | 40 |
| 111 | 39 | 40 |
| 113 | 39 | 40 |
| 115 | 39 | 40 |
| 117 | 42 | 42 |
| 105 | 48 | 48 |
| 107 | 48 | 48 |
| 109 | 48 | 48 |
| 110 | 48 | 48 |
| 112 | 48 | 48 |
| 114 | 48 | 48 |
| 116 | 48 | 48 |
| 118 | 48 | 48 |
| 120 | 53 | 53 |
| 122 | 53 | 53 |
| 124 | 53 | 53 |
| 126 | 53 | 53 |

INDEX OF EXHIBITS (Continued)

EXHIBITS ON BEHALF OF THE GOVERNMENT:

| EXHIBIT: | Marked | Received |
|---|---|---|
| 128 | 53 | 53 |
| 130 | 53 | 53 |
| 72 | 67 | 67 |
| 147 | 68 | 68 |
| 73 | 70 | 70 |
| 74 | 70 | 70 |
| 75 | 70 | 70 |
| 76 | 70 | 70 |
| 77 | 70 | 70 |
| 78 | 70 | 70 |
| 79 | 70 | 70 |
| 80 | 70 | 70 |
| 81 | 70 | 70 |
| 82 | 70 | 70 |
| 91 | 73 | 73 |
| 92 | 74 | 74 |
| 93 | 76 | 76 |
| 94 | 76 | 76 |
| 95 | 76 | 76 |
| 96 | 76 | 76 |
| 97 | 76 | 76 |
| 98 | 76 | 76 |

INDEX OF EXHIBITS (Continued)

EXHIBITS ON BEHALF OF THE GOVERNMENT:



| EXHIBIT: | Marked | Received99 |
|---|---|---|
| 99 | 76 | 76 |
| 100 | 76 | 76 |
| 101 | 76 | 76 |
| 102 | 76 | 76 |
| 103 | 76 | 76 |
| 85 | 85 | 85 |
| 86 | 87 | 87 |
| 87 | 87 | 87 |
| 88 | 87 | 87 |
| 89 | 87 | 87 |
| 143 | 92 | 92 |
| 144 | 95 | 95 |

(Proceedings commenced, 12:00 p.m.)

THE COURT: Good morning -- or afternoon, whichever.

MR. WELSH: Good afternoon, Your Honor.

MR. ANDERSON: Good afternoon, Your Honor.

THE COURT: I think there are two more jurors on their way upstairs.

**(Jury in, 12:03 p.m.)**

THE COURT: You may be seated. Good afternoon. Thank you for being back.

You may resume with the witness.

MR. WELSH: Thank you, Your Honor.

Your Honor, does the witness need to be sworn again for today's purposes?

THE COURT: Yes.

CHRISTOPHER BOOTH, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q If you could just really briefly remind the jury of your name?

A My name is Christopher Booth with the Lynchburg Police Department.

Q Please show the witness Government's Exhibit 151. I believe you left off talking about November 1st of 2018. And we had finished admitting Government's Exhibit 129.

Do you remember that?

A Could you remind me what 129 was?
Q Well, if you could reference Government's Exhibit 151 in front of you here.
A Yes, that's item number 1.
Q Okay. Now, if we could show just the witness Government's Exhibit 152.
Do you recognize this?
A Yes.
Q What is it?
A This is a continuation of 151. This is in reference to a controlled drug purchase that occurred on January 24th, 2019, with Kenneth Adgerson.
Q Okay. And where do the details contained in Government's Exhibit 152 come from?
A My report.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 152.
THE COURT: It will be admitted.
(Government's Exhibit 152 marked.)
(Government's Exhibit 152 admitted.)
BY MR. WELSH:
Q So when was the next controlled purchase that occurred -- or was there a controlled purchase that occurred in January of 2019?
A Yes; on January 24th, 2019 with Kenneth Adgerson.

Q And what happened on that date?
A The confidential informant, which was CRI Biggs, contacted Quentin Horsley through Snapchat. During the Snapchat, he was advised to contact Kenneth Adgerson to purchase one ounce of cocaine.

MR. ANDERSON: Judge, I'm going to object to the characterization. Please excuse me for interrupting, but I think the exhibit can speak for itself rather than his characterization of what it says.

THE COURT: Sustained.

MR. WELSH: Your Honor, allow me to show the witness an exhibit, and I believe I can go from there --

THE COURT: Okay.

MR. WELSH: -- and address the issue raised by counsel.

BY MR. WELSH:
Q If we could show the witness Government's Exhibit 69.
What is Government's Exhibit 69?
A This is a snapshot from a video sent to me by CRI Biggs.
Q Okay. Who took this picture?
A The screenshot?
Q Well, who took this picture of the screenshot?
A I believe I -- I'm not sure who -- which one of us, one of the -- the CRI sent the video to me, and I believe I made the screenshot.

Q Okay. Were you present for this when this was --
A When the video -- yes.
MR. WELSH: Your Honor, I'd move to admit Government's Exhibit 69.
THE COURT: It will be admitted.
MR. ANDERSON: I don't have an objection to it being admitted. I'll reserve cross on the issues that I have for that.
(Government Exhibit 69 marked.)
(Government Exhibit 69 admitted.)
BY MR. WELSH:
Q So what did Confidential Informant Biggs tell you this was?
MR. ANDERSON: Judge, I'm going to object to him testifying as to what the confidential informant said. I believe that would be hearsay.
MR. WELSH: Your Honor, I believe it can be admitted for notice, not for the truth of the matter. So it wouldn't be hearsay.
THE COURT: It's admitted for what?
MR. WELSH: For notice -- the notice of what it is, as opposed to for the truth of the matter.
THE COURT: Notice of what?
MR. WELSH: Notice of informing the agent of where the message came from.

THE COURT: All right. It will be admitted.

BY MR. WELSH:

Q What did the informant tell you this came from?

A We had talked to the informant about purchasing cocaine. The informant advised me that they had reached out to Horsley via Snapchat, and that he was advised by Horsley to reach out to Kenny.

Q Okay.

A Which is Kenneth Adgerson.

Q And what is this number that is provided here?

A That's a phone number, 907-6461.

Q And then what does it say after that?

A You know, it's Kenny.

Q So what happened after this in the course of the controlled purchase?

A The CRI reached out to the phone number that was provided to Kenneth Adgerson.

Q Okay. And can you walk us through how that controlled purchase proceeded from that point?

A They made the phone call. The CRI was advised to come to Euclid Avenue. I believe the exact is Euclid and Park. After that, the CRI was searched, as well as their vehicle. The CRI then was provided the $1,200 of documented U.S. currency. The CRI then drove to the area of Euclid Avenue and contacted -- we were able -- we stayed in the area. They put the live wire on

and the video recording devices. We were able to hear a phone conversation between the CRI and another male. The CRI went to the -- CRI Biggs went to the 600 block of Euclid Avenue. I was able to observe a male matching Kenneth Adgerson's description approach CRI Biggs' vehicle. There was a conversation and the deal was complete. The CRI then responded back to our meet location.

Q Okay. And what happened when the informant arrived back at the location?

A I retrieved my live wire and audio/video recording device.

Q And what else did you do?

A The baggie or suspected cocaine was in the vehicle. I retrieved that.

Q Okay. I'm going to show you Government's Exhibit 68.

Do you recognize this?

A Yes.

Q What is it?

A A baggie of suspected cocaine that was --

Q Does that come from that date?

A Yes.

MR. WELSH: Your Honor, I'd seek to admit Government's Exhibit 68.

THE COURT: It will be admitted.

(Government Exhibit 68 marked.)

(Government Exhibit 68 admitted.)

BY MR. WELSH:
Q Now I'm going to show you Government's Exhibit 133, if you could open that up.
What is Government's Exhibit 133?
A This is the baggie of cocaine from that date.
Q And how do you know it's the same cocaine that you obtained from that date?
A It has the correct case number. My initials are at the top, and it has the date of 1-24-2019.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 133.
THE COURT: It will be admitted.
(Government Exhibit 133 marked.)
(Government Exhibit 133 admitted.)
BY MR. WELSH:
Q I'm going to show you Government's Exhibit 70.
Do you recognize this?
A Yes.
Q What is Government's Exhibit 70?
A It says item number 31. This was removed from item number 18 from the search warrant that was conducted at 1009 Misty Mountain Road.
Q Okay. So can you describe how you went about doing that?
A The item -- Detective Isner was the recorder for this incident. He seized the items. There were five cell phones

that were seized as item number 18. I responded to the police department property of evidence on March 6, 2019. I opened item 18 and I separated those items. Item 18 was kept as one phone. Then I also created item 29, 30, 31 and 32, which this being 31 has separate items. Then I did a daily request with our forensics unit.
Q Okay. So where did this phone originally come from?
A 1009 Misty Mountain Road, Apartment 1212.
MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 70.
THE COURT: It will be admitted.
(Government Exhibit 70 marked.)
(Government Exhibit 70 admitted.)
BY MR. WELSH:
Q Now, are you familiar with the area of Misty Mountain Road?
A I am.
Q And can you describe the locations of the buildings and what kind of area it is?
A This particular building was down at the bottom. You go -- from Timberlake Road, if you're coming from downtown, you take a left -- or coming from Ford Avenue, you go up Timberlake Road, take a left and down into the apartment complex. This building is all the way down at the bottom at the cul-de-sac. Right at the cul-de-sac, you take a right. It's the first

building on the right as you turn in.
Q Okay. And what kind of building is it?
A It is an apartment building.
Q Are there multiple units inside?
A Yes, inside of each apartment.
Q And have you performed surveillance in that area?
A I have.
Q And have you seen the defendant in that area?
A I have.
Q Were you present at Misty Mountain Road, Apartment 1212, on February 11th, 2019?
A On February 7th?
Q Excuse me, I may have misspoken, February 11th of 2019.
A Yes, I was.
Q Okay. And why was law enforcement there?
A There was a search warrant for Apartment 1212 at Misty Mountain Road.
Q And had you obtained that search warrant for that location?
A I did.
Q And had you obtained search warrants for other locations in the city?
A I did.
Q And what were those other locations?
A I don't have my notes. There was Misty Mountain Road,

Norwood Street, the AAAA storage building -- or a storage locker at that building -- an address, I believe it was Third Street, and 2111 Columbia Avenue, I believe.

MR. WELSH: One moment, Your Honor.

BY MR. WELSH:

Q Just a follow-up.

You said you had seen the defendant in the area of Misty Mountain Road; is that correct?

A Yes.

Q Had you seen him access the building at 1009 Misty Mountain Road?

A I did not observe him actually go into Apartment 1212, but I have observed him exiting that building.

Q Okay.

A The building that 1212 was in.

Q Okay. How many times approximately?

A I know of at least two times that I have observed. I don't remember the dates, but I know that I have observed him there at least on two occasions --

Q Okay.

A -- outside of that building.

MR. WELSH: I have no further questions at this time, Your Honor.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q Detective Booth, good afternoon.
A Good afternoon, sir.
Q So I understand you essentially developed Mr. Hubbard as an informant?
A Yes, I was the one who interviewed him.
Q And I understood your testimony I think yesterday, you observed him doing essentially a distribution of a narcotic. You went to pat him down and he took off running?
A What we -- that incident, we were there to serve a warrant for another individual. Mr. Hubbard was not involved as far as that warrant. He just happened to be there. When we went to serve that warrant, he was there. And during that interaction we -- as you said, he kept moving his hand down. And when I advised him I was going to pat him down, that's when he ran.
Q And you do that for officer safety, obviously?
A Yes, sir.
Q And when you got to what you thought had been some averted movement, you went to pat him down and he took off running?
A Yes.
Q You gave pursuit?
A Yes.
Q And along the route of the pursuit you had some instinct or observation that maybe he had discarded something from his person?
A Yes. Once he was detained, that's when we located in

his --
Q You walked the path back with which you had traveled in pursuit of him?
A Yes, sir.
Q And you found what was a baggie of a controlled substance?
A Yes, sir.
Q And you talked with him at that point about why he ran. He told you why he ran?
A Yes.
Q He didn't want to go back to prison?
A Yes.
Q And so you developed him at that point and inquired of him what information he might provide to you that could assist in any investigations you were involved in?
A Yes.
Q And to do that -- is it within your department's policy to do that, that you have to notify or get approval from the Commonwealth attorney's office?
A I don't -- I believe it is policy. I don't have the policy with me, but it is routine that we on a felony -- like a felony charge, that we would reach out to the Commonwealth before we don't charge on that charge.
Q And is the charge that was under consideration for Mr. Hubbard possession with the intent to distribute a controlled substance?

A Yes.
Q And so you inquired of the Commonwealth attorney whether you could have permission to develop him as an informant with an opportunity to work off his charges?
A Yes, to work for consideration.
Q And when we say work off his charges or work for consideration, you and I understand those terms.
Could you tell the ladies and gentlemen of the jury what that means?
A Yes. When you -- when a confidential informant is working off -- or working for consideration on a charge, that means that they have a pending -- some informants would have a charge they've already been arrested and taken to the magistrate. Some informants, they have not yet been charged, but we have the probable cause to obtain that charge. And if they won't -- and we'll sometimes approach them. And if they want to work for consideration, then we will reach out to the Commonwealth. And if the Commonwealth approves, then we will -- because the Commonwealth ultimately has to -- in the state case, the Commonwealth ultimately has the decision to whether they're going to prosecute or not.
Q At the state -- is it fair to say that at the state level the Commonwealth attorney's office and the assistant Commonwealth attorneys are the equivalent of the federal level's U.S. attorney's office and the assistant U.S.

attorneys?
A Yes, I believe so.
Q They make the charging decisions whether it's the state court, the Commonwealth makes them. In federal court, the U.S. attorney makes what the charging decisions will be?
A Yes, sir.
Q And you, after having an informant that may have, in your view, worked and obtained credit, you can make recommendations to that charging officer regarding what you think should happen with his -- in response to his cooperation?
A Yes, sir. Basically, once a confidential informant -- in my experience, once they have done what they can do, provide the information they can provide, done the controlled purchases they can do, I will go to the Commonwealth attorney, let them know exactly what that informant had done, and that's when they make their decision.
Q And Detective Booth, do you also have confidential informants that, in addition to the consideration of cooperation that can gain value for them, that there are actually some who receive money for their cooperation and information?
A Yes, sir, some informants do receive monetary compensation for doing controlled drug purchases.
Q Okay. And I'm going to kind of go through this with you chronologically. When I get to Mr. Bowman, I'll ask you about

some of those financial compensations he may have received.
A Okay.
Q So Mr. Hubbard -- focusing on Mr. Hubbard, if I understand your testimony yesterday, he essentially cooperated and assisted with five controlled purchases from Mr. Horsley?
A Yes. Yes.
Q Ranging in the dates of August of '17 up and through October of '17?
A December.
Q December. December 29, I believe?
A Yes, December 29th, yes, sir.
Q And as a result of his cooperation in those controlled purchases, you made a recommendation, did you not, to the Commonwealth attorney that Mr. Hubbard should not be charged with possession with intent to distribute cocaine himself?
A Based on that, yes.
Q Based on those five controlled buys?
A He received consideration on other things as well.
Q Maybe other suspects or individuals?
A Yes.
Q And in each one of those controlled purchases, the drug involved in the distribution was cocaine?
A With Mr. Horsley?
Q With Mr. Hubbard and Mr. Horsley?
A Yes.

Q And so Mr. Hubbard's last work for you as it related to Mr. Horsley, was that December the 29th of 2017?
A Yes.
Q And then in June of 2018 is when you recommended that he not be charged with possession with intent to distribute cocaine?
A I don't remember the exact date or when, but...
MR. ANDERSON: May I approach, Your Honor?
THE COURT: You may.
THE WITNESS: Yes, sir.
BY MR. ANDERSON:
Q Detective, after having reviewed the document that I handed you, does that refresh your recollection of when you made the recommendation?
A It says for CRI Biggs.
Q I'm sorry?
A This recommendation is Detective Trent for CRI Biggs, Jaimz Bowman.
Q Excuse me. Detective, thank you. I told you I was going in chronological order, and I went backwards. I apologize.
MR. ANDERSON: May I approach to retrieve that?
THE COURT: Yes, sir.
BY MR. ANDERSON:
Q Let me clarify for you so that I'm not trying to confuse you. I had the wrong date. Thank you for bringing that to my

attention, if I may approach and show you this document.
(Hands document to witness).
A Yes, sir.
Q So to correct the record and to be sure we're on the same page, Mr. Hubbard -- your recommendation to have no charges placed against Mr. Hubbard would have been in May of 2019?
A Yes, sir.
Q Do you know when -- and again, Mr. Hubbard's last cooperation was December 29th of '17 --
A I believe so.
Q -- as it relates to Mr. Horsley?
A Yeah, for Mr. Horsley.
Q And the recommendation to reward him for that was in May of 2019?
A I believe so, if that's the date on the memo. I know it says May 3rd. I believe it was 2019.
Q May the 3rd of 2019?
A I'm sorry, I didn't look at the -- yes, May 3rd, 2019 is the date this was sent.
Q I'm the one that got it backwards. So understood, but May the 3rd of 2019?
A Yes, sir, that's when I sent that or typed that memo.
Q Does that date of May the 3rd, 2019, does that have any significance to you as it relates to when Mr. Horsley was first indicted by the federal government?

A I don't recall my reasoning for that particular date. I'm sorry.
Q The quantities of cocaine that Mr. Hubbard received in the distributions that you've talked about previously for Mr. Horsley, those five, is it accurate to say to the jury they started out as smaller quantities and worked up to 1-ounce quantities?
A Yes. The first buys started -- the first three buys started as a half-ounce quantity, and then the last two went to a 1-ounce quantity.
Q Is it customary when you work in the industry like you're in in developing the informants and pursuing targets, that you try to work up the quantity of the distribution?
A Typically we will try to work up, if possible, but our main consideration is what the CRI or the informant would feel comfortable with. We're not going to ask a confidential informant that typically purchases $100 worth of cocaine to go purchase a half ounce of cocaine. So we wouldn't -- we'll go up, if possible.
Q Fair to say, Detective, that when you're working an informant and they do a transaction for you that's a quarter ounce, you say to them, Can you get a half ounce?
And when they get a half ounce you say, Look, can you get them up to an ounce; fair?
A Depending on the situation, but yes, that is accurate. If

we believe that that informant can purchase more, we will, in some situations.
Q Now, when you finished with Mr. Hubbard, you then developed a confidential informant that you referred to as Biggs?
A Yes.
Q And Biggs' name is Jaimz Bowman?
A Yes, sir.
Q Do you know or do you recall when you came in contact with Mr. Bowman and how you developed him as a confidential informant?
A Jaimz Bowman, CRI Biggs, he worked primarily with Detective Trent. I don't recall exactly that whole situation. That was Detective Trent's case. I recall pieces of it, but I don't feel comfortable giving full details.
Q Is it fair to say Detective Trent was the detective that was managing Mr. Bowman as a confidential informant?
A Yes. CRI Biggs or Jaimz Bowman was Detective Trent's CRI. I worked with CRI Biggs as well on certain cases.
Q And you share information with each other within your -- within your division of the detectives who were working in the vice area?
A Yes, we do.
Q And so there came a time when you learned that Mr. Bowman had been approved to work as a confidential informant, going

through that same process with the Lynchburg Commonwealth attorney's office?
A Yes.
Q Do you have knowledge or were you aware of what charges Mr. Bowman was involved with that he was trying to work off at that time, or is that something that Detective Trent would know?
A Detective Trent would know. I believe it was a distribution-related case.
Q He had -- he had a pretty extensive criminal history and past, didn't he?
A I believe he does have a criminal history. I don't know exactly what's on that history, though.
Q If I may ask the government to put up Government Exhibit 69, please.
Thank you.
Detective Trent, I want to ask you about this exhibit. As I understand it, this is a screenshot of a Snapchat conversation; is that right?
A Yes. CRI -- CRI Biggs sent me, it was an actual video of the message. Basically, he videoed the text messages and then sent -- or the Snapchat and sent it to me.
Q So we're talking about Mr. Bowman?
A Yes.
Q Your understanding is that Mr. Bowman videoed a Snapchat?

A Yeah, I received a video of the Snapchat.
Q And Government 69 is not that video, is it?
A This is a still from that video.
Q So to say it's a screenshot would not be the right term?
A I guess you could say a screenshot if you paused it and took a screenshot of the video, yes.
Q And so, was there more video sent to you as well?
A The screenshot was part of a video. Yes, there was more to the video as far as --
Q What was the video? How long was the video?
A From my recollection it was a short video, basically -- basically went over the phone. It was recorded, and then that was it. This message was recorded.
Q So your understanding is that Government 69 is a screenshot or a photograph of what was presented to you in a video format purporting to be a Snapchat communication between Mr. Bowman and Gossie?
A Gossie, yes, that's correct.
Q And it has a time in the top left-hand corner?
A 10:04.
Q Is that the time the video was photographed?
Is that the time the video was sent or taken on Snapchat, or do you know?
A That was the time on the informant's phone. I don't remember if that's the exact time of when it was sent to me.

Q And were you -- did you learn the date and time this video originated?
A May I refer to the report?
Q Please.
A (Witness perusing document).
Based on my report -- or the report from the controlled drug purchase on Kenneth Adgerson on January 24th, 2019, the CRI had advised me that they had reached out to Horsley earlier on Snapchat, who advised them to contact Kenny -- that was an abbreviation -- who had previously been identified as Kenneth Adgerson. The CRI sent me the video of the Snapchat message, which indicated that Horsley's Snapchat name was Gossie. That was per the CRI, Biggs.
Q So your best -- your best recollection and your best belief is that sometime around January the 24th of 2019 is when this Snapchat would have occurred and when Mr. Bowman made it available to you?
A On that date, on January 24th, 2019, I had the CRI make the recorded phone call to Mr. Adgerson using the number that was provided in this Snapchat at 10:49. Based on my belief, the Snap message would be at 10:04.
Q And so do you have, either from your knowledge of what you recall when you screenshotted this from the Snapchat video that was forwarded -- a video of the Snapchat that was forwarded to you in relation to January the 24th of 2019 when that

Snapchat -- Snapchat communication occurred?
A I can't say definitively. I believe it occurred that morning, but I can't 100 percent tell you.
Q Fair enough.
And from the face of Government 69, it gives a number at the bottom, right?
A Where the thumb is?
Q I'm sorry?
A Are you referring to where the thumb is on the photograph?
Q Yes.
A The 9076461 number?
Q Yes, sir.
And did you observe Mr. Bowman put that in the phone?
A I believe -- I don't have that documented that I watched him put it in the phone.
Q What about the line above that on Government 69, what's that say?
A It says 9076461, you know it's Kenny, "you" being just the letter U.
Q It doesn't say, Contact Kenny. It doesn't say, I'm directing you to Kenny. It says, You know it's Kenny?
A Yes, that's what it says.
Q At that point in time did you know who Kenny was?
A Yes, based on prior investigations.
Q Kenny Adgerson, wasn't he?

A Kenneth Adgerson, yes.
Q You also had a controlled purchase with Mr. Hubbard and Mr. Horsley on November the 1st of 2018?
A That would be CRI Biggs.
Q I'm sorry?
A November 1st --
Q Excuse me. Excuse me. You're right. That was with the confidential informant and cooperator, Mr. Jaimz Bowman?
A Yes, on November 1st of 2018.
Q And that was on November the 1st of 2018?
A Yes, sir.
Q And you recall hearing the conversation between Mr. Biggs and the voice you've identified as Mr. Horsley?
A Are you talking about the video from the controlled drug purchase that date?
Q Do you have your notes in front of you, Detective, with respect to that --
A I do.
Q -- report of activity dated November the 1st of 2018?
A I do.
Q It says that the CRI -- that's Mr. Bowman -- made a recorded phone call to Mr. Horsley?
A Yes.
Q Advised Horsley he was on Ford Avenue, and Horsley advised him that he would have to run by the crib to get it?

A Yes.
Q Right?
A Yes.
Q Can you tell the ladies and gentlemen of the jury what does "crib" mean in the slang terms that's used in this context?
A Based on my understanding, it is residence.
Q Residence?
A Home, residence.
Q Again, just to be clear, that for purposes of inquiring mostly about Mr. Bowman, Detective Trent would have been his handler in these investigations?
A During the controlled drug purchase -- this particular controlled drug purchase on November 1st, 2018, I would be the lead on that investigation sort of as a whole for CRI Biggs, which is Jaimz Bowman. Detective Trent is his main contact.

MR. ANDERSON: One moment, please, Your Honor, if I may.

(Pause.)

MR. ANDERSON: Thank you, Your Honor. That's all the questions that I have.

THE COURT: All right.

MR. WELSH: I have no further questions, Your Honor.

THE COURT: All right. Thank you. You may step down.

MR. WELSH: Your Honor, may this witness be excused or is he subject to re-call?

MR. ANDERSON: May he be subject to re-call, please?

MR. WELSH: No problem. Thank you.

Your Honor, the government calls Lieutenant Craig Dowdy.

CRAIG DOWDY, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon.
Could you please state and spell your name for the record?
A Sure. Do you want my first name as well?
Q Yes, please.
A I'm Lieutenant Craig Dowdy, C-R-A-I-G, D-O-W-D-Y.
Q And how are you employed?
A I'm employed with the Lynchburg Police Department.
Q How long have you been with the Lynchburg Police Department?
A Just over 17 years.
Q What do your duties include there as a lieutenant?
A Right now I'm a lieutenant watch commander over field operations.
Q I want to turn your attention to September of 2017. What was your position then?
A I was the sergeant of the vice narcotics unit.

Q And what was your involvement in the investigation of Quentin Horsley?

A On that particular date and time I was just on surveillance for a controlled drug buy.

Q So I want to turn your attention to September 15th of 2017. What were you doing on that date?

A On that date I was in my unmarked vehicle, and I was sitting in the parking lot directly across from the Hardee's parking lot on Langhorne Road. I was actually in a parking lot adjacent to Lansdown Place, which if you were looking at the Hardee's on Langhorne Road, it would be the right side of the building, and there is an entrance there. So I was making observations of when the informant arrived and when the target arrived and then once the buy was complete.

Q And what did you see while you were there performing surveillance?

A At about 12:10 the informant arrived and parked on the same side of the building that I was facing at about 12:10. At about 12:11 the informant went inside Hardee's for a moment. Came back out at about 12:12 and got back in their vehicle. At about 12:17 a two-door white Infiniti with the tag VNS3422 arrived and parked next to the informant on the same side of the building that I was facing. And then the informant got out of their vehicle and got in the front passenger side of that vehicle. That was about 12:17. And then there was a brief

exchange, and then the informant got back out of that vehicle and got in theirs at 12:18. Then I observed the white Infiniti actually leave the lot of Hardee's.
Q Okay. Were you able to see who was inside of the white Infiniti as it drove away?
A I was. I was able to see the driver as Quentin Horsley, and he had a white T-shirt on.
Q Okay. Do you see him in the courtroom here today?
A Yes. He's sitting right here with the vest and peach-colored tie on.
MR. WELSH: Thank you.
Your Honor, I'd ask the Court to note the identification.
THE COURT: All right.
BY MR. WELSH:
Q Now I want to show you Government's Exhibit 41, which has already been admitted into evidence.
Is this consistent with what you saw on the date of your surveillance?
A Yes.
Q And was that consistent with what you saw Mr. Horsley wearing that day?
A As far as the white T-shirt, yes.
MR. WELSH: I have no further questions, Your Honor.
THE COURT: All right.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q Detective, good afternoon.

A Good afternoon, sir.

Q So with the informant, Mr. Hubbard --

A Correct.

Q -- this observation you've testified about was on December the 7th of 2017?

A No. It was September the 15th, 2017.

Q December -- September the 15th of 2017?

A That's correct.

Q And it was for -- your understanding is for what, a half an ounce of cocaine?

A I don't recall the amount. I was just on surveillance at that time.

Q Oh, you weren't involved in the actual conversations that took place between Mr. Hubbard and Mr. Horsley?

A Not as far as the conversations. I was just strictly on surveillance.

Q Okay. So all you did was observe?

A That's correct.

Q You didn't take the photographs?

A No.

Q You just saw what you observed?

A That's correct.

Q And is it your testimony today that Government Exhibit 41 -- bring that back up, please.

Thank you.

Is it your testimony today that you believe that individual depicted in Government Exhibit 41 is Mr. Horsley?

A Yes, based on my observations on that date in person.

Q Based on your observations on that date of September the 15th of 2017, you believe that to be Mr. Horsley?

A Correct.

MR. ANDERSON: Thank you.

MR. WELSH: No redirect, Your Honor.

THE COURT: All right. Sir, you may step down.

MR. WELSH: And may this witness be excused?

MR. ANDERSON: No objections.

MR. WELSH: Your Honor, the government calls Detective Steven Trent.

STEVEN TRENT, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon. Would you please state and spell your name for the record?

A Steven Trent, S-T-E-V-E-N, T-R-E-N-T.

Q And how are you employed?

A I am a sergeant with the Lynchburg Police Department.

Q How long have you been with Lynchburg Police Department?

A 16 years.
Q And what do your current duties include?
A Currently I'm the sergeant over the vice narcotics unit.
Q And I want to refer you back to February of 2019. What was your position back then?
A February of 2019 I was a detective in the vice narcotics unit.
Q And what did your duties include as a detective in the vice narcotics unit?
A My duties would include conducting controlled drug buys, managing informants, and investigating narcotics offenses.
Q And I want to specifically draw your attention to February 11th of 2019.
Where were you on that date?
A February 11th, I was the case agent, and we were executing two search warrants here in the City of Lynchburg.
Q Okay. Where were those search warrants at?
A One search warrant was at 614 Euclid Avenue, Apartment A. And the second one was at 1639 Blackburn Street here in the city.
Q Was that in coordination with other search warrants that were occurring in the city?
A Yes.
Q And were you physically present at 1639 Blackburn Street?
A Yes, I was.

Q What was your role there?
A I was a case agent, also to assist with searching and interviewing any potential people on scene.
Q I'm going to show you a series of physical exhibits, and bring them up to you and ask you if you recognize them.
A Yes, sir.
Q If we could start with Government's Exhibit 104, do you recognize Government's Exhibit 104?
A Yes, I do.
Q And what is that?
A This is one of the items that was seized from 1639 Blackburn Street.
Q How do you know it's one of the items seized?
A My initials are on the packaging material.
Q And what did you do with the substance after seizing it?
A Once the items are seized, it's sealed and packaged and then placed into our evidence locker.
Q Okay. Now I'm going to show you Government's Exhibit 106.
Do you recognize Government's Exhibit 106?
A Yes, I do.
Q What is Government's Exhibit 106?
A This is another item that was seized from the residence at 1639 Blackburn Street.
Q And how do you know it's one of the items seized?
A My initials are on the evidence bag associated with the

case number and date.
Q And what did you do with the substance after receiving it?
A This item, too, was packaged, sealed, and placed into our evidence locker.
Q I'm showing you Government's Exhibit 108.
Do you recognize that?
A Yes, I do.
Q And what is that?
A This, too, is an item that was seized out of 1639 Blackburn Street.
Q And how do you know it is one of those items?
A It also has my name on the evidence package.
Q Let me show you Government's Exhibit 111.
What is Government's Exhibit 111?
A This also is another item that was seized from 1639 Blackburn Street and placed in an evidence bag.
Q And how do you know it's the same substance?
A It's also got my initials on the evidence packaging.
Q I'm going to show you Government's Exhibit 113.
Do you recognize Government's Exhibit 113?
A Yes, I do.
Q And what is that?
A This also is another piece of evidence seized from 1639 Blackburn Street.
Q Can you describe what kind of substance that is or what it

looks like?
A This is a brownish-tan chalky substance in powder form.
Q And how do you know it's the same substance that you received that day?
A It also has my initials on the packaging material.
Q I'm going to show you Government's Exhibit 115.
What is Government's Exhibit 115?
A This is another item that was seized from 1639 Blackburn Street during a search warrant.
Q And how do you know this is the same substance that you received that day?
A It also has my initials on the packaging material.
MR. WELSH: Your Honor, I'd move to admit Government Exhibits 104, 6, 8, 111, 113, and 115 into evidence.
MR. ANDERSON: Your Honor, may I just have an objection subject to being connected up? These items were recovered from two separate residences not associated with Mr. Horsley. So subject to being connected up to what might be an allegation of the underlying conspiracy, conditionally admitted, please.
THE COURT: All right. They'll be admitted subject to being tied in.
MR. WELSH: Thank you, Your Honor.
(Government Exhibits 104, 106, 108, 111, 113, and 115 marked.)

(Government Exhibits 104, 106, 108, 111, 113, and 115 admitted.)

BY MR. WELSH:

Q So where did these substances come out of? Where were they found specifically at 1639 Blackburn?

A 1639 Blackburn Street, they were in one of the bedrooms in a closet on the very top shelf.

Q Were you involved in a second search on February 11th of 2019?

A Yes, I was.

Q And where was that at?

A That was at 614 Euclid Avenue, Apartment A, here in the City of Lynchburg.

Q And so where did you start out the day?

A I started off the day at Blackburn Street.

Q And then you went over to 614 Euclid Avenue?

A That is correct.

Q And what did you do at 614-A Euclid Avenue?

A I came in contact with Detective Burgess, who was the recorder from that search warrant, and he advised me of some of the items that were found at that location. Also while on scene, we ended up having a vehicle that was at that location towed to the shop for a search warrant that was going to be obtained as well.

Q Okay. And so what happened? What vehicle did you

identify?
A It was a Monte Carlo and a BMW.
Q All right. And what did you do with respect to the vehicles?
A Both of those vehicles were towed, and then I obtained search warrants on each one of those vehicles.
Q All right. And did you assist in the execution of those search warrants?
A Yes, I did.
Q What did you find in the vehicles?
A I'll refer to my notes here. Inside the Monte Carlo in the passenger compartment were several documents with an individual's name on it. And when I opened the trunk there was a Kay Jewelers bag -- of the Monte Carlo. Inside that bag there were several packaged white chunk substance consistent with what appeared to be narcotics at the time.
Q Okay. What else did you find in the vehicle?
A Also inside was a red and black gym bag. It was pretty heavy, picking it up. I opened the bag up, and inside the bag was a firearm.
Q Okay. What type of firearm was found?
A It was an Anderson Arms M-15, serial number 18112771.
Q Okay. I'm going to show you Government's Exhibit 117.
Do you recognize this?
A Yes.

Q What is it?
A This is the item that came out of the search warrant from the trunk of the vehicle, the Monte Carlo.
Q Okay. How do you know it's the same substance that you received from the Monte Carlo?
A This was packaged by me, and my initials are on the packaging.
Q And when you arrived at 614 Euclid Avenue, do you know approximately where the Monte Carlo was in relation to that residence?
A It was parked on the street in front of the residence.
Q And do you know who was found at 614 Euclid Avenue?
A Yes. Kenneth Adgerson, as well as Tiesha Austin.
Q And did you believe 614-A Euclid Avenue to be his residence?
A Yes.
MR. WELSH: Your Honor, I would move to admit Government's Exhibit 117.
MR. ANDERSON: Subject to the same objection, Your Honor.
THE COURT: It will be so admitted.
(Government Exhibit 117 marked.)
(Government Exhibit 117 admitted.)
MR. WELSH: I have no further questions, Your Honor.
THE COURT: All right.

MR. ANDERSON: Judge, I have no questions now, but I would ask that Detective Trent be subject to re-call.

THE COURT: All right. Thank you, sir. You may step down.

MR. WELSH: Your Honor, the government calls -- actually, at this time, Your Honor, the government and the defendant have reached several stipulations. And I believe now would be an appropriate time to read those stipulations into the record, subject to the Court's agreement with that.

THE COURT: Members of the jury, counsel is about to read the stipulations to you. You can consider this as proven fact, what he states as the stipulation, that the government and the defendant have agreed to.

MR. WELSH: The United States and the Defendant, Quentin Lowell Horsley, hereby stipulate and agree to the following evidence and agree that no additional evidence need be introduced with respect to this matter: Government's Exhibit 104, this exhibit, is a bag containing a substance that was seized by the Lynchburg Police Department on February 11th, 2019, and marked as DEA Exhibit 4. A forensic chemist with the Drug Enforcement Administration tested the contents of Government's Exhibit 104 and has determined with scientific certainty that the substance is approximately 534.2 grams of heroin, a Schedule I controlled substance. The evidence has not been tampered with or changed by any party or by law

enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 105 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 104. The parties stipulate that Government's Exhibit 105 is true and accurate; and that if the chemist had been called to the stand to testify, would have testified to the information contained in this exhibit.

Government's Exhibit 106 is a bag containing a substance that was seized by the Lynchburg Police Department on February 11th, 2019, and marked as DEA Exhibit 5. A forensic chemist with the Drug Enforcement Administration tested the contents of Government's Exhibit 106 and has determined with scientific certainty that the substance is approximately 296.9 grams of methamphetamine, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 107 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 106. The parties stipulate that Government's Exhibit 107 is true and accurate; and that, if the chemist had been called to testify -- to the stand to testify, would have testified to the information contained in this exhibit.

Government's Exhibit 108 is a bag containing a substance that was seized by the Lynchburg Police Department on February 11th of 2019 and marked as DEA Exhibit 1. A forensic chemist with the Drug Enforcement Administration tested the contents of Government's Exhibit 108, and has determined with scientific certainty that the substance is approximately 998.9 grams of cocaine hydrochloride, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 109 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 108. The parties stipulate that Government's Exhibit 109 is true and accurate, and that if the chemist had been called to testify -- or called to the stand to testify, would have testified to the information contained in this exhibit.

Government's Exhibit 110 is a photograph taken by a forensic chemist with the Drug Enforcement Administration during the examination of the government's exhibit -- during the examination of Government's Exhibit 109. The parties stipulate that Government's Exhibit 110 is a true and accurate depiction of how Government's Exhibit 109 appeared when it was examined.

Government's Exhibit 111 is a bag containing a

substance that was received by the Lynchburg Police Department on February 11th of 2019 and marked as DEA Exhibit 2. A forensic chemist with the Drug Enforcement Administration tested the contents of Government's Exhibit 111 and has determined with scientific certainty that the substance is approximately 974 grams of cocaine hydrochloride, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 112 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 111. The parties stipulate that Government's Exhibit 112 is true and accurate, and that if the chemist had been called to the stand to testify, would have testified to the information contained in this exhibit.

Government's Exhibit 113 is a bag containing a substance that was seized by the Lynchburg Police Department on February 11th of 2019 and marked as DEA Exhibit 3. A forensic chemist with the Drug Enforcement Administration tested the contents of Government's Exhibit 113 and has determined with scientific certainty that the substance is approximately 463 grams of heroin, a Schedule I controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does

not challenge the chain of custody of this item.

Government's Exhibit 114 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 113. The parties stipulate that Government's Exhibit 113 is true and accurate, and that if the chemist had been called to the stand to testify, would have testified to the information in this exhibit.

Government's Exhibit 115 is a bag containing a substance that was seized by the Lynchburg Police Department on February 11th of 2019 and marked as DEA Exhibit 8. A forensic chemist with the Drug Enforcement Administration tested the contents of Government's Exhibit 115 and has determined with scientific certainty that the substance is approximately 2,901.8 grams of methamphetamine, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody to this item.

Government's Exhibit 116 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 115. The parties stipulate that Government's Exhibit 116 is true and accurate, and that if the chemist had been called -- had been called to the stand to testify, would have testified to the information contained in this exhibit.

Government's Exhibit 117 is a bag containing a

substance that was seized by the Lynchburg Police Department on February 11th, 2019, and marked as DEA Exhibit 6. A forensic chemist with the Drug Enforcement Administration tested the contents of Government's Exhibit 117 and has determined with scientific certainty that the substance is 457 grams of cocaine hydrochloride, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 118 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 117. The parties stipulate that Government's Exhibit 118 is true and accurate, and that if the chemist had been called to the stand to testify, would have testified to the information contained in this exhibit.

The stipulation is signed by both counsel for the government and counsel for the defendant.

I submit that as Trial Stipulation Number 1 to the Court. At this time I would move to admit, based on the stipulation, Government's Exhibits 105, 107, 109, 110, 112, 114, 116, and 118.

THE COURT: All right. They will be admitted.

(Government Exhibits 105, 107, 109, 110, 112, 114, 116, and 118 marked.)

(Government Exhibits 105, 107, 109, 110, 112, 114,

116, and 118 admitted.)

MR. WELSH: I have additional stipulations, Your Honor, much in the same manner as the ones previously read.

The United States of America and Defendant Quentin Lowell Horsley hereby stipulate and agree to the following evidence and agree that no additional evidence need be introduced with respect to this matter: Government's Exhibit 119 is a bag containing a substance that was obtained by the Lynchburg Police Department on August 18th of 2017 and marked as item 1 in Case Number 2017038528. A forensic chemist with the Virginia Department of Forensic Science tested the contents of Government's Exhibit 119 and determined with scientific certainty that the substance is approximately 10.92 grams of cocaine, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody to the item.

Government's Exhibit 120 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 119. The parties stipulate that Government's Exhibit 120 is true and accurate, and that if the chemist had been called to the stand to testify, would have testified to the information contained in the exhibit.

Government's Exhibit 121 is a bag containing a substance that was obtained by the Lynchburg Police Department

on August 29th, 2017 and marked as Item 1 in Case Number 2017039114. A forensic chemist with the Virginia Department of Forensic Science tested the contents of Government's Exhibit 121, and has determined with scientific certainty that the substance is approximately 11.04 grams of cocaine, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 122 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 121. The parties stipulate that Government's Exhibit 122 is true and accurate, and that if the chemist had been called to the stand to testify, would have testified to the information contained in this exhibit.

Government's Exhibit 123 is a bag containing a substance that was obtained by the Lynchburg Police Department on September 15th of 2017 and marked as Item Number 1 in Case Number 2017040033. A forensic chemist with the Virginia Department of Forensic Science tested the contents of Government's Exhibit 123 and has determined with scientific certainty that the substance is approximately 10.18 grams of cocaine, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not

challenge the chain of custody of this item.

Government's Exhibit 124 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 123. The parties stipulate that Government's Exhibit 124 is true and accurate, and that if the chemist had been called to the stand to testify, would have testified to the information contained in this exhibit.

Government's Exhibit 125 is a bag containing a substance that was obtained by the Lynchburg Police Department on December 7th of 2017 and marked as Item 1 in Case Number 2017044614. A forensic chemist with the Virginia Department of Forensic Science tested the contents of Government's Exhibit 125 and has determined with scientific certainty that the substance is approximately 29.002 grams of cocaine, a Schedule II controlled substance. The substance has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 126 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 125. The parties stipulate that Government's Exhibit 126 is true and accurate, and that if the chemist had been called to the stand to testify, would have testified to the information contained in this exhibit.

Government's Exhibit 127 is a bag containing a

substance that was obtained by the Lynchburg Police Department on December 29th, 2017 and marked as Item Number 1 in Case Number 2017045778. A forensic chemist with the Virginia Department of Forensic Science tested the contents of Government's Exhibit 127, and has determined with scientific certainty that the substance is approximately 27.88 grams of cocaine, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 128 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 127. The parties stipulate that Government's Exhibit 128 is true and accurate, and that if the chemist had been called to the stand to testify would, have testified to the information contained in this exhibit.

Government's Exhibit 129 is a bag containing a substance that was obtained by the Lynchburg Police Department on November 1st of 2018, and marked as Item Number 1 in case number 2018016265. A forensic chemist with the Virginia Department of Forensic Science tested the contents of Government's Exhibit 129 and has determined with scientific certainty that the substance is approximately 27.03 grams of cocaine, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law

enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 130 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 129. The parties stipulate that Government's Exhibit 130 is true and accurate, and that if the chemist had been called to the stand to testify, would have testified to the information contained in this exhibit.

This stipulation is signed by counsel for the government and counsel for the defendant, and I would submit this as Trial Stipulation Number 2.

Your Honor, I have one more brief stipulation. And I would move into evidence at this time, based on the stipulation, Government Exhibits 120, 122, 124, 126, 128, and 130.

THE COURT: They will be admitted.

(Government Exhibits 120, 122, 124, 126, 128, and 130 marked.)

(Government Exhibits 120, 122, 124, 126, 128, and 130 admitted.)

MR. WELSH: And finally, the parties hereby stipulate and agree that Government's Exhibit 133 is a bag containing a substance that was obtained by the Lynchburg Police Department on January 24th of 2019, and marked as Item Number 1 in Case Number 2019001246. A forensic chemist with the Virginia

Department of Forensic Science tested the contents of Government's Exhibit 133, and has determined with scientific certainty that the substance is approximately 27.62 grams of cocaine, a Schedule II controlled substance. The evidence has not been tampered with or changed by any party or by law enforcement in any meaningful way. The defendant does not challenge the chain of custody of this item.

Government's Exhibit 134 is a forensic chemist's certificate of analysis that was produced after testing the substance in Government's Exhibit 133. The parties stipulate that Government's Exhibit 134 is true and accurate, and that if the chemist had been called to testify to the stand, would have testified to the information contained in this exhibit.

It is signed by counsel for the United States and counsel for the defendant.

That, Your Honor, I've marked as Trial Stipulation Number 3, and move to admit Government's Exhibit 134.

THE COURT: It will be admitted.

(Government Exhibit 134 marked.)

(Government Exhibit 134 admitted.)

MR. WELSH: Thank you, Your Honor.

THE COURT: All right. At this time we'll take about a 20-minute recess.

**(Jury out, 1:23 p.m.)**

(Recess.)

THE COURT: All right. Call the jury.

**(Jury in, 1:45 p.m.)**

THE COURT: You may have a seat.

Please call your next witness.

MR. WELSH: Your Honor, the United States calls Brandon Hubbard to the stand.

BRANDON HUBBARD, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon, Mr. Hubbard. Could you please state your name and introduce yourself to the jury?

A Yes, my name is Brandon Hubbard.

Q How old are you, Mr. Hubbard?

A I'm 40.

Q Do you know an individual named Quentin Horsley?

A Yes.

Q Do you see him in the courtroom?

THE COURT: You may take your mask off.

THE WITNESS: Okay.

BY MR. WELSH:

Q Do you see him in the courtroom today?

A Yes.

Q Could you point him out by something he's wearing?

A Excuse me?

Q Could you point him out by something he's wearing?

A He's right there.
Q Okay. At some point were you confronted by the Lynchburg Police Department with potential criminal charges?
A Yes.
Q What was the nature of that?
A I was stopped and I ran from the police. Drugs was found in the direction I ran.
Q Okay. How much drugs?
A Half an ounce.
Q Of what?
A Cocaine.
Q Did you have it?
A Yes.
Q Where did you get it from?
A I got it from Quentin.
Q Did you end up agreeing to be a confidential informant with the Lynchburg Police Department?
A Yes.
Q What did that mean to you?
A I had to cooperate.
Q What was your understanding of the agreement?
A I had to purchase drugs so I wouldn't be charged.
Q What would happen to you if you lied about something during that process?
A I would be charged.

Q What would happen if you didn't come here and testify today?
A I would be charged.
Q I want to draw your attention to August 18th of 2017. Do you remember doing a controlled purchase with law enforcement on that date?
A I don't remember the exact date.
Q Okay. Do you remember doing multiple controlled purchases as an informant?
A Yes.
Q Who did you make those purchases from?
A Quentin.
Q Did you do that again on August 29th of 2017?
A Once again, I don't remember the dates.
Q During those purchases, did you meet with anyone else?
A No one else besides law enforcement.
Q You didn't make the purchase from anyone else?
A No.
Q After cooperating that way, were charges ultimately brought against you?
A No.
Q Have you been charged for that conduct that you talked about?
A No.

MR. WELSH: No further questions for Mr. Hubbard,

Your Honor.

THE COURT: All right.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q Good afternoon, Mr. Hubbard.

A Good afternoon.

Q So this jury has heard about your involvement with Detective Booth. He was who you were responsible for doing some work for him?

A Yes.

Q Working off the charges that you had?

A Yes.

Q And you've done pretty well since then, haven't you?

A Yes.

Q And you're not -- you're here to tell the truth, right?

A Yes.

Q You said that if you didn't, you would get charged. Did you mean charged with perjury?

A Charged with perjury, I guess, and also with whatever I originally would have been charged with back in 2017.

Q Has someone suggested to you if you didn't testify, the charges might be reinstated against you in the City of Lynchburg?

A It was a possibility.

Q No one has suggested that to you, though, did they?

A Excuse me?
Q No one has suggested that to you?
The government hasn't threatened you with any charges if you aren't here today, have they?
A Well, they haven't threatened me, but I asked the question what could potentially happen.
Q Okay. You're just here to tell the truth?
A Yes.
Q And so the jury has heard about the transactions you had with Mr. Horsley. I think there were five of them during the period of August through December of '17, right, or you can't recall?
A I don't remember how many it was.
Q Okay. Let me ask you this: Can you remember the transactions that you did with Mr. Horsley, the size and the quantity of the cocaine that you purchased from him?
A Yes.
Q Did they start out at a half ounce?
A Yes.
Q And so you're saying when you were running that day from Officer Trent, what you dropped along the way was a half ounce?
A Yes.
Q Then you had two additional half-ounce purchases from Mr. Horsley?
A Yes.

Q Does that sound right?
A Yes.
Q And then two additional purchases of one ounce each; does that sound right?
A I don't recall honestly.
Q Can you recall this, that it was never more than an ounce?
A Yes.

MR. ANDERSON: Thank you. That's all.

MR. WELSH: I have no redirect, Your Honor.

THE COURT: All right. You may step down. Thank you.

MR. WELSH: Your Honor, may this witness be excused?

MR. ANDERSON: We have no objections to him being excused.

THE COURT: All right. You may be excused.

MR. WELSH: Your Honor, the government calls Detective David Goodell.

DAVID GOODELL, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon.
A Good afternoon.
Q Could you please state and spell your name for the record?
A My name is David Goodell, G-O-O-D-E-L-L.
Q And how are you employed?

A I'm a detective with the Lynchburg City Police Department.
Q And what are your duties at the Lynchburg City Police Department?
A I'm a member of our digital forensics unit.
Q How long have you been in the digital forensics unit?
A Part time since 2016, full time since 2019.
Q And what do you do in that unit?
A We do the recovery of evidence from digital devices, whether it's cell phones, computers, tablets.
Q And what do your day-to-day duties include?
A Mostly the downloading of cell phones and creating reports for other detectives.
Q How many devices have you been involved in downloading?
A Overall, over 400 cell phones -- over 300.
Q What kind of training have you received on --
A I've been to several hundred hours of data recovery and acquisition, multiple cell phone forensic tool classes to include Magnet Axiom Forensics, which is 40 hours of training, Cellebrite certified operator and certified physical analyst, which is a 40-hour class which gets you a two-year certification. There's a recertification class every two years.
Q Okay. Can you describe what kind of certifications you have in that field?
A I've got, like I said, my Cellebrite certification,

Certified BlackLight examiner. I've been to some other trainings that don't necessarily have certifications that go with them, just the training in and of itself.
Q What's required to obtain those different certifications?
A Cellebrite, it's a 40-hour training class. You have to recertify on that every two years to stay current. BlackLight is also 40 hours -- I'm sorry, that's a 32-hour class, and it's a two-year certification also.
Q Have you ever been qualified to testify as an expert?
A I have not.
Q Have you ever been disqualified from testifying as an expert?
A No.
MR. WELSH: Your Honor, I'd seek to admit this witness's testimony as an expert witness.
MR. ANDERSON: Your Honor, may I voir dire just briefly?
THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. ANDERSON:
Q Good afternoon --
A Yes, sir.
Q -- Officer.
So you did some extractions of telephones in this particular investigation?

A I did.
Q And did the software you used consist mostly of Cellebrite?
A It did.
Q And is that the only one you used?
A Yes.
Q And you were trained on Cellebrite by attending classes -- it's a software program, right?
A Yes, that's correct.
Q We know these terms, but for the jury, it's a software program. You were able to download it, go into the phone, and produce the results from the communications --
A Yes.
Q -- on that device?
A That's correct.
Q You don't know who is executing the device or who is receiving it, other than by telephone numbers that you associate with that?
A That's correct.

MR. ANDERSON: I'm satisfied. Thank you, Judge. I have no objection to his qualifications.

THE COURT: You may so qualify. You may testify.

MR. WELSH: Thank you, Your Honor.

BY MR. WELSH:
Q Can you generally describe what Cellebrite Physical

Analyzer is, the software that you're talking about?
A So Cellebrite Physical Analyzer is a software that analyzes an extraction that we can obtain from a cell phone using a Cellebrite UFED software.
Q Can you describe the process that you did when you received the phone and used that software?
A Sure. So once we get the phone out of evidence, we bring it back to our office. The UFED software runs on a self-containing device. It's called a UFED Touch. It's a touchscreen computer that runs the software. You connect the cell phone to that using a USB cable, the same one you would use to power your phone. And Cellebrite would normally -- well, it would detect the model of the phone, and it will kind of do what the steps are to get it to connect and download the information off the device.
Q Okay. And what do you do after that?
A At that point when it does that, it writes it to a USB flash drive. And then we will take that to another computer that's running Cellebrite Physical Analyzer. We will use Physical Analyzer to open that extraction, and then it will parse that data into a form that's readable and usable.
Q Okay. Then what do you do?
A At that point you can generate what's called a UFED reader report, and that is kind of a portable format of what Physical Analyzer has created. It comes with an executable file so

anybody can take it to any computer and open that report and be able to see the information that was obtained in that extraction.
Q In your training and experience, is the imaging software from Cellebrite reliable?
A It is.
Q And does it create an accurate and reliable extraction of the digital device you're examining?
A It does.
Q Is it possible for Cellebrite to add data to a device?
A It doesn't add any user data. Some of the extractions that it does, it will put a small -- it's called a client, a small piece of software on the phone in order to interact with the phone. But once it's done, it deletes that piece of software, and it's not making any changes to any user data. It's just installing that one program to be able to download the information.
Q Would that be considered like a background file?
A I don't know if it's necessarily background. It's running on the device, but it's only running for the amount of time it takes to download the device and then it's removed.
Q Okay. And is this a process that you regularly rely on?
A Yes.
MR. WELSH: Now, if I could approach the clerk and receive Government's Exhibit 70, which has been admitted into

evidence.

BY MR. WELSH:

Q I'm showing you what's already been admitted as Government's Exhibit 70.

Do you recognize this?

A I do.

Q And what is it?

A This is item 31 from a Lynchburg PD case, 20192209. It's a Samsung cell phone.

Q And when did you encounter Government's Exhibit 70 first?

A I initially encountered it back in June of 2019.

Q And what did you do with Government's Exhibit 70?

A I signed it out of our property and evidence department. I brought it back to our office where I removed it from its sealed packaging, and then connected it to the Cellebrite UFED and obtained an extraction from it.

Q And did you do that in the same manner in which you previously described by using Cellebrite?

A Yes.

Q I'm going to show you Government's Exhibit 72.

What is Government's Exhibit 72?

A This is an extraction report that you can create through the Cellebrite reader that is providing all the information that Cellebrite extracted from the device.

Q So I know it's hard to see here because it's up on the

screen, but how big is this file?
A 1,036 pages.
Q So it's a pretty large file?
A Yes.
Q Was this created using the reliable means you've described?
A Yes, it was.
Q And in your training and experience, is it a true and accurate copy of the contents of Exhibit 70?
A It's a true and accurate copy of the extraction from item 70.
MR. WELSH: Okay. Your Honor, I would move to admit Government's Exhibit 72 into evidence.
THE COURT: It will be admitted.
(Government Exhibit 72 marked.)
(Government Exhibit 72 admitted.)
BY MR. WELSH:
Q I want to show you Government's Exhibit 147.
What is this?
A This is an extraction of the SIM card that was from item number 70.
Q How did you create -- or first of all, where did this report come from?
A The report is generated from Cellebrite Physical Analyzer.
Q And who created this report?

A I did.
Q And did you do it using the same reliable means you've described?
A Yes.
Q And in your training and experience, is it a true and accurate copy of information contained on Government's Exhibit 70?
A Yes, of the SIM card.
MR. WELSH: Your Honor, I'd move to admit Government's Exhibit 147.
THE COURT: It will be admitted.
(Government Exhibit 147 marked.)
(Government Exhibit 147 admitted.)
BY MR. WELSH:
Q All right. Can you explain for the jury what a SIM card is?
A A SIM card, it has a couple of names. It's subscriber information module or identifier module. And it's basically just a small card that goes inside your cell phone that contains some network data that allows your phone to communicate, including the phone number for that device is stored on the SIM card.
Q Okay. I'd like to refer you to page 2 of this document, the last two lines, if we could blow that up, lines 8 and 9.
What information does a SIM card tell you?

A One of the things it gives you is MSISDN, which is mobile station integrated services directory number, which is commonly known as the telephone number for the phone.
Q Okay. So is this the number?
Could you read that from the jury?
A It is 434-444-7305.
Q So is it fair to say the conversations that are coming from that phone are coming from that number?
A Yes.
Q And so the content coming -- that's contained in Government's Exhibit 72 is associated with that number?
A Yes.
Q All right. Now I'm going to approach and show you Government's Exhibits 73 through 82.
What are Government's Exhibits 73 through 82?
A These are extractions from the Cellebrite Reader Report from item number -- or Exhibit 70 for text message conversations between this device and several other phone numbers.
Q Okay. Is each report an individual conversation?
A Yes.
Q And where does that information come from?
A The reports themselves are being generated from the UFED reader report.
Q Where is the underlying information coming from?

A The underlying information is in the extraction from the device.
Q So is it fair to say that this is the same data as Government's Exhibit 72, but reformatted?
A Yes.
Q And did you perform a review to check whether the data in this was actually on Government's Exhibit 70, the actual phone?
A Yes. I did a manual validation of all these messages to confirm that they were on item 70, and they were.
Q And so in your experience -- your training and experience, is what's contained in Government's Exhibit 73 through 82 a true and accurate copy of the contents of Government's Exhibit 70, the actual phone?
A Yes.
MR. WELSH: Your Honor, I would move to admit Government's Exhibits 73 through 82.
THE COURT: It will be admitted.
(Government Exhibits 73, 74, 75, 76, 77, 78, 79, 80, 81, and 82 marked.)
(Government Exhibits 73, 74, 75, 76, 77, 78, 79, 80, 81, and 82 admitted.)
BY MR. WELSH:
Q All right. If we could just display for -- and I'll come back and grab these.
If we could display Government's Exhibit 73. I'm not

going to go through each and every one of these reports with you, but if we could just highlight the header in this part here just to talk about what these columns are.
So can you explain what the party column shows?
A The party is going to be the other half of this conversation, so the other -- the other party that's involved in the conversation with the user of this device.
Q Okay. So this is a message coming from the device going to that number; is that right?
A Yes. So number 1 would be sent from Exhibit 70 to this other phone.
Q Okay. And what about row number 2 when it says "inbox" or "from"?
A That would be a message coming from the other party in this conversation to Exhibit 70.
Q And the phone number referenced here would be the one we looked at on the SIM card, right?
A Well, the phone number that's displayed here is the other party, but the phone number on the SIM card would be the number receiving these messages.
Q Okay. Can you explain the date and time column?
A Yeah. So the time -- the date and time is just going to be the date and time -- for item number 1, it would be the date and time that that was received.
Q Okay.

A Or sent to this other number.
Q Can you explain to the jury what the UTC --
A So UTC is a time standard. It's the equivalent of Greenwich Mean Time. That's where all time zones are based off of UTC. So UTC minus five is the equivalent of Eastern Standard Time.
Q And for all of these exhibits, 73 through 82, how is the timing organized?
A So for these it's going to be from the newest message to the oldest.
Q Okay. And what does the column status mean?
A The status is just whether it was a message that was sent, and it will tell you if the message was read.
Q And is the same going to be true for Government's Exhibits 73 through 82?
A Yes.
MR. WELSH: Now, if I could approach and retrieve Government's Exhibit 90.
BY MR. WELSH:
Q I'm showing you Government's Exhibit 90, and I'm going to show you Government's Exhibit 91.
Can you tell the jury what Government's Exhibit 91 is?
A 91 is an extraction that I received from another agent who had downloaded a phone, and I was provided that from Detective Bailey.

Q What type of software was used in that extraction?
A Cellebrite, the UFED.
MR. WELSH: Your Honor, the Court has filed a certificate under Rule of Evidence 902(14) for the admission of this exhibit as a digitally downloaded device.
At this time, I would seek to admit Government's Exhibit 91.
THE COURT: All right. It will be admitted.
(Government Exhibit 91 marked.)
(Government Exhibit 91 admitted.)
BY MR. WELSH:
Q What did you do with Government's Exhibit 91?
A I didn't do anything with the physical device. I was provided a flash drive by Detective Bailey that had the extractions on it.
Q Well, let me correct you. So Government Exhibit 90 is the actual phone?
A Right.
Q Government Exhibit 91 is the extraction?
A Yes, that's correct.
Q All right. What did you do with the extraction?
A So I used Cellebrite Physical Analyzer to process that extraction to create a UFED reader report to be able to export some text message conversations from that.
Q Okay. And was that created using the reliable means that

you previously talked about?
A Yes.
Q And in your training and experience, is it a true and accurate copy of the contents of that extraction file?
A Yes.
Q And let's show you Government's Exhibit 92.
What is Government's Exhibit 92?
A This is a PDF report from Cellebrite showing the contents of the extraction from item N-4, which is Exhibit 90 that I received. That's the extraction that I received from Detective Bailey.
Q Okay. Who created this report?
A I did.
Q And was it made using the means you just described?
A Yes.
MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 92.
THE COURT: It will be admitted.
(Government Exhibit 92 marked.)
(Government Exhibit 92 admitted.)
MR. WELSH: Okay. If we could show in the middle of Government's Exhibit 92 there is a row titled "user name," if you could show that area.
BY MR. WELSH:
Q Okay. Can you identify the call number that's associated

with Government's Exhibit 92?
A So I see what appears to be a phone number listed as a user name here. I've never seen a phone number as a user name, but further down in that report I believe it's listed as an MSISDN --
Q Okay.
A -- which is more accurate.
Q Well, let's scroll down and go to that.
A Under the MSISDN, there's the 434-849-4230.
Q Okay. So this MSISDN number, that's that unique identifier?
A Yes, that's the phone number.
Q Okay. And so this is the phone number that's being used by --
A Correct.
Q Okay. So have you previously reviewed Government's Exhibits 93 through 103? Let me show them to you.
Have you previously taken a look at those exhibits?
A Yes.
Q What are those?
A These are extracted reports from the UFED reader report that I created from Exhibit 91, and they're just -- they're reports of text message conversations.
Q Are those individual conversations and broken out in that way?

A Yes.
Q And so where does that information come from?
A It's coming from the extraction that we have that's in the -- item 92, I believe it was.
Q Okay. And is that the same information in the full report, but just reformatted?
A Yes.
MR. WELSH: Your Honor, I would seek to admit Government's Exhibits 93 through 103.
THE COURT: Be admitted.
(Government Exhibits 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, and 103 marked.)
(Government Exhibits 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, and 103 admitted.)
BY MR. WELSH:
Q If we could pull up Government's Exhibit 102, and just pull up maybe the first two rows there.
Again, like we did with the other exhibits, I don't want to run through every conversation, but can you explain what these different columns mean?
A Sure. For message 1 the "from" is going to be who the message is coming from. In this case it's not populated, so it's going to indicate it's coming from the device we extracted it from. So that would be item 90. The "to" is who that message is going to. The time stamp is going to be the date

and time that it was sent or received; again, the UTC time. Again, the time you see there is the actual time, but UTC minus 4, again, it's Eastern Time, but in this case it's going to be Eastern Daylight Time.
Q Okay. And how is that name -- the name there in the "to" column is Kenny, right?
A Yes.
Q And how is that populated into the report?
A So it's going to be pulling that information from any contacts that are saved in the phone.
Q Okay. So that's how it's saved in the phone?
A Yes.
Q And just to be really clear, because -- so when this is blank, that means it's coming from the phone and going to, in this case, Kenny?
A Yes.
Q And then on row number 2, it's coming from Kenny and going to --
A This device.
Q -- this device?
Okay. And that's also reflected under content. It states direction outgoing that would confirm that, correct?
A Correct.
Q Okay. Is the same going to be true for the other individual conversation exhibits that you admitted?

A It is.

MR. WELSH: Your Honor, I have no further questions for Detective Goodell.

THE COURT: All right.

MR. ANDERSON: I think I just have one area of questions, if I may.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q So the SIM card that you made reference to?

A Yes.

Q The phone extraction that was done from that device was done on June the 7th of '19?

A Yes.

Q But you also got the SIM card from that device and did an extraction of the SIM card in addition to the original extraction?

A Correct.

Q And that SIM card extraction was done on March the 9th of 2022?

A Correct.

MR. ANDERSON: Thank you, sir. That's all.

MR. WELSH: No further questions, Your Honor.

May this witness be excused?

THE COURT: He may. Thank you.

MR. WELSH: Your Honor, the government would call

Detective Candice Ball.

CANDICE BALL, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon.
A Good afternoon.
Q Could you please state and spell your name for the record?
A My name is Candice Ball, C-A-N-D-I-C-E, Ball is B-A-L-L.
Q And how are you employed?
A I'm with the Lynchburg Police Department.
Q And what's your position at the Lynchburg Police Department?
A I am a detective within the forensics unit.
Q What do your duties include as a detective in the forensics unit?
A I'm responsible for examining any electronic devices that come into the police department, whether it be a cell phone or computer, and extracting the data from those devices for investigation.
Q How many devices have you been involved in examining?
A Approximately 500 devices that are cell phones.
Q And you may have already said this. How long have you been in the forensics unit?
A I have been in the forensics unit approximately eight years.

Q Have you received training on the extraction of cell phones?
A Yes.
Q What kind of training have you received?
A I have attended numerous trainings through the National White Collar Crime Center. Some of those include basic and intermediate data recovery and acquisition, Apple iDevice Forensics. In addition to those, I've attended the Cellebrite Physical Certified Operator and the Cellebrite Certified Physical Analyst training. I've attended Magnet Axiom's forensics training. I've attended IOS fundamentals training through Digital Shield, as well as BlackLight tool training.
Q Can you explain Axiom and what kind of training you received in that program?
A Yes. Axiom is a tool we use to examine cell phones and computers. I attended approximately a 40-hour course. And they show you how to use the tool, how to connect devices to it and obtain extractions, which provides us the data that is contained on those devices.
Q And can you describe what kind of experience you received specific to iPhones?
A Yes. I have attended two of the trainings that I noted before, which is the iDevice Fundamentals through Digital Shield. And that was approximately a 40-hour class that I attended that's specific to iDevices, whether it be iPhones,

tablets that are Apple devices; in addition to the white collar crimes training, which is the IOS forensics training; in addition to just dumping numerous iPhones specifically in the 500, approximately, count that I provided.
Q Have you received any certifications in the area of cell phone extractions?
A Yes. I have -- I currently have a certification with Cellebrite for their Cellebrite Certified Operator and Cellebrite Certified Physical Analyst to use that tool. And I also have a Certified BlackLight Examiner certification as well.
Q What was required to obtain that Cellebrite certification?
A The Cellebrite is a two-part class, approximately 40 hours for that, week-long. And you are required to update that certification every two years. I think it's approximately a five-hour course where you have to go in and complete some forensics that they provide you and answer questions on that.
Q Have you ever been qualified to testify as an expert before?
A No.
Q Have you ever been disqualified from testifying as an expert?
A No.
MR. WELSH: Your Honor, I would seek to admit this witness as an expert in the area of digital forensic

examination of cell phones, and have her testify as an expert.

THE COURT: Yes.

MR. ANDERSON: For her first time, we have no objection. Congratulations.

THE COURT: Go ahead. She is so qualified and may so testify.

MR. WELSH: Thank you, Your Honor.

BY MR. WELSH:

Q Can you describe what program you used in relation to this case?

A Yes. I used Magnet Axiom.

Q And what type of software is that?

A It's a software that we obtain a license for. It is held on my computer or a laptop that I'm using and it's stored on there. And I basically use that and direct it to the device that I want to examine and pull the data from.

Q And can you describe what you would do generally with the phone using the Axiom program?

A Yes. Generally I first ensure that the phone is not connected to any WiFi or cell network. So I check to ensure airplane mode is enabled. That's just to ensure that nobody makes any changes to the phone, does anything to remote wipe that device or alter the data.

I then direct the tool to the device of interest that I'm looking at, and it's either connected to my laptop or a desktop

computer that I have for forensics. I direct it to that device, and then I advise it what information I want to pull from that device specifically.

Q Okay. And do you do next?

A I then start the process. It will run itself and pull all the data that's currently stored on that device. Once it does that, it will generate a report that I'm able to review. It places it into nice categories so it's more -- easier to look at just for the visible eye. So it sections it into categories based on the data that's on the phone, whether it be a category for photographs, text messages, emails, anything like that.

Q Okay. And in your training and experience, is this imaging software from Axiom reliable?

A Yes.

Q And does it create an accurate and reliable extraction of the digital device you're examining?

A Yes.

Q And is it possible for Axiom to add data to the underlying device or the report it creates?

A No. It does not add any information to the user data that is stored on the phone.

Q And is this a process that you regularly rely on?

A Yes.

MR. WELSH: So if I could approach and retrieve Government's Exhibit 83.

BY MR. WELSH:
Q I'm showing you what's already been admitted as Government's Exhibit 83.
Do you recognize this?
A I do.
Q What is it?
A This is a cell phone device that I examined which was labeled as N-2. That was an iPhone device.
Q And what did you do when you received this device?
A This device specifically, I photographed it to document what the device looked like when I received it. I also ensured that it was in airplane mode to make sure no alterations were made to that device or the data that was on it.
I then connected device to my MacBook Pro forensic workstation. And utilizing Magnet Axiom, I directed it to obtain an extraction of the contents of that iPhone. Once that was completed, it generated a report for me. I was able to then generate a secondary report that I was able to provide to Detective Bailey for them to review to examine the information that was on the phone.
Q Okay. Let me show you Government's Exhibit 85.
Have you previously reviewed Government's Exhibit 85?
A Yes, I have.
Q And what is it?
A This is a report that I generated. It's a PDF document

that contains all the information that I extracted from this device.

Q And was that created using the reliable means you previously described with Axiom?

A Yes.

Q In your training and experience, is it a true and accurate copy of the contents of Government's Exhibit 83?

A Yes, it is.

MR. WELSH: Your Honor, I would move to admit Government's Exhibit 85 into evidence.

THE COURT: We'll admit that.

MR. WELSH: Thank you, Your Honor.

(Government Exhibit 85 marked.)

(Government Exhibit 85 admitted.)

BY MR. WELSH:

Q Now, within this report are you able to identify the phone number that's used by this phone?

A Yes.

Q And is it fair to say that this is a very large report?

A It is.

Q If we could go to page 2,556, which may be a challenge. Here we go. And if we could pull up record 148 and blow that up.

So what does this information within this report show?

A This report shows the SIM card activity, which is a small

chip that is placed into cell phones which allows you to connect to a cell phone provider, whether it be something like Sprint or Verizon. And that will house the information about the telephone number that is associated with the phone that it's currently installed into.
Q So where it says "identifier" here, is that the phone number that's associated with this phone?
A That's correct.
Q Have you searched this report for other possible SIM card activity?
A Yes.
Q And did it indicate that there was any other SIM card or any other number used or anything?
A No, it did not. It was just this telephone number.
Q So this was the number that was used by that phone?
A Correct.
Q All right. Now, I'm going to show you Government's Exhibits 86, 87, 88, and 89.
Have you previously reviewed those documents?
A Yes, I have.
Q What are they?
A These are PDF documents that I generated from that original report that I had specific to telephone numbers that were of interest for this investigation.
Q Where does that information come from?

A This is stored on the phone in the chat or conversation section of the phone.
Q Is it fair to say that it's the same information in that very large report, but reformatted?
A That's correct.
Q And in your training and experience, do they -- are each of these reports a true and accurate copy of the contents of that phone?
A Yes.
MR. WELSH: Your Honor, I would move to admit Government's Exhibits 86 through 89.
THE COURT: They will be admitted.
(Government Exhibits 86, 87, 88, and 89 marked.)
(Government Exhibits 86, 87, 88, and 89 admitted.)
BY MR. WELSH:
Q So if we could bring up Government's Exhibit 86.
And again, I'm not going to ask you about all of these, but if you could explain some of the details here. What is this -- at the top of the document it says "display name" and then a number is listed.
Can you explain what that means?
A Yes. The number that you see next to display names, there is a contact, which was provided or entered into the phone as a telephone contact, and it then was associated with a telephone number that you see there, which is the 1-434-426-7069. So

that is a contact that somebody saved in this phone.
Q So this says Blacc Rock. That's how that number is saved in the phone?
A That's correct.
Q And then who is communicating -- where it lower says, "local user," what does that mean?
A With Magnet Axiom it identifies the telephone number and the telephone number that is stored on the phone as a local user. So that is the person that is communicating from that phone with the other person.
So for here you see there are two participants in this conversation. One of them is Blacc Rock with that telephone number. The other person is the local user, which is the telephone number that we were looking at before.
Q Okay. And then if you can just explain the difference between the gray and the blue here in this conversation?
A Yeah. So this report was generated in a conversation view. The gray on the left is the messages that were sent from Blacc Rock, and the messages on the right are the messages that were sent from the local user, which is the telephone itself.
Q And can you explain the time zone and how times are listed in these reports?
A Yes. The time zone for this device is showing UTC, which is Coordinated Universal Time. This is a time that is used around the world ensure that exact precise times are set on

clocks. And so this is just a time zone that most forensic tools use because it's able to be precise when it's calculating the time zones.

So for this you see that it's in UTC. And you can adjust that based on what area you're looking for, whether it's minus five, four, depending on the time zone you're looking for.

Q Okay. So just to be really clear, the times that are listed here would not be Eastern Standard Time?

A Correct. You'd have to subtract from that.

Q Okay. And is that going to be the same, all those details about these types of reports, the same for Government's Exhibits 86 through 89?

A Yes, that's correct.

MR. WELSH: No further questions, Your Honor.

THE COURT: All right.

MR. ANDERSON: No questions. Thank you.

THE COURT: Thank you. You may step down.

MR. WELSH: And Your Honor, may this witness be excused?

THE COURT: Yes.

MR. WELSH: Thank you.

Your Honor, the government's next witness is Kenneth Adgerson. He is an in-custody witness, if we could have the Marshal service assist.

KENNETH ADGERSON, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon, Mr. Adgerson. You can pull down your mask while you're testifying, if you could just pull it completely. Thank you.

Could you please state and spell your name for the record?

A Kenneth Adgerson, K-E-N-N-E-T-H, A-D-G-E-R-S-O-N.

Q And how old are you?

A 38.

Q Where are you originally from?

A Baltimore, Maryland.

Q At some point did you move to Lynchburg, Virginia?

A Yes.

Q And how long were you living in Lynchburg, Virginia?

A Since 1996.

Q Where are you currently residing?

A Here.

Q Where is here?

A Blue Ridge.

Q Okay. Well, let me ask you --

A Or Lynchburg.

Q Well, where did you sleep last night?

A Jail.

Q Okay. At the Lynchburg Adult Detention Center?

A Yes.

Q And I'll just ask if you could kind of speak up a little bit and try to get as close to the microphone as possible.
Are you currently facing charges?
A Yes.
Q And what's the status of your case?
A I pled guilty to conspiracy and possession of a firearm in furtherance of drug trafficking.
Q All right. I'm going to show you Government's Exhibit 143.
MR. ANDERSON: Your Honor, while the government is looking for that next exhibit, may we have a cautionary with respect to his plea of guilty not being considered as evidence of guilt as to Mr. Horsley, please?
THE COURT: Members of the jury, the fact that this witness may have pled guilty is not evidence that the defendant is guilty. The fact that he pled guilty to a conspiracy, I guess naming the defendant also, is not evidence that the defendant is guilty. The evidence has to come from the witnesses to prove that fact.
MR. WELSH: Thank you, Your Honor.
BY MR. WELSH:
Q Now, I'm going to show you a hard copy.
Do you recognize that?
A Yes.
Q And what is that document?

A My plea bargain.
Q And if you can look at the last page there, is that your signature?
A Yes.
Q And on all the pages contained in there, are those your initials that you initialed on it?
A Yes.
MR. ANDERSON: Your Honor, I'd move to admit Government's Exhibit 143.
THE COURT: It will be admitted.
(Government Exhibit 143 marked.)
(Government Exhibit 143 admitted.)
BY MR. WELSH:
Q Now, I just want to go over what you pled guilty to.
What was -- this states you pled guilty -- what does it state that you pled guilty to?
A Count One and Ten.
Q Okay. And what's Count One?
A Conspiring and distributing -- possess with intent to distribute methamphetamine, cocaine, heroin, cocaine base; more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance in violation of Title 21, United States Code, Section 841 --
Q Actually, Mr. Adgerson, I don't need you to read the whole

thing. We've got it up here. I'll just leave it at that.
Can we pull up Count Ten.
What's Count Ten just generally that you pled guilty to?
A Possession of a firearm in furtherance of drug trafficking.
Q If I could refer you to page number 4 of this document. If we could highlight the provision that says "substantial assistance."
What is this provision?
A It says even if I cooperate that the United States has no obligation for a motion for a reduction of my sentence.
Q So why are you here testifying today?
A Just clearing my conscience.
Q Well, do you hope to receive some kind of benefit?
A If it's possible, but it really wasn't a major factor.
Q What do you need to do to receive some type of benefit?
A Tell the truth.
Q What would happen if you lied?
A Just whatever I say didn't mean anything.
Q Who determines if you receive that benefit of substantial assistance?
A I guess the judge or you.
Q Well, which -- what's your understanding of who determines how much benefit you receive?
A I think you make a recommendation, but the judge got the

final say-so.
Q And who determines what kind of sentence you get?
A The judge.
Q And you said you want to clear your conscience.
What do you mean by that?
A It's kind of hard to explain, but you know in the end when you think -- when you think things are going one way, and at the same time it's something completely different, when you're tired of the over and over, just walking away from it. You know, this is my walking away from it.
Q All right. I'm going to show you Government's Exhibit 144. I'll show you a hard copy you have in front of you.
Is this the statement of facts you signed as part of your plea agreement?
A Yes.
Q And can you go to, I think it's the second-to-last page.
Is that your signature there?
A Yes.
Q Is that the signature of your attorney?
A Yes.
Q And did you agree that the facts contained in here are true and accurate?
A Yes.
MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 144 into evidence.

THE COURT: All right.

MR. ANDERSON: Your Honor, the only thing I would say is that as it relates -- the facts are true and accurate as it relates to him. It's not evidence against Mr. Horsley.

THE COURT: Well, the fact that he is pleading guilty -- he may testify about his relationship, and that is evidence that the jury may give such weight as it wishes to or thinks is proper.

Go ahead.

(Government Exhibit 144 marked.)

(Government Exhibit 144 admitted.)

BY MR. WELSH:

Q Let me characterize that in another way.

Are the statements contained in here statements that you are purporting to be true and accurate?

A Yes.

Q Okay.

THE CLERK: Just for clarification, was that admitted, Judge?

BY MR. ANDERSON:

Q Okay. Now, do you know Quentin Horsley?

A Yes.

Q How long have you known him?

A For a while.

Q How long is a while?

A I'd have to go back to I tried out for the Y.
Q What were you trying out for at the Y?
A Football for the Y years ago.
Q And, you know --
A 11s and 12s.
Q So you were -- since the time you were 11 and 12 years old?
A Yeah. But other than that, as a person...
Q And do you see him in the courtroom today?
A Yes.
Q Can you point him out by something he's wearing?
A A vest and a tie.
Q All right. Now, you pled guilty to drug trafficking.
When did you begin selling cocaine?
A 2008.
Q Okay. And what were you selling at that point?
How did you get involved in that?
A I came out of the penitentiary and I couldn't find a job. It was kind of like a last resort.
Q And back at that time, how were you getting cocaine?
Who were you getting cocaine from?
A Anybody who -- anybody who would sell it. You know, I'd go here. I might try to go out of town and just get small amounts.
Q Were you selling cocaine weekly at that point? Daily?

What frequency?
A I would say I guess daily.
Q And how long did that continue?
A Off and on until I got arrested.
Q All right. Well, that covers a lot of time, I guess.
During that time were you -- that initial time, were you working at all?
Did you have a job?
A Probably down the line, I got a job.
Q When was that?
A On and off, probably about 2014.
Q Okay. And around that time when you had a job, were you still selling cocaine?
A On and off.
Q And at that time were you selling any other drugs?
A No.
Oh, marijuana. Yes, marijuana.
Q Okay. And back at that time in 2014, who were you selling cocaine and marijuana to?
A Anybody who had money. It wasn't a specific thing. Just where I was at. You walk up. If you needed it, I had it.
Q Did you have a set list of customers?
A I mean, there was I guess like frequent people, just the usual people in the neighborhood that I was staying in.
Q How were you getting around at that time?

A When?
Q Back in 2014, you were selling cocaine.
How would you get to different deals and to different places?
A Cabs or drive myself. And then down the line I met Roberta Haskins, and she was driving me around, about 2016.
Q In 2016, Roberta started driving you around?
A Around about that time.
Q And what was that setup?
Why was she driving you around?
A I didn't have a driver's license and she was bored. So she used to give me a ride around to take care of certain things. And then it became her taking me around to make drug transactions.
Q So you were paying her?
A Yes.
Q About how much at that time in 2016 were you paying her to drive you around?
A Maybe $35, $40 a day, plus gas and food.
Q What was your relationship to her?
A We were just friends.
Q Was it anything more than friends?
A No. We were just friends.
Q Anything romantic about your relationship?
A No. We were just friends. I had a girlfriend. She used

to give her rides, too, to take her back and forth to work.
Q Who was your girlfriend at that time?
A My son's mother, Tiesha Austin.
Q At some point did you get back in contact with Quentin Horsley?
A Yes.
Q When was that?
A Somewhere around about that same time. It was kind of like a by-chance thing.
Q Okay. Well, describe that meeting.
A We ended up at the same -- we ended up at the same place. You know, we was into the same business. And it was kind of like, hey, I can give it to you for cheaper than what you're buying it from anybody else.
Q So where did this conversation take place?
A This place called a shop.
Q Is that here in Lynchburg?
A Yeah.
Q And who was there when you came by and said that?
A It was me, Roberta, I think one more guy, one more -- Antoine Haskins.
Q Okay. I'm trying to figure out when exactly it was.
Do you remember the weather when that initial conversation occurred?
A I had a jacket on. I can't quite pinpoint exactly. It

was cool because we had jackets on.
Q Okay. And do you remember what Quentin Horsley was driving?
A Yeah, a truck with Alaska plates.
Q So what exactly did Quentin Horsley say?
A Just pretty much that, whatever you want to buy, I can give you. I can get it to you cheaper than what anybody else can give it to you for.
Q What was he referring to?
A Cocaine.
Q So what happened after that initial meeting?
A I tried it out. I wanted to see if -- see if what he said was true and if he weren't just talking.
Q What do you mean that you tried it out?
A I made a purchase.
Q How much was that first purchase?
A Two zips.
Q So what's a zip?
A An ounce.
Q And how much did you purchase -- purchase that for, if you remember?
A It was like 1,200 apiece, 2,400.
Q And did you buy it outright?
A Yeah. I bought two and he gave me two.
Q So let's explain that.

What do you mean, you bought two and he gave you two?
A I paid for two and he fronted me two.
Q Can you explain what fronting is?
A Consignment, I guess that's a better word for it.
Q Okay. So did you have to pay him back later for the other two he gave you?
A Yes.
Q And how did you pay him for the other two that you did buy?
A Cash.
Q How did you get in contact with Quentin Horsley to facilitate that?
A I called him.
Q How did you get his number?
A He gave it to me while we were having the conversation.
Q Where did you meet with him to pick up those four ounces of cocaine?
A I can't remember the exact spot.
Q Okay. So then what -- after you received those four ounces of cocaine, what did you do with them?
A I sold them.
Well, I broke them down. I cut them and I sold them.
Q All right. Can you explain breaking down or cutting?
A I added something to it to extend the amount, and I sold it in small quantities.

Q What did you add to it?
A Miralax.
Q And what ratio did you add into the cocaine you had?
A One for one. So for every ounce, an ounce of Miralax.
Q So you basically took four ounces and turned it into eight ounces?
A Yes.
Q And then what did you do with that eight ounces?
A I sold them in small quantities.
Q What kind of quantities?
A Half a gram, gram, 16ths, eightballs.
Q What were you -- how much were you charging for those amounts?
A $25 for a half a gram, $50 for a gram, $60 for a 16th.
Q Who were you selling to?
A Everybody, pretty much, because the price went down, so everybody who pretty much used cocaine.
Q Any specific people you remember back at that time?
A Three years -- it's been, what, three years?
Q Did anybody complain about the cocaine you sold them?
A No.
Q Did they compliment the cocaine you sold them?
A Yeah. A lot of people said it was fire.
Q What does fire mean?
A It's good. I guess it's good.

Q Do you yourself use cocaine?
A Yes.
Q Are you a regular user of cocaine?
A Daily.
Q Were you using that cocaine that you bought back then?
A Yes.
Q And did you try it out?
A Yes.
Q And what did you think of the quality that you got back then?
A Yeah, it was some of the best that I ever had.
Q So what did you do after selling the four ounces you turned into eight ounces?
A When I made his money, I paid him.
Q Do you remember where you went to go pay him back?
A The exact location to that, no, I don't remember.
Q Okay. What did you do next?
A I continued the business relationship.
Q All right. So how often were you contacting Quentin Horsley?
A I was texting him weekly, pretty much.
Q And texting him for what purpose? What were you texting him about?
A For -- to re-up.
Q What does to re-up mean?

A To get more drugs.
Q And what quantities were you buying from them?
A It started going up, two, four. It raised up to a lot.
Q Okay. Well, let's start out with how long were you getting two ounces from him?
A I got two ounces a couple of times. Then I got four ounces a couple of times.
Q How frequently is this?
Is this daily, weekly, monthly?
A It's like weekly.
Q Okay. So when you started getting four ounces from him, how long did that continue?
A It continued -- I mean, it just -- it went up every time, but the business relationship continued all the way until the morning that we got locked up.
Q And as a user of cocaine, what's a user amount of cocaine that you personally would use on a single occasion?
A Well, it really depends on what's going on.
Q Okay.
A Hey, I'm just trying to hang out and have fun, it could be an eightball to maybe a quarter. And it could be I'm stressed out and mad at the world, it could be up to a half ounce.
Q Okay. And do you know how many grams are in an ounce?
A Yes.
Q How many?

A 28.
Q Is there a reason you know that fact?
A Yeah. I mean, we learned it in school, but that's how it's weighed out in ounces.
Q So during this time frame when you're moving from two to four ounces, where were you meeting with the defendant?
A We'd meet in different places.
Q Where are some of those locations?
A We met at a gas station in Timberlake. We met at a gas station on Langhorne Road. We met on a side street over by the park. Just different locations.
Q And where would you bring cash to him to pay for that at that time?
A In traffic if I called him and said, hey, I got the money for you, we'd pay each other -- not pay each other, but I'd pay him in traffic. He might say, Hey, I'm in Rivermont. I'll meet you at the store; or hey, I'm over here by the Plaza; or he might just pull up in front of my house.
Q During that time as things were progressing, what did the defendant say about the cocaine trafficking?
Did he ever talk to you about how much you were receiving, or did he ever talk about plans or anything else?
A Just to get bigger. The bigger you get, the bigger I can get.
Q How much were you purchasing -- when you're going from two

to four ounces, how much were you purchasing ounces for?
A 1,200 apiece, and it went up to 1,300 and then 1,400 all the way through.
Q And how much do you think you were making in terms of profit off of each of those ounces?
A It all depends.
Q Okay.
A It all depends. I might see maybe a thousand dollars profit off of each ounce. That's after I cut it.
Q So during this time, were you working? Did you have a legitimate job?
A No, not no more.
Q Okay. So let's talk about how that progressed, talk about how you went from two to four ounces.
What happened after that?
A After a while -- I think it was like right around by Christmas, and just -- things just went up to the big leagues, it seemed like. And I think that's when I got the -- I got the first brick.
Q Okay. So Christmas of what year?
A Was it '16 -- '16, '17. Sorry about the times. Just -- you know, I've been locked up since '19. I think it was about 2016, right around 2016.
Q Okay. Is it possible that it was later than that?
MR. ANDERSON: I'm going to object to leading, Your

Honor. He asked about possible. He's asked and answered the question.

MR. WELSH: I'll withdraw the question, Your Honor.

BY MR. WELSH:

Q All right. Describe that. You said that you received a brick.

What do you mean by a brick?

A A kilo of cocaine.

Q And what's a kilo, or what's that a term for?

A A brick.

Q Okay.

A A kilo of cocaine.

Q Do you remember when you received -- or the circumstances of receiving that first kilo of cocaine?

A I called him. I was like, What's going on? He's like, I gotcha. I'm about to pull up. I remember because it was kind of like it was snowy outside. He pulled up. So I'm standing outside on the sidewalk. I'm like, I don't see you nowhere. He's like, Sitting right here in the truck. I'm like, What truck? It had a big red Christmas bow on it. I got in the car and got the first one. Then kind of from there, it's just like the business relationship was what it was. Just took care of business.

Q How much did you purchase that kilo of cocaine for?

A I didn't. He gave it to me on the front.

Q And what did you do with the kilo of cocaine?
A I broke it down and cut it and sold it.
Q How much did you end up paying him back for it?
A It was like almost right around 40, but I was short. I think I was short like six or seven thousand.
Q Okay. So you said 40. Do you mean 40,000?
A Right around 40,000, but I was short like -- that's how much I owed, but I was short like five or six thousand.
Q How long did it take you to sell it?
A Like two weeks. I think two weeks, maybe two and-a-half weeks.
Q All right. So after getting that first kilogram, what happened after that?
A Just -- that's what it became. And then one day he texted me -- he texted me about -- no, he called me. Asked me where I was at. And he was going through a situation, and he thought that the police was after him.
Q Okay. So describe that meeting. How long is that after the time you received your first kilogram?
A It was maybe a couple of months. Maybe six, seven months later.
Q Okay.
A Maybe eight. So this might be like in 2017 going into '18 into the summertime because I had moved. I had moved into my new house in 2018.

Q Okay.
A So that's when the conversation happened, in 2018.
Q Where is your new house?
A I lived on Euclid Avenue.
Q Okay. So describe this conversation that takes place at your house between you and Horsley?
A He pulled up with a piece of paper and he said that he think the police after him. He think that somebody put the police on him about his cars.
And I was like, Well, if you feel like the police is after you for your cars, then you need to just fall back. And, you know, I can try to handle business for you while you stay out of the way.
Q What do you mean by fall back?
A Get out of -- get out -- get out of the public eye for a while.
Q Why was he coming to you and telling you about this?
A We had -- we had a business relationship. We conversate. So I guess he felt that he could talk to me about it, because I guess he didn't really deal with too many people.
Q What were the documents that he showed you?
A It was like -- it looked like a bank paper. It just had a list of cars and the names next to the cars of who supposedly owned the cars.
Q So in between this time when you got your first kilogram

and this meeting, were you still receiving cocaine from the defendant?
A Yes.
Q All right. How frequently and in what quantities after that first kilogram?
A It was the same thing. After that meeting it became more, because he kind of like was stepping out of the way.
Q Okay. So after that meeting, what took place?
A After that meeting, I came back. He gave me a bag. It was like a duffle bag. It had a lot of work in it. And he was like, I'm going to chill for a while. If somebody call me, I'll call you.
Q Okay. So a couple of things. When did he give you that bag?
Was that at that meeting?
A I think later on that day.
Q Okay.
A Because he left and came back.
Q And where did he deliver that to you?
A To Euclid Avenue.
Q And you said -- you described it as work. What do you mean by work?
A It was a bag of cocaine.
Q Is work another name for that?
A Yeah, it's a street term.

Q And what did you mean when you say that he said he just needed to chill?
A What did you say?
Q What did you -- what did you mean? You said that -- sorry. If you can describe what he said about falling back and chilling?
A Oh, falling back is staying out of the way, not running around making no plays or really being seen too much doing anything illegal.
Q So what happened after he dropped off that bag with you?
A It's kind of like I became -- what's the word for it? If it's almost like I became his flunkie. I just did what he asked me to do.
Q Okay. What was he asking you to do?
A If somebody called him that he really don't want to deal with, he'd tell them to call my phone.
Q Okay. And then what would you do when that happened?
A I'd complete the drug transaction.
Q So he gave you that bag to hold onto. Did that activity continue?
A Yeah, no, we -- well, with that then we -- like, going to re-up. We'd go to re-up.
Q Who were some of the people that he was referring to you?
A Some of the people?
Q Yeah.

A Well, a guy named Jaimz.
Q Do you know Jaimz's last name?
A I think it was Bowman.
Q Okay. Why did he send Jaimz Bowman to you?
A I don't know, because I'm pretty sure that he could have took care of business with him, but apparently he -- he sent him to me instead of making the sale hisself.
Q Okay. And where did you meet with Jaimz?
A I met him at my house once. I met him at Five Star Market. I met him at Kroger's. I met him at Fridays. I met him at downtown on Commerce Street. There's one other place. I think I met him at Five Star twice.
Q Okay. Who else did Quentin Horsley refer you to, to sell drugs?
A I think a dude named Jamie, if I ain't mistaken.
Q Okay. What did you sell to Jamie, or what did you provide to Jamie?
A Some ice.
Q What's ice?
A Methamphetamine.
Q So how did you get ahold of ice?
A He had purchased it in a re-up.
Q Okay.
A We had a text conversation about it. And he was telling me, you know, he -- he can get it -- he can get the ice and a

few other different type of drugs.

I was like, you know, I don't really -- I don't really know about ice. That ain't my lane, you know.

Well, what do you know about it?

I was like, you know, I can scout it out and kind of like figure -- see who got it -- I mean, see who's looking for it. It just so happened that I guess that was a person that he dealt with.

Q Did Horsley ever talk about where he was getting -- during this time frame, where he was getting drugs from?

A He said -- as of people or places?

Q Either.

A He said -- one time when we was texting he said something about amigos, but everybody uses that term for where you get cocaine from. Everybody say you get it from amigos. It could be black, white; or they say, we can get it straight out of Texas for the cheap.

Q Okay. Did he ever talk about other locations he got cocaine from, or drugs?

A No. I think we tried to get some drugs one time from -- from Atlanta, but it ended up being a dry run.

Q All right. Describe that. Do you remember when that happened?

A I can't think of the exact -- of the exact time. This was like before the first brick, and we went down there. We went

down there for drugs and ended up going shopping. It was like a lot of weird chain of events. I guess the people -- the people we went down there to see, I think they had ill intentions. So we ended up -- we ended up just coming back. In the process, people was following us. They almost ran them off the road. We came back.
Q So describe "we." You said, We went down.
Who went to Atlanta?
A It was me, him, and the other guys in the car. I don't know none of them. They was weird. They was his people that he knew.
Q What did Horsley tell you the purpose of the trip was?
A We was going to go get some work.
Q And by that you mean drugs?
A Yes.
Q And were you going to go pay for drugs?
A Yeah, we were going to purchase drugs.
Q During that trip, did you or Quentin Horsley bring money down?
A Well, yeah, he brung money. We split it up in the car so it wouldn't be a whole lot of money just one person holding it.
Q How much money?
A You're never supposed to count somebody else's money.
Q Did you see it?
A Yeah, I held some of it.

Q What did it look like?
A Probably a couple thousand -- probably about maybe 40 -- 30 or 40,000.
Q During that trip, did you return with any drugs?
A No. We ended up going shopping.
Q What happened after coming back?
A When we came back he said that -- he said, Don't worry about it. I'm going to figure something else out. And then he left.
Q Where did he go?
A I think he went to Hawaii. Then he called me from Hawaii and said, Hey, I got somebody coming. I need you to pick something up for me.
Q Where did he tell you to go?
A To a hotel. I went to a hotel and met a person. It was like a weird -- a weird drug transaction. I was on the phone. They was on the phone. You know, we're looking at the drugs. They're looking at the money. You know, he was out of town. So I got the work and I went back home.
Q Where was the hotel?
A On Wards Road.
Q Do you remember which hotel it was?
A I think it was called -- is it the Best Western? It's right behind Exxon.
Q Okay. But here in Lynchburg?

A Yes.
Q Okay. So where did Horsley tell you -- what did he tell you to bring to that hotel?
A He told me to bring the money from the trip.
Q Where did you acquire that money?
A Before he left, he gave it to me.
Q So you were holding onto --
A Yes.
Q -- some money?
A Yes.
Q And then who did you meet with at the hotel?
A It was kind of like a Spanish-looking guy.
Q Did you talk to him at all?
A Not really. It was more like I knocked on the door. He knew I was coming. I was talking to him, telling him I see the work and it looked good. You know, it smelled good. It looked like it was all there.
Q What was in the bag?
A Money.
Q Well, what was -- what did you exchange the money for?
A Cocaine.
Q How much cocaine?
A It was like -- it was about like -- I think probably like a key, if I'm not mistaken. It might have been a little bit more the first time. You know, the packaging be different

sometimes. Sometimes it's one. Sometimes it's two in one package.

Q What did you do with the cocaine that you picked up from the hotel that time?

A I took it home. I was supposed to just hold it until he came back, but he was gone so long I was like, well, you know, I need to make some moves. So I sold the majority of it by the time he came back.

Q How long did that take?

A Not long.

THE COURT: We'll take a recess now for about 20 minutes.

**(Jury out, 3:22 p.m.)**

(Recess)

**(Jury in, 3:48 p.m.)**

THE COURT: All right. You may be seated.

You may proceed.

MR. WELSH: Thank you, Your Honor.

BY MR. WELSH:

Q Mr. Adgerson, when we were last talking, we were talking about the time when you had gone to a hotel and acquired a duffle bag at that time.

Were there other times -- what happened after that first time of going to the hotel?

A Well, after that, just whenever it was time to re-up, we'd

go to a hotel.

I'm trying to get my thoughts together. This is not like something I do every day, so this is all new and it's like -- I know things are choppy.

But just when it was time to go re-up, sometimes -- I'd say half the time he would go. But it's like, you know, he would give me the money and we'd go in and then we'd make the transaction. You know, we'd come back outside. Roberta was driving. She'd drive for me. He had his own car, you know. We'd drive to my house, and from there he'd go on to wherever he needed to go.

It was like that on a few occasions, you know what I'm saying? He gives me the go to go myself. He let me know that, you know, this is where you need to go get it from. Take this there.

Q Okay. Let me ask it maybe in a different way.

After that first time you went to the hotel, when was the next time you remember going to a hotel to pick up drugs?

A It wasn't that much longer when he came back, because me and him went together.

Q Okay. So on that second time, you were with him?

A Yes.

Q And what happened on that second time?

A We went in the room. We both pulled up. He gave me the bag. He gave me a bag of money. We walked in the room. We

made the transaction. There was a few people in there, like a female, a baby, and like two guys. We go in there and we made the transaction and then we left.
Q Did you know those people?
A No.
Q Can you describe those people?
A Like, the girl looked kind of white. The guys looked Spanish.
Q How many times did you go to a hotel to pick up drugs in that way?
A A few times.
Q What do you mean by a few?
A Maybe -- I guess maybe like seven, eight, nine times.
Q Okay. And what did you acquire when you went there on each of those occasions?
A Most of the time it was just -- I just know we was going to get cocaine. Every now and then it might be a little bit of marijuana, and then one time it was just -- it was -- it was a lot of different things. You know, I was asking him, like, I thought I was going to go get this, but this is something different right here.
Q What do you mean by a lot of different things?
A It was different drugs. It was all different drugs. It was drugs we weren't normally selling.
Q Okay. And what did he say when you told him that?

A I told you I could get these things for a certain amount. So we just -- we'll just figure it out from here.
Q When did that first -- when you first noticed that, when did that start to occur?
When did other drugs begin to appear?
A Like '18, like towards the end of '18.
Q Are there any times that stick out of going to the hotel that you remember?
MR. ANDERSON: Judge, I'm going to object to leading. We've been this way. It's just asked and answered.
THE COURT: Well, I don't think that was a leading question. Overruled. Go ahead.
BY MR. WELSH:
Q Are there any times that stick out that you remember going to a hotel to pick up drugs?
A I mean, a couple of different times stuck out, but I'd say the next to the last time stuck out the most.
Q Okay. How come?
A It was -- he called me and was like, I need you to do me a favor. I was like, What's up? He's like, The people here -- I need you -- I need you to grab -- I need you to grab the work for me. I was like, cool, you know. This is nothing new. It's routine, kind of. So I pull up at the hotel. And when I get there, there's a whole lot of drugs. There's like more than what we normally have.

Q When was this?
A I would say this is right before -- right before -- right before '19, like right at the end of '18. '18, getting close to the end. Right before Christmas, because after that we did a lot for Christmas and then went out of town.
Q Can you describe what you picked up on that occasion?
A It was coke, heroin, meth, and I think some weed, if I ain't mistaken.
Q When was the last time that you picked up at a hotel?
A I think right before we got locked up, like in January.
Q What did you pick up on that occasion?
A It was about the same things, but like a bigger -- but like a bigger quantity. Like I said, you really can't kind of determine the amount of the drugs because, like, if you take a stack of Xerox papers, you know, one time it might be one, but you can get the same package that look the same and this time it's two in the package, or one and a half. So you really can't determine until you scale everything up.
Q Where did you take the drugs that you picked up from the hotel?
A First I went to my house and then to Roberta's house.
Q When you say your house, can you --
A Euclid Avenue. First I went to Euclid Avenue. Then I went to Roberta's house.
Q When did you start using Roberta's house?

A Maybe the beginning of '18.
She's a friend. She just needed some help. So, you know, for exchange, you know, she drove me around. In '18, she started holding the drugs.
Q Why did you use her house specifically?
A It was the least place somebody would think about.
Q Why did you move them from your house? Why did you stop using your house?
A The neighbors that I have and the amount, I didn't want -- I didn't want to keep it in my house.
Q Did you ever provide Roberta with drugs?
A Yeah. When we first met, she used to -- she used to snort Percocets.
Q Did she ever use any other kind of drug around you?
A Not around me.
Q Did you ever provide her with cocaine?
A Just if she -- if she said she was taking it to somebody else. But other than that, I never seen her use no other drugs.
Q Okay.
A She smoked weed one time. She'd get paranoid.
Q Do you remember when law enforcement came to your home on February 11th of 2019?
A Yes.
Q Where were you at that time?

A Standing in the kitchen.
Q And were you arrested at that time?
A Yes.
Q What did you have in your house at that time?
A Crack cocaine.
Q How much crack cocaine?
A I think like 100 grams, if I ain't mistaken, maybe a little over.
Q What is crack cocaine? Can you explain what crack cocaine is to the jury?
A It's powder cocaine and baking soda mixed so you can smoke it.
Q How do you make it?
A Hot water, baking soda, and cocaine.
Q And then what do you do with it?
A You smoke it.
Q Okay. Do you just combine those ingredients?
A Yeah, combine them.
Q Okay. How did you -- did you make those -- that amount of crack that was found in your house?
A Yes.
Q Okay. Where did you cook it up?
A In the kitchen in the microwave.
Q Okay. Had you sold crack to other people?
A Yes.

Q How many times?
A I mean, when I was young, that's what I did.
Q Was that pretty routine that you were selling crack and powder cocaine at the same time to different people?
A Yes.
Q Did you ever discuss crack cocaine with Quentin Horsley?
A A few times. We talked about it just what the work could stand. But outside of that, we have like a conversation like, oh, for example, what can you put -- how much do you think we can put on seven grams? I'd say I could put in six on seven -- six grams on seven grams. Conversation like that.
Q Okay. Did he ever provide you with crack cocaine?
A Not with crack cocaine.
Q Okay. Are you aware that law enforcement found cash in your home?
A Yes.
Q Do you know approximately how much that was?
A Like 70,000, I think.
Q Where did that money come from?
A Well, about 60, 64 -- about 64,000 came from drug proceeds. The rest of it came from I started a lawn service business.
Q Where did you keep the money in your house?
A Some of it in the safe. Some of it in my safe, and I think like maybe five or $6,000 in a kitchen drawer.

Q What kind of vehicle -- what kind of vehicles did you have prior to your arrest?
A I had a 750Li BMW. I had an '87 Monte Carlo. I had -- I think it was a '97 Maxima and a '91 Grand Marquis.
Q What did you have in the Monte Carlo?
A I think it was -- it was cocaine and a gun.
Q Okay. Do you know how much cocaine?
A I think it was maybe like 20 ounces, maybe less, something like that.
Q How did you acquire that cocaine?
A Well, I was -- I was talking to Mr. Horsley, and he -- he called me and was like, Hey, grab me a couple of nines, which is nine ounces of cocaine.
I was like, All right. Cool. I was like, I'm at the crib.
He's like, All right. I'll pull up in a few.
So when he pulled up, I was coming out of the house. The police pulled up. He was parked on the wrong side of the street. So he moved his car to the right side of the street. When the police turned, I took the cocaine and put it in the trunk of my car.
And he was like, All right. Just grab you later. I'll just grab it when I come back. It's kind of hot right now.
Q When was that in relation to when you got arrested?
A Within that week of being arrested.

Q What else did -- what else was in the trunk?
You mentioned that there was a firearm in the trunk?
A Yeah.
Q Where did that come from?
A The firearm came from -- I guess somebody called him, one of the guys he deal with --

MR. ANDERSON: I'm going to object to speculation and guessing from the witness.

THE WITNESS: Oh, I'm sorry.

BY MR. WELSH:
Q Yeah, if you can be specific, what did --
A Be specific?
Q What did he tell you?
A He told me to go holler at a person.
Q Who was that person?
A My mind went blank. I'm sorry.
Fonzo.
Q Okay.
A He told me to go --

MR. ANDERSON: I'm going to object to hearsay. He's not an alleged conspirator.

MR. WELSH: Your Honor, I believe the statement was that -- well, I can ask follow-up to be clear. I don't think that is a hearsay statement.

THE COURT: What is -- are you asking who -- someone

said something to him?

MR. WELSH: I can ask a follow-up for clarification, Your Honor.

THE COURT: All right.

BY MR. WELSH:

Q What did Quentin Horsley tell you to do?

A He told me to go see Fonzo and take him a half. He's going to give me something to hold till he can pay it off.

I said, Cool. When I got there, he gave me a gun.

I called him and said, He gave me a gun.

Q When you called somebody?

A I called Quentin and said, He gave me a gun.

He said, Oh, what kind of gun is it?

I said, It look like a chopper. What you want me to do with it?

He said, I'm gonna come get it.

I said, All right, because I don't want it, you know. So we need to figure it out.

He said, Okay.

And I went to my house and I put the gun in the trunk. It was still there.

Q I'm going to show you Government's Exhibit 1, which has previously been admitted into evidence.

Do you recognize this location?

A Yes. It's Roberta's house.

Q Okay. If we could go to Government's Exhibit's 4.

THE COURT: Mr. Welsh and the witness both, I think you all need to speak up. My clerk, who is over in the corner, said he could not hear.

MR. WELSH: My apologies, Your Honor.

THE COURT: So the jury can't hear.

BY MR. WELSH:

Q And what is this a picture of?

A It's a duffle bag.

Q Okay. And are you familiar with that duffle bag?

A From the last drug transaction.

Q Okay. And where did you acquire that duffle bag?

A From the hotel room.

Q And what did you do with it when you acquired it?

A I took it to Roberta's house.

Q And why did you do that?

A Because that's where I kept the drugs at. The thing with the drugs being at her house was, you know, he had asked me one day, like, You be keeping all those drugs at your house while those people -- while those dudes live next door to you?

I said, No. I said, I take the drugs to Robin's house. Because that's what I call Roberta, Robin.

Q I'm sorry, who asked you this?

A Quentin. He asked me did I keep the drugs at the house.

I said, No, I keep them at Robin's house.

And he was like, Oh, all right. Well, where does she live at?

I told him exactly where she lived at. I said, And she knows that if anything -- if anything was to happen to me while I'm out here making moves that she's supposed to call you to come get the bags.

Q When did you have that conversation with Quentin Horsley?

A Right before Christmas. Right before Christmas of '18.

Q Okay. Did you ever see Quentin Horsley distribute narcotics to anyone else?

A Yeah, a few times.

Q Okay. Who did you see him distribute narcotics to?

A Name-wise?

Q Yes.

A I seen him serve a guy named Esco, a guy named Travis, a couple of randoms.

Q Okay. When did you see him sell drugs or provide drugs to Esco?

A A few times in '17. Well, at least '17 and mid '18.

Q Okay. And what was -- do you know what he was providing him with.

A Cocaine. Cocaine and -- I think cocaine and I think toward -- I think in '18 he might have sold some ice, if I ain't mistaken.

Q Okay. What about Travis, do you know what he was selling

to Travis?
A Cocaine.
Q And when did you see him sell cocaine to Travis?
A A few occasions, '17, '18. And then in the early '18s, he stopped dealing with him.
Q Did you ever talk to anyone else who was supplied with drugs by Quentin Horsley about that fact?
A No. You know, everybody claimed that they buy drugs from the same person, but, you know, I actually seen multiple transactions. We were in two different lanes. He was doing what he was doing and I was doing what I was doing. And every now and then those lanes crossed paths where, you know, I could see that -- that I actually seen him --
Q Okay.
A -- outside of him giving it to me, other than that.
Q Okay. I'm going to show you Government's Exhibit 81. It's already been admitted into evidence. I'm going to give you a physical copy, and we're also going to bring it up on the screen.
Now, have you previously seen that -- that document?
A Yeah, these are my text messages.
Q Okay. Who are those text messages between?
A Me and Quentin.
Q Okay. And do you remember those conversations?
A Yeah.

Q Okay. Now I'm going to come take that back from you, and I'm going to bring you Government's Exhibit 102.
Have you previously looked at this set of documents?
A Yes. This is my text messages.
Q Okay. And who is it a conversation between?
A Between me and Quentin.
Q Okay. So I want to walk through some of these messages. I'm going to bring them up on the screen for the jury's reference. I'm going to start out with a message here.
So first of all, do you remember having this conversation with Quentin Horsley?
A Yes.
Q Okay. And here there is -- above the word "Kenny," there is a phone number.
Do you recognize that phone number?
A Yes.
Q And whose phone number is that?
A Mine.
Q And so can you read through -- this first message would be -- can you read through this message?
A I haven't forgot about you, fam. I got you in a few.
Q And so that's a message being sent from this phone. It says "outgoing" above that, right?
A Yeah.
Q And then can you read the message marked number 2?

A Okay. I'm on your time, bruh.
Q Okay. So who says, I'm on your time, bruh?
A I did.
Q Then read message number 3.
A I ain't rushing.
Q And if we could scroll down to see four and five. I'm sorry, if we could scroll back up.
What did you mean when you said, Okay, I'm on your time, bruh?
A I mean, I'm waiting for you. I can't do nothing till you get ready. So I can't rush you.
Q Okay. If we could go down to message 9.
Okay. If you could read message 9. And who is this coming from?
A Is this from me? It's from me.
Q Okay. And if you could read the message for the jury.
A Had went out of town with the fam for five days. I'm running behind.
Q And if you could continue reading on to the next message.
A But I'm on the grizzly. Got eight bands with five joints left.
Q And how did Horsley respond?
A Okay. Cool. You wanna give me the eight?
Q Okay. So what does that mean? What does that series of messages mean?

A I had 8,000 on what I owed him, but I had five ounces left.
Q And what's his response to it? Interpret what that response means.
A Cool, you got eight. You can just bring me the eight right now.
Q When you're talking in numbers like that, what are you talking about?
When it says, "give me the eight," what does that mean?
A Give me the 8,000. You can give me the 8,000.
Q Was that common to just abbreviate 8,000 by just using the number 8?
A Yeah. It was a waste putting a bunch of zeroes if you already know what you're talking about.
Q Do you remember taking cash to -- the $8,000 to Quentin Horsley on this particular occasion?
A Yeah, most likely. If he said he wanted it, then we'd just meet in traffic or wherever.
Q Okay. All right. If we could scroll down to message 16.
All right. So can you read message 16 here?
A I say, Yeah, don't wanna get demoted. I'm trying to get promoted. LOL.
Q What did you mean by that?
A Meaning that I was trying to -- I was trying to go up and not get a smaller amount. I wanted to continue to get a bigger

amount.
Q Was there something that prompted why you said, Yeah, I don't want to get demoted?
A Yeah, I was messing up the money.
Q What do you mean by messing up the money?
A Sometimes you live above the means, and I was trying to -- I was trying to live a little bit above the means, and I was messing up the money.
Q Okay. And so how does he respond after you say that in text message 17?
A He said, You good, bruh.
Q If we could scroll down a little bit.
Then what does he say?
A Try to move it faster, you know.
Q What does that mean?
A Just get rid of it.
Q Okay. And if we go down to you see 19 and 20, how do you respond?
A I am.
Q And then what's his response?
A So we can move more work.
Q And what does work mean?
A More drugs.
Q Okay. And if you would just scroll down so we see 21.
What's your response?

A Yeah, I'm on it 24/7.
Q What did you mean by that?
A I mean, I'm all day, all night, seven days a week.
Q All right. If we could go down to message 36.
What is this message?
A I told him I had $10,200. I was almost finished.
Q Why were you telling him that?
A So I can get -- so I can get some more product.
Q So that was money you were going to pay him?
A Yeah.
Q Okay. If we could scroll down a little more so we can see 37.
And what was his response?
A My nigga.
Q And then if you could scroll down a little more to see 38.
What do you then say?
A All right. Just hit me when you get up so we can keep it moving. I gotta another one for you.
Q Okay. If we could go all the way down to message 90.
Okay. What does message 90 say?
A This wetback just taking his fucking time.
Q Okay. And who sent that message?
A He did.
Q All right. What is he referring to?
A The re-up is taking forever.

Q Okay. What do you mean, the re-up?
A The drugs coming in.
Q And who is he referring to?
A That's just slang for whoever is supposed to be bringing the drugs. Everybody automatically assumed the Mexicans and Colombians bring all the drugs.
Q And then how do you respond to his statement there in text message 91?
A I said, Damn, he dragging his feet.
Q Okay. If we could scroll down the conversation.
And what's his response to that?
A He said, Hell, yeah, fam.
Q What's that, SMH?
A Shaking my head.
Q Okay. And then message 93?
A Any good news yet?
Q If you keep going down, 94.
And what's his response there?
A Will be tonight, my nigga.
Q And then 95?
A Let you know what's what.
Q And then what do you say here in message 96?
A I said, All right. My phone been going ham. You the man out here. You caused a drought.
Q What do you mean when you said, You caused a drought?

A Ain't no drugs on the street.
Q Why was there a drought?
A Because we couldn't re-up.
Q And how does he respond in message 97?
A He said, Go ahead, my nigga, laughing like shit.
Q If you go down to 98, who sent this message in 98?
A I did.
Q Okay. And what did you say?
A I said, You did. We been talking about this since the summertime. Without catman cartel, the whole city will starve.
Q What's "catman cartel"?
A It was a little inside joke about -- about people buying work. The catman came from -- it was a car he was driving one time.
Q Okay.
A Just made it a joke. Called it catman cartel.
Q Who is it a joke between?
A Between -- well, at the time it was between me, him, and Travis.
Q And so how does he respond to your message there in message 99?
A He said, Man, this shit crazy, my nigga.
Q If we go down to 100, your response?
A I said, Hell, yeah, but he will show up. He always do.
Q If we go down to 101, his response?

A He said, Yeah, he coming so I ain't tripping.
Q And 102?
A And it's still early shit. Meet him at like 9 a few times so...
Q And then we see 103 and 104 together. There we go.
And your -- what did you continue saying?
A I said -- I said, Like you say, he dragging his feet.
Q Okay. And what was his response to that?
A Yeah, I'm pressing him though.
Q All right. What did he mean by: Yeah, I'm pressing him though?
A Telling him to hurry up. Just -- not just satisfied with I'm coming. Like, where you at? Like, hurry up.
Q Now, were you in contact with this supplier?
A No.
Q Let's go down to message -- on page 22, message 152.
Now, this message is on -- what date is this message 152 on?
A November 15, 2017.
Q And who sent this message here?
A He did.
Q And what does he say?
A He showed me like seven bricks, bruh. I don't know when he coming.
Q And what's your response?

A Well, at least you know he got it.
Q And if we could scroll down to 154.
And what's his response to that?
A That's what I said.
Q And 155?
A Tell him to stop playing and get up here, LOL -- laughing out loud.
Q 156?
A I'm gonna go to ATL my damn self and find this wetback.
Q And how do you respond to that?
A Let me know. I'm all in.
Q Do you remember this conversation in relation to your trip down to Atlanta?
A No. That's a separate incident.
Q Okay. If we could go to page 26, message 183.
Okay. Who's sending this message 183?
A He is.
Q All right. What does he say?
A Might need you to go with me tonight to pick these keys up.
Q All right. What's your response?
A Let me know. I'm all in.
Q All right. Keep scrolling down.
And then what does he say?
A OTW.

Q And then in message 186?
A For you 12, but I'm gonna have to go up, man. Fuck that.
Q And what does that mean?
What's the reference to 12?
A 1,200 or zip all the way through.
Q Okay. What about message 187 here?
A 1,250 or 13.
Q Okay. What about -- how do you respond to that?
A Are we going in the city or are we hitting the road?
Q All right. If we could go down to 189.
And how did -- then what does he say next?
A LOL. Just across from the airport, fam.
Q And then following that?
A We ain't gotta go nowhere.
Q What is this conversation here that he's talking about?
A Picking the work up.
Q Okay. And if we could go down to 191.
What do you say in message 191?
A You need me to bring the heat or we don't need one?
Q What did you mean by that message?
A A firearm.
Q And how does he respond to that?
A Nah, we good just to drive it back.
Q Okay. What about down in 193?
A Okay.

Q All right. And then 194?
A He trust me to owe him 95,000. So we good, bruh. And this was a couple of times.
Q Okay. So who's sending that message?
A That's him.
Q All right. And how do you respond to that?
A Okay, okay, bet.
Q All right. We go down to 196.
And what does he say next?
A Yeah, you know I haven't called you to hold me down, but a nigga stay flooded. So we good, bruh.
Q What do you mean by that?
A We keep the work.
Q And if you can keep going down to 197?
A Shit, they went and got tacos one time while I was in the room. LOL.
Q What do you mean by that?
A Literally went and got tacos.
Q All right. If you could go down to message 198.
What do you say in response to that, and 199?
A I said, "Yalty."
That might have been a typo.
Q And then 199?
A LOL. Tacos.
Q All right. Keep going down to message 200. Keep going

down a little bit more.

What does he say in message 201?

A They love me, bruh.

Q Keep going down to 202.

What is your response to that?

A Already you know I'm here. Shit, you take care of my fam. You know you got my.

Q What did you mean by that?

A That through the drugs that I'm getting, I take care of my family.

Q You're saying that Quentin Horsley is taking care of your family?

A Through the drugs that I was getting from him, I had the means to take care of my family.

Q If we can go down to 203 and look at 204.

Who's sending this message 204?

A He is.

Q And what does he say?

A I know I have gave them close to a million now. Real talk.

Q And if you could go down to 205 and 206.

And what's your response when he says that?

A Eating.

Q And then what is his response to that?

A If not that, at least 600,000.

Q So what's he saying in that -- those three messages together?
A That he had paid the people almost a million dollars; if not a million dollars, at least 600,000.
And I say "eating" meaning that he had the means to make that amount of money.
Q Okay. And if we could scroll down to page 37 and look at message 259.
Okay. Who's sending this message in 259?
A He is.
Q All right. And what does he tell you?
A When you get a chance, drop that change to me, fam.
Q What does that mean?
A When I get a chance, bring him the money.
Q Okay. And how do you respond in message 260?
A Okay.
Q All right. If we can go down to 261.
What do you say in 261?
A I say, You want me to bring the 10 tonight?
Q And when you say 10, what were you referring to?
A 10,000.
Q All right. And how does he respond to that?
A Or the a.m., which is good for you, bruh.
Q Okay. So we can go down to page 62 and look at message 444.

Okay. What's message -- first of all, can you refer us to the date of message 444?
A 3-19-2018.
Q All right. And who sends this message?
A I did.
Q And what do you say?
A Not trying to move slow this time. Was trying to finish it all before I called. The first nine was done Saturday. Just trying to finish the weight now.
Q What does that mean?
A The first nine ounces was finished by Sunday.
Q Okay. And how does he respond to that?
A By Saturday.
Q How does he respond to that?
A All right. Cool, what you wanna do then.
Q Okay. Go down to message 446 and 447.
What do you say next?
A It don't matter. I can finish the other joints and get it all at one time or however you want to do it. I'm 4,000 in on the other one.
Q What are you describing there?
A I'm 4,000 in on the next part of the package.
Q And why are you reporting to him how this is going?
A Just the money I owe him.
Q Okay. And how does he respond in message 447?

A All right. Cool.
Q And if we go down to message 448.
What does he say next?
A You want the nine.
Q And how do you respond to that?
A Yeah, I will go get the bread so I will have it with me. I have to drop my daughter off at daycare 8 a.m., and I will just wait for you to hit me.
Q Okay. If we could go to page 71 and look at message 509, and see 509 and 510 together.
All right. When does this message occur?
A 4-24-2018.
Q And what do you say?
A I need another nine.
Q And what are you asking for in that message?
A I need another nine ounces.
Q All right. And how does he respond?
A Okay.
Q If we go to page 74, if you go to message 531.
All right. Who is sending message 531?
A I am.
Q What do you say?
A Things looking good yet?
Q And how does he respond to that?
A Not yet.

Q If we could scroll down.
And how do you respond to that?
A I said, Okay, they blowing me up. LOL. When you wait, you make the whole city wait. You the king of the volcano.
Q What did you mean by that?
A It was terminology from a movie, the king of the volcano.
Q What's it from?
A It was from a movie.
Q What movie?
A What's the name? It was with Robert De Niro in it. I can't think of the exact name of the movie, but that's what they call theirself, the king of the volcano.
Q What was the context of this conversation? What did you mean?
Why did you say: When you wait, you make the whole city wait?
A When you don't have no work, the whole city don't have no work.
Q If we could go down and see 534.
So what's his response to that?
A LOL.
Q And then what does he say?
A He said, Man, I was supposed to been grabbed it, but I was asleep and he left.
Q Okay. If we could go to page 75 down to message 539.

Okay. So when does this message occur?
A 4-26-2018.
Q And who sends message 539?
A He did.
Q And what does he say?
A You know anybody that does ice?
Q Okay. And do you know what ice is?
A Methamphetamine.
Q And if you could scroll down.
And how do you respond to that message?
A I said, Damn, yeah, but that's a crazy game. LOL.
Q And what's his response to that?
A Yeah, I know. I heard.
Q If we could go down to 542, what does he say after that?
A How much does the zips go for?
Q What's a zip?
A An ounce.
Q And what's your response to that message?
A I said, I don't know. I think that shit like 140 a gram street level. So I don't know how much a zip is.
Q Okay. And what's his response in 544?
A Oh, okay.
Q And if we could go down, what does he say in message 545?
A You know I can get that too.
Q All right. If we can go down to 546.

And what do you say after that?
A That shit hot.
Q What did you mean by that?
A Meaning you're going to jail if you sell it.
Q And what's his response to that in 547?
A Word.
Q And if we could keep going down to 548, who is sending this message in 548?
A He is.
Q And what does he say?
A 750 to 800 a zip.
Q And how do you respond in message 549?
A That's a killer flip.
Q And his response in 550?
A Yeah, I know.
Q And then what do you say in 551?
A Yeah, but they said there's some MSN shit going around that's fake. So be careful.
Q What does that mean?
A That people was selling dummies. It's like some type of -- it was something that looked like meth.
Q Okay. And then what do you say at message 552?
A I said, Damn, he trying to make you a millionaire for real. Fucking sign me up.
Q What did you mean by that?

A If you're with it, I'm with it. Put me in the game.
Q Okay. Go down to 553 -- actually, down to 554.
And so, what does he say here?
A So you know this shit gonna be straight. I'm about to call you.
Q And in 555, how do you respond?
A Okay.
Q And then in 556?
A You know I'm a team player.
Q And in 557?
A Indeed. You're the first person I told.
Q What did he mean by that?
A I was the first person he told.
Q All right. Let's go to message 558.
Who's sending this message?
A He is.
Q All right. And what does he say?
A He got the heroin too.
Q All right. And if we go down further, what does he say in message 559?
A 50,000 a brick.
Q What's a -- if you can remind the jury, what's a brick?
A A kilo, a kilogram.
Q If we go to 560, what do you say in response to that?
A We have to plug into places like Richmond for that.

Q And then his response to your text?
A Yeah, or Roanoke.
Q Okay. 562?
A Yeah, move here, but these niggas out here rats. But I'm all in to lock down somebody else's city.
Q What did you mean by that?
A By what? Which part?
Q The entire thing?
A That everybody out here was telling, so it would be safer to go lock down somebody else's city.
Q Okay. And his response in 563?
A Hell, yeah.
Q If we keep going to 564, what does he say in 564?
A Put the raw out there.
Q What is raw?
A The raw uncut.
Q Okay. And if you go down to 565, what do you say in message 565?
A Yeah, and run it up. Fuck it, catman cartel.
Q Is that that reference to the joke that --
A Yeah, the joke, yeah.
Q And what about in 566?
A LOL. Damn right.
Q And how do you respond in 567?
A You know I'm ready.

Q All right. If we go down to 569.
And what does he say in message 569?
A Do the ice move out there?
Q And how do you respond in 570?
A I don't know. We can scout it out.
Q All right. And what's he say in 571?
A We gotta set that up.
Q What about 572?
A Just let me know.
Q And then how does he respond in 573?
A All right.
Q I'm going to show you Government's Exhibit 88, which has been admitted into evidence. I'm going to bring it up on the screen, but I'm also going to show you a hard copy.
Now, you previously looked at Government's Exhibit 88?
A Yes.
Q And do you recognize the number at the top of Government's Exhibit 88 sort of in display names there?
A Yes.
Q And what is contained in this document?
First, whose phone number is that?
A It's mine.
Q And do you remember the conversations that are in Government's Exhibit 88?
A Yes.

Q So I want to take you to page 4.

MR. WELSH: There seems to be something on the screen, if we could -- there's a pointer.

THE CLERK: Sean, I got it.

MR. WELSH: Okay. Thank you.

BY MR. WELSH:

Q If we could start with -- so first of all, which parts of these messages are coming from you and who is this conversation with?

A The gray ones is mine, the blue ones is his, and it's between me and Quentin.

Q Okay. So if we can start with this message here -- I think I can draw here.

If we can start with -- so what does he say in this message?

A He said, What you come up with?

Q Okay. And how do you respond?

A 34 x 1,150 equals 39,100. I got that and I still got 3.5 plus two bands from my pop, 600 from the alley.

Q Okay. And what did you mean by that?

A Two bands from an older guy that I was dealing with, and the 600 was from money I made in the alley.

Q All right. If we could look at the next message.

What do you say next?

A What happened was I started adding money to the new pack

instead of separating it.
Q If we could keep going down.
A It at first but everything -- everything covered my bad.
Q What are you explaining here?
A That I was starting one pack and finishing one -- and finishing the last one at the same time, and the money was lapsing over. So it was throwing the count off.
Q Okay. And if we could scroll down a little bit.
All right. What does he say in response to that?
A You had a nine left before the whole one.
Q And what's your response?
A Yeah, that's 10,350.
Q If we could go down to page 6.
All right. And if we could start with the top here. So what is this message, this first message here, if you could read that?
A Do you want me to whip some of the new to see how it whip?
Q What does that mean?
A Like I was telling you about that earlier, about the crack to see how much it could take.
Q Okay. And how does he respond to that?
A I got Brandon with me. Is that cool?
Q Do you know Brandon?
A Not really. It was some guy that he started running sometimes.

Q Okay. And how do you respond?
A I said, yeah.
Q All right. If we could go down.
So then what does he say after that?
A Outside.
Q And then what does he say?
A We should change the brand to millionaire cartel.
Q Okay. And if we keep going down?
A LOL.
Q And then you said?
A Hell, yeah.
Q Then keep going down.
A Word. That's gonna kill 'em.
Q And then what does he say here?
A That joint hard. Damn right.
Q What does that mean?
A The work, I told him I could put a seven on a seven and it would come back hard. I could put seven grams with seven grams of baking soda in it, and it would come back hard.
Q Okay. If we could go down.
And what do you say in response to that?
A We should get shirts.
Q Well, I think --
A What I said?
Q Yeah.

A Niggas really gonna hate.
Q His response?
A We should get the shirts.
Q And then?
A And hit the clubs out of town to tell these niggas to get on board. Real talk.
Q Okay. Then if we could go down to page 8, and if we could look at this series of messages that starts with that number there, the third message. No, I'm sorry, the third message. There we go. Thank you.
All right. What does he say here?
A All right, bet.
Q And then what does he provide?
A A phone number.
Q Okay. Do you remember being sent that phone number?
A Yeah.
Q All right. And can you read the next two messages?
A You good, brother.
Q Okay.
A I sent Jamie around there.
Q All right. Do you know who Jamie was?
A I don't know exactly who the person was, but that's the person that I made the sale to.
Q Okay. What did you sell to?
A I sold him some ice.

Q Okay. Why did he send you that number?
A I think that was Jamie's phone number, if I ain't mistaken.
Q Okay. And if we could go to page 14.
All right. And if we can bring up this message that starts with "bruh."
Okay. Could you -- this is a message coming from you?
A Yeah.
Q And what do you say?
A I said, Bruh, this crazy. You know I'm not gonna touch the money. You take care of my family. I would put my life on the line to save yours, bruh. Plus, re-up is always an exact count. I think dude might have took it.
Q And then what did you say?
A I'm gonna get the 2,200 and bring it to you. I'm gonna handle the problem myself.
Q Why are you saying this?
A Because I took -- I took the money to my house, and some kind of way the money came up about $2,200 short. And I'm letting him know I'm not going to steal from you. That's not the type of time we was on.
Q When you were arrested, did you owe the defendant money?
A Yeah.
Q How much do you remember that you owed him?
A About 100,000.

MR. WELSH: Court's indulgence, Your Honor.

(Pause.)

MR. WELSH: I have no further questions, Your Honor. And if I could, I'll approach and collect the exhibits that I've handed the witness.

THE COURT: How long do you think you'll be?

MR. ANDERSON: Your Honor, if it please the Court, I expect it's going to be quite a bit longer than ten minutes. This might be an appropriate time to break.

THE COURT: Members of the jury, we will recess now until tomorrow morning at 9:30.

Of course, overnight do not discuss the case with anyone. Do not allow anyone to discuss it with you. Do not remain within the hearing of anyone discussing the case. So come back tomorrow morning at 9:30 to the assembly room that you reported to previously.

(Jury out, 4:52 p.m.)

(Proceedings adjourned, 4:52 p.m.)

C E R T I F I C A T E

I, Lisa M. Blair, RMR/CRR, Official Court Reporter for the United States District Court for the Western District of Virginia, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/s/ Lisa M. Blair                    Date: February 7, 2023