UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

************************************************************

UNITED STATES OF AMERICA, Plaintiff,
vs.
QUENTIN LOWELL HORSLEY, Defendant.

CRIMINAL CASE NO.: 6:19CR13
MARCH 24, 2022, 9:35 A.M.
LYNCHBURG, VIRGINIA
JURY TRIAL, DAY 3
APPEAL NO.: 22-4671

Before:
HONORABLE NORMAN K. MOON
UNITED STATES DISTRICT JUDGE
WESTERN DISTRICT OF VIRGINIA

************************************************************

APPEARANCES:

For the Government:

SEAN MICHAEL WELSH, ESQUIRE
United States Attorneys Office
Western District of Virginia
255 West Main Street, Room 130
Charlottesville, VA 22902
434-293-4283

For the Defendant:

ANTHONY FRANKLIN ANDERSON, ESQUIRE
BROOKS ALEXANDER DUNCAN, ESQUIRE
Anderson Legal
P.O. Box 1525
Roanoke, VA 24007
540-982-1525

Court Reporter: Lisa M. Blair, RPR, RMR, CRR, FOCR
255 West Main Street, Suite 304
Charlottesville, Virginia 22902
434.296.9284

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT PRODUCED BY COMPUTER.

INDEX OF WITNESSES


WITNESSES ON BEHALF OF THE GOVERNMENT: PAGE

KENNETH ADGERSON (Continued)

Cross-Examination by Mr. Anderson 4
Redirect Examination by Mr. Welsh 49

JAIMZ BOWMAN

Direct Examination by Mr. Welsh 56
Cross-Examination by Mr. Anderson 61

TRAVIS SMILEY

Direct Examination by Mr. Welsh 69
Cross-Examination by Mr. Anderson 80

MATTHEW KNABB

Direct Examination by Mr. Welsh 98
Cross-Examination by Mr. Anderson 115

DANIEL BAILEY

Direct Examination by Mr. Welsh 117

WITNESSES ON BEHALF OF THE DEFENSE: PAGE

STEVE TRENT

Direct Examination by Mr. Anderson 163

DANIEL BAILEY

Direct Examination by Mr. Anderson 165

INDEX OF EXHIBITS

EXHIBITS ON BEHALF OF THE DEFENSE:

| EXHIBIT: | Marked | Received |
|---|---|---|
| 1 | 21 | 21 |
| 2 | 91 | 91 |
| 3 | 96 | 96 |
| 153 | 110 | 110 |
| 154 | 123 | 123 |
| 155 | 123 | 123 |

(Proceedings commenced, 9:35 a.m.)

THE COURT: Good morning. The jury is ready to come. They're all here and they're coming up on the elevator.

THE CLERK: Do you want him to go ahead and get Mr. Adgerson, the witness?

THE COURT: Yes, go ahead and bring the witness out.

**(Jury in, 9:35 a.m.)**

THE COURT: Good morning, ladies and gentlemen. You may have a seat and we'll proceed.

You may proceed.

MR. ANDERSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q Good morning, Mr. Adgerson.
A Good morning.
Q We've never met. My name is Tony Anderson. I represent Mr. Horsley.
Now, Mr. Adgerson, you were arrested on February the 11th, 2019 --
A Yes, sir.
Q -- at your home on Euclid Street?
A Yes.
Q And when they came to your home to do the search, you were present then?
A Yes.

Q And present also with you at the time in your room were four cell phones?
A Yes.
Q A red pair of Nike shoes that had some money in them?
You don't remember that?
A No, not the shoes.
Q How about the two guns that were there, do you remember those?
A Yes.
Q And you ultimately were charged with being a felon in possession of those guns and having -- possessing guns while possessing with the intent to distribute narcotics --
A Yes.
Q -- a Schedule I or II drug?
A Yes.
Q And so you were taken into custody and you were taken to the Lynchburg detention -- adult detention center?
A Yes.
Q And while you were there, you had available to you use of the telephone; did you not?
A Yes.
Q And you would make phone calls while you were in jail?
A Yes.
Q And Ms. Austin, I think did you identify her as your girlfriend?

A Yeah, at the time she was.
Q At the time she was.
And at the time did she live with you at Euclid -- the Euclid Street address?
A Yes.
Q And so you would call her from the jail?
A Yeah, a few times.
Q Do you remember calling her from the jail almost after immediately being locked up and saying to her, Get me some money. There are a lot of people that owe me money.
And you gave her a list of names of individuals that owed you thousands of dollars?
A Yeah, I think so.
Q Well, let's talk about the name "Trill." Do you recognize that name?
A Yes.
Q What's the proper name for the individual that you've identified as "Trill"?
A Travis.
Q Travis?
A Yes.
Q Travis Smiley?
A Yes, sir.
Q And he's a lifelong friend?
A Yeah, you could say that.

Q Consider him a best friend?
A Yeah.
Q And while you were in the jail, you called Ms. Austin and asked about Trill, didn't you?
A Yes.
Q You wanted to know why he wasn't arrested?
A Yes.
Q And you also advised Ms. Austin, did you not, that Trill would be responsible for collecting money and bringing money to you?
A That's what I told her.
Q You gave her a list of other names of individuals who owed you money?
A Yeah, I think like a couple of people who owed me -- who owed me some money from loans, not from drug transactions.
Q Now, when you -- I'm sorry?
A Money from loans, not from drug transactions.
Q All the money you were telling her you were owed that she should collect for you --
A Yes.
Q -- were from prior drug transactions you had had?
A No. No, sir. Not all of them.
Q You're saying "no, sir" to that?
A Not all of them.
Q When you identified Trill, you said Trill -- do you

remember how much you said Trill owed you?
A I probably said he owed me a lot, because I always say that he owes me a lot.
Q You just always say that?
A Yeah.
Q And he actually owed you over $50,000, didn't he?
A Yeah, I say that all the time. Actually, I said he owed me over 100.
Q You mean you say it all the time, but it wasn't true?
A Yeah, it was a phone conversation between me and her because I knew at the time that when I was conversating with her that our phone calls would be listened to, because after the initial phone call that I had with her, the police came back and went back to the house again and they took her other gun.
Q Yeah, that's right, because you knew it was being recorded, is what you're telling this jury?
A Yeah. When I --
Q Yeah. And she called you all excited one day and telling you, Guess what? When they were here doing the search, they missed what?
Do you remember that?
A They missed her other gun.
Q Missed a gun, didn't they?
A Yes.

Q So they went back again a second time. And you say "they," the Lynchburg Police Department, went back a second time based on that telephone conversation you had with Ms. Austin and retrieved the firearm?
A Yes, they retrieved the gun, I think. And then they also told her that she can come back and pick it up whenever she wanted.
Q And so you're saying that when you made that phone conversation -- when you made that statement to Ms. Austin, you knew it was being recorded, and you did that so the police would go pick up the gun?
A No.
Q Okay. So the only part that you're talking about that you just kind of say things that you really don't mean is when you said Trill owes me $50,000 or more?
A Yeah, pretty much.
Q And pretty much, is it true, sir, that when you make these comments, these talk -- if I use the term "puffery," do you know what that means? You're trying to puff up something. You're trying to make it bigger than it was. You're trying to embellish what you're saying.
That's what you're saying you did with Trill in these conversations?
A Well, let me clarify what you're saying to me. When we had those conversations when I first got locked up, I was

frustrated knowing that everything that I say or everything that I was doing was being recorded. And by me being frustrated I was saying, oh, this person owes me this amount of money and this person owes me that amount of money. Make sure you get it, in reference to telling her that, hey, people are going to pay. People were going to give you money. Make sure I get it, please.

Q And so then, if I'm understanding you correctly, sir, when you said, Where's Trill, I don't understand why Trill is not here, you're not saying that Trill should have been arrested too, are you?

A Yeah, I was saying that.

Q You were saying that.

And he should have been arrested because Trill -- Tracy --

A Travis Smiley.

Q -- Travis Smiley is the individual you were selling and had a drug relationship with at that time?

A Yeah. We were all -- we were all selling drugs at the same time, but our drug relationship selling drugs side by side or purchasing drugs from each other is different.

MR. ANDERSON: With the Court's permission, I would -- and Madam Clerk, if you would help us with this, we have a recording that we would like to play.

MR. WELSH: Your Honor, I haven't been shown this. I would request to hear what this is. I'm not sure what defense

counsel is intending to introduce here.

MR. ANDERSON: This is the recording of the jail call, a clip of one of the jail calls that you provided to us in discovery.

MR. WELSH: Your Honor, I think Rule 613 allows the government to -- or the adverse party for an impeachment statement to request to be able to hear what's about to be played.

THE COURT: You've got to take your mask off. I can't hear you.

MR. WELSH: Your Honor, I think Rule 613 of the rules of evidence allows the adverse party to be able to hear what is about to be played as a statement for impeachment. And I haven't heard exactly what this is going to be. This is the first notice of this.

THE COURT: I'm still not understanding.

MR. ANDERSON: Your Honor, I think -- if I may, Mr. Welsh -- I think the government is saying they would like to hear this recording that we're going to play. They have a right to do that under Rule 613 when it's being offered for impeachment. It's a very short clip. What I might suggest is that --

THE COURT: Tell him what it's about.

MR. ANDERSON: Yes.

(Off-the-record conversation between counsel.)

MR. WELSH: No objection, Your Honor.

THE COURT: All right. Go ahead.

(Audio playing.)

MR. ANDERSON: Thank you.

BY MR. ANDERSON:

Q Mr. Adgerson, the male voice we hear on that call, is that your voice?

A Yes.

Q And the female voice is Ms. Austin?

A Yes.

Q And that's one of the jail calls that you made that I made reference to in the earlier questioning of you?

A Yeah.

Q And you're talking about everybody's pointing the fingers. That's what you said?

A Yeah.

Q What did you mean by that, sir?

A That's when my case was in the state.

Q I'm going to walk you through that, sir, in just a minute. That's exactly right.

You talk about everybody is pointing the finger at you. Who were you referring to?

A No. I was just saying it seemed like everybody was pointing the finger at me.

Q Who did you believe those individuals to be when you made

that statement?
A I thought it was Travis. I thought it was Robin. It was a lot going on when we first got locked up.
Q Yes, sir.
A But I know when we first got locked up, we wasn't -- we wasn't worried about a federal charge. So when we first -- when we first got locked up, you know, I -- I talked on the phone all the time giving a million misdirection conversations because I knew everything was always recorded.
Q You were giving calls on the phone to misdirect the conversation?
A Yes, because I knew every phone call is recorded.
Q Were you trying to talk in code?
Who were you trying to misdirect?
A No. I was just -- I was just frustrated. I was frustrated. So I was making it to misdirect every phone call, because I felt like if the state wanted to spend money listening, that I was just going to misdirect all the phone calls.
Q Okay. And so, let's see if this is a misdirection that you're referring to. Let's focus your recollection to one of those jailhouse calls where you're discussing the Monte Carlo.
Do you recall that conversation with Ms. Harrison?
A Who?
Q Ms. Austin.

A I guess.
Q Do you recall the Monte Carlo was the vehicle that was parked at your house on Euclid Street?
A Yeah.
Q And what you told this jury yesterday, that the bag in the trunk of that car belonged to Mr. Horsley, and that in the red and black bag there was a firearm, but that firearm belonged to or was traded to you to give to Mr. Horsley?
A Yes.
Q Right?
A Yes.
Q Do you remember telling Ms. Austin in the jail phone call that you didn't know anything about the Monte Carlo?
You didn't know anything about what was in the Monte Carlo?
A Yes. I had a phone call across the jail -- across from the jail to the street.
Q Yeah.
A Like I was saying.
Q But you admit you said that, though?
A I believe so. I don't know. If it's there, I had to have said it, but I also said that a lot of the conversations that we had was -- it was just misdirection. I said anything. I think a few phone calls I might have even said I bought drugs from the police.

Q And your misdirection -- your attempt to misdirect you would employ when you were trying to direct the attention away from you and onto someone else; is that right?
A No. No, not at all. I was causing frustration. I was frustrated because I was locked up, so I was going to frustrate the people who wanted to listen to the phone call with me.
Q You were trying to misdirect the police department?
A Whoever was listening.
Q Whoever was listening?
A Yeah.
Q Who did you think was listening?
A At the time I felt like everybody was listening.
Q Do you know it's recorded at the Lynchburg Adult Detention Center?
A Yes, sir.
Q You know they have an officer whose job there is to listen to those calls?
A Yes.
Q So when you say everybody, you have to include to pin that to law enforcement officers?
A Yeah, I guess so. I felt like whoever was listening, I just gave them something to listen to.
Q So let's talk about your state charges. Your original state charges were possession with the intent to distribute a Schedule I or II controlled drug, being a felon in possession

of ammunition, possession of a gun on a person while possessing a Schedule I or II drug, and receipt of a stolen firearm.
Do you remember those being your state charges?
A No.
Q You don't remember those?
A I think my state charges was possession with intent and possession of a -- I think possession of a firearm as a convicted felon. I don't think I got a stolen firearm charge.
Q That's what you recall your state charges being?
A Yeah.
Q That's what you were being held in jail -- you were being held in jail on those state Lynchburg charges?
A Yes.
Q And when you made reference in that phone call to an August court date, you thought it was August 20th; Ms. Austin corrects you and says it was August the 16th?
A Yes, my state court date.
Q And that was your appeal where your bond had been denied. You were going to go to circuit court in the City of Lynchburg and request bond, that you be let out of jail?
A Yeah, but I think -- no, I think that was my preliminary hearing.
Q And it was denied, and you appealed that to the circuit court?
A Yes. Yes.

Q And that appeal was heard on April the 16th --
A Yeah.
Q -- of 2019 in the Lynchburg Circuit Court.
And it was denied, right?
A Yes, because they said -- I think they said I was going to get charged federally or something.
Q You actually -- you actually had your trial date continued to November at that April the 16th bond hearing.
But something did happen while you were in the Lynchburg jail. You received a letter from the United States government?
A Yes.
Q If I use the term target letter, do you know what that means, sir?
A The letter that said they was going to charge me -- they were seeking charges and like a certain amount of days, if I'm not mistaken.
Is that it?
Q Typically, a target letter would advise you that you are a target or a subject of a federal grand jury investigation, and it would advise you as a target of such rights that you have.
Is that the letter you're referring to, sir, the type of letter?
A I guess that's the letter you're talking about.
Q Well, that -- you had some knowledge that while you were in the Lynchburg Adult Detention Center being held without bond

on state charges related to everything that happened at your house on Euclid Street on February the 11th of 2019, that the federal government was interested in prosecuting you.
You knew that?
A Yes.
Q You knew that sometime in March of 2019, right?
A Yeah, when they actually gave me charges.
Q No, sir, when you received the target letter?
A Yeah, that I was -- but I wasn't charged then. But I got the letter that said I need to respond in 30 days.
Q Right. It said you could respond in 30 days?
A Yeah.
Q And so you weren't charged federally. You weren't indicted federally until around May the 8th, May the 10th of 2019.
Does that sound right?
A I think so.
Q So just to break it down easily, you're originally on state charges. You're held without bond. You get a target letter from the United States government, and then you're indicted by the United States government in May of 2019?
A Yes.
Q I'll represent to you those are the time frames, okay?
A Okay.
Q Now, something happened, though, for you to know the

difference between a federal proceeding and a state court proceeding. And I assume -- am I correct in assuming that you gained that information from a lawyer that was appointed to represent you?

A Yeah. I asked my lawyer about the letter, and he said that --

MR. WELSH: Your Honor, I believe this falls into a potentially privileged statement. He's talking about what his lawyer advised him. I believe that calls for a privileged statement.

MR. ANDERSON: I'm not asking him to say anything that was a privileged communication between he and his counsel.

BY MR. ANDERSON:

Q I believe what he was about to say -- and I don't want to put words in your mouth, but I will ask you if you were about to say the lawyer you had didn't do federal work, and so you had to get a federal court lawyer.

Is that right or wrong?

A No, that's wrong.

Q That's wrong? Okay. Don't say what that lawyer said to you, because that's a privileged communication.

You're looking in the back of the courtroom. Your lawyer is in the courtroom today, right?

A I don't have my glasses on. I can't see that far.

Q I'm sorry?

A I don't have my glasses on. I can't see that far.
Q Before you made an appearance in your federal case, though, you were savvy enough to write a letter directed to the United States attorney?
A Yeah.
Q Mr. Adgerson, did you have an opportunity to see on your screen -- can you identify that document?
A Yeah, it's a letter I wrote to the address that --
Q Is that your handwriting?
A Yeah.
Q And that letter is directed to Mr. Welsh?
A Yes.
Q Who did you know -- who did you believe Mr. Welsh to be at that time?
A That's the name that was on the letter.
Q The name on the letter that you're referring to that you received?
A Yes.
Q That we believe is a target letter?
A Yes.

MR. ANDERSON: Your Honor, I would move the admission of this letter as Defendant's 1.

THE COURT: Is there something more to the letter than I see on the screen?

MR. ANDERSON: Yes, there's more to it, Your Honor.

And there's a P.S. with it as well.

MR. WELSH: No objection, Your Honor.

THE COURT: All right. It will be admitted.

(Defense Exhibit 1 marked.)

(Defense Exhibit 1 admitted.)

MR. ANDERSON: In terms of the physical letter exhibit, would you like us to offer that as well for Madam Clerk?

THE CLERK: It can be emailed.

BY MR. ANDERSON:

Q Mr. Adgerson, tell the jury, if you would, please, sir, what your purpose in writing this letter was?

A Well, you just said I couldn't --

Q What was the purpose you wrote this letter to Mr. Welsh?

A Well, when I talked to the lawyer when he came to see me for my state charge, during the session I was talking on the state charges, I asked him -- I had asked him about what am I supposed to do about the letter? And he said the only thing he could advise me is to wait for -- wait for me to get the federal lawyer after I get indicted.

Q You didn't take that advice, though. You didn't wait, because you sent this letter to Mr. Welsh before you were indicted on the federal charge?

A Because the letter said that I had, like, 30-some days to respond to it. So in the process of getting the letter, still

having the state charges, and then getting indicted. So I wrote the letter to -- so he would know that I received the letter.

Q And contrary to what advice you may have been given, you just took it upon yourself to write this letter to Mr. Welsh.

And let me direct your attention to the P.S.

A Okay.

Q So you're saying to Mr. Welsh in the P.S., you're negotiating already. You want to know what the offer is before you essentially cooperate?

A No.

Q Right?

A No. What it is, is when I got the target letter and I asked my lawyer about the target letter, then asking around in the jail they said, Hey, you got a federal charge. When you get a federal charge like this, they're trying to give you a lot of time.

I said, Well, I got -- they was trying to charge me with just the two things. They wanted to talk about the two things on there. So my P.S. was, you know, I want to know what you want so I can deal with my kids again before I sign my life over.

Q So when you say, I would like to know what the offer is for what we will be negotiating for. I'd really like to see my children --

A That's what --
Q -- before I sign my life over to what you're asking me, hopefully a bond, then a great plea. Sorry for taking so long.
A Yeah, that's what -- the target letter says that for negotiation. It's just the words off of what the actual target letter says. I'm responding back, because I was trying to figure out why I couldn't get a bond hearing. So I was hoping that in responding -- in responding to the target letter, I could get a bond hearing.
Q On your state court charges, because you hadn't been charged federally yet?
A No, when it switched over.
Q When it switched over?
A Yeah.
Q And so you were charged in May of 2019 federally, right, the indictment?
A Yeah.
Q The original indictment was in May of 2019?
A Yes.
Q And then you had a lawyer to represent you on your federal charges?
A Yes.
Q And consistent with this letter here, wanted to know what you had to do in Defense Exhibit 1, the offer to negotiate. You began that process in July of 2019?

A Yes.
Q Now, when you were in the Lynchburg jail, the Lynchburg Adult Detention Center, you're awaiting this process that we've just described for the jury?
A Yes.
Q You have -- you have reached out on your own to Mr. Welsh --
A Yes.
Q -- on behalf of the government wanting an offer?
A Yes.
Q You're having visitors at the Lynchburg Adult Detention Center come and see you?
A Yes.
Q And put money on your books?
A Yes.
Q Trill -- Travis Smiley, who we know as Trill -- was one of those individuals?
A Yeah, a few individuals put money on my books.
Q Robin Haskins, Roberta Haskins -- we know Roberta and Robin Haskins to be the same individual?
A Yes.
Q Ms. Haskins came to visit you at the jail?
A Yes.
Q And there were times where you were limited in the number of people who could visit you on a particular date or time or

per week?
A Yeah.
Q And so, how often would Ms. Haskins visit you, sir?
A I seen her once when I was down there.
Q Did -- was there --
A And that was before the federal indictment.
Q Did she come to visit you before you were indicted federally?
A Yeah, that's what I was saying, before I was federally indicted.
Q And she came to visit you and put money on your books?
A I guess. The jail receipts don't really have names on it. So you really don't know who put money on the books until now. There's a process now where you can see, but then the receipts just come with a dollar amount on it.
Q Do you recall a time when she came to visit another individual and switched that visit to visit with you in the same visit area?
A Yeah, that was the one time she came before the federal indictment.
Q How did you know that she was there to visit another individual and then switched to you when you all were in the same visitation pod?
A Because she was visiting the person sitting next to me.
Q And she then switched over and started visiting with you?

A Yes.
Q And that was before you were indicted federally?
A Yes.
Q Now, do you recall also, Mr. Adgerson, that Travis Smiley, Trill, would visit you often in the jail?
A No, not at all.
Q You don't remember him ever visiting you?
A No, I'm not for sure. I don't think he came. I think if he did, he might have came once, but I'm not for sure if he came, because most of my visits was between my mom, my sister or my girlfriend, my daughters -- my kids' mother.
Q Let's do it this way. Do you remember Trill -- Travis Smiley -- having phone conversations with you while you were in the jail?
A Oh, yeah.
Q Would you call him?
A Yeah.
Q When you're in jail, you have to use your phone privileges to call out?
A Yeah.
Q You don't have your cell phone with you?
A Yeah.
Q You can't make calls to the outside. You've got to rely on your phone time to call people that you want to call?
A Yeah.

Q And you would call Trill on his cell phone?
A Yes.
Q Do you recall Trill being on the cell phone and videoing that conversation of himself talking to you on the phone?
A Probably. He'd do it all the time.
Q He'd do it all the time?
A Yeah.
Q Did you know he livestreamed that to Facebook?
A No.
Q Now, Mr. Adgerson, do you affiliate with a street gang?
A No.
Q Were you ever the big homie of the Eight Tray set of the Crips?
A No. And I was on gang probation. And in the process of being on gang probation, they ask you to sign a paper to denounce being in a gang. And we had a situation with my probation officer. I said that. In order for me to say that I'm not in a gang no more, I would have to have been in a gang. But -- but, you know, having friends -- having friends and stuff like that in street gangs, but nothing is really real. A lot of people just do a lot of faking. So a lot of it is just conversation. But paperwork-wise, when I came home from jail from my marijuana distribution, they put me on gang probation. And we had a big situation about -- about me saying that I'm not in a gang just because I was classified in a gang because

of the neighborhood that I lived in and some of the stuff that I used to do when I was younger.
Q Mr. Adgerson, do you remember being called to an interview, sometimes referred to as a proffer?
Have you heard that statement before, sir?
A Yeah.
Q Do you recall meeting with the Lynchburg police Detective Booth, the assistant U.S. attorney, Mr. Welsh --
A Yes.
Q -- you, and your lawyer were present on July the 8th, 2019?
A Yes.
Q And the purpose of that proffer, sir, was it not for you to have an opportunity to speak with the government in a privileged setting, meaning that whatever you said in that proffer could not be used against you to prosecute you unless you committed perjury --
A Yes.
Q And do you remember, sir, making the statement --
A It should be the same statement that I just made, when I said, you know, we was kids.
Q I'm sorry?
A About me knowing people in a gang or dealing with people in a gang or where other people classified me as --
Q Well, sir, do you remember telling them that you were the

big homie --
A I said --
Q You said --
(Reporter clarification.)
Q I apologize. If you would allow me, sir, to ask the question and then I'll allow you to answer. I'm sorry to interrupt you.
A I'm sorry.
Q So my question is: Did you say to them in that meeting that them -- being the individuals I have identified -- that you were a big homie of the set of the Eight Tray under the Crips criminal gang?
A The Eight Tray criminal gang, or are you saying just criminal because Eight Tray -- I'm confused.
What are you saying?
Q I'm asking you, did you tell them that --
(Overlapping speakers.)
A Yeah, I said that's -- I said that's what they classified -- that's what they were saying. I was confused.
Q We're doing it again. I'm talking over you. It's driving Madam Court Reporter crazy. We're both going to apologize to you and the jury for that.
A I'm sorry.
Q My question to you is: Did you tell -- do you remember telling those individuals you were the big homie of the Eight

Tray set of the Crips street gang?

A I told them that they said I'm the big homie of the Eight Tray street criminal gang. But I also told them the same thing that I just told you, that I had a situation with my probation officer where they wanted me to say that I'm not in a gang anymore. And I wouldn't sign the paper, because in order to say you're not in a gang, you have to have admittance to being in a gang. That was also part of that conversation too.

Q So you told them that you were faking about being a big homie?

A Yeah. All of that was -- was in the conversation. And we went to the part of the probation officer because I told the officer, I said, if you go to the -- go to my probation officer, I wrote on there that I'm not in a gang.

Q You were just trying to act like you were in the gang or make people believe you were in the gang, but it was a fake -- you really weren't a gang member?

A Yeah. We've been doing it since we were kids. We would watch a movie and everybody wanted -- everybody wanted to choose a side.

MR. ANDERSON: Madam Clerk, may I ask you to pull up Government Exhibit 143, please.

THE CLERK: Mary will have to do it.

MR. ANDERSON: Ma'am, may I impose on you.

Thank you.

BY MR. ANDERSON:

Q Mr. Adgerson, I'm showing you what has been admitted as Government Exhibit 143. I believe yesterday you identified that as your plea agreement?

A Yes, sir.

Q And that plea agreement was executed by you on October the 18th of 2019?

A Yes.

Q Is that right?

A Yes, sir.

Q And the government asked you some questions about this yesterday, but I want to go into what your understanding is, okay, because you indicated that you agreed to plead guilty to Count One and Count Ten of the superseding indictment?

A Yes.

Q And that superseding indictment was issued or returned against you in September of 2019, right?

Do you recall that?

A That's when we went back to Charlottesville?

Q Likely so.

A All right. Yes.

Q You discussed -- I'm not asking you what your lawyer may have told you, because that's a privileged communication.

What I am asking you is: You had an understanding of what the sentencing guidelines -- the United States Sentencing

Guidelines meant to you as it related to this plea agreement; did you not?
A Yeah, ten to life.
Q I'm sorry?
A Ten to life is -- you're asking what --
Q I'm not asking you about the range of punishment. I'm asking you about paragraph 2 on page 3 of your plea agreement.
A Yeah.
Q I'm referring particularly to paragraph 2 on page 3 of your plea agreement.
A I understand I would not be eligible for parole.
Q I'm sorry?
A I understand I will not be eligible for parole.
Q No, sir. It's titled, "Sentencing Guidelines."
A Yeah. "The parties agree." This here?
Q So my question for you, Mr. Adgerson, is: You had an understanding as to what the sentencing guidelines were and how they affected your plea in this case; did you not?
A I don't understand the question.
Q It's in your plea agreement.
A Okay.
Q Your plea agreement says that you're agreeing with the United States that you are accountable for certain --
A For this.
Q -- quantities of a converted weight -- drug weight, right?

Do you see that?
A Yes.
Q And it says a level 36?
A Yes.
Q Do you see that?
A Yes.
Q You had an understanding of what level 36 means, didn't you?
A Yeah, my lawyer explained it to me.
Q In terms of your potential range of punishment or sentence guideline range of punishment, you knew what that was?
A Yes.
Q And you knew, sir, didn't you, that the only way you could maneuver yourself out of the guideline sentence was to receive a motion for substantial assistance?
A To be honest --
Q I'm sorry?
A Due -- due to what I said is what boosted it up. So I already understood what I was saying and where it was going to take me. To maneuver through it wasn't -- wasn't really a target point, but if it was granted, it would be graciously accepted.
Q I'm not sure I follow all that.
A I said that -- you asked me did I understand about the offense level and the converted drug weight.

Q Yes.
A And I said yes because the statements that I gave equaled up to that converted drug weight and put it to that level. So I understood that. And to maneuver through it wasn't a target point, but if it was granted, I would -- I would accept it.
Q Let me ask you --
A Grateful.
Q I'm sorry. I thought you were finished. I apologize.
Let me ask it this way: Your target point was getting the lowest sentence you could possibly get?
A My target point was clearing my mind, as I said from the beginning. When I -- when I talked to him -- when I talked to Mr. Welsh with my lawyer, when I divulged the information, it was no -- it was no actual target point. It was more that I was done with everything that was going on. I was stressed out. I gave it all away all at one time and then I was done with it.
Q Sir, I think you said yesterday to clear your conscience?
A That's what I just said.
Q That's why you're here, to clear your conscience. You don't care about this plea agreement.
You don't care about paragraph 3 of that plea agreement?
A I had already -- I've already signed the plea agreement. It's already what it is. When I gave -- when I gave the conversation, I cleared my conscience. I gave it all away. I

gave it all away. I got right with God and just left it at that.
Q So you're asking this jury today to believe that if you didn't receive substantial assistance, you'd be fine with that based on your information, because your conscience is clear?
A I'm letting the jury know that I cleared my conscience. And as long as I'm right with God, what happens next is not in my hands.
Q Not your concern?
A I'm sorry?
Q What happens next is not your concern?
A It's not in my hands. Yes, sir.
Q It's out of your hands. It's not your concern?
A Yes.
Q Let's go, if I could, Ms. Vogt, please, to page 4 of -- paragraph 4, page 13. I apologize. I'm sorry page 4, I apologize, of 13. Particularly, I want to go to paragraph 3 up above that. Right there.
Mr. Adgerson, do you see paragraph 3 entitled, "Substantial Assistance"?
A Yes, sir.
Q "I understand the United States retains all of its rights pursuant to Federal Criminal Procedure 35(b)" --
A Yes.
Q -- "USSG, Section 5K1.1 and 18 U.S.C. Section 3553(e)"?

A That's right.

Q I want to ask you about those code sections. I'm going to phrase them in terms I think you will understand. I hope so.

Do you understand, sir, that 5K1.1 is the provision in the United States sentencing guidelines that allows the Court to sentence below a recommended guideline range based on your substantial assistance?

A I mean, I guess, yes.

Q Well, I mean, I'm asking you, sir. Was that your understanding?

A About the 5K1?

Q Yes, sir.

A I just understood that when everything is over, there is nothing promised. There is no guarantees. There is nothing on the table from where I sit. My plea agreement sits at where it is -- it sits at where it is. Anything extra than that is just a blessing.

Q You understood, sir, that before a motion of substantial assistance could be considered by the Court, it has to be made by the United States government?

A Yeah.

Q It's in the United States attorney's sole discretion to determine whether you've earned substantial assistance.

Is that your understanding?

A Yes.

Q And then the provision of U.S.C. 3553(e), that is a provision that says that the government has in its sole discretion the right to make a motion for substantial assistance that would allow the Court to sentence you below any statutory mandatory minimum period of time.

Did you understand that?

A Yeah. Yes.

Q So you know the crimes for which you pled guilty --

A Yes.

Q -- carry statutory mandatory minimum punishments?

A Yes.

Q And you know the only way this Court could have an opportunity to sentence you below those mandatory minimums were if the United States government made a motion for substantial assistance on your behalf?

A Yes. And I also understand that it is not -- it's not obligated. But if they chose to, they could, but they don't have to. So it's not a guarantee.

Q That just goes back to clearing your conscience?

A Yeah. It's not a guarantee. So it's doesn't -- that kind of really didn't matter because it's not a guarantee of anything. The only thing that's guaranteed is that I sign the paper for what they charged me with.

Q Sir, did you understand that nothing is guaranteed because it's up to the government to decide to make the motion. That's

what you're trying to do is earn that motion. And then once they make that motion, it's up to the Court to accept it and determine what credit you should get for that.
Is that your understanding?
A Are you asking me or are you telling me that's what I'm doing?
Q I'm asking you: Is that your understanding?
A My understanding is after everything is over, it's up to the government if they would want to file a motion. If they do, they can. If they don't, it doesn't matter. The only thing set in stone is that I sign this plea agreement for what everything is on here.
Q And if they decide not to make the motion, you're okay with it?
A Yes.
Q Because you're just here to clear your conscience?
A Clear it.
Q You're not here to benefit from any bargain you've made with the government?
A When I talked to the government, I gave them everything -- everything that was on my mind. I answered all their questions and I left it alone. After that, I was brung the plea bargain. So I was charged for what I was charged with. I signed it. And that's where it is, kind of.
Q Mr. Adgerson, yesterday you related to this jury an

occasion of when -- you tied it to a notion that Mr. Horsley was in Hawaii, and that you had picked up a bag, and you got tired of waiting for him to come back. So you took that bag and you sold it?

A Yes.

Q You kept the money; is that right?

A No. When he came back, I paid him.

Q But I'm right about what you said yesterday; you took it, you got tired of waiting, and you went out and sold it -- sold it all?

A Yeah, I picked it up, and I was supposed to wait for him to come back. But he was taking so long, I ran out. I sold it and I paid him for what I sold.

Q I'm going to direct you again to one of those meetings you had with the government, the agents, the government lawyer and your lawyer. I'll tell you that it occurred on September the 27th of 2021, this past September, about a year -- almost a year after you were indicted with the superseding indictment, 11 months after you had signed the plea agreement, which is Government Exhibit 143.

Do you remember telling the agents and the government at that time something different regarding that bag of drugs that came in when Mr. Horsley was in Hawaii?

A No. I'm not for sure.

Does it say I said anything different, or was it in the

same -- maybe a day or two off, or an hour or two off? I'm not really understanding what you're asking me.
Q Do you remember telling them you went to the room -- you went to the room with money, as instructed. You met with brown-skinned males, non-African American. In exchange for the bag of currency, you were provided a bag by one of the males. You advised that you did not know what was in the bag at that time, that you maintained possession of that bag until Mr. Horsley returned from Hawaii. And when he returned from Hawaii, you said that you and he went through the contents of that bag and you advised that the bag contained just shy of a kilogram of cocaine. And you advised them that Mr. Horsley provided you with nine ounces of that kilo of cocaine.
Do you remember telling them that, sir?
A Yeah, but that might have been a separate occasion.
Q Well, you said that was when he went to Hawaii?
A We did so many different -- we did a lot of transactions. So you know what I'm saying, the specific one, if I may have made a mistake on a specific transaction, I could have -- it could have been: Oh, I went to the room to get this, this time, and then I reiterated back or clarified that I may have, you know, confused each time. But everything I gave -- everything I gave was accountable for the simple fact when I sat down with the government and I gave them -- when I -- what's it called? Debriefed?

Q Debriefed, proffer?
A Yeah. When I gave my proffer, I gave all truthful statements, and I gave it all up prior to even having a motion. So it wasn't -- it wasn't formatted around anything. It wasn't targeted. I gave it all the truth and I cleared my conscience. It's just -- I'm confused because it's almost like you're asking me like am I telling a lie about what I said, even if I may have confused a moment of either/or. But everything I said is in order. If it's not chronological order, it's in order of what I said.
Q Mr. Adgerson, I appreciate that. I appreciate the pivot, always being truthful. I know that that is something you likely have been through when you've met to prepare your testimony that I'm sure the government suggested to you: Always be truthful, right?
A I was being truthful from the beginning.
Q Even though --
A I was being truthful --
Q Excuse me. Let me finish, sir.
A I'm sorry.
Q Then I'll do the same.
A Yeah, I'm sorry.
Q Even though when you make a material misstatement that I would suggest is such, you fall back on it as: Well, maybe I just mis-recollected it correctly, but the truth is what I'm

saying here today; is that right?
A No. What I'm saying is if you ask me, for example, if I had on a certain outfit on the day that I did something and I told you what I did, I might have misinterpreted the outfit. It's not that I told a lie. It's that I might have missed --
Q Some facts may have been wrong?
A No. All the facts is facts. But then you also have to understand we're having a conversation about something that happened four -- almost four or five years ago. So I'm trying to pull recollection as of -- by the moment. It's not things that I sit around and think about all the time.
Q Did I -- are you finished?
A Yes, sir.
Q Did I understand yesterday, sir, that you indicated you were a heavy user of cocaine?
A Yes.
Q Did I understand you to say a quarter ounce, eightball?
A Yes, sir.
Q And if things got really stressful, a bad day, a half ounce?
A Yes.
Q You would actually do that quantity of cocaine?
A Yes.
Q During this period of time you were giving your testimony about?

A Was I doing it at the time I was giving my testimony?
Q You were doing that in 2017 and '18?
A Yeah, I was snorting cocaine from -- maybe from the time I was 17.
Q To the time you were arrested?
A To the time I was arrested.
Q Fair enough.
Now, what kind of drug relationship did you have with Travis Smiley, Trill?
A What do you mean, the drug relationship? As of what, like, purchasing drugs or selling drugs?
Q You all actually sold drugs together, didn't you?
A Yeah, sometimes.
Q And that's how you incurred a large debt with him or he incurred a large debt with you?
A No. We -- it's just debts that occur. Sometimes -- the last thing he owed me some money because we started a lawn care business together, and I put up 95 percent of the money.
Q What was that last part?
A We started a lawn care service, and I put up 95 percent of the money.
Q So he had -- what was the trade name of that, Travis Smiley Lawn Care?
A No. It was -- he had Smiley's, and I had Kenny's Proficient Hands, and then we merged and made -- I'm trying --

I'm sorry, I'm trying to think of the name. I bought all the posters and all the signs.
Q Did you ever tell the government that you made $50,000 a year from that lawn business?
A Yeah, from -- I had a few contracts. I had a few contracts with -- with different houses and different residences. I had a lot of receipts also to show -- to show the scope that -- and my tax returns and stuff. I had all -- all the paperwork was straight.
Q And that's how you tried to explain the money that was found in the safe at your house when you were arrested on February the 11th, 2019?
A Yeah, that's how I tried to explain it. That's how I tried to explain it when --
Q I apologize.
A That's how I was trying to explain it in the beginning by giving truthful statements, and it changed.
Q So are you saying that how you tried to explain it in the beginning was not true, and then you changed it to a truthful statement?
A What I'm saying is in the beginning I was trying to figure out how to -- how to get -- how to get the money back, but not all of it was drug proceeds. But I was told that there was never going to be no telling where the drug proceeds start and it may end. So there is no way to even -- to even try to

acquire the money back.
Q One moment, please.
(Pause.)
MR. ANDERSON: One moment, please, Your Honor.
(Pause.)
BY MR. ANDERSON:
Q Mr. Horsley, after you were charged federally -- and by that I mean after May of 2019, after you were indicted in the federal court, federal violations of drug laws, okay, you met the government --
A Are you talking to me?
Q Yes, sir.
A I'm Adgerson.
Q Mr. Adgerson. I apologize.
You signed the consent to search your telephones on July 16th of '19?
A Yes.
Q And you had those four phones and you used four different phones during the course of your drug transactions?
A Yes.
Q And do you remember the first number of those phones that you gave?
A No. It's been four years. The only reason I would be able to say -- if you show me the numbers, I could tell you what it was. But it should be a 540 number and I think three

434 numbers, if I'm not mistaken. I think it was two iPhones, a flip phone, and --
Q What about the phone number 434-333-1705?
A I think that might be my daughter's phone.
Q I'm sorry?
A I think that might have been my daughter's phone, a 333 number. Yeah, I don't think that was my telephone.
Q I'm looking at what you suggested were the phone numbers you used in your drug business.
A Was it -- is it 333?
Q 333-1705, area code 434.
A It might be -- it might be 434 -- I guess 333.
Q How about 434-907-6461?
A Yeah. Yes.
Q Is that one of the phones?
A Yeah.
Q You mentioned something about a 628 number, just those three digits, 628, does that mean anything to you?
A The phone number?
Q Yes, sir.
A Yeah, I had a lot of phones, actually. So I dealt with multiple cell phones. You know, you buy a cell phone, whatever area code you want to put it in. But yeah, as a matter of fact, the 628 phone is the last phone I used, I think. That was a flip phone.

Q 628, those were the last three digits of the last phone you used?
A Yeah. Well, not the last three digits, but after the area code.
Q And Mr. Adgerson, there came a time when you started dealing directly with sources of supplies that you would meet to pick up your shipment, right?
A No.
So I'm not confused at what you're saying, you said at a time I met with my source of supply to pick up my supply; is that what you just asked me?
Q Yes, sir.
A No. I met with the source of supply to pick up the supply for Mr. Horsley.
Q And so you deny to this jury, then, that you would go meet with a source of supply by yourself and pick it up?
A No. What you just asked me was did I meet with my source of supply. What I said was I met with the source of supply for Horsley under direction of him to go pick it up.
Q There came a time when Mr. Horsley wasn't involved in that, and you made those transactions and conducted them yourself, didn't you?
A He's been involved in every transaction, just not every transaction was he there. Under direction of being in the same area is different. But if you say, hey, go take this here and

pick this up, not I'm going on my own. I'm calling the person and he's saying, Hey, I want this.
Q Mr. Adgerson, we've got that part. We understand the script.
Tell us about Robin Haskins. Was she your driver?
A Yes.
Q And she drove you for these transactions?
A Yes.
Q She would drive you when you would sell it? She would drive you when you would go pick it up?
A Yes.
Q And you brought it back and you stored it at her house?
A Yes.
Q You and Ms. Haskins alone did that, true or false?
A No, not every time.
Are you saying every single time?
Q I don't know how many times there were, sir. I'm asking you?
A Okay. If we say half the time before he stopped coming, we would all go together, but in separate cars. And then under direction -- under direction towards the end, that he was sending me to pick it up myself.
Q Okay. I hear you. It's all about Mr. Horsley. It's all about direction and less about you. We get that.
Right?

A I'm not understanding what you said.
Q Who is the only person in this courtroom you can give substantial assistance to the government on, sir?
Do you see anybody else on trial in here?
A No.
MR. ANDERSON: That's all.
THE COURT: Redirect?
MR. WELSH: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WELSH:
Q Mr. Adgerson, when you previously talked to the government, did you talk about other individuals who were involved in selling drugs with you?
A Yes, I think so.
Q And in your testimony yesterday you mentioned people that you sold drugs to; is that right?
A Yes.
Q And you talked about Jaimz Bowman; is that right?
A Yes.
Q And I can't recall exactly.
Who are some of the other people that you sold drugs to that -- during this period of time?
A Him. I said Esco. It was pretty much anybody who -- oh, and Travis.
Q I want to bring up Government's Exhibit 144.

Yesterday you previously recognized this as the statement of facts accompanying your plea; is that right?
A Yes, sir.
Q And if we could go to the last page again -- actually, the second-to-last page -- that's your signature and you have agreed to these facts, correct?
A Yes, sir.
Q And if we could read and highlight paragraph 18.
Could you read that to the jury?
A Adgerson had and intentionally possessed an Anderson Model AM-15 rifle found in the trunk of his vehicle, and did so in furtherance of a drug trafficking crime; specifically, the conspiracy to distribute a controlled substance charged in Count One of the superseding indictment.
Q So you have agreed in your statement of facts that you possessed that AM-15 rifle that was found in the Monte Carlo; is that right?
A Yes.
Q And you're not trying to pawn it off on somebody else. You're admitting that you possessed that firearm, right?
A Yes, and how it got there.
Q And you pled guilty to that charge referencing that firearm?
A Yes, sir.
Q I want to go down to paragraph 20.

This is another statement in your statement of facts that you have agreed to, right?
A Yes, sir.
Q And could you read that for the jury?
A In total, during the conspiracy, Adgerson personally obtained at least $450,000 in proceeds from the distribution of a controlled substance.
Q So you agree that you made $450,000 -- at least $450,000 from drug trafficking activity?
A Yes.
Q Mr. Anderson asked you about this letter back in March and April of 2019 where you were asking for a great plea, right?
A Yes.
Q If we could go back to the statement of facts and go to page 5.
Now, you've read through this and you've agreed to these facts, correct?
A Yes.
Q Now, does this include all of the substances that were seized from the Blackburn address?
We can take a second and read through here. We can even go back to page 4.
A Yes.
Q And actually, let's highlight paragraph 13.
Could you read this for the jury?

A In total, historically, and not including the substances seized on February 11, 2019, during the conspiracy, Adgerson distributed and -- distributed or assisted Horsley in distribution more than 25 kilograms of cocaine hydrochloride, more than five grams of methamphetamine -- I mean, five kilograms of methamphetamine, and more than five kilograms of heroin.
Q So you agree that's a true statement?
A Yes.
Q And you would agree that you are going to be held accountable for that?
A Yes.
Q We can take this exhibit down.
Mr. Anderson also asked you about substantial assistance. Do you know what's going to happen in your case?
A No, sir.
Q And what would happen if you were lying here in court?
A If I was to lie, the proffer papers say that I could be charged with everything that I gave in the proffer.
Q Mr. Anderson also asked you about Mr. Horsley's trip to Hawaii.
Did you know Mr. Horsley to take vacations and other trips?
A Yes. Multiple vacations, multiple trips.
Q Where were some of those places?

MR. ANDERSON: Judge, I think I'll object to that. That's outside the scope of the cross. That's not in any rebuttal to what was brought out on cross, only the Hawaii trip that he referred to in his direct testimony yesterday.

MR. WELSH: Your Honor, I think Mr. Anderson brought up the Hawaii trip and his knowledge -- and the timing of things. I'm asking follow-up.

THE COURT: If there's any confusion about trips, he can clear it up.

THE WITNESS: He went -- from the Internet you can see he went to Dubai --

MR. ANDERSON: Judge, I'll object what he's watching from the Internet. That's hearsay.

THE WITNESS: I'm confused.

MR. WELSH: I'll withdraw the question, Your Honor.

THE WITNESS: Do I say that I know personally because conversations --

MR. WELSH: That's fine.

BY MR. WELSH:

Q So you knew an individual named Travis Smiley, right?

A Yes.

Q That's Trill.

Did you know him to have a relationship with Mr. Horsley?

A Yes.

Q What was the nature of that relationship?

A They had the same kind of relationship that me and Mr. Horsley had.
Q In what way?
A Drugs.
Q Did you ever see Mr. Horsley sell drugs to Travis Smiley?
A Yeah, a few times.
Q Did you ever talk to Mr. Smiley and Mr. Horsley about selling drugs to each other?
A Yeah. And Mr. Horsley cut off Mr. Smiley because he was taking too long to pay him.
Q Mr. Anderson asked why you had so many -- well, he asked about your multiple cell phone numbers that you talked to law enforcement about, right?
A Yes.
Q Now, why did you have different cell phone numbers?
A I had a lot going on, and I had multiple cell phones, multiple -- multiple things going on. I had the business. I had drug transactions. I had numbers that the schools and stuff called, because I had full custody of my oldest daughter. So I had phones for just the schools and stuff to call. So I gave them all the numbers just in case it was anything specific that they wanted to see. I became an open book.
Q Did you know Mr. Horsley had multiple cell phone numbers?
A Yes.
Q Mr. Anderson asked whether you had been in contact with

the people bringing drugs to the hotels that you talked about, right?
A Yes.
Q And you were -- you had been in contact with the people bringing to the hotels, correct?
A Yes, physical contact, yes.
Q But did you ever have contact with the main supplier?
A No.
Q Who had contact with the main supplier?
A Mr. Horsley.
Q And where did the drugs that were found at Blackburn Street come from?
A The hotel.
Q And why did you pick them up from the hotel?
A Because Mr. Horsley sent me to pick them up.
MR. WELSH: No further questions, Your Honor.
THE COURT: All right. We're through with this witness. We'll take a recess now.
**(Jury out, 11:03 a.m.)**
(Recess.)
THE COURT: Who's going to be your next witness?
MR. WELSH: The next witness, Your Honor, is Jaimz Bowman.
THE COURT: Tell them to bring him on up. We need the defendant, too.

MR. WELSH: Your Honor, I'd like to inquire when the Court would like to take a lunch break. I've got I believe two witnesses I can call prior to lunch that I think will take us at least 45 minutes to an hour. I think that would bring us into 12:00 and I think would be an appropriate time for lunch. The reason I'm asking is that the following witness is not feeling well, is not -- it's a stomach issue. He is vaccinated. And I'm just trying to plan for his purposes, since he's not feeling well.

THE COURT: Well, let's see where we are. Where is the witness?

MR. WELSH: He's downstairs at the moment, but he would like to find a couch to go and lay down on because his stomach is upset. And it's a law enforcement witness, so not a layperson. But he is just in some discomfort and I'm trying to figure out what's best to help him out.

THE COURT: Okay. Well, we'll see. Let's take the next witness and see how far we can go.

MR. WELSH: Okay. Thank you, Your Honor.

**(Jury in, 11:25 a.m.)**

THE COURT: You may have a seat.

All right, sir, you may proceed.

MR. WELSH: Thank you, Your Honor. I believe the witness needs to be sworn.

JAIMZ BOWMAN, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good morning.
And you can pull your mask down?
Thank you.
Could you please state your name for the record?
A Jaimz Bowman.
Q And could you please spell your name for the record?
A J-A-I-M-Z, B-O-W-M-A-N.
Q And maybe you can pull that microphone a little closer and just make sure you speak into it.
How old are you, Mr. Bowman?
A I'm 31.
Q And did you previously act as an informant with the Lynchburg Police Department?
A Correct.
Q Do you know Quentin Horsley?
A Yes.
Q And do you see him in the courtroom today?
A Yes.
Q Can you point him out by something he's wearing?
A He's on my left right here.
Q Okay. How do you know Quentin Horsley?
A Due to associates we had together, the same associates.
Q How long have you known him?

A A couple of years.
Q When you say the same associates, what do you mean?
A Like friends that know each other, you know.
Q I want to turn your attention to November 1st of 2018.
Do you remember meeting with the Lynchburg Police Department on that day?
A Correct.
Q And what did you meet with them to do?
A To do a buy.
Q Okay. And who were you buying from?
A Quentin Horsley.
Q And what were you buying from him?
A Cocaine.
Q Do you remember how much cocaine?
A An ounce.
Q And do you remember how much you were buying it for?
A I don't remember the price.
Q Okay. What happened when you first met with the Lynchburg Police Department to do that?
A Got the money, made the phone call. I left.
Q Okay. And when you say made a phone call, who did you make the phone call to?
A To Quentin.
Q All right. And what happened after that?
A I went and met up with him.

Q Where did you go?
A I think it was TGI Fridays.
Q Okay. And did you meet with anyone else there?
A No.
Q Did you go inside the TGI Fridays?
A No.
Q What happened when you met him there?
A I just met up with him, grabbed what I was coming to get, talked for a little bit, and then I left.
Q Okay. Did you hand over the money to him?
A Yeah.
Q And he gave you some sort of substance or something?
A Correct.
Q And then what did you do after that?
A I left.
Q And where did you go?
A Met back up with LPD.
Q All right. I want to turn your attention to January 24th of 2019.
Do you remember meeting with the Lynchburg Police Department on that day?
A I do.
Q And what happened on that day?
A They set up another buy.
Q And how was that set up?

A I think I made a phone call, or something like that. I was told to hit Kenny up.
Q Okay. I'm going to show you what's been marked and already admitted into evidence as Government's Exhibit 69.
Do you recognize this?
A I do.
Q What is it?
A A Snap message.
Q Okay. And who is the Snap message between?
A Between myself and Q -- Quentin.
Q All right. So it says at the top here, Gossie.
Who is Gossie?
A That was Quentin.
Q And at the bottom there, what's it say at the second-to-last line there?
A You said the second-to-last line?
Q Yeah, right under -- Gossie is listed a second time and then there's -- where the number begins?
A You know it's Kenny.
That's what it say.
Q Do you know a Kenny?
A Yeah.
Q Who is Kenny?
A He's another associate, another friend.
Q Okay. Do you know Kenny's last name?

A No, not by heart.
Q What did you do after meeting with the Lynchburg Police Department on this occasion on January 24th?
A I think I ended up linking up with -- meeting up with Kenny.
Q Okay. Was that after receiving this?
A Correct.
Q And did you call that number?
A I did.
Q What happened when you met up with Kenny?
A Pretty much the same thing. Gave him the money and got what I came for.

MR. WELSH: One moment, Your Honor.

(Pause.)

No further questions, Your Honor.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q Good morning, Mr. Bowman.
A Good morning.
Q My name is Tony Anderson. I represent Mr. Horsley. I'm going to ask you a few questions, if I may.
So on November the 1st of 2018, right --
A Correct.
Q -- you purchased one ounce of cocaine from Mr. Horsley?

A Correct.
Q And that was the controlled purchase you have just talked about, right?
Now, when you called to set up that transaction, did Mr. Horsley tell you that it would be delayed a little bit because he had to run by his crib to pick it up?
A I really don't remember everything word for word, but that kind of sounds familiar.
Q If I told you that's what information that you provided to the detectives -- I believe it would have been Detective Booth at the Lynchburg Police Department?
A Correct.
Q On that same day when you returned from the purchase when he asked you what had happened, and that you said you had recorded the call, that Mr. Horsley advised you were at Ford Avenue, and that he said he would have to run by the crib to get it.
Does that refresh your memory of what you said back on November the 1st of 2018?
A Correct.
Q If I may see -- ask for Government's Exhibit 69.
So Mr. Bowman, this is a photograph of a Snapchat conversation?
A Correct.
Q And is that your phone that's depicted in the Snapchat?

A Correct.
Q And does it have a date on it?
A No.
Q The time in the top left corner looks like 10:04.
Do you recall when that was, if that was the time that it was received?
A I don't remember --
Q You don't remember?
A -- to be honest.
Q I understand. That's all we can ask for.
You really can't say, then, today when this Snapchat was sent to you on a date certain. You can just tell us the time of the day; is that true?
A Correct.
Q And are you, in this particular depiction of this Snapchat saying, What's the number, big bro, so I can call him to meet me?
A Yeah, that's me.
Q Is that what you had sent to an individual by the name of Gossie?
Is Gossie saved in that phone as a Snapchat name?
A Snapchat name.
Q And you believe that to be Mr. Horsley?
A Correct.
Q And when it says, What's the number, big bro, so I can

call him to meet me, you're asking him the number for an individual that's going to meet you?
A Correct.
Q And the response from Gossie is a phone number, 907-6461. And it says, You know it's Kenny, right?
A Correct.
Q You knew that meant Kenny Adgerson?
A Correct.
Q And you have Kenny Adgerson stored in your cell phone device under a contact name?
A Not at that time I didn't.
Q I'm sorry?
A Not at that time I didn't.
Q What time was it that you had it stored that way?
A It wasn't stored until after I got the number.
Q You can't remember?
Do you remember when you were making this revelation to Detective Booth where he was taking this photograph of this Snapchat -- Snapchat conversation in Government Exhibit 69 that when you called that number, it populated and came up on your screen Kenny.
Does that refresh your memory about it?
A Correct.
Q So Kenny would have been in your phone contacts prior to calling that number, right?

A Right.
Q Okay. So when you said it wasn't in there at the time, that's a little different, isn't it?
A To be honest with you, I don't remember. It's three years ago.
Q I'm sorry?
A To be honest with you, I don't remember. It was three years ago.
Q You don't remember any of it three years ago?
A Hit and miss.
Q Do you remember in June of 2019 you were being held in the Lynchburg Adult Detention Center?
A Okay.
Q I'll help refresh your memory a little bit, okay? You had been on probation for a drug-related possession, and your matter had been treated as a first offender under Virginia law. And you had not complied with the terms of that probation. And you had had two months imposed on you as a jail sentence that you had to serve. I think the Court actually sentenced you to ten months, all but two suspended.
Does that help refresh your memory?
A It does.
Q And so while you were in the Lynchburg Adult Detention Center in June of 2019, you were held at the same time in a cell or in a unit with Kenneth Adgerson.

Do you remember that?
A Correct.
Q Do you remember calling and asking to be moved apart from each other?
A I didn't make a phone call to do that.
Q You did not?
A No.
Q Did you ask somebody to have you removed?
A A family member did.
Q Did you ask someone to have you moved from where you were to the Campbell County Jail?
A My family did, yes.
Q And that was because you were afraid of being associated with Mr. Adgerson?
A I just feel like it would be a conflict of interest.
Q You were concerned that he might think you were the person who had kind of told on him?
A If you want to say that.
Q I'm asking you. That's how I would phrase it. Would you agree with that statement?
A I'm agreeing with you.
Q Do you remember that Mr. Adgerson had a conversation with you at that time before you were moved. And he advised you that Travis Smiley, also known as Trill, was putting money on his books while he was in jail?

A Somewhat.
Q Do you remember Mr. Adgerson telling you that Mr. Smiley owed him $50,000?
A I do.
Q Do you remember Mr. Adgerson telling you that he was trying to get Mr. Smiley -- Trill -- to retrieve his cell phone from the police department because he was concerned about narcotic deals that were on that phone?
A I don't remember that.
Q Do you remember in that same conversation that Mr. Adgerson was concerned about getting that phone back because of narcotic transactions that would be on that phone. And he said that he had done deals on that phone with Mr. Horsley, and that it was over $200,000 worth?
A Not off the top.
MR. ANDERSON: May I approach, Your Honor?
THE COURT: You may.
BY MR. ANDERSON:
Q I'll show you this document and ask you to read what's highlighted in yellow. Just read it to yourself.
A (Witness perusing document).
Q Mr. Bowman, thank you very much for taking a look at that.
Having read the document that I've handed you there, does that refresh your memory or recollection of what --
A Correct.

Q -- you said back in June of '19?
And is it accurate that you advised the Lynchburg Police Department that Mr. Adgerson had made those statements to you about trying to get the phone back?
You have to answer yes or no.
A Correct.
Q And he was concerned about getting that back because there were drug transactions on there, some of which might total $200,000 with Mr. Horsley?
A Yes.
Q That was in June of '19.
Now, you had participated, under the direction I think of Detective Trent of the Lynchburg Police Department in making what this jury has heard about and learned about, what we call controlled purchases. And you did several of those for Detective Trent that involved Mr. Adgerson?
A Correct.
Q And you did those -- you did at least four, as I recall. And they would have been in the summer of 2018; is that right?
A Correct.
Q And you would -- during that controlled type of purchase, you would call Mr. Adgerson's phone number; you would make the arrangements for the transaction; you would appear to do the transaction; turn the drugs back over to Detective Trent?
A Correct.

Q And in each of those transactions, that involved cocaine?
A It did.

MR. ANDERSON: May I approach and retrieve that document, please?

Mr. Bowman, thank you very much. That's all the questions I have.

THE COURT: Anything else?

MR. WELSH: We have no further questions, Your Honor.

THE COURT: All right.

MR. WELSH: Your Honor, may this witness be excused and released?

THE COURT: Yes.

MR. WELSH: Thank you, Your Honor.

MR. ANDERSON: We have no objection.

THE COURT: All right. Do you have another witness?

MR. WELSH: Your Honor, the government calls Travis Smiley.

TRAVIS SMILEY, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:
Q Good morning, Mr. Smiley.
A Good morning.
Q Could you please state and spell your name?
A Travis Smiley, T-R-A-V-I-S, S-M-I-L-E-Y.
Q And how old are you?

A 38.
Q And where are you originally from?
A Lynchburg.
Q So you've been here your whole life?
A Yes.
Q Are you currently facing charges?
A Yes.
Q Where are those charges out of?
A Lynchburg.
Q What charges are you facing?
A Distribution with intent.
Q And when you say Lynchburg, do you mean the state court?
A Yes.
Q And have you pled guilty to those charges?
A No.
Q So that case is still pending?
A Yes.
Q Why are you here testifying today?
A For consideration.
Q What's your understanding of consideration?
A That I could possibly have a better outcome in my situation.
Q Who decides if you receive any kind of benefit?
A The judge.
Q Who decides how much benefit you receive?

A The judge.
Q And this is the judge in your state court case, right?
A Yes.
Q Has anyone made any promises to you about how your charges will resolve?
A No.
Q Has anyone told you what to say?
A No.
Q What would happen if you lied here in court today?
A It wouldn't benefit me.
Q Do you know Quentin Horsley?
A Yes.
Q Do you see him in the courtroom today?
A Yes.
Q Could you point him out by something he's wearing?
A White shirt, blue vest.
Q What do you call him or refer to him as?
A "Q."
Q When did you first meet Mr. Horsley?
A 2017.
Q How did you come to first meet him?
A He approached me in the parking lot about selling some dope.
Q I'm sorry, I didn't quite hear you there.
A He approached me in the parking lot about selling dope.

Q Okay. Parking lot of where?
A Moss Creek Apartments.
Q Is that where you were living at that time?
A Yes.
Q Can you describe that first interaction that occurred?
A I was in the parking lot working on a car. And he said, I got a way for you to make some real money.
Q What was he offering you?
A Cocaine.
Q How did you respond to that?
A We exchanged numbers, and I told him I would give him a call.
Q Did you end up giving him a call?
A Yes.
Q And about how long after that first meeting was that?
A A couple of weeks.
Q What happened when you made the call?
A I purchased some cocaine from him.
Q Okay. How much did you order?
A A half ounce.
Q Did you end up meeting with him somewhere?
A Yes. I met him in the parking lot.
Q Is that the same parking lot at the Moss Creek Apartments?
A Yes.
Q How much did you purchase the cocaine for?

A 600.
Q Do you remember -- or do you remember how Mr. Horsley arrived to the parking lot?
A He was driving a green Maxima.
Q What did you do with the half ounce of cocaine you received?
A I cut it.
Q Can you describe cutting for the jury?
A Stretching it out, adding filler to it.
Q What kind of filler do you add?
A A laxative.
Q And with that half ounce, how much filler did you add?
A Seven grams.
Q And then what did you do with the cocaine at that point?
A I bagged it up and sold it.
Q Who did you sell to?
A Stanley, Jaimz, Kiera, a few people.
Q In what quantities did you sell it to them?
A From half a gram to eightballs.
Q Okay. When was the next time you got in contact with Mr. Horsley?
A About three weeks later.
Q How did you get in contact with him that time?
A I called.
Q This was a while ago, but do you remember what his number

was?
A I don't.
Q What did you order on that second occasion?
A I got an ounce.
Q And did you pay for that up front?
A Yes.
Q Did you receive any additional cocaine?
A Not at that time.
Q Okay. Where did you meet on that second occasion?
A In the parking lot again.
Q And what did you do with that ounce of cocaine?
A I cut it.
Q And who did you sell it to?
A The same customers.
Q How long did it take you to sell it?
A About three weeks.
Q All right. When was the next time you got in contact with the defendant?
A I had called him again.
Q Okay. And what was your conversation at that time?
A He told me he would throw me something for what I bought. So I bought an ounce and he threw me a half ounce.
Q Okay. What does that mean, to throw you something?
A Give it to me on consignment.
Q And what did you do with that cocaine you received?

A I cut it again.
Q And did you sell it?
A Yes.
Q Who did you sell it to?
A The same customers.
Q And what did you do after that?
A What do you mean?
Q Well, did you pay Mr. Horsley back for that --
A Yes.
Q -- cocaine that he gave to you?
A Yes.
Q And how did you pay him back or where?
A I have called him and we met out in public. I paid him as cash.
Q Okay. When was the next time you got in contact with Mr. Horsley?
A I don't remember exactly.
Q Okay. Well, what was the nature of the next time you got in contact with him?
A I believe we had met out at Fridays at the bar.
Q When you say "Fridays," what do you mean?
A It's a restaurant.
Q Is that TGI Fridays?
A Yes.
Q What happened when you went to TGI Fridays?

A There was a general conversation about acquiring more.
Q Okay. And what were the specifics of that conversation?
A That basically we had to step up the timeline. You need to move more. So you need to get more.
Q Who is saying that?
A Quentin was telling me that I need to get more.
Q Okay. And how did you respond to that?
A I'll see what I can do.
Q So did he provide you with anything on that occasion?
A No.
Q All right. When was the next time you started -- or did he provide you at a time after that?
A I don't remember the date exactly.
Q Okay. Well, what happened after that point, after that conversation, and you responded in that way?
A I had got some from him that wasn't good quality.
Q Okay. Well, describe when you received something not of good quality.
A It was already cut before I got it.
Q How did you find out that it wasn't good quality?
A Everybody complained about it.
Q And who do you mean by everybody?
A My customers.
Q Were there other times when you purchased cocaine from Quentin Horsley?

A Yes.
Q How many?
A I had got two ounces.
Q How frequently were you getting two ounces?
A I can't say for sure.
Q Was it monthly? Was it weekly? Was it daily?
A Bi-weekly.
Q And how long did that last?
A Until like 2018.
Q Okay. So when did it begin, do you think?
A The end of '16, beginning of '17.
Q And lasted until when?
A 2018.
Q So over the course of a year?
A Yes.
Q When you would reach out to Quentin Horsley, would he be the one who would deliver you the cocaine?
A Not all the time.
Q What about the times when he wouldn't be the one who delivered it?
A He would send Kenny.
Q Who is Kenny?
A Kenneth Adgerson.
Q Did you ever reach out directly to Kenny?
A Yes.

Q And did Kenny sell you cocaine?
A Yes.
Q Did Kenny sell you any other drugs?
A No.
Q Did you ever talk to Quentin Horsley about other drugs?
A Yes.
Q When did that happen?
A One night we had met up. I think we were at the Dish. It's a bar downtown on Main Street.
Q Okay. And what was that conversation?
A He said that he had dog food and ice cream.
Q What's dog food?
A Heroin.
Q What's ice cream?
A Meth.
Q What did he say about it?
A Said that it was cheaper.
Q Why was he talking to you about it?
A I guess he wanted me to go into different avenues.
Q Well, I don't want you to guess.
Was he offering you at that time?
A Yes.
Q What did he offer you?
A The same deal as the cocaine: Whatever I bought, he would front me.

Q Did you agree to those terms?
A No.
Q Did you ever talk to Kenneth Adgerson in that time frame about Quentin Horsley?
A What do you mean?
Q Well, did you talk to -- when Kenny would deliver cocaine to you, did you talk to him about Mr. Horsley?
A Yes.
Q And what did Kenny say about Mr. Horsley at that time?
A That he was basically moving up and had more stuff than he can handle.

MR. WELSH: One moment, Your Honor.

(Pause.)

BY MR. WELSH:

Q Going back to the conversation at TGI Fridays, so Mr. Horsley mentioned dog food and ice cream; is that right?
A Uh-huh.
Q And did he show you any of those items at that time?
A Not in the restaurant, no.
Q I'm sorry, what was that?
A Not in the restaurant, no.
Q Okay. Well, what do you mean by not in the restaurant?
A He had some in his car.
Q Okay. So walk us through what happened there.
A We went outside to a black Jaguar. He had a Crown Royal

bag with heroin and meth in it.
Q Okay. So a couple of details there.
What kind of vehicle was Horsley driving?
A A black Jaguar.
Q And what did he show you?
A He showed me meth and heroin.
Q Okay. And where was that?
A In the Crown Royal bag.
Q Where did he take it out from?
A Somewhere in the car.
MR. WELSH: No further questions, Your Honor.
THE COURT: Thank you.

CROSS-EXAMINATION

BY MR. ANDERSON:
Q Good afternoon, Mr. Smiley. My name is Tony Anderson. I represent Mr. Horsley.
How are you this afternoon?
A Okay.
Q You were charged with four counts of possession with the intent to distribute cocaine, a Schedule I or II drug in the City of Lynchburg, correct?
A Yes.
Q And those charges not only charged you as distributing, they charged you as having a prior subsequent offense?
A Yes.

Q And you were initially held in court without bond, right?
A Not that I recall.
Q I'm sorry?
A Not that I recall.
Q Well, do you recall that you were charged and you were taken into custody?
A Yes.
Q Do you recall how long you were in jail before you were released from custody?
A Eight weeks.
Q Eight weeks?
A Uh-huh.
Q So during that eight weeks, something had to occur for you to be released on bond, right?
A Right.
Q Because your case wasn't tried during that time?
A Right.
Q In fact, those four charges that you have, have still not been tried, have they?
A Right.
Q They've been continued multiple times. And I think they currently are set to be heard on June the 1st of 2022 in the Lynchburg Circuit Court?
A Yes.
Q Sound right?

So let's examine, if you will, with me, okay, what took place in that eight-week period that resulted in you being released, okay?

You began to cooperate, didn't you?

A Yeah.

Q And you began to cooperate with the Lynchburg Police Department, correct?

A Yes.

Q And you were asked on behalf -- on your behalf, the Commonwealth attorney for the City of Lynchburg asked if you could work -- I think you called it consideration a moment ago, correct?

A Uh-huh.

Q Sorry, sir --

A Yes.

Q -- but we have to answer yes or no.

A Yes.

Q And then ultimately as you were held over that eight-week period and you cooperated, you started to get a little bit more favorable treatment as to your release. Fair enough?

A Explain that.

Q What happened during the eighth week of your detention was you began to cooperate. The court, based on the recommendation of your defense lawyer and the assistant Commonwealth attorney, agreed on bond for you -- to be released on bond.

Do you remember that?
A Yes.
Q That's $7,500 as I recall.
Do you remember that?
A Yes.
Q And then it's after that, that you learned of the cooperation that you were given that the matter was going to become a federal investigation. And you started to cooperate with the federal government and the task force officers from Lynchburg, right?
A Right.
Q And you made multiple statements to them over the course of time. Sometimes we refer to those as a proffer interview.
Do you remember those?
A I don't recall.
Q Do you remember meeting with Detectives Knabb and Davis from the Lynchburg Police Department?
A Yes.
Q September the 2nd of '20?
A Yes.
Q And do you remember making statements during that interview?
A Yes.
Q You talked to them about intelligence that you had on who was selling cocaine in the Lynchburg area?

A I spoke to them about a lot of different things.
Q Including cocaine?
A Yes.
Q Including several different individuals, right?
A Yes.
Q And Kenneth Adgerson -- the jury has met Mr. Adgerson -- you and he were like brothers, weren't you?
A Yes.
Q Been that close for over 25 years?
A Yes.
Q You and he were in the drug trafficking business?
You sold cocaine together?
A Yes.
Q He sold some to you, you sold some for him, and you sold some together?
A Not exactly.
Q Well, how did it work?
A We sold it together.
Q I'm sorry?
A We sold it together.
Q Sold it together?
A Yeah.
Q And would you go in with Mr. Adgerson on drug deals and purchase to sell?
A Yes.

Q The drugs you were selling at that time were cocaine?
A Yes.
Q Anything else?
A No.
Q When Mr. Adgerson was arrested, you went to the Lynchburg Adult Detention Center to visit him?
A Yes.
Q You put money on his books?
A Yes.
Q Do you agree that you owed him at least $50,000 at that time?
A No.
Q Do you agree that you owed him any sum of money, or that you owe him any sum of money?
A No.
Q So you're telling this jury today you don't owe him a cent for any drug deals or drug trafficking?
A No.
Q Not then and not now?
A Not that I recall.
Q Do you recall that when you would visit with Mr. Adgerson at the Lynchburg Adult Detention Center, that you put money on his books?
A Yes.
Q And do you recall that while he couldn't always visit,

sometimes he would call you on your cell phone?
A Yes.
Q He would call you from the jail?
A Yes.
Q And you would livestream on your Facebook your chats with Mr. Adgerson when he was talking on the phone, and you were talking on your phone and livestreaming the conversation?
A Yes.
Q Do you remember doing that?
A Uh-huh.

MR. ANDERSON: Your Honor, if it please the Court, we have one issue that we would need to take up out of the presence of the jury.

THE COURT: All right. You may come up.

(Sidebar commenced.)

MR. ANDERSON: Judge, the issue is we have this live Facebook post that Mr. Smiley has just recognized. We want to play it, but the government hasn't had a chance to hear it. It's only about a two-minute clip. I would like the government --

MR. DUNCAN: I'm not sure how long it is, Your Honor. I don't believe it's very long, though, at all.

MR. ANDERSON: We would like to --

THE COURT: Do you know what the clip is?

MR. WELSH: I don't know what the clip is. I think

Rule 613 provides that the adverse party gets an opportunity to see it. I would like the opportunity to see it prior to it being played to be able to challenge if there is any reason to challenge it.

MR. ANDERSON: I think he's entitled to see it. I just --

THE COURT: All right. Well, we'll recess.

MR. ANDERSON: Recess quickly.

THE COURT: Is this the last you're going to do?

MR. ANDERSON: No. Do you want me to hold this off to the last?

THE COURT: No, no, that's all right. Well, he wants to see it.

MR. ANDERSON: Yeah, we'll have to let him. If it's okay with you, maybe just send the jury out for a few minutes, let him look at it, and bring him back in.

(Sidebar concluded.)

THE COURT: Okay. Members of the jury, I'm going to let you step into the jury room for a minute. It won't be too long, I think.

**(Jury out, 12:16 p.m.)**

THE COURT: Why don't we break for lunch. I understand the jury ordered lunch, and it's here. So we'll break now for lunch.

MR. ANDERSON: Your Honor, if that's okay with the

Court, it's fine with us. I'm sorry it came this way, but that's okay. We're happy with that.

THE COURT: Try to be back here about 20 minutes after 1, I believe.

Tell the jury we're going to take a lunch hour now, a lunch break.

(Recess.)

THE COURT: Are you all ready to call the jury, then?

MR. WELSH: Yes, Your Honor.

THE COURT: Call the jury.

**(Jury in, 1:22 p.m.)**

THE COURT: You may be seated.

You may resume.

MR. ANDERSON: Thank you, Judge.

BY MR. ANDERSON:

Q Mr. Smiley, before we broke for lunch I had asked you about the live Facebook chat you did while you were speaking on the telephone with Kenneth Adgerson when he was in the Lynchburg Adult Detention Center.

Do you recall that?

A Yes.

Q And do you remember doing that?

A Yes.

MR. ANDERSON: We'd like to play it.

THE CLERK: Are you ready to play it now?

MR. DUNCAN: Can we run it just to his screen from mine?

Is this showing?

THE CLERK: Just him.

(Video playing.)

BY MR. ANDERSON:

Q Mr. Smiley, do you recognize that?

A Yes.

Q Is that you on that Facebook Live post?

A Yes.

Q And you're holding a cell phone and you're talking -- is Mr. Adgerson on the phone talking with you in that livestream?

A Yes.

Q And you show the phone. It shows the number on there.

Did you see that?

A Yes.

Q That's the number from the Lynchburg Adult Detention Center?

A Yes.

Q And you -- you say, Got the king of the free world on the phone.

Did you hear that?

A I didn't. I could barely hear it.

Q I'm sorry?

A I could barely hear it.

Q Do you remember saying that to him?
A I don't recall that.
Q But you couldn't hear it on here?
A Say that again.
Q You say you couldn't hear it on what we just played?
A Right.
Q Did you hear Mr. Adgerson say to you, Got Carmen [sic] San Diego across the United States trying to extort me for money?
A No, I didn't hear that.
Q You didn't hear that?
A No.
Q Do you hear yourself say, Arizona, you know who you are?
A No.
Q You didn't hear that?
A No.
Q Do you remember saying that?
A I don't.
Q Do you remember Mr. Adgerson saying to you, or could you hear on there, They still out there making money on the street and I'm in here?
A I don't. I didn't hear that.
Q You didn't hear that?
A No.
Q Do you remember saying, or did you hear on there, You all know what it is. Don't get shit twisted?

A Yes.
Q The F-word the rumors, and the F-word the haters?
A Yes.
Q You heard that?
A Yes.
Q And that was you saying that?
A Yes.
Q What was your meaning of saying that to him?
A A lot of people were speaking bad about him in his situation. And basically, you know, F the rumors. Rumors are rumors so they don't hold any weight.

MR. ANDERSON: Your Honor, the defendant would move for the admission of the recording as Defendant's 2.

THE COURT: It will be so admitted.

(Defense Exhibit 2 marked.)

(Defense Exhibit 2 admitted.)

BY MR. ANDERSON:
Q Mr. Smiley, just to run through with you very quickly, again, when you were taken into custody on your state warrants with the City of Lynchburg, that's all you've ever been charged with currently are those crimes that allege distributions of cocaine as subsequent offenses in the Circuit Court for the City of Lynchburg?
A Correct.
Q And you first met with law enforcement and Detectives

Knabb and Davis on September the 2nd of 2020.
Do you recall that?
A Yes.
Q And it was after that meeting on September the 15th of 2020 you were released on bond, an agreed bond.
Do you remember that?
A I don't recall. I think I did get bond on September 15th, though.
Q Now, you testified to this jury earlier this morning that on an occasion -- in response to the government's question, on an occasion you recalled at the TGI Fridays, you described an incident where you say Mr. Horsley had a Crown Royal bag?
A Yes.
Q And they asked inside. You said, No, not inside, outside in the car.
Do you remember that?
A Yes.
Q And you remember that you told this jury this morning that inside that bag was heroin and methamphetamine?
A Yes.
Q Going back to that first statement and interview you did with the detectives, let me remind you who was present at this interview. This would have been your second interview on February the 11th of 2021. You were out on bond. February the 11th of 2021 you met with the assistant United States attorney

Mr. Welsh, task force officer Mr. Bailey, Lynchburg Police Detective Knabb, and your lawyer was present at the Lynchburg Police Department to conduct that interview.

Do you remember that?

A Yes.

Q And do you recall what you said to them at that time about the Crown Royal bag?

A I don't recall.

Q I'm sorry?

A I don't recall.

MR. ANDERSON: May I approach the witness, please, Your Honor?

THE COURT: You may.

BY MR. ANDERSON:

Q Mr. Smiley, if you would, sir, if you would read the two paragraphs to yourself, not out loud, that are circled or squared in the blue ink.

A (Witness perusing document).

Q Having read that report, Mr. Smiley, does that refresh your memory of what you said on February the 11th of 2021?

A Yes.

Q And you made reference to a Crown Royal bag?

A Yes.

Q And at that time you said it contained methamphetamine?

A Yes.

Q You said that -- I believe that it was shown to you, or Mr. Horsley put his hand in it and showed you what it looked like?
A Yes.
Q Not one time in that report, sir, do you use the word "heroin," do you?
A Not at that time.
Q In fact, no time other than this morning, sir, when you made reference to the Crown Royal bag have you ever suggested it had heroin in that bag, did you, sir?
A I don't recall.
Q As we have established, your charges are still pending in the Circuit Court for the City of Lynchburg. After you made bond, do you recall that the matter was set to be tried on November the 15th of 2020?
A Yes.
Q It was continued to December the 7th of 2020?
A Yes.
Q That was continued to May the 8th of 2021?
A Yes.
Q Then again to June the 7th, 2021?
A Yes.
Q Then again to November the 14th of 2021?
A Yes.
Q Then again to October the 4th of 2021?

A Yes.
Q Then again to February the 23rd of 2022?
A Yes.
Q Then to March the 7th of 2022?
A Yes.
Q And then finally, June the 1st of 2022?
A Yes.
Q And those continuances have been granted each and every time based on your cooperation with the Lynchburg Police Department and the United States waiting for Mr. Horsley's trial to be completed, right?
A I'd assume so.
Q I'm sorry?
A I'd assume so.
Q You'd assume so?
Do you assume it's because that consideration you're looking for, for those charges to be resolved, right?
A Yes.
Q You're aware, I take it, that the Office of the Commonwealth Attorney for the City of Lynchburg is waiting on a response from the United States about your testimony here today?
A I don't know how the process works.
MR. ANDERSON: Your Honor, I'm reminded that with respect to the video clip that was just admitted as Defendant's

Exhibit 3 --

THE CLERK: 2.

MR. ANDERSON: Excuse me, Defendant's Exhibit 2, that wasn't played on the jury's video box because I didn't ask for that to be published after it was admitted.

THE CLERK: Correct.

MR. ANDERSON: May that be published to the jury at this point?

And that would conclude my cross-examination.

THE CLERK: Did you also need to admit the jail call from earlier?

MR. ANDERSON: Yes.

THE CLERK: So that would be 3, then, if that's admitted.

MR. ANDERSON: The jail call earlier for 3. Thank you.

(Defense Exhibit 3 marked.)

(Defense Exhibit 3 admitted.)

(Video playing.)

MR. WELSH: I have brief redirect, Your Honor.

REDIRECT EXAMINATION

BY MR. WELSH:

Q Mr. Smiley, you were interviewed by law enforcement that Mr. Anderson referenced on February 11th of 2021.

Do you remember that?

A Vaguely.
Q And on that occasion you brought up this incident at the TGI Fridays.
Do you remember talking about that?
A Yes.
Q And at that time more than a year ago you said that Mr. Horsley offered you methamphetamine at the TGI Fridays.
Do you remember saying that?
A Yes.
Q And you said that it was in a Crown Royal bag.
Do you remember saying that more than a year ago?
A Yes.
Q And at that time you said it was -- that the methamphetamine was good quality. It looked like broken glass.
Do you remember talking about the quality?
A Yes.
Q And you said that more than a year ago, correct?
A Yes.
MR. WELSH: Okay. No further questions, Your Honor.
THE COURT: All right. May this witness be excused?
MR. ANDERSON: We have no objections, Your Honor.
THE COURT: All right. Thank you. You may leave. You may step down.
MR. WELSH: Your Honor, the government calls Detective Matthew Knabb.

MATTHEW KNABB, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon, sir.

A How are you doing, sir?

Q Could you please state and spell your name for the record?

A My name is Detective Matthew Knabb, and it's spelled K-N-A-B-B.

Q How are you employed, Detective Knabb?

A The Lynchburg Police Department.

Q And what's your position?

A I'm assigned to the vice narcotics unit.

Q How long have you been in that position?

A Since the fall of 2017.

Q What do your duties include in the vice narcotics unit?

A I'm primarily responsible for investigating middle to upper level drug distributors that operate in Lynchburg and the surrounding areas of central Virginia.

Q In that position have you interviewed people about the drug trade?

A Yes, sir.

Q About how many interviews have you conducted related to that?

A In my career, it would be fair to say hundreds. I've spoken to a lot of people in my time.

Q Is it fair to say that's your daily responsibility to conduct those interviews?
A Yes, sir. I talk to anybody I can.
Q What different types of people have you talked to in relation to the drug trade?
A Anybody from the top -- I'm sorry, the bottom person that uses the drugs on the street to the mid-level distributor to the person at the top that is responsible for moving large quantities.
Q Have you reviewed other materials related to drug trafficking?
A Yes, sir.
Q What types of materials?
A Some of the common ones would be Facebook content, cell phone data, text messages, ledgers, owe sheets.
Q What about social media?
A Yes, sir.
Q Have you testified as an expert before?
A I have.
Q In what fields have you testified as an expert?
A In narcotics distribution and firearms here in the City of Lynchburg in the circuit court.
Q Any other fields?
A No, sir.
Q Have you ever been disqualified as an expert?

A No, sir.
Q What kinds of training have you received in narcotics trafficking?
A Well, starting with the basic police academy which teaches you basic narcotics detection and apprehension to basic advanced undercover school and some other schools in between.
Q Where did you attend the basic police academy?
A I attended one in the State of Ohio in Akron. And then I transferred and was hired by the Virginia Beach Police Department where I started that academy in 2006.
Q Okay. And you mentioned undercover training. What was involved in that training?
A Yeah, I've attended two of them. Both were in Florida. And they are week-long schools, both basic and advanced. And they're designed to teach you how to identify, apprehend, infiltrate drug distribution networks, anything from acting as an undercover detective in plainclothes to court trial and prep.
Q What other kinds of training have you received in narcotics trafficking?
A I've attended a couple other classes such as a dark web class put on by the DEA which involved distribution through the computer, a couple of basic street-level narcotic interdiction courses as well.
Q Have you ever acted in an undercover capacity?

A Yes, sir.
Q What does it mean to act in an undercover capacity?
A Basically it means posing as somebody other than a law enforcement officer during the course of my investigation. So purchasing controlled substances from other people or plainclothes surveillance, stuff like that.
Q And is that acting in a similar way to a controlled drug purchase?
A Yes, sir. It's just done by a detective rather than an informant.
Q And you've mentioned a period of time that you've been active at the Lynchburg Police Department.
How long have you been in law enforcement in total?
A Sixteen years. I've been in since 2006.
Q And are you familiar with terminology used in drug trafficking?
A Yes, sir.
Q And are you familiar with weights and prices involved in drug trafficking?
A Yes, sir.
MR. WELSH: Your Honor, at this time I would seek to qualify Detective Knabb as an expert in the field of narcotics trafficking.
THE COURT: All right.
MR. ANDERSON: I have no objection to the detective

being qualified as an expert in narcotic drug trafficking.

THE COURT: He may so testify --

MR. WELSH: Thank you, Your Honor.

THE COURT: -- to his opinion in that field.

BY MR. WELSH:

Q Now, Detective Knabb, can you describe what a user amount of cocaine is?

A A typical user uses approximately half a gram to a gram, small quantities.

Q What about methamphetamine?

A Similar.

Q What about heroin?

A Heroin users are actually smaller than that. Heroin is sold to the user by the point of a gram. So one gram would be ten hits of heroin.

Q And how often does a typical user take those individual amounts?

A It greatly varies on a variety of things; anything from the purity of the drugs to the tolerance level of that person, and of course which drug specifically they're using. For cocaine, for example, they may use a couple of times over the course of a day if it's a normal average user, or sometimes once every couple of weeks.

Q Can you describe what general distributable quantities of cocaine would be?

A Yeah, when we start looking at distributable amounts of cocaine, you're starting to look at anything where you're starting to find several grams of cocaine together. So the basic terminology -- street terminology -- would be what's called an eightball, which would be a super low level distributor, somebody just selling very low quantities.
Q What is an eightball?
A An eightball is an eighth of an ounce, which is 3.5 grams.
Q Can you describe in your training and experience and as an expert how large scale drug trafficking -- how large scale drug traffickers operate?
A Yeah, the biggest thing is it's a network. When we investigate large dealers, we always notice that they -- it is composed of a variety of people. Different people have different roles inside of these networks such as anything from the person that's responsible for driving the drugs, people that just drive. There's the low level dealers, the mid level dealers, all the way to the supplier himself, people that run stash houses. There's a variety of assignments that we commonly see.
Q Can you describe the term fronting?
A Yeah. Fronting is essentially getting drugs on consignment. In other words, if I was attempting to obtain an ounce of cocaine from a supplier, that supplier would give me that ounce of cocaine for -- either free up front, expecting

payment on the back, or a partial payment up front.
Q How do large scale drug traffickers typically store drugs?
A Well, in my experience they store them away from themselves. I mean, every operation is different, but the main takeaway is they try to hide them in other areas that can be undetected.
Q And what types of places in your training and experience would those be stored at?
A Yeah, commonly one of the most frequent would be a stash house. When we see large level dealers, almost always they have a secondary address or secondary addresses plural where these drugs will be stashed at. That's just to avoid either detection by rival drug dealers, detection by law enforcement; or if it is detected, that person isn't detected with the drugs.
Q Can you describe the process of cutting drugs?
A Yeah, cutting drugs is essentially multiplying the product. That's done to really up your profit level. And it's done all the way from the low level user to the top. I'm not saying everybody cuts, but a lot of people do.
Q And how is that done with cocaine?
A Cocaine is most commonly a one-to-one ratio. So they'll take a portion of cocaine and another equal portion of -- common cutting agents are inositol and baking powder. They'll essentially blend those together and then repackage it so that

you've now, for example, taken one ounce and you've turned it into two ounces.

Q And what about heroin?

A Heroin is similar -- cut similarly. They use some different cutting agents. Baking soda is one, but we find that heroin is cut with a lot of different things, all the way to chocolate milk mix.

Q What about methamphetamine?

A Methamphetamine is almost never cut in my experience. I've talked to one person that has done it or knows how to do it, but it's not something I have commonly seen.

Q How do drug dealers keep track of their activity?

A A lot of times if they're selling a lot, ledgers and owe sheets, which is they can be digitally or handwritten notes that detail what maybe somebody owes them for possibly fronting drugs.

Q What's an owe sheet?

A An owe sheet we find commonly where it's essentially a handwritten piece of paper saying, you know -- say, example, three or four people have purchased these quantities from the dealer and that dealer is expecting this amount of payment. So it lists the amount they sold and what they're expecting for payment at a later date.

Q When you say owe sheet, you mean O-W-E, right?

A Yes, sir.

Q Okay. And what's the purpose of that type of document?
A Well, if it's a person selling a lot of drugs, sometimes it could be hard to keep up with everything they're selling, who owes them what.
Q How do individuals involved in drug trafficking typically pay for drugs?
A Cash. It's usually a cash business.
Q How do individuals involved in drug trafficking communicate?
A Primarily through cell phones, text message, phone calls, etc.
Q And in your experience, do drug dealers openly talk about drug trafficking in those -- on those communication platforms?
A They openly have conversation and communication, but it's almost always done in a code language, so it's not just obvious to somebody that's not involved in what's going on.
Q I'm going to ask you about some different terminology and ask if you are familiar with that term and then what that term means.
A Yes, sir.
Q Are you familiar with the term "zip"?
A Yes, sir. It refers to an ounce, 28 grams.
Q What about the term "plug"?
A A plug would be a source of supply. So somebody at the top that you would obtain the narcotics from.

Q What about when someone uses the word "half"?
A Half can mean usually like half ounce.
Q What about a quarter?
A A quarter ounce or 7 grams.
Q What about the word "brick"?
A A brick is commonly referred to as a kilogram or a thousand grams.
Q What are some street terms for cocaine?
A Some of the common ones would be powder, soft, blow.
Q What about heroin?
A It's usually around here called either food or dog food. Sometimes they call it slow because of the effect it has on the body.
Q And what about methamphetamine?
A Methamphetamine is, around here, usually referred to as cream or ice cream or fast.
Q And are there other terms that are used for those drugs that they mention?
A Yeah. It's important to know that there's a variety of terms. You could look and find literally hundreds for each, but there's usually a set. In this area there's some terms that are more commonly used than others.
Q What about the term "work"?
A Work would be the product itself. To put that into a sentence, I need to get some work so I can...

Q What about the term "ticket"?
A Ticket, usually that's the price that you're asking for it. What's the ticket for this item? Give me the ticket on that.
Q What about the term "band"?
A A band is a stack of a thousand dollars.
Q What about when someone uses the term "fire"?
A Fire usually refers to the purity level of a drug. So if I was selling drugs -- if I was boasting that my product was fire, I'd be boasting that I had good pure product.
Q Are you familiar with a device called a kilogram press?
A Yes, sir.
Q What's the significance of a kilogram press? What is that?
A A kilogram press is essentially a press, usually handmade or homemade, that you take a thousand grams of whatever product you're compressing and you press it into a brick for transportation.
Q Are you familiar with stamps that are on kilograms?
A Yes, sir.
Q What's the significance of a stamp?
A Well, stamps oftentimes are on kilograms to identify possibly where they came from, especially with the cartel they'll -- they have a variety of stamps as an identifier to show whose product it is.

Q Are you familiar with different prices for drugs?
A Yes, sir.
Q How do you learn about different prices for drugs?
A I do it through interviewing people, and then of course I do a lot of -- we do a lot of controlled drug transactions where we actually buy the drugs ourselves either with -- as an undercover or with an informant.
Q How stable are drug prices?
A They fluctuate on a variety of different things.
Q What are some of those different things?
A Yeah, well, for example, when COVID hit, cocaine was harder to get and the price of cocaine almost doubled. Purity levels, where it's coming from. If you're getting something out of Roanoke it's probably going to be cheaper than if you have to go to, say, New York and get it, just as an example.
Q Why is it important for you to know that information?
A It's important for me to have an idea of what the prices are for a lot of reasons. But if I'm about to purchase something myself as an undercover or with an informant, I need to know that the ballpark price we're paying or about to pay is consistent with what it's worth, and make sure it's not a robbery or a rip or something like that.
Q I'm going to put up on the screen for you Government's Exhibit 153. Take a look at that.
What is this document?

A This is a list of the exhibits within this case, the lab analysis. And it outlines what they are worth starting with the wholesale going all the way to the user on the street.
Q And did you assist in the preparation of this document?
A Yes, sir.
Q And where does the information come from?
A Well, the numbers on the left -- so the weights, the lab numbers, the exhibit numbers -- are coming directly from the certificate of analysis provided to us by -- I'm not sure. I think these came from both DEA and the Virginia Department of Forensic Science. And then the numbers on the right are the numbers I know those items to be worth based on my training and experience.

MR. WELSH: Your Honor, I would seek to admit Government's Exhibit 153 as a summary exhibit.

THE COURT: It will be admitted.

MR. ANDERSON: If we could publish. Thank you.

(Government Exhibit 153 marked.)

(Government Exhibit 153 admitted.)

BY MR. WELSH:
Q What time frame do these values correspond to?
A Well, I calculated these time frames based on the 2017 to 2018 time frame.
Q So let's start on the bottom here with the box set that's -- or colored in gray. What is this bottom part of the

chart showing?
A I'm trying to demonstrate here the base values of each product. So cocaine, the most common price for a gram of cocaine is $100.
Q Okay.
A And a kilogram of cocaine at that time was approximately $38,000.
Q What about heroin and methamphetamine?
A Yes, sir. Heroin at that time was on average $150 a gram or around $70,000 for a kilogram, and methamphetamine was $80 a gram to a little over $13,000 a kilogram.
Q So let's go to the top here and look at the box that's colored in green.
Can you explain what each of these columns mean and the information in there?
A Yes, sir.
I'll start with Exhibit 108 at the top line. You'll see directly beside that the lab number associated with it. The grand total weight calculated on that lab analysis was 998.9 grams, which is essentially one gram shy of what's referred to as a kilogram or a thousand grams.
I have listed here wholesale. So that's what, if somebody was going to purchase that kilogram of cocaine, they would expect to pay $38,000 for that kilogram.
When they bring it back, if you take a thousand grams and

you sell it to the users on the street, the street value demonstrates by the time the drugs have worked their way down to the user, what it's worth on the street value. So you essentially have a thousand grams or 998.9 grams, and at $100 a gram, that comes out to $99,900.

Q Okay. What about that last column there?

A Yes, sir.

That demonstrates if it's cut. So if they cut at a one-to-one ratio, that demonstrates the significance of cutting, why people cut, because you've essentially doubled your profit. You paid $38,000, and ultimately by the time it gets to the street it's worth almost $200,000.

Q Would it be fair to characterize the wholesale price as what a drug dealer would purchase -- the price from purchasing from the supplier?

A Yes. And that's what that's referred to. If someone was purchasing a kilogram to redistribute it, that's the approximate price they would pay.

Q And then the amount that could be sold for is what's listed in the street value part?

A Yes, sir.

Q And so if you could look at the total in this green box for the cocaine, what's the total amount of cocaine seized here, and walk through those values?

A Yeah. The total weight of cocaine seized, 2,429.9 grams.

The wholesale value of that would be approximately $96,000. Uncut, if you sold it just as it is without multiplying it, that's worth roughly around $243,000. And if you cut it at a one-to-one ratio, you're looking at around $486,000.
Q So what's reflected in the second orange or whatever color you want to call this here?
A Yes, sir.
That's reflecting the values of the heroin. And so as an example, just like the top, I'll start with 113. The gross weight of that was 463 grams, which is just shy of half a kilogram. So it's roughly $35,000 in value. Once you sell that all the way down it's close to 70 grams. And once you cut it to a one-to-one ratio, it's about $138,900.
If you look at the grand totals for heroin between those two lab analysis, 113 and 104 exhibits, you have just shy -- a couple grams shy of one kilogram of heroin with an estimated value of $70,000. The street value uncut is around $149,550. And of course if you cut it, you're looking at $299,100.
Q So let me ask you: A kilogram is obviously measured in the metric system. What is a kilogram in relation to a pound?
A A kilogram is 2.2 pounds.
Q Okay. And are certain drugs typically referred to in kilos versus -- kilograms versus pounds?
A Yeah, the one -- so heroin and -- well, technically you can hear them all referred to in a pound quantity. Cocaine and

heroin is more commonly in the kilogram on the metric system. The one we see referred to in pounds more often than not would be the methamphetamine.

Q Okay. Well, that's a good segue into this blue chart here. Can you walk us through the methamphetamine values here?

A Yes, sir. There's two exhibits here, Exhibit 106 and 115. I'll give the total for those: 3,198.7 grams. So that's over three kilograms. The wholesale value of that, if they had purchased that, those three together would be around $42,000. The street value of that would be around $205,920. And since methamphetamine is not commonly cut, I did not put a one-to-one cut ratio on that number.

Q Okay. And then if you could just walk us through the final part there, the yellow part that says "grand total," and what the values are here?

A Yes, sir.

If you take all those exhibits up above, the green, the orange and the blue, if you was to combine all those weights and calculate them, you're looking at wholesale -- in other words, what the drug distributor would have paid for those drugs -- would have been over $200,000 -- $208,000 roughly. By the time those drugs are sold back to the street you're looking at almost $648,470 uncut. Of course if you were to cut all of those, not including the meth, at a one-to-one ratio you'd be looking at a little over a million dollars' worth of drugs.

MR. WELSH: One moment, Your Honor.

(Pause.)

No further questions, Your Honor.

THE COURT: Okay. Thank you.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q Good afternoon, Detective. How are you today?

A Doing great, sir.

Q So has it been your experience that, particularly in the area of heroin distributions, that in this time frame, 2017 up until 2019, there started to be an influx of bags that had markings on the bags?

A At the user level we see a lot of markings, stamped bags.

Q And so they would -- some would be like a red horse on there or a lobster? I'm trying to think --

A Right.

Q I don't have your experience, but I've heard of some.

A Yeah, I don't have an exact stamp off the top of my head for you today, but in essence the bags -- and when I say bags, I'm referring to like the user quantities, the .1 grams, it was common to see stamps on those.

Q And it's fairly common that I expect you would retrieve those at the user level, either -- sometimes, God forbid, when there is an overdose?

A Yes. That would be a key piece of evidence.

Q And those little baggies are collected. And you try to trace back, based on the markings of the bags, who may have been the distributor?
A It could be a piece of evidence that would assist us in figuring that out, yes, sir.
Q And typically if you are involved in an undercover operation such that you were trying to locate the distributor of that heroin, you would start with the kind of baggie designations and move upward?
A I would look to see how far I could take it, if I had the evidence to show that path.
Q And also is it not part as well, if I'm understanding it correctly, in the investigative stages of drug distributions, you infiltrate with informants?
Some are paid informants?
A Yes, sir.
Q Working off charges that they may have?
A (No verbal response).
Q Some are undercover informants who are law enforcement officers?
A Yes, sir.
Q And you seek to make those purchases to infiltrate the line of distribution; is that a fair statement?
A Yeah, that's a good synopsis of it, yes, sir.
MR. ANDERSON: Thank you. That's all I have.

MR. WELSH: I have no further questions, Your Honor. May this witness be excused?

THE COURT: He may.

MR. WELSH: The United States calls Detective Daniel Bailey.

DANIEL BAILEY, CALLED BY THE GOVERNMENT, SWORN

DIRECT EXAMINATION

BY MR. WELSH:

Q Good afternoon.

A Good afternoon.

Q Could you please state and spell your name for the record?

A It's Daniel Bailey, D-A-N-I-E-L, B-A-I-L-E-Y.

Q How are you employed?

A I work for the Lynchburg Police Department.

Q How long have you been with the Lynchburg Police Department?

A Since January of 2022.

Q What do your duties include with the Lynchburg Police Department?

A I am currently assigned to the vice narcotics unit as a detective, but I'm also full time assigned as a task force officer on the Drug Force Administration Task Force.

Q What does that mean to be assigned to the drug task force?

A So the DEA is a federal organization that combats drug trafficking. And so my scope of the investigations grow a

little bit broader being sworn as a federal task force officer. So I investigate drug trafficking organizations.

Q And the Drug Enforcement Administration is also known as the DEA, correct?

A That's correct.

Q And so how long have you been in that position with the DEA?

A So currently -- this current stint I have been with the DEA and in vice since August of 2017. Then I spent a prior six- or seven-year stint just in vice alone.

Q What has been your role in this case?

A So this case was just starting or had already started. So Detective Booth and Detective Trent, they were orchestrating or in charge of all the controlled buys. I assisted mostly with once the -- it became time or appeared to be it was time to start obtaining search warrants and executing search warrants. Once those search warrants were executed and the evidence from those search warrants were obtained, I obtained search warrants for a cellular phone seized during the course of that investigation. I performed interviews of individuals that had knowledge about this drug trafficking organization.

Q And have you reviewed phone communications related to this case?

A Yes.

Q And you may have already said this, but you've been

involved in interviews related to this case, correct?
A Yes, sir.
Q All right. Are you familiar with any residents at 1009 Misty Mountain Road, Apartment 1212?
A Yes.
Q And that's here in Lynchburg, right?
A It is.
Q And I want to show you Government's Exhibit 148.
You've seen this admitted into evidence, correct?
A Yes.
Q And what's this a picture of?
A That's a picture of a closet inside that apartment.
Q Okay. And if we could show Exhibit 159. 159, please.
THE CLERK: These are already entered?
MR. WELSH: They are.
THE CLERK: Thank you.
BY MR. WELSH:
Q Excuse me, 149.
A That is a photo of a little statue trinket of Mr. Horsley and another female.
Q Where is this picture taken from?
A I believe that was in the bathroom, one of the bathrooms of the apartment.
Q At Apartment 1212?
A Yes, that same apartment.

Q And if we could bring up Government's Exhibit 19 and zoom in to where it says "sale" there, and take a look at this part.
Could you read what name is listed there?
A Yes. Quentin Horsley.
Q And what address is it addressed to?
A 1009 Misty Mountain Road, Apartment 1212, Lynchburg, Virginia, 24502.
Q Actually, could you read under customer ID?
A Yes.
Q And what does it say underneath customer ID?
A 434-444-7305.
Q Are you familiar with that number?
A Yes. It's a cellular phone number that was utilized in previous controlled drug buys from Mr. Horsley.
Q Okay. And I want to show you --
MR. WELSH: Your Honor, may I approach the clerk to retrieve two physical exhibits? I'd like to retrieve 158 and 157.
BY MR. WELSH:
Q Okay. So for the record I've handed you Government's Exhibits 157 and 158. Actually, if I could pull up -- take back 157. Okay. Now we can all see the other exhibit, 157.
What is Document 157 here?
A It is an invoice for repairs done on a Jaguar vehicle, a black Jaguar, and it shows that Mr. Quentin Horsley was the

customer.
Q And where was this document found?
A Inside the same apartment, 112 -- 1212, sorry.
Q And the money counter that's right where -- or excuse me, Government's Exhibit 158 that's right in front of you, what is that item?
A That is an electronic money counter.
Q Are you familiar with money counters?
A I am.
Q Do you know anything about how they work?
A Yeah. We personally as a vice unit have one to count the money. It does it more -- in a quicker and more efficient manner. Also in my experience I've also found those in the residences of upper-level narcotic traffickers in a way to count money. Drug trafficking is a cash business for the most part. Dealing in large quantities will require large amounts of cash. So, therefore, money counters are often used to expedite that process of counting the money.
MR. WELSH: I'm going to come back and hand you both of these two exhibits.
BY MR. WELSH:
Q Okay. Now, did you have the occasion to interview Mr. Horsley at some point?
A Yes, sir, I did.
Q When did that interview take place?

A February 21st, 2019.
Q And what was the nature of that interview?
A Mr. Horsley had been taken into custody on state indictments, and myself and Detective Booth had traveled up to Maryland where he was taken into custody. I took possession of his person and transported him back to Lynchburg, Virginia.
Q And did you provide Mr. Horsley with his *Miranda* warnings?
A I did.
Q Did he acknowledge that he understood those?
A Yes.
Q And have you previously reviewed Government's Exhibit 154?
A Yes.
Q And have you previously -- and what is Government's Exhibit 154?
A A full recording of that audio -- of the interview.
Q And about how long is that entire interview?
A Upwards of four hours.
Q And is that because that's the entire trip from Maryland back to Lynchburg?
A Yes, sir.
Q And what is Government's Exhibit 155?
A A snippet of that recording.
Q And what's discussed in that clip of the recording?
A Mr. Horsley's association with the apartment at Misty Mountain.

Q And are both Government's Exhibits 154 and 155 true and accurate depictions of the interview that occurred?
A Yes, sir.
MR. WELSH: Your Honor, I would move to admit Government's Exhibits 154 and 155 into evidence and then publish 155 to the jury.
THE COURT: They will be admitted and you may publish.
(Government Exhibits 154 and 155 marked.)
(Government Exhibits 154 and 155 admitted.)
(Audio playing.)
BY MR. WELSH:
Q What does the defendant say about Misty Mountain in that clip there?
A That he was assisting with paying for the rent there.
Q Now I'm going to retrieve Government's Exhibit 70, which is a phone.
I'm showing you Government's Exhibit 70, which has previously been admitted into evidence.
A Yes, sir.
Q Where was this item found?
A Inside that same apartment.
Q And if I could show you Government's Exhibit 147, previously admitted into evidence, and go to page number 2 and highlight the last two lines there.

Okay. So what does this show with respect to this document?
A The phone number associated with that item, which is 434-444-7305.
Q And that's the same phone that was found at Misty Mountain, correct?
A Yes.
Q What's the significance of that number?
A Again, that number was used to facilitate -- to contact Mr. Horsley to facilitate narcotic transactions.
Q Based on all that, do you have an opinion as to who lived at Misty Mountain Road?
A Yes.
Q Who is that?
MR. ANDERSON: Judge, I'll object to that. I don't know that that's within the scope of his expertise.
MR. WELSH: Your Honor, I believe it's a lay witness opinion and he can offer based on the facts in this case. It's of course an opinion, and Mr. Anderson can question him as to the basis of it, but I believe he's laid a foundation for it to offer an opinion on it.
THE COURT: What is the basis of his opinion?
MR. WELSH: Your Honor, the basis of the opinion would be the discussions -- or the evidence he's previously discussed: The photographs, the receipt, the phone number, the

discussion in the post-*Miranda* interview as the basis for it.

THE COURT: I think the jury has heard all of that.

MR. WELSH: They have, Your Honor.

THE COURT: Well, I think the jury could decide who it was, if they know.

MR. WELSH: Okay. I'll withdraw the question, Your Honor.

BY MR. WELSH:

Q Let me show you, Detective Bailey, Government's Exhibit 150, which I'll need to switch over to the ELMO.

So this is Government's Exhibit 150. Are you familiar with this document?

A Yes. That document was located in the same apartment as well.

Q Okay. So in your training and experience, what type of document is this?

A An owe sheet, O-W-E sheet.

Q What is an owe sheet?

A A list of individuals who owe money to a source of supply.

Q And does it just list customers?

A Sometimes it lists the narcotics as well.

Q And have you reviewed this document?

A I have.

Q What's on this first line here at the top of the document?

A Gotta get every dollar.

Q And then what's listed down the side here?
A Appears to be names of people.
Q Okay. I'm going to zoom in.
Can we read these names for the jury?
A Low, Jamie, Ralph, Cash, Brandon, Kenny, Duane, Matt, Jawonza, PJ, June -- Rat, I believe -- Bishop, Nate, Nat, and Magic.
Q And in kind of bigger letters here, what's listed over here?
A Ralph with an addition of two numbers together and then a phone number beside it.
Q And are any of these individuals you've come across in this investigation?
A Yes. Brandon and Kenny. And there are other names that are listed that were found within the data extraction of the phones that belong to Mr. Horsley.
Q Do you see Quentin Horsley listed on this list?
A I do not.
Q Do you see any nicknames for him like Q listed on there?
A No, sir.
Q I want to go to the top and review a couple of the items that are listed above "gotta get every dollar."
Can you see those? Those are a little darker. So can you read the terms in dollar figure -- or I'm sorry, the terms in numerical figures that are listed at the top?

A Yes. Starting at the top it says street, 58,000; H-town, 83,000. Then there's another block associated with that. It's another 100,000. Then cream -- there's a little bit of a glare -- I can see 86,000 and something. And then the next block is WH, 82,000.
Q Can you remind the jury what types of drugs were seized at 1639 Blackburn?
A Heroin, cocaine, and methamphetamine.
Q In your training and experience, do drug dealers use code words for drugs?
A Yes.
Q What is cream usually referred to as?
A Methamphetamine.
MR. ANDERSON: I'm sorry, I didn't understand the question. Was the question cream?
MR. WELSH: Cream.
MR. ANDERSON: Okay. Thank you. Sorry.
BY MR. WELSH:
Q How do you interpret the other words that are listed here?
MR. ANDERSON: Judge, I'm going to object as to his interpretation of the other words. I don't think that's relevant.
THE COURT: Well, you can ask him any specific word.
MR. WELSH: Your Honor, I think, again, it's a lay witness opinion that Detective Bailey can offer in the context

of the investigation of what those terms mean.

THE COURT: Well, he can, but just specific words. I mean, you can ask him what a certain word means.

BY MR. WELSH:

Q Allow me to ask you, what is your interpretation of what "H-town" means on this document?

A In my experience I know H to be a common letter or word to be used to describe heroin. And so, in my opinion, "H-town" is referring to heroin.

Q And what about this WH?

A In my opinion, I believe that's just an abbreviation for white, which is a code name for cocaine.

Q And what about cream?

A Cream is a code name for crystal methamphetamine.

Q And could these terms refer to people or nicknames of people?

A I have not come across in my investigation anyone named that. H-town I know to be another word for Houston, Texas, but not for a person.

Q If we could pull up Government's Exhibit 72.

Can you remind the jury what Government's Exhibit 72 is?

A It's a full extraction of the cell phone.

Q And have you reviewed the contents of it?

A I have.

Q And are there references to who the user of the phone is

contained in this?
A There were multiple messages that were sent to this phone from other users, and those messages contain the word or the name "Quentin," like Quentin and then the statement afterwards. So like they're writing a letter to the user of the phone.
Q And now I'm going to retrieve Government's Exhibit 90. I'm going to show you Government's Exhibit 90 and 83.
Can you remind the jury where Government's Exhibit 90 was found?
A During the course of Mr. Horsley's arrest in Maryland.
Q And what about Government's Exhibit 83?
A The same.
Q And I want to show you Government's Exhibit 92.
And what is Government's Exhibit 92?
A It's a full extraction of Exhibit N-4, this cellular phone.
Q Now, have you reviewed the contents of Government's Exhibit 92?
A I have.
Q And did you review photographs contained on -- within Government's Exhibit 92?
A Yes.
Q And what did you find in the photographs?
A There were multiple selfie photographs of Mr. Horsley.
Q If we could go to page 3 and highlight the top

conversation so that we include the first -- not the entire thing. Down to 3 p.m., if we could. That's perfect. Thank you.

Okay. So what's contained on page 3 of Government's Exhibit 92?

A It appears to be an email.
Q Okay. And what email is associated with this?
A An email named qhorsley84@gmail.com.
Q What's the basic content of the email?
A Apparently he was going to be attending or had attended an event, and it was discussing parking.
Q Okay. And who is it addressed to at the top of the email?
A Quentin.
Q Okay. Now, have you compared Government's Exhibit 92 to Government's Exhibit 72?
A Yes.
Q What did you find in your comparison of those two documents?
A There were several of the same text messages contained on both; however, in 4 there are more and up-to-date messages on that device.
Q When you say 4, that's Government's Exhibit 90?
A Yes, I'm sorry. I apologize.
Q Okay. If we could go to Government's Exhibit 93.

First, what is Government's Exhibit 93?

A It's a text message extracted from Exhibit 90.
Q Okay. If we could highlight this message here. What's the date of this message?
A 12-29-2017.
Q And where is this coming from?
A Yes, this is coming from the device.
Q Okay. And who is it going to?
A An individual saved as Alonzo.
Q All right. And what's the content of the message?
A This says Quentin, I just spoke with you. My address is 1001 Third Street.
Q Okay. So if we could bring up Government's Exhibit 95 and go down to page 6 and look at message 43.
All right. So what is Government's Exhibit 93?
A An extraction of a cell phone text conversation from that same exhibit.
Q And so that's just an individual conversation?
A Yes.
Q And who is this a conversation between?
A I don't have a name. There doesn't appear to be a name associated with it. Just with another number, 434-253-0556.
Q Okay. And what does whoever the number ending in 0556 state?
A He sent a message saying I took 3,600 to your sisters.
Q And how does -- what is the response?

A Thanks bruh.
Q If we could go down to page 11 and message 77.
Okay. And if we could look at these messages. First of all, what date are these occurring on?
A February 17th, 2018.
Q All right. And what does the user of 0556 say?
A I have 1,400 right now for you. I have seven left.
Q Okay. And how does -- what's the response?
A Okay.
Q And then the following message in 79?
A Would you be able to throw a half.
Q And if we could scroll down, and see message 80.
A What we at all together.
Q Okay. And how does the user of 0556 respond?
A 1,800 but I'm give you 1,400 of the 1,800.
Q What does that mean?
A That's how much he owes him. And he says I'm giving you 1,400 of the 1,800 that I owe.
Q Just to be clear, you were here for the testimony of Kenneth Adgerson, correct?
A That's correct.
Q And he testified that the user of this phone was Quentin Horsley, correct?
A Correct.
Q All right. If we could go to Government's Exhibit 97 and

go to page 2 and look at text message number 9.
All right. First, when is this message occurring?
A 9-7 of 2017.
Q Okay. And what number is it coming from?
A 434-426-7218.
Q And what does the user of the number 7218 say?
A Just told my boy to set up a meet with them. Told him everything was A-1. Numbers and quality speak for itself. These country -- blank -- ain't playing, though. Gotta be A-1.
Q Okay. And then what's the response?
A And this city -- blank -- ain't playing I mean F-ing plug Little Bill.
Q Okay. Now, in this series of conversations do you see reference to a "Little Bill?"
A I do.
Q And do you know what that is a reference to?
A It's my understanding it's like a cartoon character like Bill Cosby, I believe.
Q Okay.
A I don't know the significance behind it, but that's my understanding of what that is.
Q Okay. If we could scroll down to message 11.
And so then how does the user 7218 respond?
A I feel ya but I'm trying to eat bruh, pound sign. Gotta be right. Stop being greedy. Give to the needy. LLS.

Q Okay. And then what's the response to that coming from this phone?
A My -- blank -- I'm not greedy. It's business until you can move four a week. Then the ticket gotta stay the same.
Q What does that mean?
A So he's saying until you up what you're getting from me to what I'm assuming is going to be four ounces, then the price per ounce is going to stay the same.
Q Okay. And if we could just scroll down so we can see message 13.
Then what follows that?
A The message was sent, Trust me everybody is still paying 1,250.
Q Okay. And what's that in reference to?
A The price per ounce.
Q If we could go down to page 3 and look at message 20.
All right. So this is another message in that same conversation, right?
A Yes.
Q And so what does 7218 say?
A I'm saying did you tell them the number or not.
Q And if we could scroll down. And then what does he say after that?
A Yeah, I told him 19 for the half .
Q And after that?

A Yo.
Q So message 23, this is coming from the phone, correct?
A Correct.
Q All right. So what does it say there?
A Well, you get 500 if he buy it. That's cool. My man, go let me know. Should have everything set by the time yo ugly -- A -- get back. LLS.
Q Okay. And then message 25, what does that say?
A Cause the half is 18,500 and the whole is 37. I gotcha.
Q What do you interpret that to mean?
A A half of a kilogram is $18,500 and the whole kilogram is $37,000.
Q Is that consistent with prices at that time for cocaine?
A Yes.
Q All right. And if we could scroll down and make sure we can see 26 and 27 here.
What are these two messages saying?
A He's asking what about four -- and I'm assuming ounces. And it's responding 4.5 will be 5,000.
Q And is that consistent with the price of cocaine at that time?
A Right. Yes.
Q If we could go down to page 9 and look at message 64.
Message 64 is which -- who is sending that message?
A The other party is sending the top message.

Q Okay. And what does that say?
A At the crib chilling, bro, finished. You wanna link tonight or tomorrow. Got that five I owe you that will come through Friday or you want to wait and link then. It's up to you, Little Bill.
Q And then what's the response?
A Come through.
Q If we could go to page 10, it's message 72.
Okay. So which direction is message 72 coming from?
A The top message is incoming.
Q Okay. And what does that say?
A Little Bill, you know anybody that will buy a compressor.
Q What's the response to that?
A What kind?
Q What's the response in message 74?
A Stop acting retard, Little Bill. I can fabricate and weld them joints up, F-ing put S under car tires and S.
Q Okay. And if we could keep going down to 75.
A Call me.
Q So who was sending that message, "call me"?
A That was an outgoing message.
Q Okay. And now 76?
A That's an incoming message, How much weight you wanna do at one time in the box?
Q And then 77?

A About 600 grams.
That was an outgoing message.
Q So how do you interpret those messages together?
A It appears they were trying to discuss making a press. And 600 grams, they want a box big enough to be able to compress 600 grams into it.
Q Okay. If we could go down to 78, can we read this message?
A Aite. Gonna take me a few days. Gotta build on my lunch break.
Q Then he responds at 79?
A He responds, Okay.
Q And 80?
A Then an outgoing message, Give me a draw up of what it will look like.
Q Okay. And 81?
A He responds, Aite.
Q And if we keep going down.
A Then the incoming message advised that the dimensions for that press will be 4 by 8 by 1.5.
Q Okay. And what about 83 here?
A That's 4 inches wide, 8 inches long, 1.5 inches tall/high exact measurements for one brick.
Q What do you take that statement to mean?
A That the kilo -- well, the press that the sender was going

to be making was describing that if I make it to these dimensions, it's the exact measurement for a kilogram brick.
Q Okay. And then the response to that 84?
A An outgoing message says, Yeah.
Q And then down in 85?
A Another outgoing message saying, One brick is what I need.
Q And 86 and 87 just -- 86 and 87?
A Aite.
And then he responds, Bet.
Q Okay. And now down one more to 88?
A Yo.
Q And then 89?
A Incoming message, Bro, I got all the materials for the project. About to get on this blueprint. Send it to you later.
Q Okay. If we could go down to page 13 and look at message 93, when does this message occur?
A 10-16-2017.
Q All right. And what does -- what's this first message here?
A How long will it take?
Q That's an outgoing message?
A Yes.
Q And then what's the next message?
A Incoming message, I don't know, bro. Gotta do this on my

own time. Can't do it on work time. On that note, I gotta either stay over or go in early, and I don't get paid for that. How much do you think them -- blanks -- can go for? No lowballing, Little Bill. We can split 50/50.
Q Okay. And if you can go further down?
A An incoming message, I'm looking out for you, Little Bill, because I 'F' with you and you always did me right. I know MFs be paying a grib -- blank.
Q Okay. And go down to 96.
A Be done by the end of the week, incoming message.
Q And then next, 97?
A IDK -- I don't know -- for real, bro.
Q All right. And if we go down, look at 98.
A I feel you. When we get this "S" correct, I never knew of a blank with an official joint. Heard about them joints up north. Them blanks was going for a grib. That's why only the pins got the official joints. We go focus on the bottom -- blank -- low ticket band or two, maybe more.
Q And then what's the response for that?
A For the press?
Q So what do you take those two messages together to mean in the context of this?
A My interpretation of it there is he -- the two individuals involved in the conversation weren't familiar with anybody around here that ever had a kilogram press.

And if you could scroll up a little bit further, the going rate for them were a couple thousand dollars if you were to buy one.

Q Okay. And then the outgoing message was for the press, right?

A Yeah. He's asking: Are you talking about the press, is that what you're referring to?

Q Okay. If we could go down a little further and look at message 100 and 101.

What's this message on 101?

A It says, Yeah, Little Bill -- I'm sorry, that was an outgoing message.

So that joint gonna be official like that.

Q Okay. Keep going down, and then down to 103.

A And then it was an incoming message saying, The finished product will.

Q And then 104?

A Okay, okay, bro.

Q And then 105?

A I gotta see it.

Q And then 106?

A If it work, can make them any size and any shape.

Q 107?

A Can paint them too if yo Little Bill ass wanna be cute LLS. Can add a stamp too.

Q And if you could read message 108, what direction is that coming from?
A That's outgoing.
Q All right.
A Real talk, though, you can make it have a stamp though.
Q 109?
A Yeah, shouldn't be a problem.
Q And then down to 110?
A I need it to work.
Q What is a stamp?
A So stamps are used in a variety of ways, one to stamp heroin lids, which they're little wax lids of individual doses of heroin. And then on a larger scale, stamps are impressed into cocaine, you know, as a trademark of where the main source is coming from.
Q Okay. If we could go down to page 21 and look at message 151.
A That's the incoming message. It says, Damn, what up with them essays.
I believe he's not referring to a report. He's referring to another slang term for Hispanic.
Q Okay. And what's the response in the outgoing message for that?
A I don't know, man. Something must have gotten stopped.
Q Okay. And then if we go down to page 43 and look at

message 310, if we could --
A The incoming message, You ready, bro bro?
Q All right. And what's the outgoing response?
A Nah.
Q And then 312?
A Damn, Little Bill, tighten your ass up and then connect.
Q What's the word "connect" mean?
A Source of supply.
Q All right. Go down to 314.
What's the response here?
A It's an outgoing message saying they lost 12 tons.
Q And what's the date of these series of messages here?
A 4-27-2018.
Q All right. If we could go to Government's Exhibit 101.
What is Government's Exhibit 101?
A It's another text exchange extraction from that same exhibit.
Q If we could look at just the first message here. What direction is this message?
A It's an incoming message, Yo, it's Ralph, fam. Call me.
Q Okay. What's the significance of Ralph?
A That name was on the owe sheet.
Q So that would be -- that's one of the names listed here on Government's Exhibit 150?
A Yes.

Q All right. So if we could go further down and look at page 6 and look at messages 43 through 44.
A That's an incoming message from Ralph. I got my car. I can still meet you on Langhorne.
Q And then what's the response?
A I'm on the way.
Q What's the significance of Langhorne?
A It's the street where multiple of the previously mentioned controlled buys took place.
Q And if we could go down to page 11 and go to message 87.
So first, what's the date of this message?
A 2-19-2018.
Q All right. And what's the direction of this first message 87?
A It's an incoming message, Yo, bruh, the broke down "S" don't come back.
Q Okay. The next message?
A It turned black.
Q And if we could keep reading, 89?
A Blank -- you don't know what you doing.
Q And then 90?
A What you trying to do?
Q Okay. And go to 91.
A He responds, I was going to turn it into half and half.
Q And 92?

A You don't know what you're doing. That's fire, bro.
Q So what do those series of messages together mean?
A To me it sounds like the sender of the text messages was trying to cook crack cocaine and failed at it, and was trying to complain about the quality of the original powder cocaine. Mr. Horsley was explaining to him that it was good --

MR. ANDERSON: I'm going to object to the use of Mr. Horsley.

THE COURT: The jury has heard the evidence.

MR. WELSH: That's fine. The witness doesn't need to make the characterization, Your Honor.

BY MR. WELSH:

Q The outgoing message, how -- what is the response in the outgoing message?
A You don't know what you're doing. That's fire, bro.
Q Okay. What does fire mean?
A Good quality of narcotic.
Q Okay. And if we could keep going down to message 93, what's the incoming message?
A I taste like bake at the bottom.

I'm sure that was a typo. I'm sure it's it tastes like bake at the bottom.
Q Okay. And down to 94?
A My uncle whipped it for me. That's "war" he do.

I'm assuming that's "what he do."

Q 95?
A Nah, bro.
Q That's an outgoing message?
A Yes.
Q And 96?
A Another outgoing, I could have cooked it for you.
Q So what does that mean? That's an outgoing message from his phone.
What does cooked mean?
A Cooking powder cocaine into crack cocaine.
Q Okay. And if we go down to 97?
A Incoming message, Aite. I'll tell you what.
Q And what about 98?
A The user of the phone responded, What?
Q 99?
A I'll bring you the half of it tomorrow and you can cook it for me.
Q Okay. And 100?
A I don't play games with the work, bro.
That was an outgoing message.
Q All right. 101?
A Okay.
Outgoing.
Q And 102?
A When I bring you the rest of the bread.

Q And 103?
A Outgoing, Okay, cool, I gotcha.
Q And if we could keep going down.
All right. 104, which direction is that message going?
A That's an incoming message.
Q What does that say?
A I'm trying to get on, fam.
Q All right. 105?
A I gotcha, fam.
Q Finally, 106?
A I got hard too.
Q What's "hard" a reference to?
A Street language for crack cocaine.
Q And which direction is that message?
A Outgoing message.
Q All right. If we could go to Government's Exhibit 103.

THE COURT: Why don't we take a break now. It's been a long time. So we'll take a 20-minute recess.

**(Jury out, 2:57 p.m.)**

THE COURT: Call the jury back.

**(Jury in, 3:19 p.m.)**

THE COURT: All right. You may be seated.

MR. WELSH: Thank you, Your Honor.

BY MR. WELSH:

Q All right. Detective Bailey, if we could turn to

Government's Exhibit 103.

First if we could just focus on the top here so we can see the columns. So who is involved in this set of text messages listed here?

A A contact with the name of Marcus and a phone number of 706-513-0521.

Q Okay. So if we could go down to page 2 and look at message -- starting at message 9.

And so what direction is this message 9 coming from?

A It's an outgoing message. I seen all that. What up with this paper.

Q If we could keep scrolling down, it looks like what's message number 10?

A It appears to be a photograph of someone behind the driver wheel of a vehicle driving down the road.

Q Okay. And if we could go down to 11.

And which direction is this message coming from?

A It is an outgoing message. He need to give you some. Ain't nobody got to give that -- blank -- period.

Q Okay. And then message 12?

A It is a photograph. It appears to be inside a house.

Q Okay. And message 13, which direction is this?

A It's an outgoing message. I still need my money, fam.

Q And message 14?

A It is an outgoing message. That's not my problem. I gave

that product to you period.
Q And what's the date of this message?
A 9-5-2017.
Q And what's the response in 15?
A I agree.
Q And then 16?
A You gotta send something, man.
Q If we could go down to page 8 and look at message 47.
A It's an incoming message. I got to see what my deposit is from the store, but the banks are closed.
Q Message 48?
A It's an outgoing message. Look, I'm gonna come down. I need my paper, bruh.
Q What does "paper" refer to?
A Money.
Q If we could keep going down, what's message -- which direction is message 49?
A That is an outgoing message. You playing games with my money now.
Q All right. Then down to 50?
A That's an outgoing message, And dude, house you went to only gave him a ounce or two. So where the work at.
Q And 51?
A This is an incoming message: I was busy today and I had my phone on low. The bread that I was going to send today, I

had to use it, but the guy that get the boy from me need some SA.
Q Okay. And then 52?
A Okay. So that's a continuation. So going back to the previous message, The boy from me need some Saturday, so I will send what I make off of it then.
Q Okay. What's the context of that message, that response there?
A Just talking about he had -- apparently the user of this phone had provided narcotics to the sender of these messages, and apparently money was made. He's asking where is the money from the sales of those narcotics, and apparently there was a discrepancy on how much was given to the person by Marcus. And he was saying so where is the other work, which is another street slang for narcotic.
Q Okay. And what about this message in 53 here?
A How much paper, man? I need it.
Q All right. Let's go down to page 10 and look at message 61.
What's the date of this message?
A 9-18-2017.
Q And what direction is this one going?
A It's an outgoing message. How much longer I gotta wait, cuzo.
Q Okay. And then message 62?

A Another outgoing message, Cause whoever you gave it to gotta kick the paper. I'm coming down with my people.
Q All right. If we could go down to 63?
A It's an outgoing message, Who is this -- blank?
Q Then if we could go down to page 22 and bring up message 146.
What's the date of this message in 146?
A February 26, 2018.
Q And what direction is it going?
A It's an outgoing message, When can you send me some paper?
Q And then 147?
A I need it.
Outgoing.
Q And if we could keep going down, 148?
A It's an incoming message, If I didn't have to pay all the extra stuff yesterday, I would have had it.
Q And 149?
A You should have got me my paper first, man.
Q And then 150?
A And I feel that you kept my work to come up.
Q In which direction is that message going?
A That's an outgoing message.
Q And down to 151?
A What do you mean?
Q And then 152?

A I mean you kept most of the work I gave you. You might have gave dude an ounce or two, but not all of it.
Q Okay. And down to 153?
A I'm not crazy, man.
Q And 154?
A It's incoming. I told you that I let Tony do it. I didn't mess with no work for a while.
Q All right. And 155, what direction is that going in?
A That's an outgoing message, Man, I need my bread.
Q And 156?
A That's an outgoing message. Y'all got the same -- you got the game F'd up -- F'd, man.
Q Okay. And 157?
A Incoming message, I know you need it.
Q And 158?
A Outgoing message. Yeah, you supposed been had me out that way.
Q And finally, 159?
A So when will you straighten your bill? Outgoing message.
Q Have you reviewed other conversations in Government's Exhibits 94, 99, 100, and 96?
A Yes, sir.
Q And do those contain conversations about narcotic sales?
A Yes, sir.
Q All right. I'm going to refer you first to that phone

that you have in front of you, Government's Exhibit, I believe it's 83.

Where is this phone from?

A It was also seized during Mr. Horsley's arrest.

Q And then now if we could bring up Government's Exhibit 86.

First, what is Government's Exhibit 86?

A A text message exchange extracted from that cellular phone, Exhibit Number 83.

Q Okay. And so who are the -- what's the -- who are the participants in this conversation?

A Blacc Rock with phone number 434-426-7069.

Q Okay. And if we could go down to page 3, and maybe we can zoom in a little bit, and start with the third full message down.

A So the user of the phone said, What you wanted again?

Mr. Rock responded, A quarter -- QU, which I believe to be a quarter.

Q Okay. And then if we go down?

A And then he said, A soft.

Q First, what's the date of this message?

A 1-6-2019.

Q Okay. So the user of the phone then says, A soft.

What about after that?

A A Q of soft?

Q And after that?

A Mr. Rock said, Hard.
Q Okay. And then what does the user of the phone say after that?
A He advised Mr. Rock to call Kenny at 907-6461.
Q Are you familiar with that number?
A That is a phone number previously identified to be used by Mr. Adgerson.
Q Okay. Could we expand the box a little bit just so we can see.
And if we could keep scrolling down. Now, this message at the top, what does Blacc Rock say?
A Who that?
Q And then what does the user of the phone say?
A That's who move for me.
Q Okay. And if we could go down.
And then what's the response to that?
A Mr. Rock says, Still at our price, right?
Q Okay. And what's the response after that?
A 250.
Q Okay. If we could go to Government's Exhibit 87.
All right. If we could -- so what is Government's Exhibit 87?
A Cell phone text extraction from Exhibit Number 83.
Q Okay. And what's the number that's involved in this conversation?

A 434-426-7218.
Q Are you familiar with that number?
A Not off the top of my head. I'm sorry.
Q Okay. We could start -- look at the message at the bottom of the page.
What does the user of Government's Exhibit 83 there say?
A On 11-19-2018 the user of that phone said, This is my new number.
Q Okay. And then if we could go down to -- scroll down one page -- page 2.
Okay. And if we could look at the bottom of the page there, and pull up that message, the very last message.
A Lil, give your boy my number so he cam -- actually, can -- hit me when he pull up.
Q So if we could, what time and date are listed for that message?
A 11-20-2018 at 3:18 p.m.
Q Okay. So if we could pull up Government's Exhibit 88 and go to I believe it's page 6.
I was wrong. It's page 7., the next page. I'm sorry, one more page.
Okay. And if we could highlight -- well, first of all, what is Government's Exhibit 88?
A Another text exchange extracted from that same exhibit.
Q Okay. And who has previously identified Government's

Exhibit 88 as a conversation?
A I believe it was Mr. Adgerson.
Q Okay. So this is one of the things he talked about yesterday, right?
A Correct.
Q All right. So if we could highlight the three blue messages here. Okay. So what's this number that's listed in this top message here?
A It's the phone number from the previous text exchange we just spoke about.
Q Okay. So that's the number from Government's Exhibit 87, right?
A Yes.
Q And that's -- can you say what's the date that that number is texted from this user to Mr. Adgerson?
A 11-20-2018 at 4:23 p.m., roughly an hour or so after.
Q Okay. And then the following message?
A You good, bro?
Q Okay. And then following that?
A I sent Jamie around there.
Q Okay. And does the name Jamie have any significance in this investigation?
A The name Jamie was also found on the owe sheet.
Q That's the second number listed here on Government's Exhibit 150, right?

A I don't know. It's on that owe sheet, yeah.
Q If I show you that, would you just confirm?
A Yes, it is the -- Jamie is listed as the second name down.
Q Okay. Thank you.
A Yes, sir.
Q So if we could go back to Government's Exhibit 87 and go to page 6 on Government's Exhibit 87 and look at this message, the third from the bottom.
Okay. So now we're switching back. This is the number ending in 7218?
A Yes.
Q What does the user of that number say in this first message here?
A Bro, I just talked to your boy. Told him 2. Hope that's cool. Forgot I had his number. Hit him and verify everything, Lil Bill. You be taking too long and "S."
Q Okay. And what's the date of that message?
A 12-27-2018.
Q If we could go to Government's Exhibit 89.
What is Government's Exhibit 89?
A A text message exchange from that same exhibit.
Q Okay. And if we could go -- and who is involved in this conversation here?
A The number 1-854-444-1221.
Q If we could go down to page 2 and highlight the message in

the middle that starts with "yo."
So let's start with this. Can you read this message?
First of all, what's the date of this message?
A 11-13-2018.
Q And where is the message coming from?
A The user of the phone.
Q Okay. And what does the message say?
A Yo, you went up to the press on me.
Q And what is the press? What does that mean?
A That's the kilogram press.
Q Okay. And how does this 1221 number respond?
A No -- blank -- that's how they came and it's fire. I just took it to somebody to drop it.
Q Okay. If we could scroll down a little bit.
And the next messages?
A They look pressed to me. I can do that myself.
Q When did those messages occur?
A 11-13-2018.
Q All right. If we could go down a little more.
And the next message?
A The user of the other phone sent a message, One ain't even open. I opened that one because he told me to check it, and later on he got 8 more.
Q Okay. If we could go down a little more.
A It swim and jump back ASAP too. It do look two tone but

it's all shiny and it jumped back quick.
Q What does that mean?
A Powder cocaine has a sheen to it. It's almost like a glassy or crystalline sheen to it. You can tell by looking at it what appears to be authentic.
As far as the press goes, my interpretation of those is that this is a source of supply. This source of supply cut it himself and tried to press it into a kilogram himself. And the user of the phone was complaining that, you know, hey, I could have done that myself. This doesn't look good to me.
Q Okay. If we could keep scrolling down, what about this message here? It's a continuation of the conversation.
A The user of the phone, Man, I need stamped for 34.
Q Okay. And what is the significance of 34?
A The approximate price for a kilogram of cocaine.
Q Okay. And the next message?
A I couldn't see no shine -- blank.
Q Okay. Keep going down.
A My blank, it's stamped. M all shine.
Q Okay. If we could go down to page 5.
All right. And start with the second message from the bottom there. So first, when does this message occur?
A 11-14-2018.
Q And who is this message coming from?
A The user of the phone.

Q And what does it say?
A The scorpion joints?
Q And what's the term "joints" mean?
A Well, a joint can refer to an ounce of cocaine and a kilogram of cocaine.
Q Okay. And if we could go down, what's the next message here?
A You know I need that fire to get my back jumping.
Q And what's the response to that?
A Yes, scorpion.
Q Scroll down one more. Well, yeah, if we can keep reading?
A The user of the phone replied, Yo yo. The sender gave what appeared to be a time that he was outside or the sender was outside.
Q Okay. And now if we could show Government's Exhibit 110, which has been admitted into evidence.
So if we could -- well, first of all, what is Government's Exhibit 110?
A It is Exhibit 1. It was one of the substances or items seized from the Blackburn address.
Q Okay. And where was this picture taken?
A At the Mid-Atlantic Laboratory by the chemist that conducted the analysis of that item.
Q Okay. Can we zoom in on this?
And what is -- what is this a picture of? What are we

looking at?
A It appears to be an imprint of a scorpion to me.
Q Okay. And what is the substance underlying that? I know it's in evidence, but --
A Yeah, it's a brick of cocaine.
MR. WELSH: One moment, Your Honor.
I have no further questions, Your Honor.
MR. ANDERSON: One moment, please, Your Honor.
Thank you, Your Honor. I have no questions. We ask that he be subject to re-call, but I have no cross right now.
MR. WELSH: Thank you, Your Honor. With that, the government rests.
THE COURT: All right. Do you want to call your first witness?
MR. ANDERSON: Your Honor, may we approach, please?
THE COURT: Yes.
(Sidebar commenced.)
MR. ANDERSON: Can you all hear me?
Judge, can the record reflect that we moved for judgment acquittal of Rule 29. We'll leave it to the Court's discretion at this point and just have the record reflect that we've made it timely, and we'd argue that they haven't proved the underlying conspiracy to connect it together.
THE COURT: Okay.
MR. WELSH: You'd like the government's response?

I think there's been sufficient evidence. Several witnesses have testified, including Mr. Adgerson, establishing a conspiracy that -- with text messages that it's reasonably foreseeable that those drugs were involved, and has presented evidence from law enforcement about the different distribution counts. And so I would submit that in the light most favorable to the government, there is sufficient evidence to proceed.

THE COURT: Okay. I think it is a jury issue.

MR. ANDERSON: Your Honor, I have one short witness that we could call to put on. I don't think -- it will probably take us to 4:00, if that. Then I might ask the Court to consider where we are scheduling-wise.

THE COURT: We won't finish tomorrow if we don't use all of today.

MR. ANDERSON: We'll finish tomorrow.

THE COURT: Will the jury finish?

MR. ANDERSON: I think the jury will get the case before 10 or 11:00.

THE COURT: How many do you have after this?

MR. ANDERSON: Potentially one.

THE COURT: Okay. Not more than an hour or so?

MR. ANDERSON: But I could put one on this afternoon.

THE COURT: Put somebody on there.

(Sidebar concluded.)

MR. ANDERSON: Your Honor, the defense would call

Detective Trent.

(Pause.)

Your Honor, if it please the Court, I think that he may have just stepped away for just a second. It may take a few minutes just to have Mr. Trent back here.

THE COURT: Is he in the building?

MR. WELSH: I'm not sure, Your Honor. I believe we'd have to check. He was here earlier. I don't think that we were -- I wasn't sure that the defense was going to call Detective Trent at this time. So -- but we can find him quickly.

THE COURT: Find him. Somebody should have his phone number -- cell number, I guess, and ought to be able to know right away where he is.

MR. WELSH: Yes, Your Honor.

THE COURT: Members of the jury, if you wish, you can step into the jury room. It will just be a short time, I think.

We're probably going to let you go a little earlier.

**(Jury out, 3:46 p.m.)**

MR. WELSH: Your Honor, it sounds as if he's three minutes away. He's just down the street. I believe we'll be able to resume quickly.

(Recess.)

MR. ANDERSON: The witness is here.

THE COURT: If the jury is ready, can you bring them in.

**(Jury in, 3:52 p.m.)**

STEVEN TRENT, CALLED BY THE DEFENSE, SWORN

DIRECT EXAMINATION

THE COURT: You may be seated.

MR. ANDERSON: Thank you, Judge.

BY MR. ANDERSON:

Q Good afternoon, again, Detective Trent.

A Yes, sir.

Q Just a brief area of questioning I have for you.

Detective Trent, I'm going to focus your attention, please, to June 22nd of 2018. I don't know if you have your narrative report in front of you?

A June the 22nd, I do not.

Q It's in reference to your handling and conversation that you had with Mr. Jaimz Bowman.

A Okay.

MR. ANDERSON: May I approach the witness, please, Your Honor?

THE COURT: Yes.

BY MR. ANDERSON:

Q Detective Trent, when you were developing Mr. Bowman as an informant, he was giving you information about where he could do a controlled drug purchase?

A Yes, sir.
Q And he gave you the name of the individual to whom he thought he could inform on?
A Yes.
Q I believe that would have been Mr. Adgerson?
A That's correct.
Q And that day he provided you with a cell phone number for Mr. Adgerson; did he not?
A Yes, he did.
Q Could you relate to the jury what that cell phone number was, please?
A 434-907-6461.
Q Thank you. I'm sorry to bring you back for that short piece of evidence, but thank you very much.
A That's fine.

MR. ANDERSON: That's all.

MR. WELSH: I have no cross-examination, Your Honor.

THE COURT: All right. Members of the jury, we're going to stop now until 9:30 tomorrow morning, and resume then.

Of course, overnight do not discuss the case with anyone or let anyone discuss it with you, or remain within the hearing of anyone discussing the case. So you're excused now.

You didn't have another witness?

MR. ANDERSON: Your Honor, I have one more quick -- just ask Detective Bailey to come back for one quick

questioning.

THE COURT: Oh, I'm sorry.

MR. ANDERSON: Your Honor, may Detective Trent be excused?

THE COURT: Yes.

DANIEL BAILEY, CALLED BY THE DEFENSE, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. ANDERSON:

Q You are, again, Detective Bailey?
A Yes, sir.
Q You've been on the stand this afternoon?
A Yes, sir.
Q And I likely could have asked you this on cross and neglected to, but it occurred to me I should ask you this.

So in terms of the gathering of the evidence when the searches were conducted on February the 11th of 2019, at some point you were made aware of, if not actually participated in, the seizure of certain items at Blackburn Drive?
A Yes, sir. I was never present at Blackburn Drive, but those items were brought back I think to a common location at the police department where it was packaged there. I was present, but I don't -- during the initial packaging or inventory of those items, I was not part of.
Q You are aware -- are you aware, sir, of the items that were recovered from what was reported to be shelving in the

closet above another shelving?
A Yes, I'm aware of those items, yes.
Q And those items consisted of what we've heard referred to as a duffle bag, and then other items contained within other duffle bags or other bagging, and where illegal substances were determined to have been located?
A Yes, sir.
Q Are you aware, sir, whether any of those baggages of any type were submitted for fingerprint analysis?
A Yes. So I don't have it in front of me. I do know that multiple items were sent for analysis. I know that one came back with no viable latents removed. And then due to -- we received notification from the lab that they were not going to test the other items for fingerprints.
Q So if I might break that down a little bit, the larger duffle bag the jury has seen a photograph of that's kind of black in color with the strap, that was submitted for fingerprints?
A No, sir, I'm sorry, the contents. The packaging of the narcotics and everything within the duffle bags were sent --
Q I got it.
A -- for analysis, not the bags themselves.
Q Just the narcotics packaging was submitted.
Is it accurate to say that one latent print was developed --

A I don't know the --
Q -- but not suitable for comparison purposes?
A Yes, sir.
Q But the outside packaging and baggage was not submitted for fingerprinting?
A The duffle bags, like the cloth materials were not, correct. Yes.

MR. ANDERSON: That's all I have. Thank you.

MR. WELSH: I have no cross-examination, Your Honor.

THE COURT: All right. Thank you.

Ladies and gentlemen, thank you, and you may now leave.

**(Jury out, 3:58 p.m.)**

(Proceedings concluded, 3:59 p.m.)

# C E R T I F I C A T E

I, Lisa M. Blair, RMR/CRR, Official Court Reporter for the United States District Court for the Western District of Virginia, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/s/ Lisa M. Blair Date: February 22, 2023