UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

************************************************************

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO.: 6:19CR13 |
| | MARCH 25, 2022, 9:30 A.M. |
| | LYNCHBURG, VIRGINIA |
| Plaintiff, | JURY TRIAL, DAY 4 |
| vs. | APPEAL NO.: 22-4671 |
| QUENTIN LOWELL HORSLEY, | Before: |
| | HONORABLE NORMAN K. MOON |
| | UNITED STATES DISTRICT JUDGE |
| Defendant. | WESTERN DISTRICT OF VIRGINIA |

************************************************************

APPEARANCES:

For the Government: SEAN MICHAEL WELSH, ESQUIRE
United States Attorneys Office
Western District of Virginia
255 West Main Street, Room 130
Charlottesville, VA 22902
434-293-4283

For the Defendant: ANTHONY FRANKLIN ANDERSON, ESQUIRE
BROOKS ALEXANDER DUNCAN, ESQUIRE
Anderson Legal
P.O. Box 1525
Roanoke, VA 24007
540-982-1525

Court Reporter: Lisa M. Blair, RPR, RMR, CRR, FOCR
255 West Main Street, Suite 304
Charlottesville, Virginia 22902
434.296.9284

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT PRODUCED BY COMPUTER.

INDEX

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT:

By Mr. Welsh 34

CLOSING ARGUMENT ON BEHALF OF THE DEFENSE:

By Mr. Anderson 59

REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT:

By Mr. Welsh 75

(Proceedings commenced, 9:30 a.m.)

THE COURT: Good morning. Have a seat.

Are we ready to call the jury back?

MR. WELSH: Yes, Your Honor.

THE COURT: All right. Is all the evidence in?

MR. ANDERSON: Your Honor, the defense is prepared to rest.

MR. WELSH: Your Honor, the government just wants to submit as a procedural matter the stipulations in this case and submit those as exhibits, I think without objection, so that they can be sent back with the jury.

THE COURT: Okay.

MR. ANDERSON: We have no objection to that, Your Honor. And I think we have moved the defendant's exhibits that were offered into evidence.

THE COURT: If you'll take your mask off, that will help.

MR. ANDERSON: Judge, as you can see from these proceedings, these masks make it very hard. I'm having the same issue. So I apologize.

Your Honor, with the Court's permission, we would rest. We've moved the admission of all of our exhibits.

We would renew our motion for judgment of acquittal, Rule 29, with respect to the different standard that's in place now. We submit that the evidence presented in support of the

underlying conspiracy as charged in the indictment, reasonable men could not differ, and therefore we would move for judgment of acquittal as to Count One.

MR. WELSH: Your Honor, I think the evidence in this case has been demonstrated through multiple witnesses, through recordings, through text messages that establish a conspiracy and establish the minimum weights in this case, as well as the individual distribution counts. And so I would offer that this is a matter for the jury.

And I also have three stipulations marked as exhibits to hand up to the Court.

THE COURT: Okay. We'll mark the stipulations as exhibits and they'll be admitted.

MR. WELSH: Thank you, Your Honor.

THE COURT: Anything else?

MR. WELSH: There is -- looking at the Court's exhibit list, I believe there are two exhibits that were offered and admitted into evidence. Those would be 157 and 158.

Excuse me. My apologies, Your Honor. It was early in the list and I missed it. There are no other issues, Your Honor.

THE COURT: Okay. Let's run through these instructions. What's the objection to the first instruction? Let's go through them. I know there are not objections to

everything.

What is your first objection?

MR. ANDERSON: Your Honor, the government and the defendant may have agreed. The one instruction that we had a strenuous -- sorry, forgot to do that again -- was jury instruction number 32.

THE COURT: All right.

MR. ANDERSON: And after discussion with the government, I think the government is going to agree that that should be withdrawn.

MR. WELSH: I think that's right, Your Honor. I believe that the elements and what's described in instruction number 32 are covered in other instructions, and I think it's sufficient to proceed without it.

THE COURT: All right. That will be removed.

What's the next one? Number 5, is that -- is there an objection to that?

MR. ANDERSON: Judge, the only objection the defendant has to instruction number 5 is the last sentence where it sets forth -- it begins, "For example." We submit that's argument and that that last sentence should be struck. That's the objection we have to number 5.

MR. WELSH: Your Honor, the government's position is that that should be included. It's a reasonable description of circumstantial evidence. I think it's helpful for the jury,

and I think something that's been used by many courts, and that there is no issue with it.

THE COURT: All right. Okay. I'll give it. I think for some people, it will help.

Any other instruction?

MR. WELSH: Nothing from the government, Your Honor.

MR. ANDERSON: Judge, I'm going to withdraw the concern -- the objection that we had with instruction number 7. I believe it's all right now.

THE COURT: Okay. I denied the defendant's motion that the case be dismissed, at least I thought I had.

(Pause.)

I normally do not send the indictment back, unless you all wanted to.

MR. ANDERSON: If we're not sending the indictment back, Your Honor, I think that takes care of it.

(Pause.)

**(Jury in, 9:45 a.m.)**

THE COURT: You may be seated.

Ladies and gentlemen, both sides have rested their case, and now you have heard all the evidence. It becomes my duty, therefore, to instruct you on the rules of law that you must follow in applying -- in arriving at your decision. Now, in case I might misspeak or read something wrong, but the instructions as I read them are going to be on the ELMO here,

and you'll be able to see them. If I should say something different than what's in the written instruction, the written instruction applies. And if it's anything serious, I'd like for it to be pointed out.

You, as jurors, are judges of the facts. But in determining what actually happened in this case -- that is, in reaching your decision as to the facts -- it is your sworn duty to follow the law I am now in the process of defining for you. And you must follow all of my instructions as a whole. You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. That is, you must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I give it to you, regardless of the consequences.

By the same token, it is also your duty to base your verdict solely upon the testimony and evidence in the case, without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors in this case, and they have a right to expect nothing less.

Attorneys for the government and for the defendant may have referred to some of the governing rules of -- or may refer to some of the governing rules in the law in their various arguments, whether in the opening or closing of the

trial. It was proper for them to do so. However, if you perceive that there are any differences between the law as stated by an attorney or the law as stated by the Court, those -- through these instructions, you are to be governed at all times by the Court's instructions.

The defendant, Quentin Lowell Horsley, has pled not guilty to the offenses charged. He is presumed to be innocent. The superceding indictment against the defendant is not evidence of guilt. The law does not require the defendant to prove his innocence, or to present any evidence, or to testify.

Every defendant in a criminal case has an absolute right not to testify. In this case, the defendant has chosen to exercise his right to remain silent. You must hold this -- you must not hold this decision against the defendant, and it would be improper for you to speculate as to the reason or reasons for his decision. You must not draw any inference of guilt from the defendant's decision not to testify.

The government has the burden of proving him guilty beyond a reasonable doubt; and if it fails to do so, you must acquit him. The government must prove every element of the crimes charged beyond a reasonable doubt. If you find that the government has proved beyond a reasonable doubt every element of an offense with which the defendant is charged, it is your duty to find the defendant guilty of that offense. On the other hand, if the government has failed to prove any element

of the offense beyond a reasonable doubt, then you must find the defendant not guilty of that offense.

The law presumes that reasonable doubt is a concept within the ordinary competence of a jury; that is, that you will be able to apply reasonable doubt according to its plain, ordinary, and everyday meaning. Therefore, I will not define any further what is or is not a reasonable doubt.

The defendant is not on trial for any act or conduct not specifically charged in the superseding indictment.

As stated earlier, it is your duty to determine the facts, and in so doing you must consider only the evidence I have admitted in the case. The term "evidence" includes the sworn testimony of the witnesses and the exhibits admitted in the record. Testimony or evidence that I told you to disregard are not evidence and must not be considered.

Anything you may have seen or heard outside the courtroom is not evidence and must be completely disregarded.

Any statements, objections, or arguments made by the lawyers are not evidence in the case. It is the duty of the attorney on each side of the case to object when the other side offers testimony or other evidence which the attorney believes is not properly admissible. Counsel also have the right and duty to ask the Court to make rulings of law, and all those questions of law must be decided by the Court. You should not show any prejudice against an attorney or his client because

the attorney objected to the admissibility of evidence or asked the Court for a ruling on the law. My rulings on the admissibility of evidence do not indicate any opinion about the weight or effect of such evidence. You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence. It is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you.

During the course of the trial, I occasionally made comments to the lawyers, or asked questions of a witness, or admonished a witness concerning the manner in which he should respond to the questions of counsel. Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

Any notes that you have taken during trial are merely aids to your memory. If your memory differs from your notes, you should rely on your memory and not on the notes. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence, and should not be unduly influenced by notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

While you should consider all the evidence in the case, you are permitted -- while you should consider only the evidence in the case, you are permitted to draw reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in the case.

You may also consider either direct or circumstantial evidence. Direct evidence is testimony of one who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating either the guilt or innocence of the defendant. For example, if someone enters your home holding a dripping wet umbrella and that person's clothes and hair are wet, these facts are circumstantial evidence that it's raining outside.

I guess also that you had a bad umbrella.

(Laughter.)

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It requires only that you weigh all of the evidence and be convinced of the defendant's guilt beyond a reasonable doubt before he can be convicted.

I have said that you must consider all of the

evidence. This does not mean, however, that you must accept all of the evidence as true and accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given to his or her testimony. In weighing the testimony of a witness, you should consider: One, the witness's relationship to the government or the defendant; two, the witness's interest, if any, in the outcome of the case; three, the witness's manner of testifying; four, the witness's opportunity to observe or acquire knowledge concerning the facts about which the witness testified; five, the witness's candor, fairness, and intelligence; and six, the extent to which the witness has been supported or contradicted by other credible evidence.

You may accept or reject the testimony of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

In this case, the government called as one of his witnesses an alleged accomplice, Kenneth Adgerson, named as a co-defendant in the indictment, with whom the government has entered into a plea agreement. This agreement provides for

dismissal of some charges, and a stipulation concerning the applicable offense level for purposes of calculating his advisory sentencing guideline range. Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this Court.

An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of such a witness may alone be sufficient to sustain a verdict of guilty. You should keep in mind that such testimony is always to be received with caution and weighed with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt.

The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence of the guilt of any other person.

During the trial, you may -- you heard the witness -- testimony of witnesses that I have found to be qualified as an expert based on their knowledge, skill, experience, training, or education.

Merely because such a witness has expressed an opinion does not mean that you must accept it. You should judge such testimony like any other. You may accept it, reject it, or accept it in part and reject it in part. And you should

give it such weight as you think it deserves, considering the witness's education, experience, the soundness of the reasons given for the opinion, and all other evidence in the case.

The testimony of an informant, someone who provides evidence against someone else for money or to escape punishment for his own misdeeds or crimes, or for other personal reason or advantage, must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.

The jury must determine whether the informer's testimony has been affected by self-interest, or by the agreement he or she has with the government, or his or her own interest in the outcome of the case, or by prejudice against the defendant.

The testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol. The jury must determine whether the testimony of the drug or alcohol abuser has been affected by drug or alcohol abuse, or by the need for drugs or alcohol.

The testimony of someone who has been told either that his crimes will go unpunished in return for testimony, or that his testimony will not be used against him in return for that cooperation must be examined and weighed by the jury with greater care than the testimony of someone who is appearing in

court without the need for such an agreement with the government.

The jury must determine whether the testimony of this witness has been affected by self-interest, or by the agreement he has with the government, or by his own interest in the outcome of this case, or by prejudice against the defendant.

A witness may be discredited or impeached by contradictory evidence by a showing that he or she testified falsely concerning a material matter, or by evidence that at some other event at some other time the witness has said or done something, or has failed to say or do something, which is inconsistent with the witness's present testimony. If the earlier statements were made somewhere other than in court during trial, they are admissible only to discredit or impeach the credibility of the witness, and not to establish the truth of those earlier statements.

As judges of the facts, it will be up to you to determine the credibility, if any, to be given to the testimony of a witness who has made prior inconsistent or contradictory statements.

Recordings of conversations have been received in evidence and have been played for you. Typewritten transcripts of these tape-recorded conversations have been furnished to you. Those transcripts also undertake to identify the speakers engaged in the conversation. The transcripts are for the

limited purpose of helping you follow the conversations as you listen to the recordings, and also to help you keep track of the speakers.

The conversations themselves are evidence in the case. The typewritten transcripts are not evidence. What you hear on the tapes or videos is evidence. What you read on the transcript is not. Differences in meaning between what you hear on the recordings and read in the transcripts may be caused by such things as the inflection of a speaker's voice. It is what you hear, however, and not what you read, that is in evidence. Whether the transcripts correctly or incorrectly reflect the conversation or the identity of the speakers is entirely for you to decide based upon what you hear on the recordings and what you have heard here about the preparation of the transcripts, and upon your own examination of the transcripts in relation to what you hear on the recording.

If you cannot, for example, determine from the tape or video recording those particular words were spoken, or if you cannot determine from the tape recording who said the particular word or words, you must disregard the transcript insofar as those words or the speaker are concerned.

A law enforcement officer or investigative officer's testimony should be evaluated by you just as any other evidence in the case. In evaluating the officer's credibility, you should use the same guidelines that you apply to the testimony

of any witness. In no event should you give greater or lesser weight to the testimony of any witness merely because he or she is a law enforcement or investigative officer.

A separate crime or offense is charged in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find the defendant guilty or not guilty as to one of the offenses charged should not control your verdict as to any other offense charged.

The superseding indictment charges that the offenses were committed "on or about" a certain date. The government does not have to prove with certainty the exact date of the alleged offense. It is sufficient if the government proves beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

I will now go over the charges in the superseding indictment and the elements the government must prove beyond a reasonable doubt in order to convict the defendant of those charges. As I instructed you previously, the superseding indictment against the defendant brought by the government is only an accusation, nothing more. It isn't proof of guilt or anything else.

Count One of the superseding indictment charges that beginning in or about August -- August 2017, and continuing to in or about February '19 in the Western District of Virginia,

the defendant, Quentin Lowell Horsley, knowingly and intentionally conspired with Kenneth Bernard Adgerson, Junior, and others to distribute and possess with intent to distribute a controlled substance, specifically: A, more than 500 grams of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance; B, more than 500 grams of a mixture or substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance; and C, more than 800 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance.

MR. WELSH: Your Honor, if you could -- I believe that's 100, if we could restate that to the jury.

THE COURT: In C?

MR. WELSH: In C, Your Honor.

THE COURT: What did I say?

MR. WELSH: I believe you said 800.

THE COURT: Okay. C is more than 100 grams, as you can see, of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, all in violation of federal law.

A criminal conspiracy is an agreement or a mutual understanding knowingly made or knowingly entered into by at least two people to violate the law by some joint or common plan or course of action.

Conspiracy is a crime in and of itself, separate from the underlying drug crimes. Thus, because the essence of a conspiracy offense is the making of the agreement itself, it is not necessary for the government to prove that the defendant or any co-conspirators actually succeeded in accomplishing an unlawful plan to commit drug offenses.

For you to find the defendant guilty -- this is still on Instruction 20, conspiracy.

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt: One, that at some time during the dates charged, two or more persons entered into an agreement or understanding; two, that the purpose of or object of the agreement was to do one or more of the criminal purposes charged; and three, that the defendant voluntarily joined the conspiracy knowing of its purpose and intending to keep -- to help accomplish that purpose.

An act is done knowingly, as used in the superseding indictment and these instructions means that the act in question was done voluntarily and intentionally, and not by ignorance, mistake, or accident.

The intent of a person at a given time may not ordinarily be proved -- proved directly because there is no way to directly -- no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person

intended -- what a person intended a particular time, you must consider any statements made or acts done or omitted that the person and all other facts and circumstances received into evidence which may aid in your determination of that person's intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of his acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during trial.

The crime of conspiracy requires the government to prove an agreement existed between two or more persons to commit a crime.

The government does not need to prove that the alleged co-conspirators entered into any formal agreement or that they directly stated between themselves all of the details of the scheme.  An informal agreement to accomplish a common plan may be sufficient.

The government may rely on indirect evidence from which the conspiracy or agreement may be inferred.  The agreement need not be in writing or cover all of the details of what the conspiracy is, its object or purpose, or how it is to be carried out.

The agreement only -- need only be a tacit or mutual understanding between the conspirators.  The government need

not offer proof of an overt act or an active step -- the government need not offer proof of an overt act, or an active step, in furtherance of the conspiracy alleged to sustain a conspiracy conviction.

Simply put, to find that an agreement existed between co-conspirators, you must be convinced that there was a mutual understanding, either spoken or unspoken, between the conspirators to commit an unlawful act.

The government is not required to prove that a member of the conspiracy joined at its beginning, nor that all of the details of the scheme were actually carried out, nor that the alleged conspirators succeeded in accomplishing their unlawful objectives.

By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement. Therefore, you may infer the existence of the conspiracy using indirect or circumstantial evidence, such as the circumstances of this case and the actions and statements of the parties involved.

Circumstantial evidence tending to prove a conspiracy may consist of a defendant's relationship with each other -- members of the -- other members of the conspiracy, the length of this association, a defendant's conduct, and the nature of the conspiracy.

While circumstantial evidence may sufficiently

support that an agreement between conspirators existed, the government must nonetheless establish proof that such element of a conspiracy existed beyond a reasonable doubt.

One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If a person understands the unlawful nature of a plan or scheme, and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient proof for him to be a member of the conspiracy, even though the person had not participated before, or even though he or she played only a minor role or part.

A person's mere presence at the scene of an event, even with knowledge that a crime is being committed or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who also -- but who happens to act in a way which advances some purpose of a conspiracy does not thereby become a conspirator.

In sum, to find the defendant willingly joined the conspiracy, you must be convinced that the defendant voluntarily and intentionally entered into the conspiracy with the alleged members and with an understanding of its unlawful

character.

The existence of a mere buyer-seller relationship alone is insufficient to support a conspiracy conviction, even if the buyer intends to resell the purchased drugs to others.

However, you may consider the purchase of drugs for resale, along with all other evidence, such as a continuing relationship or repeated transactions, in determining whether there was a conspiratorial agreement between the buyer and seller, or other persons, to distribute or possess with intent to distribute one or more controlled substance.

The evidence has shown that one or more of the individuals with whom the defendant is charged with conspiring may have been an undercover government agent. A defendant may not be convicted for conspiring only with a government agent. Therefore, in order to find the defendant guilty of a drug conspiracy, the evidence must establish that the defendant conspired with at least one criminally culpable, non-government agent.

If a defendant willingly joins a conspiracy, he is presumed to continue in that conspiracy unless and until he takes affirmative steps to withdraw. In other words, if you conclude that the defendant knowingly and voluntarily became part of the conspiracy, the burden then shifts to that defendant to show that he thereafter withdrew; that is, the defendant took affirmative steps to defeat or disavow the

purposes of the conspiracy.

If you believe a conspiracy existed, and defendant knowingly entered into that conspiracy with knowledge of the conspiracy's purpose, then you may consider acts and statements by co-conspirators as evidence in this case as to the defendant. A conspirator is responsible for the offenses committed by any other member of the conspiracy so long as the committed offense was in furtherance of, or the foreseeable consequences of such a conspiracy.

This is true even though the acts and statements may have occurred in the absence of and without the knowledge of the defendant, provided that these acts and statements were knowingly done or knowingly made during the existence of the conspiracy and in furtherance of the purposes of the conspiracy.

A single conspiracy may exist even when there are changes in membership, or members leave or join the conspiracy, or variability in the conspiracy's activities, or both, so long as at least two of the co-conspirators continued to act for the entire duration of the conspiracy. The fact that members of the conspiracy were not always identical or directly connected to one another does not necessarily imply that separate conspiracies existed. A member of a conspiracy need not know or work directly with all of the other members of a single conspiracy.

The government has charged a particular conspiracy, and the government has to prove that the defendant was a member of that conspiracy charged in the superseding indictment. If the government does not prove that, then you must find the defendant not guilty, even if you find that he was a member of some other conspiracy not charged in the superseding indictment.

Proof that a defendant was a member of some other conspiracy is not enough to convict, unless the government also proves beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment.

The government is required to prove that the substance involved in this case were, in fact, controlled substance.

In determining whether the government has satisfied the burden of proof on this issue, you may consider lay testimony or any relevant circumstantial evidence. Such circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence from the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as an illicit drug, and testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried out with secrecy or deviousness, and evidence that

the substance was called by the name of the illegal narcotic by a defendant or another -- or other in his presence.

I further instruct you that neither expert chemical analysis nor expert testimony is necessary for you to conclude that the substance involved in this case was or was not -- was or were, in fact, controlled substances.

Count One has charged the defendant with conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine, more than 500 grams of cocaine hydrochloride, and more than 100 grams of heroin.

You may find the defendant guilty if the quantity of the controlled substance for which he should be held responsible is different than the quantity charged. Thus, the verdict form prepared for you will require you, if you find the defendant guilty, and you find the defendant -- find the government has proved beyond a reasonable doubt that one or more of these charged narcotics was involved, to specify on the verdict form your unanimous finding concerning the quantity of such charged narcotic, if any, that was attributable to the defendant.

The burden of proof is on the government to prove beyond a reasonable doubt the quantity attributable to the defendant.

The quantity includes the amounts fellow conspirators distributed or possessed with intent to distribute, or

attempted to distribute or possess with intent to distribute, if you find that such distribution or possession was a necessary or natural consequence of the defendant's agreement or understanding that was reasonably foreseeable to the defendant.

Again, the government has the burden to prove beyond a reasonable doubt the quantity of the specific controlled substances involved. You must agree unanimously as to each controlled substance involved.

It is charged in Count Five of the superseding indictment that on December 7, 2017, in the Western District of Virginia, the defendant, Quentin Lowell Horsley, knowingly and intentionally distributed and possessed with intent to distribute a mixture and substance containing a detectable amount of cocaine hydrochloride, a controlled substance, in violation of federal law.

It is charged in Count Five of the superseding indictment that on or about December 29, in the Western District of Virginia, the defendant, Quentin Lowell Horsley, knowingly and intentionally distributed and possessed with intent to distribute a mixture and substance containing a detectable amount of cocaine hydrochloride, a controlled substance, in violation of federal law.

MR. DERISE: Judge, that should say Count Six in the first line of that. That was a typo. It says it in the title,

but not in the first line.

THE COURT: Okay. I'll ask the jury to note that. I'm marking out "Five" in the first line and inserting "Six."

Okay. It is charged in Count Eight of the superseding indictment that on or about November 1, 2018, in the Western District of Virginia, the defendant, Quentin Lowell Horsley, knowingly and intentionally distributed and possessed with intent to distribute a mixture and substance containing a detectable amount of cocaine hydrochloride, a controlled substance, in violation of federal law.

The government has charged the defendant in Counts Five, Six, and Eight of the superseding indictment with knowingly and intentionally distributing and possessing with intent to distribute a mixture and substance containing a detectable amount of cocaine hydrochloride.

To sustain its burden on these counts, the government must prove each of the following elements beyond a reasonable doubt: The defendant possessed with intent to distribute or distributed a controlled substance; the defendant knew that the substance possessed was a controlled substance; and third, the defendant did so knowingly.

Regarding the second element of possession, it is not necessary for the government to prove that the defendant actually held or possessed the controlled substance. Rather, the government will have satisfied its burden of proof if it

proves either actual or constructive possession.

Constructive possession exists when a defendant exercises, or has the power to exercise, dominion or control over the item. The law allows proof of constructive possession by either circumstantial or direct evidence.

I further instruct you that possession may be sole or joint. In other words, it is possible for the government to prove, and for you to conclude, that more than one individual joined or possessed the same quantity of drugs.

On the other hand, the government must prove more than mere presence of the defendant at a location where drugs are found. Rather, mere presence on the premises where drugs are found or the mere association with one who possesses drugs is insufficient to establish the possession needed for a conviction.

As used in the third element, the phrase "with intent to distribute" means to have in mind or to plan in some way to deliver or transfer possession or control over a thing to someone else. It may be established by direct testimony of those with personal knowledge of relevant activity or plans. It may also be inferred from a number of factors; including, but not limited to, drug quantities, packaging, how and where drugs were hidden, and the amount of cash seized, if any.

Evidence that the defendant distributed to a co-conspirator is sufficient to support a conviction for

distribution of a controlled substance.

During the trial you may have heard references to cocaine base. You may have also heard references to crack and/or crack cocaine. I instruct you that these terms all mean the same thing; that is, that crack base -- crack and crack cocaine are one and the same substance.

I further instruct you that cocaine base, or crack or crack cocaine, is a controlled substance under the applicable law.

I further instruct you that cocaine, methamphetamine, and heroin, are controlled substances under the applicable law.

The government's evidence allegedly includes evidence of unexplained wealth; that is, evidence that the defendant has allegedly acquired property or spent money in excess of his lawful income and resources.

Although evidence of unexplained wealth is generally permitted in drug prosecutions to prove illegal dealings and ill-gotten gains, you alone must determine what weight, if any, to give the government's evidence in this case.

Therefore, I instruct you to consider carefully whether the government's evidence of unexplained wealth supports the contentions in this case, or whether there is some lawful or other less incriminating explanation.

Verdict forms have been prepared for your convenience. I will show them to -- well, I'll show them to

you now.

On the first page of the verdict form, Question 1 as it applies to Count One, and you see that Count One of the superseding indictment alleges that defendant, Quentin Lowell Horsley, conspired to distribute and possessed with intent to distribute one or more controlled substance; namely methamphetamine, cocaine hydrochloride, heroin, or cocaine base. Check one only. You check guilty or not guilty. If you check guilty, you go to Question 2.

On the next page, Question 2 says: Identify the controlled substances and corresponding amount attributed to Quentin Lowell Horsley that formed the basis of the conspiracy in Count One. Check all controlled substances that apply. For the amounts, check only one amount for each controlled substance.

And under methamphetamine, if you find that they've proven beyond a reasonable doubt there were 500 or more grams of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers or salts of its isomers, then you would check that form. If you do not believe the government proved 500 grams, but a lesser amount, you go to the next sentence where it says 50 grams or more of a mixture. And if you believe beyond a reasonable doubt that the government has proven at least 50 grams or more, then you would check that amount. But if you believe that the government did not prove

as many as 50 grams or more, but still had a detectable amount of -- proved a detectable amount of the drugs, you would check five.

Then you go on to cocaine hydrochloride. If you find that the amount distributed was 500 grams or more, you would check that amount. But if you believe the government did not prove that amount by a reasonable -- beyond a reasonable doubt, but did beyond a reasonable doubt prove a lesser amount of cocaine hydrochloride, you would check that amount.

And with regard to heroin, if you think the government proved beyond a reasonable doubt an amount 100 grams or more of a mixture and substance containing a detectable amount of heroin, then you would check that amount, check 100. But if you do not believe the government proved beyond a reasonable doubt that there were 100 grams or more, but you do believe beyond a reasonable doubt that a lesser amount -- an amount less than 100 grams or more of a mixture and substance containing a detectable amount of heroin was proven to be involved, you would check that amount.

In regard to cocaine base, you just check that amount. If you decide it's a detectable amount of cocaine base, you check that.

Regarding Question 3, on Count Five of the superseding indictment alleging the defendant, Quentin Lowell Horsley, distributed and possessed with intent to distribute

cocaine hydrochloride, check only one, guilty or not guilty.

Question 4: On Count Six of the superseding indictment alleging the defendant, Quentin Lowell Horsley, distributed and possessed with intent to distribute cocaine hydrochloride, check either guilty or not guilty.

On Count Eight of the superseding indictment alleging that the defendant, Quentin Lowell Horsley, distributed and possessed with intent to distribute cocaine hydrochloride, check only one, guilty or not guilty.

Just always repeat that everything you find has to be unanimous, and has to be beyond a reasonable doubt.

After your jury foreperson has filled out the jury form, you date it and notify the marshal that you have arrived at a verdict.

I'll give you two or three more instructions, but I'm going to give those to you after you've heard the argument of counsel.

MR. WELSH: Your Honor, I suggest we take a five-minute break to get things set up. I need to move some exhibits.

THE COURT: Members of the jury, if anyone would like to take a break now, just go back to the jury room. As soon as you're all ready to come back, let us know, and we'll come back and hear the argument.

**(Jury out, 10:38 a.m.)**

THE COURT: The verdict form on Question 2 at the very bottom where it says "cocaine base," is that -- should that be there?

MR. ANDERSON: Your Honor, I was following through the verdict form on the screen.

But Rob, we don't have copies of the verdict form.

THE COURT: Okay. We'll take a recess now.

(Recess.)

THE COURT: Back on the record.

MR. ANDERSON: Your Honor, the instruction is correct. The government and defendant -- we conferred.

THE COURT: Are there any other instructions or any objections you want to make before the jury is called back?

MR. WELSH: Not from the government, Your Honor.

MR. ANDERSON: Not from the defendant, Your Honor.

THE COURT: Okay. We can call the jury, then.

**(Jury in, 10:49 a.m.)**

THE COURT: All right. You may have a seat.

CLOSING ARGUMENT BY THE GOVERNMENT

MR. WELSH: Thank you, Your Honor. May it please the Court.

When I was growing up, there was a store down the road called Clarence and Anne's, which was your typical corner store. If you were coming home and you needed bread or eggs or

milk or something, you would stop by there before you headed home. And a number of people I was growing up with worked there, and there was a bunch of different roles at the store. You had the person who was the cashier who was checking everyone out. You had the guy who worked in the stockroom who was putting stuff out on the shelves. You had people who were making deliveries to the store. And you had the manager who was running the store and keeping everything going.

The reason I bring that up is not just to walk down memory lane and talk about this place I remember from my past, but because of the simple fact that this case involves the drug trade. And "trade" is the important word there. This is a business. This is like -- just like a regular business, except for it involves illegal drugs. And the difference is that the substance that's being sold is incredibly dangerous, and the profit margins -- as you saw from Detective Knabb -- are incredibly high, and there is a risk of getting caught by law enforcement, and a risk of being robbed; but otherwise, it's just a business. And the defendant, Quentin Lowell Horsley, was the manager of that business. He was directing people. He was in control. And you've seen that throughout the case. He is the one who is pushing Kenneth Adgerson to sell more, to move for quickly. He's the one who is demanding money from other people. And he is the one who is calling the shots.

This is a case where you see the evolution and the

development of a drug trafficking organization that starts as a mom-and-pop-selling-a-couple-of-ounces-at-a-time organization, all the way up to a million dollars of drugs found at the Blackburn address. You heard in the text messages that when the defendant was dry, when he didn't have a source of drugs, Lynchburg was dry and people had trouble getting drugs to sell.

Where does that begin? Well, we started in 2017. You heard from Kenneth Adgerson that he was a cocaine dealer. He was selling cocaine on the streets, and that he was using Roberta Haskins as a person who was driving him around as he was making deals throughout the day. Then he is approached by the defendant, Quentin Horsley, who has got a cheaper source of cocaine, and starts -- begins a relationship where the defendant is selling to Kenneth Adgerson.

And you hear the same type of thing from Travis Smiley. He says that he was looking -- that he was also selling cocaine, gets approached at the Moss Creek Apartments, gets approached by the defendant, Quentin Horsley, and then starts receiving cocaine from Quentin Horsley to go sell. That's the beginning of the conspiracy that's formed here, and what we see is the development of that. Kenneth Adgerson moves up from two ounces to four ounces to nine ounces all along in 2017 as he's going along and building in the conspiracy. And Travis Smiley says the same thing, that he was moving -- I think the first buy was a half an ounce; then it moves to an ounce; then he

says it continues over the course of a year. And as that's going, the amounts are increasing.

Then we come to the first controlled purchase in this case. And you heard from law enforcement what a controlled purchase is. You heard from Detective Booth that law enforcement takes measures to ensure that they are monitoring the transaction. And this first one occurs on August 18th, 2017. This is not a charged count, but was submitted as evidence before you. And you see that on this occasion, defendant -- law enforcement called the defendant using that number ending in 4533. And they met at the Hardee's on Langhorne, and they saw him arrive in a black Nissan, and this was used with Brandon Hubbard. And you heard from Brandon Hubbard who confirmed: I met with the defendant; I purchased drugs from him; I came back. And you heard from the videos and calls -- and you'll have those back with you to be able to look at -- and this is what was obtained, this picture of cocaine and this Exhibit 119 right here in this bag, which was 10.92 grams of cocaine determined by a forensic scientist.

Then law enforcement does another controlled purchase on August 29th of 2017, also with Brandon Hubbard, who came in and told you that he did the same thing, and that he met with the defendant. And this one, they used this number. They called the defendant on 434-444-7305. And that's important because that's the number of the phone that's found at Misty Mountain

Road, which is his residence. And you see here the defendant is driving the same black Nissan Maxima. They meet at the same Hardee's, and for $550 they purchase 11.04 grams of cocaine.

Now, I'm going to be talking about some different phone messages, but I want to review the different phones that we have in this case. So there are three phones at issue for which evidence has been presented. The first is Government's Exhibit 70, which was a phone found in Misty Mountain Road. And Government's Exhibit 72 is the full extraction of that phone. You heard about that process, about how they download the contents. And Government's Exhibits 73 through 82 are conversations that occurred on that phone. And specifically, Government's Exhibit 81 is a conversation with the co-conspirator, Kenneth Adgerson. Government's Exhibit 83 is a phone that was found at the hotel room upon the defendant's arrest at the MGM National Harbor at the casino. Government's Exhibit 85 is a full extraction of that phone. 86 through 89 are different conversations that we've talked about that are found on that phone, and are true and accurate copies of them. And Government's Exhibit 88 is a conversation with Kenneth Adgerson. And finally, the phone found in the Jaguar is Government's Exhibit 90. That was at the valet at the MGM National Harbor casino. Government's Exhibit 92 is a full extraction of that phone. 93 through 103 are conversations, and 100 is a conversation with Adgerson.

So how do we know that those phones are the defendant's phones. How do we know that those communications that are contained on those come from the defendant? Well, first of all, the phone found in his hotel room is one that's found upon his arrest. It's found in the room right next to him. The one that's found in the Jaguar would be the vehicle that was there and that he admitted to having cash in the back seat of that when he was shown $20,000 of cash that was found inside. And the phone found at Misty Mountain is where his residence is. We'll come back to Misty Mountain about how we know that it's his residence. But you also have the testimony of Kenneth Adgerson. He establishes for all three of these phones that he was communicating with the defendant, Quentin Horsley. And we talked about all of those conversations. He said, I remember these conversations, and this is what occurred, and this is the phone I was communicating with. Then you have the testimony of Detective Bailey who testified that he reviewed the contents of the phones, and he looked at the extraction in Government's Exhibit 72, and he found references to Quentin Horsley being the user of the phone.

And the same applies for the other phones. The phone found -- or the extraction in Government's Exhibit 92 contained a bunch of selfies. And then we took a look at the email address associated with it was qhorsley84@gmail.com. So these are the defendant's phones. These are his messages that he is

making. And so when we look at them, he is the person that is conversing in these messages.

So we look at Government's Exhibit 102. This is in September, early September of 2017. This is a conversation with Kenneth Adgerson. The defendant says, "Haven't forgot about you. I've got you in a few." Kenneth Adgerson responds, "Okay, I am on your time. I ain't rushing." And then the defendant responds, "Gotcha, I am ready." The defendant is indicating he's the one who is ready.

Right around the same time the defendant is having a conversation with an individual named Marcus. He says -- he says to Marcus, this is a message outgoing, "He need to give you some ain't nobody got -- blank -- to give that -- blank -- period. I still need my money. Because that not my problem that I gave that product to you, period." Marcus agrees. Then he goes on with another message right around that same time with an individual we later see is named Jamie. And Jamie says, "Just told my boy to set that up. Told him everything was A-1. Numbers and quality speaks for itself, feel me? These country -- blank -- ain't playing, though. Gotta be A-1."

It's gotta be good. We're setting something up and it's gotta be good.

The response: "In this city -- blank -- ain't playing. I'm the -- blank -- plug."

You heard "plug" means source of supply.

The response: Jamie says, "I feel you, but I'm trying to eat. Gotta be right. Stop being greedy. Give to the needy." The response: "My -- blank -- I'm not greedy. It's business until you can move four a week. Then the ticket gotta stay the same."

Right around the same time a few days later he's again talking to Marcus and making demands of money. Quentin Horsley says to Marcus, "Look, I'm gonna come down. I need my paper." You heard paper means money. I need my money. "You playing games with my money now. And dude house you went to, you only gave him an ounce or two. So where the work at?" He's referring to this is about a drug transaction. He's talking about an ounce or two. He's talking about the work. You heard that "work" means drugs. Marcus responds: "Trying to plead here. I was busy today and I had my phone on low. That bread that I was going to send today I had to use, but the guy that get it Saturday I'll send what I make off of." The defendant responds, "How much paper? I need it."

So in the middle of all these conversations as the defendant is talking to Kenneth Adgerson and talking to Marcus and talking to Jamie, the government does another controlled purchase on September 15th of 2017. And you heard about that. And you heard from Detective Dowdy, who testified that he was in the parking lot across the street, and he saw the defendant

during the transaction. And you see this picture that was taken on the video. Detective Dowdy says that, Yep, that's what I saw. That's the kind of clothes he was wearing, and he was in the white Infiniti. And they called the same number of the phone that's found in Government's Exhibit 70, the phone found in Misty Mountain. And it occurs at the same Hardee's where the other transactions occur. And they buy it for $550, 10.18 grams of cocaine. Again, not a charged count, but demonstrates what is going on in this case.

Then we go on from that. Again, Marcus the defendant says to him, "How much longer I gotta wait cuzo, because whoever you gave it to gotta kick the paper. I'm coming down with my people." That's the defendant's words to Marcus.

A few days later, the defendant is talking to Kenneth Adgerson again. Kenny says, "Had went out of town with the fam for five days. I'm running behind schedule, but I'm on the grizzly. Got eight bands" -- we heard that's $8,000 -- "with five joints left." The defendant's response, "Okay. Cool. You wanna give me the eight?"

So again you've got Kenneth Adgerson saying, I was out of town. I was running behind. He's explaining to the defendant what his schedule is. And he is saying I've got $8,000. And the defendant says, great, bring it back to me. That's because of the relationship that's formed. The defendant is supplying drugs. Kenneth Adgerson is paying him back.

Then it goes on. Kenneth Adgerson says, "Yeah, don't want to get demoted. I'm trying to get promoted." He's referencing what their relationship is. He's working for Quentin Horsley. Horsley responds, "You good, bruh, but try and move it faster, though, you know." Kenneth Adgerson responds, "Yeah, I am." And then Horsley explains it. He says, "So we can get more work, you feel me?" More work meaning more drugs.

In a later message -- now we're in October of 2017 -- Kenneth Adgerson: "Now things are starting to ramp up." And he's talking about $10,200. "Almost done." The defendant responds, "Just hit me when you get up so we can get it moving. I got another one for you." The conspiracy continues.

Further, this is messages with Jamie. This is a conversation where the defendant commissions the building of a kilogram press. He says -- Jamie responds to him, "You know anybody that will buy a compressor? Stop acting -- blank. I can fabricate and weld them joints up -- blank -- pudding -- blank -- under the tires. How much weight you want to put in the box?" The defendant responds, "About 600 grams." Jamie then says, "All right. Gonna take me a few days. Gotta build on my lunch break." The defendant asks: "And give me a draw-up of what it will look like." This conversation goes on. Jamie says, "It's gonna be 4 by 8 by 1.5." That's 4 inches, 8 inches long, 1.5 inches tall, exact measurements for one brick. Quentin Horsley says, "Yeah, one brick is what I need." Jamie

says, "Bro, I got all the materials for the project. About to get on this blueprint. Send you later." The defendant's response: "All right. Hurry up." The defendant in a later message says, "All right. Real talk, though. You can make it have the stamp too?" Jamie responds, "Yeah, it shouldn't be a problem." The defendant responds, "I need it to work." You heard that a stamp is the type of thing that's imprinted onto a kilogram. It's the type of brand that an individual puts onto a kilogram of cocaine.

In a later message -- now we're in November of 2017 -- the defendant sends a message to Kenneth Adgerson and says, "This" -- slur -- "just taking his -- blank -- time." You heard Kenneth Adgerson testify that there was a Hispanic source of supply, people who were dropping off to hotels and this supplier. Kenneth Adgerson then says, "All right. My phone been going ham. You the man out here cause you caused a drought." The defendant responds, "Go ahead." Kenneth Adgerson says, "You did. We've been talking about this since summertime." So now we're in November of 2017. He's talking about back in the summer when we were doing this before. "Without catman cartel, the whole city will starve." So when Quentin Horsley doesn't have drugs, Lynchburg doesn't have drugs. That's what this message is saying.

And, you know, Mr. Anderson's questions to Mr. Adgerson, one of the questions or one of the phrasings was "puffery"

about Kenneth Adgerson talking about, well, you say that people owe you $50,000 and that's just puffery and he's just overexaggerating. So I could see this whole city will starve meaning that's just puffery. Well, here's the defendant talking to Jamie saying the same thing, confirming what's going on in the other conversation at the same time. Quentin Horsley says, "Still dry." He says, "it's blanked up everywhere." And then Jamie says, "Damn, what's up with them" -- blank, a term that you heard refers to Hispanic individuals. And the defendant then says, "I don't know, man. Something must have got stopped." Jamie replies, "You gonna make me file for unemployment," because he doesn't have the drugs. The defendant goes on. Quentin Horsley then says to Kenneth Adgerson, "He showed me like seven bricks. I don't know when he's coming." Seven bricks means seven kilograms of cocaine. "He trusts me to owe him $95,000, so we good. And this was a couple of times. Blank, they went and got tacos one time when I was in the room." And you heard Kenneth Adgerson talking about that. It was kind of a funny story. They left him in the room -- they left the defendant in the room to go get tacos. They left him with the drugs.

Adgerson replies, "You know I'm here. You take care of my family," again establishing the relationship between the two of them. Quentin Horsley then says, "I know. I gave them close to a mill now" -- a million dollars -- "and if not that, at

least $600,000." And you heard from Detective Knabb that when an individual is purchasing from a source of supply, that the wholesale price is cheaper than it's actually going to be turned into. So if the defendant says he gave him at least a million dollars, think of the profit that was made from that.

Now, while all this is going on, while the defendant is talking about being dry, while he's having these conversations with people, law enforcement makes another controlled purchase on December 7th, 2017. And this one was conducted by Brandon Hubbard. This is Count Five in the indictment. You heard Brandon Hubbard come here and testify that he was the one who had purchased from Quentin Horsley. You heard law enforcement talk about how this was done in the same process of a controlled buy, how they made a reported call, how they monitored the transaction, how they provided the money and then watched. And this occurred over at the Greenbrier apartments. We listened to the videos that occurred here. And this came back and it was 29.002 grams of cocaine, and that's one of the exhibits that's sitting here.

Then we get to Christmas of 2017. And you heard from Kenneth Adgerson, and he told you how in Christmas of 2017, that's when he received his first kilogram of cocaine. And he described how that there was a bow on the car and that the defendant had delivered it to him and that's when he really -- things started moving because he got his first kilogram of

cocaine.

And right around that same time, law enforcement does another controlled purchase, this one on December 29th of 2017. That's Count Six of the indictment. And again you heard this one occurred at the Sunoco Street, and you had law enforcement watching and observing. The same call was made to the number ending in 7305. And when Brandon Hubbard came back, he came with 27.88 grams of cocaine, and again in another one of these exhibits here.

We continue into 2018. This is a conversation with a person who is not listed. We don't know exactly who it is, but this is a number that's conversing with us here. And this individual complains and says, "Yo, bruh. Broke down this blank. Don't come back." And you heard about that, that powder cocaine is cooked into crack cocaine or cocaine base, and that you can tell the quality of it by doing that process. Horsley responds, "You don't know what you doing. What you trying to do?" This individual goes on to explain. "I was gonna turn it into half and half." Then Quentin Horsley says, "I could have cooked it for you." Then in a later part of that conversation it says, "I got hard too." You heard that "hard" refers to cocaine base because the crack is cooked into cocaine base. He's referring to hard, and he said he could have cooked it for you too.

Then we hear from Kenneth Adgerson about how the

conspiracy continues. He says that together Adgerson traveled with Quentin Horsley down to Atlanta with $100,000. They went down there. They didn't end up meeting with anybody, but they drove around for a while. There was a couple of people there. They thought they might get robbed or something like that, and they ended up coming back empty-handed. And when they came back, even though they were empty-handed, Quentin Horsley went off to Hawaii. And when he was there, then he called Kenneth Adgerson and said, It's coming, it's here, and directed him to go to a hotel.

So Kenneth Adgerson went to the hotel, picked up the work -- picked up the drugs -- in a duffle bag going to the first meeting at a hotel, and then brought it back to his place to keep. And he talked about how he went and sold it off and everything, and the defendant finally came back, and he paid him for the drugs and everything.

And that's the start of trips going to hotels here in the City of Lynchburg, and going to these hotels and picking up these duffle bags. And at that time, the defendant approaches Kenneth Adgerson and asks him to start holding for him. That's the beginning of that process of asking him to hold onto the drugs so the defendant isn't exposed to risk. So he doesn't have to hold onto the drugs where he might get robbed or he might get stopped by law enforcement, but now Kenneth Adgerson is. You heard from Kenneth Adgerson the defendant was worried

about being looked at by law enforcement. He had some bank papers that he showed Kenneth Adgerson. That's the beginning of that process, and the beginning of repeated trips that Kenneth Adgerson told you about where they meet at a hotel. He described one where there was a couple of different Hispanic guys. That process began to continue.

And at that same time, Kenneth Adgerson begins using Roberta Haskins' house to store drugs. He begins storing drugs. He was holding drugs at his own place for a while, and then he described to you that he started using Haskins' place so he could deflect the risk himself. So he didn't have to keep them at his own place where he might get robbed or stopped by law enforcement. Now he was keeping them at his driver's house.

You heard communications here in April of 2018. Adgerson: "Things looking good yet?" Defendant: "Not yet." Kenneth Adgerson: "Okay. They blowing me up. When you wait, you make the whole city wait. You're the king of the volcano." Again, another drought. When the defendant doesn't have drugs, no one has drugs.

Further communication, Quentin Horsley: "Do you know anybody that does ice?" Ice is methamphetamine. Quentin Horsley: "How much the zips go for?" A zip is an ounce. Kenneth Adgerson: "I don't know. I think that -- blank -- like 140 a G" -- a gram -- "street level. So I don't know how

much a zip is." Defendant's response: "Oh, okay. You know I can get that too." The defendant says on April 26th of 2018, you know I can get that too. Later in that conversation, same date, Kenneth Adgerson: "You know I'm a team player." Quentin Horsley: "Indeed. You the first person I told. He got the heroin too. 50,000 a brick." He's talking -- Quentin Horsley is talking to Kenneth Adgerson. He tells him he can get ice, methamphetamine. He tells him he can get heroin. He's the first person he told. At the same time as that conduct is going on, trips to the hotel that are ongoing in 2018.

Then we get to Count Eight, a controlled purchase that occurs on November 1st of 2018. And you heard from Jaimz Bowman testify about this: That he went, he met with the defendant, and he obtained cocaine. And you heard from Detective Booth that he conducted this controlled purchase, that there was a meeting outside of TGI Friday's. You heard the controlled call. When Jaimz Bowman comes back, he brings 27.03 grams of cocaine. That's one of the exhibits listed here.

Also November of 2018, same time, shortly after that buy you hear -- this is coming from the phone that's found in the defendant's hotel room on his arrest. This is the Apple phone. You heard from Candice Ball how it was downloaded using the Apple process. The blue here is Quentin Horsley and in gray is somebody he's talking to using this number ending in 1221.

Quentin Horsley says: "Yo, you went to the press on me." And the other guy, whoever is responding there says, "No -- blank -- that's how they came and it's fire. I just took it to somebody to drop it." The defendant says, "They look pressed, man. I can do that myself."

Well, of course he can do it himself. He's got the kilogram press that he ordered more than a year ago. And he's complaining about the quality here, and he's saying that -- you heard Detective Bailey describe how it sounds like he's complaining about it. And this guy says, nope, it's good. It's fire. That's the term for good.

That conversation goes on. Whoever he's talking to describes, "One ain't even open yet. I opened that one because he told me to check it and later he got eight more. It swim and jump back ASAP too. It do look two-tone, but it's all shiny and it jumped quick." Quentin Horsley says: "Man, I need stamped" -- we heard what stamped refers to -- "for 34." And you heard from Detective Bailey that's the price of a kilogram of cocaine. And he says, "I couldn't see no shine." And this guy responds: "It's stamped, all shine."

Right around that same time Quentin Horsley talking with Kenneth Adgerson. Kenneth Adgerson talked about these messages. Kenneth Adgerson in this number 6461 says: "Do you want me to whip some of the new to see how it whip?" He's talking about testing the cocaine by turning it into cocaine

base. That's what he described to you. Quentin Horsley says, "I got Brandon with me. Is that cool?" Kenneth Adgerson says, "Yeah."

Now we get to a conversation on November 20th of 2018 where Quentin Horsley is now talking to Jamie. He's talking to Jamie on this new phone. He's talking on a different phone and talking with Jamie, but that's the same number that's identified as Jamie. We'll see where Jamie comes up here. Jamie says, "Give yo boy my number so he can hit me up -- or hit me when he pull up." And note the time and date, November 20th of 2018, 3:18 p.m.

At the same time from the same extraction, this is a conversation with Kenneth Adgerson in Government's Exhibit 88. And with Kenneth Adgerson the defendant here in blue provides Jamie's number: 426-7218. That's this number, 426-7218; and the time, 3:18 here and 4:27 here, so just about an hour after. So Jamie asks to send your boy a number, and the defendant does. He sends Kenneth Adgerson's number. And then the defendant said, "You good, bro," to Kenneth Adgerson. "I sent Jamie around there," again identifying Jamie in that message. In a later conversation Jamie responds again, "Hey, I just talked to your boy. Told him too. I hope that's cool." He's checking with Quentin Horsley to make sure that it's cool that he went to Kenneth Adgerson. "Forgot I had his number. Hit him and verify everything." He's asking Quentin Horsley to

verify everything. "You be taking too long."

In another conversation coming from the same phone, now we're into January of 2019, Quentin Horsley asks: "What you wanted again?" This individual labeled as Blacc Rock says, "Q," a quarter. Quentin Horsley says, "Soft, Q soft?" Blacc Rock responds, "Hard," referring to cocaine base. Then Quentin Horsley says, "Call Kenny," and provides Kenny's number. And that's because at this time that's how the relationship changed. Kenneth Adgerson is the person that he's sending around to take the risk. He's the one he's sending to hold onto the drugs. He's the one he's referring people to. And that's where you see -- and then -- well, let's start with this. Blacc Rock then says, "Who's that?" Horsley describes it: "That's who moves for me." Blacc Rock says, "Still at our price?" And the defendant provides the price, 250.

And the importance of this is what we see on January 24th of 2019 in another controlled purchase by law enforcement. This one doesn't take place directly from the defendant because law enforcement doesn't send the informant, Jaimz Bowman to go talk to the defendant. They attempt to. And Jaimz Bowman talks about this Snapchat message, and he talked about how he's conversing with Quentin Horsley. And when he does, Quentin Horsley provides Kenneth Adgerson's number. He says, "You know it's Kenny." And that fits with what's going on at that time, that Quentin Horsley is sending people to Kenneth Adgerson so

he doesn't have to sell to them. And during that transaction law enforcement monitors it, and they end up buying 27.62 grams of cocaine. And that's one of the exhibits that you see here on the table.

So we're through to January of 2019. And then on February 11th of 2019, law enforcement executes search warrants across the City of Lynchburg at multiple locations in the takedown of this drug trafficking operation of the conspiracy that's taking place. And the first -- one of the places they go to, all at the same time, is Blackburn Street where they find these drugs sitting up here. And you can see the different -- this is the front of the house, and this is what they find. They find a duffle bag stored in the closet that had been placed there by Kenneth Adgerson, as he told you, that he had picked up from a hotel just like the operation is supposed to work. And then inside they find these Tupperware containers, and that's what's on this table here. These packages wrapped in the cellophane here, that's what's on this table. That's what results in a million dollars of drugs in terms of street value.

And one of those kilograms of cocaine we saw in Exhibit 110. And you can see this outline of a scorpion imprinted onto the kilogram of cocaine. And this picture is taken by a forensic chemist that was imprinted onto this. So what's the importance of that? Well, we've got a conversation between

Quentin Horsley talking to this user of 1221 again. And Quentin Horsley asks, "Scorpion joints? You know I need that fire to get my -- blank -- back jumping." Whoever that is responds, "Yes, scorpion." And here we see the scorpion imprinted onto the kilogram of cocaine.

So how do we know that the drugs that are found at Blackburn are attributable to the defendant? Well, first, Kenneth Adgerson tells you. He says that -- describes the process, that he would go to the hotel and he would pick up the drugs and he would store them at Roberta Haskins' house, and that he was the one who took these drugs and put them there. And that fits with what you see in the text messages. He's telling you that, and that matches when these text messages show that he's the one who is working for Quentin Horsley, and he's the one following his direction.

You also see the reference to the other drugs on the owe sheet. And this is found at Misty Mountain, but at the top of it here you have H/town, cream, and white. Cream is a reference to methamphetamine. White you heard Detective Bailey talk about likely references cocaine. And H/town in the context of all of this references heroin in referencing these dollar amounts here for large amounts of those kinds of narcotics. And you're able to look at this document here and see the actual document.

At the same time search warrants are occurring, law

enforcement goes to 1639 Blackburn. They're also at 614-A Euclid Avenue, which is the home of Kenneth Adgerson. You see Exhibits 22 through 25, some of the pictures found. And law enforcement finds this butter container in the fridge, and they find four ounces of crack cocaine or cocaine base inside, and about $75,000 in cash you heard from Sergeant Burgess. And you hear that they found a Monte Carlo outside, and that had 457 grams of cocaine and an AM-15 rifle. Kenneth Adgerson described to you how that came about; that he was supposed to deliver drugs to someone else, and in return he got this gun, and that he was supposed to deliver it to Quentin Horsley, and they saw some cops drive by. So Kenneth Adgerson stashed it in the trunk and kept it there. And then law enforcement executed their search warrants on February 11th of 2019, and there it was. But it's part of the conspiracy. And you see the crack cocaine that's inside the butter container with a digital scale, and you see the pictures of the $75,000 in cash kept in a safe.

At the same time, the defendant gets arrested at the MGM casino. He's up there in Maryland. Law enforcement searches. They find a bag with $3,500 sitting next to him. They find high-end jewelry, Louis Vuitton jewelry, sitting in the trunk of the Jaguar vehicle that he drove up, and they find $20,000 in cash sitting in the back of his vehicle.

At the same time, law enforcement is executing search

warrants at 1009 Misty Mountain Road, Apartment 1212. And this is the defendant's residence, one of the defendant's residences. And the defendant lived there. There's a couple of reasons we know that. Well, first we see -- we've got a picture here of the defendant riding a four-wheeler in what appears to be Las Vegas with another individual. Then we've got a bill of sale for furniture. This is a Grand Furniture receipt found at the residence with the number listed 434-444-7305 directed at Quentin Horsley, 1009 Misty Mountain Road, Apartment 1212. Then you heard the recording of the defendant talking about how he pays rent for Misty Mountain Road, and referencing it, and about how he splits the rent with another individual. Then we see male clothing in the closet, a figurine matching the depiction of Quentin Horsley. And then we find -- law enforcement finds the owe sheet. And the reason -- the importance of who lives in Misty Mountain Road is important to establishing the owe sheet. It's an important document. And I urge you to take a look at it back in the jury room, because 17 people are listed on the document, including Jamie, including Ralph -- who you saw text messages between Quentin Horsley and Ralph, a person identifying as Ralph. You've got a person listed as Brandon. You have Brandon Hubbard, who purchased cocaine in this case. You have Kenny. Kenny initially is listed here as owing $55,000 and then a slash of 10,000 and 21,600. So Kenny is listed on here. But

importantly, Quentin Horsley is not listed on here. He's not one of the people that owes money, because this is his document. This is a ledger of his transactions contained here in a document titled, "gotta get every dollar."

What we also find -- or law enforcement finds -- at 1009 Misty Mountain Road is this money counter. What's the purpose of the money counter? Well, Kenneth Adgerson talks about delivering bundles of $10,000, $8,000 at any given time. Detective Bailey told you the vice narcotics unit has a money counter, banks have a money counter. And that's his knowledge and familiarity of them.

Now, in this case the defendant is charged in a conspiracy and with substantive distribution counts. The distributions refer to those controlled purchases that we've talked about on those specific dates, and the conspiracy beginning in 2017. And the question is: Which weight is attributable to the defendant? And in this case he's charged with 500 grams or more of cocaine, 500 grams or more of methamphetamine, and 100 grams or more of heroin. And the question is whether it is reasonably foreseeable in the course of the conspiracy for those amounts to be attributable to the defendant. The question is not whether he picked them up from the hotel, whether he handled the drugs and put them up into the closet, but whether it's reasonably foreseeable to him and attributable as part of the conspiracy.

And there's a couple of reasons for that. The first, you've got the owe sheet listing the different types of drugs; the second are his text messages where he's talking about getting heroin for 50,000 a brick, asking about whether ice moves; the testimony of Kenneth Adgerson talking about how he's the one who's moving it for him, and that these are part of their discussions. This is what they're talking about as being part of the conspiracy. The defendant, Quentin Horsley, is the guy in these text messages who is ordering the kilo press. He's the guy who's talking about how he can get heroin. He's the guy saying he's trusted to be with the drugs while the supplier goes out and gets tacos. He's the guy who causes the drought. He's the guy who is demanding money of people like Marcus. He's the guy who's telling Kenneth Adgerson: You've got to try to move faster. He's, in Kenneth Adgerson's words in his text message, the king of the volcano; and in the defendant's text message -- his own text message -- the plug.

And because of that, we are asking you to find him guilty of conspiracy and the substantive distribution counts.

THE COURT: All right. Mr. Anderson?

CLOSING ARGUMENT BY THE DEFENSE

MR. ANDERSON: May it please the Court. Good morning, ladies and gentlemen of the jury.

If our system was such that you could have trials

based on text messages, then you've just been a part of it and witnessed it. But this is a hall of justice where evidence -- not speculation, not conjecture, but evidence -- reasonable inferences you draw from them, and the exhibits are what you should base your verdict on. You'll remember in the opening when we met early on we talked about you would hear evidence that Mr. Horsley was involved with cocaine. And you might conclude, after hearing all the evidence, that there were certain distributions made of cocaine. But what we vehemently then and now suggested, and now submit to you for your consideration, is that Mr. Horsley was never involved with a conspiracy to distribute methamphetamine or heroin.

Now, let's look at the evidence, because the government has done a really nice job by extractions you've heard about, you've learned about. Maybe you knew about them before you were here, but certainly you've learned during the course of this trial that certain devices can be forensically examined. And from that forensic examination you can download everything that's in that phone from text messages, ingoing, outgoing. You can download telephone calls, ingoing and outgoing. You can look at what is saved in the video files and capture those. In fact, the evidence you heard from the experts that the government presented to you with regard to the cell phone extractions and the Cellebrite used was that there were thousands of pages. One witness I recall saying 2,200

pages. I think there was another -- I'm not sure if they said it, but I believe, and I would submit to you, that it was over 6,500 pages of downloads. The reason that's important, because when you scrutinize this evidence, when you scrutinize how the government has submitted to you that they're taking these text messages in this PowerPoint presentation and this proves that Mr. Horsley's device -- that he's on the device and he's the person talking when they can't have actual proof, actual evidence, someone from that witness stand saying this is what I did, one of the distinguished officers saying, I watched him and controlled it, what do they have to rely on to get there? Kenny Adgerson. Kenny Adgerson. And it is a gleeful attempt to persuade you that he is worthy of belief, that you should disregard what the Court has instructed you with respect to how you evaluate a cooperator and accomplice testimony, and forget about that language of the law that examined the testimony of Mr. Adgerson with great care and caution.

It's Jury Instruction Number 7. Now, you'll read all those instructions together as a whole. We're not necessarily saying one is more important than the other. But when you look at Jury Instruction Number 7, think about who that person is that they're talking about. That's Kenny Adgerson. And as I review this evidence with you -- and there is an instruction that tells you -- if I submit to you what my recollection of the evidence is -- and I'm sure the government joins me as well

in this, if they submit to you what their recollection is -- both of us would say don't rely on our submission of our recollection. You rely on what your collective recollection when you sit there as a member of a body of 12, it's what you decide the evidence was, is what it becomes. I'm suggesting to you what I think is our best recollection.

But I tell you this is a critical important factor, and submit that it's a critical important factor, because you got to see Mr. Adgerson on that witness stand. He is the one that volunteered: Well, I'm talking, you know, I know somebody is listening. I know they're listening. So I'm just kind of, you know, diverting, deflecting. I'm saying things that I know aren't true. Yet I don't admit that I owe Travis Smiley $50,000. I don't even admit that I owe Travis Smiley $5,000. I'm just saying this because I know that it's being recorded.

That's how that begins. I did -- the government is right -- I did say, Would you refer to that as, like, puffery? Do you know what that is? That's when you embellish. That's when you try to make it bigger than what it is. And what was his purpose for making it bigger than what it is? You'll remember the Government's Exhibit, I believe it's 134. No, it not 134. It's his plea agreement. I'll tell you what it is. It's his plea agreement where he is here, like he said, to clear his conscience. I'd submit to you that's not why he's here at all. I'd submit to you he is here to fulfill his

opportunity to try to earn that substantial assistance from the government. He is a witness who is testifying to incur a motion for a substantial assistance. The only person that can make that motion for substantial assistance is the United States attorney. So he has to embellish.

And let's look how he started, okay? He starts being arrested on February the 11th. We know that he's in the Lynchburg Adult Detention Center. You heard the telephone calls he had with Ms. Austin. You heard what he said on those calls. I submit to you that he's saying that: Everybody's pointing fingers. I'm not the one. I'm not going to fold. And it goes to -- and this is an important twist I want you to consider -- his attitude displayed then is strongly important.

And I'm going to divert to another little point here, which is Roberta Haskins. When we started this jury selection process, we were all asked to identify the witnesses that we would anticipate calling. We had some. The government had some. Ms. Haskins did not appear as a witness in this case. I want you to remember what Mr. Adgerson said right there: When I was in custody -- when we're in jail, we're allowed visitors. Ms. Haskins came to visit another inmate allegedly. But while she was there, we were in the same visiting area, she switched over and visited with me. And Mr. Adgerson, I submit, and Ms. Haskins began where I started with you, this manipulation of having Mr. Adgerson fill in and become the reliable basis

for the prosecution the United States has made. It may seem unimportant at the time, but when you ask yourself this question when you go back there, when you ask yourself the question of over thousands of pages of downloaded extractions from these devices, where is the conversations that would suggest that device the government says is Mr. Horsley was speaking with anyone in Atlanta, anyone other places other than Lynchburg, any evidence that any quantities were ever, ever considered to be purchased, ordered, directed, delivered to anyone you've heard associated with this case, particularly with respect to heroin and methamphetamine. Every conversation, I submit to you, that you have heard where it is surmised based on the testimony of the witnesses and the devices as they're identified coming from Mr. Horsley deal with cocaine, except -- except that time period in April of 2018. And the government is focused on that, and they've played it for you in the PowerPoint of the extraction where they have the conversation about ice -- methamphetamine -- and about heroin. And that's -- that's the only two times, I submit to you, that from all those extractions those words appear. And I submit to you it's more in the line of a conversation of puffery. It's a conversation: What we could do, what we did do. Was there any action on that? I submit to you there's not one piece of evidence that you've heard that suggests that there is an action of that by way of the text messaging, by way of

telephone calls, by way of Snapchats. There is zero evidence, I suggest to you, to support a notion that Mr. Horsley was involved in a conspiracy to distribute methamphetamine and heroin.

I want to bring up a chart. And I hope you have it on your monitor so you can see this. I kind of want to walk you through what we submit the evidence is. The government alleges this conspiracy starts in August of 2017 and it ends on February the 11th of 2019. So we know in August of '17 from this evidence based on controlled purchases, three of which are indicted as substantive counts in the indictment, Count Five, Six, and Count Eight are included. You have two of those in the month of August of '17. You can see the weights that we have associated with it. That's from the certificates of analysis that came in with each one of those distributions. There was one in September. There are two in the month of December. December the 7th is Count Five. December the 29th is Count Six. Significantly, you have nothing in the months of January, February, March, April, and May of 2018. You have on November the 1st of 2018 a purchase and a controlled purchase. And then you have nothing -- nothing after that. In June of 2018, you see Mr. Adgerson sells some cocaine to Mr. Bowman. Remember the testimony that we had from the agents they had to text. And then Mr. Bowman came to the witness stand. Mr. Bowman's recollection was -- recollection was fairly

impaired. He couldn't remember much about anything. But what he did remember -- and I'm going to get to that -- what he did remember was about how the screenshot Detective Booth took from when Mr. Bowman sent him his Snapchat video, okay? And in that Snapchat -- in that screenshot of that Snapchat video, the phone number is 434, I believe 907-6461. That Snapchat video, do you remember what Mr. Bowman said about it? I sent it to Detective Booth. Do you remember when you sent it? No, I don't really know when it was sent. Detective Booth testified: I received the Snapchat video the informant sent to me. The informant was Mr. Booth. He said -- at the top of it, I think it has 10:04. He has the time. You've seen that screenshot. It's what's in your exhibits. He says at the time I just assumed it was around that time, but I have no way of knowing that was the time. So when we asked Mr. Bowman that question, the sender of it, he says, I don't know. I could have sent it sometime before.

Why is that critical? Because that's part of what the government wants you to think became the direction of Mr. Horsley to Mr. Adgerson when they have a text that says, Sending you to Kenny. If Mr. Bowman had that text number already in June of '18, why are they trying to suggest to you he says on the bottom, "You know Kenny" in January of '19? Well, that's the kind of things that start to happen when you examine evidence when you're listening to the cooperators, when

you're listening to people who are using heavy substances during that time. The memories don't always match up. But it's the same number that was identified for Kenny earlier on. So it couldn't have been January of '14 when the government says that shows you that he's sending him to Kenny. He had already been -- he, Mr. Bowman, had already been purchasing his narcotics from Kenneth Adgerson.

So if you follow that chart, at the bottom you see on January 29 Adgerson sells to Bowman, the Snapchat to Detective Booth. Now --

Ma'am, do you need a break? Are you okay?

You've heard controlled buys. You now know what a controlled purchase is. You now have heard and understood how people with charges, something to work off, kind of work those out with law enforcement, how they become undercover informants. That would be Mr. Bowman. That would be Travis Smiley. That would be Mr. Hubbard.

If during the time frame of this conspiracy there was any evidence on the streets of Lynchburg or anywhere else that Mr. Horsley was selling or responsible for selling methamphetamine, where is that intelligence? If there was any evidence that Mr. Horsley was involved in the sale or distribution of heroin in any of that time frame, where is that evidence? You've heard from some of the finest and most sophisticated investigative procedures known to law

enforcement. You've heard how skilled and trained every officer who took that stand is in their role as the narcotics vice units. Can you consider for one second that if -- if Mr. Horsley was involved in the methamphetamine and the heroin distribution, that they wouldn't have been on the radar screen, that some soul who found themselves in trouble wouldn't have said: This is where my supplier is, this is who my supplier is? Wouldn't they have said Kenny Adgerson, Mr. Bowman, Mr. Hubbard, anyone else who they could have worked up towards what the government wants you to believe is the provider of the City of Lynchburg? They suggest to you that if Mr. Horsley is not available, that the whole City of Lynchburg goes down. I suspect and submit to you that with all due respect to everyone involved and associated with this case, that there is still -- still, and has been, and likely continue to be a distribution network that will keep us all busy for a while. But when we focus specifically on August of '17 to November -- excuse me, to February of '19, we are talking about cocaine and cocaine only.

Let's go to Mr. Horsley -- I mean, Mr. Adgerson. We know from the evidence that Mr. Adgerson stored -- his stash house was Roberta Haskins. The blue duffle bag that you've seen photographed that was on the shelf above the shelf at Ms. Haskins was Mr. Adgerson's. I asked the officer about fingerprints. We were able to get a latent print from one of

the plastic containers inside, but not a latent print that was suitable for comparison purposes. They didn't print the baggage. They didn't print any other information that they had. But what's critical to this view fact-finding mission that you're on as the juror is to determine what Mr. Horsley's relationship was to that bag. And the government suggests to you today you get there because it's reasonably foreseeable that even though Mr. Adgerson was on his own, that he was going to the motel by his account and meeting with the source of supply by his account, he's made the transaction, he's taken it back there. And other than the conversation that occurs in May of '18, there is absolutely no connection at all, other than the testimony of Mr. Horsley -- of Mr. Adgerson. And I submit to you that that is not the testimony that you feel good about relying on his word to put Mr. Horsley in that type of conspiracy.

The government says, wait a minute, look at that piece of paper that was found at the Misty Mountain location of the search warrant. They referred to it as an owe sheet, and it has numbers associated with the individuals on there. And they ask you to make that leap that Mr. Horsley is involved with heroin and methamphetamine from what they say is written on the top of that page. And they say we heard evidence that ice cream or cream is what's associated as a street name for methamphetamine, but that's what they want you to believe is

methamphetamine.  It doesn't say cream.  It says "crean."  Look at it yourself and draw your own conclusion.

The word "H/town" is supposed to be the evidence that connects that sheet to Mr. Horsley for heroin.  Detective Bailey says, I don't know.  Sometimes you use the first letter of the drug.  I've heard of Houston.  I've heard of H/town. But there is no evidence, other than us having to speculate, having to view what that means that that was heroin.  There is no connection between Mr. Horsley and the heroin and the methamphetamine.  And that's the part that you'll have to decide, I submit to you, when you look at your jury instructions and the verdict form.  We submit to you that Mr. Horsley is not guilty of a conspiracy to distribute or possess with the intent to distribute heroin and methamphetamine for sure.

We submit to you that with respect to the distributions of the cocaine, that the cocaine was distributed from Mr. Horsley to Mr. Adgerson.  And you've got your instruction, which is Jury Instruction Number 7, which deals with what we describe -- excuse me, Jury Instruction Number 26, which describes a buyer/seller relationship.  I mean, the definition of conspiracy is a lengthy definition.  You'll have it.  You can read those.  It has -- it's kind of confusing, I submit to you, when you look at it all trying to take it in.  I mean, sometimes a wink and a nod might form a conspiracy.

Sometimes there has to be an act in furtherance of a conspiracy. But in this case, you know, the essence of a conspiracy is an agreement. The agreement between Mr. Horsley and Mr. Adgerson was a buyer/seller relationship, I submit to you, as it relates to the cocaine trafficking. We submit that the evidence that you've heard in this case establishes and falls way short -- and I'm talking about proof beyond a reasonable doubt -- proof beyond a reasonable doubt that you feel that Mr. Horsley is guilty of a conspiracy to distribute methamphetamine and heroin.

Let's talk for a minute about Mr. Smiley. Mr. Travis Smiley took the stand. He's Trill. He is the gentleman who was able to Facebook Live -- a livestream of him talking to Mr. Adgerson when Mr. Adgerson is in the jail. He's playing his phone. He's the one that says, I'm here -- I'm going to be here as a witness to establish to you that I saw Mr. Horsley with methamphetamine. Remember that testimony, the Crown Royal bag? Mr. Smiley says, We were at the TGIF restaurant and we went outside in the car and he showed me a Crown Royal bag. And on this witness stand he said that Crown Royal bag contained heroin and methamphetamine. And when he was confronted with his prior statement about that Crown Royal bag, he only mentioned methamphetamine. And I submit to you he, Mr. Smiley, had every incentive -- every incentive to find out what this program of prosecution was, and to make sure he got

every -- every word, every drug covered that was in Count One of that indictment.

Now, why would I say that? You're looking at me like, Why would you say that, Tony? Well, here's why: You remember that Mr. Smiley was charged with four separate counts of distribution of a Schedule I or II drug in the Circuit Court for the City of Lynchburg. He was ultimately released on bond about a week or ten days after he made his first proffer to the law enforcement agency. I believe that occurred on about September the 2nd of '20. I think he was released about September the 15th of '20 on bond. And Mr. Smiley's trial has been continued 12 times -- 12 times -- waiting the end of Mr. Horsley's proceeding before his case is concluded, because, as he has testified, he knows the Commonwealth attorney for the City of Lynchburg is going to wait and see how he does in this proceeding before his cases are resolved. Now, if that's not incentive enough to get on that witness stand and say whatever he has to say, coupled with the instruction that the Court has given you that people who are testifying for an incentive, people -- and I think his words were: Why are you here, Mr. Smiley? Consideration. Have to be accepted with great care and caution from any other witness. So the words of Mr. Adgerson and the words of Mr. Smiley, I submit you have to conclude that you just can't believe them beyond a reasonable doubt to suggest that Mr. Horsley is involved with any

cocaine -- with any heroin or methamphetamine.

If -- the government referred to it several times in its opening argument -- if millions of dollars, millions of dollars. Street value is where you get the millions of dollars come from. You heard that extrapolation by Detective Bailey. Where is it? They say Mr. Horsley has $20,000 in the trunk of the car at the casino. He has $3,500 or so in an overnight bag.

This press that you've heard a lot about, where is it? Was it at Misty Mountain? I believe you'd have seen it, if it was. It's not there. It's an exaggeration. It's an exaggeration to capture and try to convince you that Mr. Horsley is involved in this larger-scale conspiracy.

Mr. Adgerson was most definitely -- most definitely trying to get promoted. He was trying to promote himself. He would embellish. He would deflect. He would do whatever was necessary to move himself further into the ranks of where he thought he wanted to be. But his evidence, his testimony should not be, I submit to you, when scrutinized the way the law suggests you have to do it, believable beyond a reasonable doubt.

You know, we've all -- Sam's Clubs -- heard of those. If we're having a conversation about: Yeah, they sell Coca-Cola at Sam's Club, you can go over there and get some of that. Maybe -- maybe that might be a suggestion or a way to

look at an agreement between two people to go get some Coca-Cola. But if you say, You know what? They also have water by the cases, they have soft drinks, they have crackers and snacks. Go over there and get you some of those. That doesn't mean that the person who said that has joined into an agreement and understanding to accomplish a goal of getting that from that -- in this analogy -- Sam's Club. That's the evidence, ladies and gentlemen, that's the evidence that the government wants you to accept from Mr. Adgerson that Mr. Horsley was involved with methamphetamine and heroin.

I know I've gone on for a while. You've been very patient in your consideration of these proceedings and this evidence. I want to thank you on behalf of Mr. Horsley for giving it a fair, measured consideration of what the law is, which you're obligated to follow. I want to thank you for your patience in listening to the evidence, and particularly listening to me as I've rattled on a little bit today.

But I want to leave you with a thought. You know, the system of justice that we have we think is pretty good, best in the world, not perfect, not without some flaws. But what it's based on -- what it's based on is that it's much better -- much better, if you're going to err, to err on the side of right, to err on the side of justice. And this case is not about the United States at this table, and it's not about me and that table. It's about Mr. Horsley. This is the only day he has.

This is the only day he'll have. You will determine his fate. And we know -- when I say "we," the lawyers know -- that this is about justice. And when you return your verdict, that's justice. That's justice. Whether it's in favor of everything the government asks you for, whether it's in favor of everything I've suggested to you, it will be justice. You'll be doing the right thing based on this evidence that you've heard. And that's all any of us can ever ask you to do is do the right thing. Do justice here. Assign responsibility for where you think it is.

I submit to you your verdict form should be Mr. Horsley was not involved with methamphetamine or heroin. I submit to you that your verdict form as to cocaine should be determined on what weight you think he is accountable for. And certainly I submit to you that Counts Five, Six and Eight kind of speak for themselves.

Thank you very much.

THE COURT: All right. You may sum up.

REBUTTAL CLOSING ARGUMENT BY THE GOVERNMENT

MR. WELSH: Mr. Anderson characterizes the government's case as a text-based case. And to be sure, even in this closing and throughout this case, we've talked about a lot of text messages. But to assume that -- Mr. Anderson's argument is to assume that all of those are lies; that there

is, in fact, no conspiracy; that all of these messages and conversations that you have the opportunity to look at when you go back as a jury are all fabricated; and that it's all embellishment; and that it's all puffery. The statement was that Mr. Adgerson makes things bigger. But it's, in fact, the defendant's messages that say he, Mr. Horsley, can get heroin; and that he, Mr. Horsley, can get ice, not an embellishment by Mr. Adgerson -- that Mr. Adgerson could do the same thing. In fact, Mr. Adgerson's statements were: I don't know how that's going to work.

But this isn't a text-based case. This is a case where you heard from the actual people involved in the conduct. You heard from Mr. Adgerson, and he told you about his relationship and how he was acting as part of this organization. And you heard from Mr. Smiley, and he told you how he was acting as part of this organization. And you heard at the same time that law enforcement was conducting these controlled purchases. This is not a solely text-based case where we are asking you to consider speculation about what different text messages mean. But the text messages, I would submit, corroborate what those statements are made by those witnesses, and you should examine them in conjunction.

Second, the instruction from the judge is for you to use your common sense and to apply your common sense in this case, not to abandon common sense. Mr. Anderson's suggestion

was this was all talk, that this was just talk about these different types of drugs, that these messages were back in April of 2018, and it's just bringing up the idea of heroin, and it's like mentioning something at Sam's Club. Well, if it's all talk, what is this? What are these drugs? Where did they come from in the conspiracy?

Mr. Anderson then describes a buyer/seller relationship. Well, as a repeated player, look to the instruction. Repeated players, you have Mr. Horsley talking to other people, commissioning the kilogram press, talking to suppliers and moving those things around. And so when I ask you to apply common sense, look to the money counter, look to the defendant's text message describing himself as a plug, look to his list of 17 customers, look to where he orders the scorpion joint, the scorpion kilogram of cocaine that's then found with the rest of the drugs.

And I'll leave you with a final point, which is that this setup of this network -- this drug trafficking network is by design. Kenneth Adgerson used Roberta Haskins as his stash house and as his driver so he could mitigate his own risk, so he wasn't the person driving, so he wasn't the person holding onto the million dollars' worth of drugs. And Quentin Horsley used Kenneth Adgerson to make plays for him, to sell to other people, and to hold the drugs for him. That's by design, because Quentin Horsley is the manager of that corner store

that I talked about. He's the one who sets the schedule, sets the prices, and is pushing his employees to do more.

And because of that, we're asking you to find him guilty of the conspiracy, find him attributable to the 500 grams of methamphetamine, 500 grams of cocaine, 100 grams of heroin, and for the three distribution counts.

THE COURT: Members of the jury, I'm now going to read the final two or three pages here of the instructions, and then you will retire to the jury room and you will have -- in the jury room you will have access to -- you will have the instructions and you will have access to the exhibits. We normally do not send the drugs and firearms or anything like that to the jury room. And also, the clerk will bring you a menu to order lunch. The Court does provide lunch during deliberations.

Upon retiring to the jury room, you should first select one of your members to act as a foreman or forewoman who will preside over your deliberations and will be your spokesperson here in court. You will take the verdict forms to the jury room, and when you've reached the unanimous agreement as to your verdict, you will have the foreperson sign -- have the foreperson -- I'm sorry -- fill them in, date and sign them, and then return to the courtroom.

If during your deliberations you should desire to communicate with the Court, please reduce your message or

question to writing, signed by the foreperson, and pass the note to the marshal, who will bring it to my attention. I will then respond as promptly as possible, either in writing or by having you return to the courtroom, so I can address you orally. I caution you, however, with regard to any message or question you might send that you should never state or specify your numerical division at the time. Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdicts must be unanimous.

It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinions, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember, at all times you are not partisans. You are judges, judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Now, the law only permits 12 of you to deliberate and

decide the case. Two of you were selected to serve as alternates. We didn't tell you at the beginning, but the jurors are drawn randomly and the computer tells us who the two alternates are. Without alternates, the inability of a single juror to complete his or her service due to illness or any other reason would require a mistrial or a retrial with another jury. Thus, service as an alternate is an essential -- is as essential a service as any other juror.

The jurors selected as alternates will have to continue to follow the Court's instructions in the event that any of the remaining 12 jurors become ill and an alternate must take his or her place.

The two alternates I am told are Tammy Franklin and -- if you would raise your hand -- and Lisa Faulk. All right. You're the two alternates. I'll ask you to remain where you are as seated, and the other jurors may now file -- there's one other thing that occurred to me during the instructions. I'll take judicial notice that the City of Lynchburg is in the Western District of Virginia.

MR. ANDERSON: We have no objection to that, Judge.

THE COURT: And also the surrounding counties such as Amherst, Campbell, Bedford, Rockbridge -- well, I don't think there is any evidence to anything other than Lynchburg.

All right. I'm going to allow you now to retire to the jury room. The instructions will be brought to you, and

you'll have access to -- if you want to see any of the drug packages, you can ask for them. They'll be -- you'll be allowed to see them.

**(Jury out, 12:25 p.m.)**

THE COURT: We'll be in recess now until the jury returns. Do you all plan to remain in the courtroom -- the courthouse --

MR. ANDERSON: Yes, Your Honor.

THE COURT: -- in case there's a question?

MR. ANDERSON: Yes.

THE COURT: Be sure that nothing goes back to the jury that's not admitted into evidence.

I'm sorry, I'll tell the alternates: You may stay and wait for the verdict to be over or I'll allow you to leave, but we need to have your cell number where we can get in touch with you, because if some juror gets sick or something happens, you're still alternates. So you still should not discuss the case with anyone. Don't allow anyone to discuss it with you or remain within the hearing of anyone discussing it.

Do we have the phone numbers?

THE CLERK: Yes.

THE COURT: Okay. You're excused.

FEMALE JUROR: I have a bag in there.

THE COURT: Oh, okay. You may go get it.

You all may be at ease.

(Recess.)

THE COURT: The jury has notified us it has reached a verdict. You know there's a second -- in the event they find the defendant guilty of Count One, then they have to now consider whether he has a prior conviction and served more than 12 months. And the answer is either yes or no. I've got the verdict form here.

MR. ANDERSON: Your Honor, is that the verdict form for the bifurcated part?

THE COURT: Yes.

MR. ANDERSON: Your Honor, if it please the Court, depending on the jury's verdict, of course, the defendant and the United States have entered into a stipulation for that. It seems that the procedure would suggest the jury be given that, and that should dispense with it, and the jury form would so reflect.

THE COURT: But we still send the jury back?

MR. ANDERSON: I believe that's the procedure that's recommended by DOJ.

MR. WELSH: Your Honor, I think it would be appropriate if, after that, I would read the stipulation and then have the jury consider that.

THE COURT: I have here Exhibit 156, which seems to be an excerpt of a sentencing order.

MR. WELSH: Your Honor, we even have a further

stipulation that both parties have signed as to the specific --

THE COURT: Do we send them both back?

MR. WELSH: Yes, that would be appropriate.

THE COURT: Call the jury back.

**(Jury in, 2:37 p.m.)**

THE COURT: Please be seated. Members of the jury, have you agreed upon a verdict?

FEMALE JUROR: We have.

THE COURT: If you would hand the verdict to the marshal.

There is one -- in Question 2 under "heroin," there is no check of the weight.

FEMALE JUROR: Sorry.

THE COURT: I mean, is that an oversight?

FEMALE JUROR: Oversight.

THE COURT: Okay. Well, I'll have the clerk read the verdict, and then on that one I'll -- we have another matter that will take a few minutes, and then I'm going to send the jury back and let them fill in whatever, that blank, if it was an oversight. I'll have the clerk publish the verdict.

Is there any objection to that? You may hear the verdict first.

MR. ANDERSON: Yes, sir.

THE CLERK: Ladies and gentlemen, is this your verdict?

In the matter of the United States of America versus Quentin Lowell Horsley, Case Number 6:19cr13, we the jury unanimously find as follows: Question (1), On Count One of the superseding indictment alleging that the defendant, Quentin Lowell Horsley, conspired to distribute and possessed with intent to distribute one or more controlled substances; namely, methamphetamine, cocaine hydrochloride, heroin, or cocaine base, answer: Guilty.

Question (2), Identify the controlled substances and corresponding amount attributed to Quentin Lowell Horsley that formed the basis of the conspiracy in Count One. Check all controlled substances that apply. For amounts checked, only one amount for each controlled substance. For methamphetamine, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers is checked. Under cocaine hydrochloride, 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride is checked. For heroin, like the judge stated, there is no box checked, and cocaine base is not checked.

Question (3), On Count Five of the superseding indictment alleging that the defendant, Quentin Lowell Horsley, distributed and possessed with intent to distribute cocaine hydrochloride: Guilty.

Question (4), On Count Six of the superseding

indictment alleging that the defendant, Quentin Lowell Horsley, distributed and possessed with intent to distribute cocaine hydrochloride: Guilty.

Question (5), On Count Eight of the superseding indictment alleging that the defendant, Quentin Lowell Horsley, distributed and possessed with intent to distribute cocaine hydrochloride: Guilty.

Signed by your jury foreman. I'm sorry, I can't read the name.

THE COURT: Just a minute. Let's let the jury go back and complete the form.

**(Jury out, 2:43 p.m.)**

THE COURT: Yes, sir?

MR. ANDERSON: Judge, if it please the Court, with respect to the jury form as it was submitted after the jury returned and submitted the form, as I understood the reading of the verdict form, there was no marking as to the quantity of drug as to heroin or as to cocaine base. Was the cocaine base left open too, or was it checked?

THE CLERK: It was open.

MR. ANDERSON: It was open?

THE CLERK: Nothing.

MR. ANDERSON: Nothing on either of those.

THE COURT: There was nothing on --

MR. ANDERSON: Your Honor, I would submit that that

is the return of the verdict, and that they would have -- not having found the weights, that would be a substantive issue and not necessarily a clerical issue that they should correct. I would suggest that that was a finding of no verdict as to those two with respect to the question that was presented.

MR. WELSH: Your Honor, I believe you inquired whether it was a clerical error and the response was that it was a clerical error; and that with respect to the heroin issue, there are two responses, either one of which needs to apply. So with respect to that issue, one of --

THE COURT: They didn't check heroin.

MR. WELSH: They didn't check either. So it has to be 100 or more or less than 100; whereas, I would agree with the cocaine base that they haven't checked cocaine base. So that would be intentional by the jury. But with respect to the other issue, there has to be one or the other choice.

THE COURT: Right. I understand your positions.

MR. ANDERSON: Judge, with respect to preserving the motion to set aside the verdict as being contrary to the law and evidence, I would make that motion. I would ask the Court for the time pursuant to the rule to allow us to address that further. That would be the only issues that I would have right now.

THE COURT: All right.

MR. WELSH: Your Honor, the other outstanding matter

is there's a notice of forfeiture in the indictment. And I believe the parties agree to reserve the issue until sentencing and not submit the issue to the jury, which would technically be permissible under the law, but neither party is asking for it.

MR. ANDERSON: Your Honor, that would be our request as well.

THE COURT: All right. Any objection to me asking the CSO to check to see if they're waiting on us?

MR. ANDERSON: Your Honor, I would say for the record that it appears they've been back for approximately ten minutes. I'm not exactly sure the time that they left. It seems to me they're having more of an issue than a clerical error. So I would at this point want them to not be interrupted to allow them to consider what the clerical error was.

THE COURT: My concern is if it were just a clerical error, they're back there for a long time and maybe they're waiting on us.

MR. ANDERSON: That's what I'm suggesting. I don't have any objection to the Court inquiring -- the marshal inquiring if that's what it is. But I would just say for the record it seems like it's more than a clerical error.

MR. WELSH: Your Honor, it seems like the CSO could make clear --

THE COURT: I'll just ask the CSO -- well, I'll send a note to them, "when you are ready, notify the marshal."

They read our mind.

Bring them back.

**(Jury in, 2:56 p.m.)**

THE COURT: All right. Have a seat. Do we have the verdict now completed?

All right. I'll ask the clerk to publish just what was previously omitted.

THE CLERK: Ladies and gentlemen, is this your verdict as to the heroin amount: You have checked 100 grams or more of a mixture or substance containing a detectable amount of heroin. In addition, you also checked cocaine base.

Do you and each of you agree upon this verdict, so say you all?

ALL JURORS: Yes.

THE CLERK: Thank you.

THE COURT: Members of the jury, there's one other question you have to answer. And there's a stipulation between the government and the defendant. And I'll let you read the stipulation.

MR. WELSH: Thank you, Your Honor.

The United States of America and Defendant Quentin Lowell Horsley hereby stipulate and agree to the following evidence, and agree that no additional evidence need be

introduced with respect to this matter. I will mark this as Government's Exhibit 165 and ask it be part of the record.

Before the offenses charged in the superseding indictment, Quentin Lowell Horsley was convicted of distribution of cocaine, a serious drug felony, in the Circuit Court for Campbell County for which he served more than 12 months' imprisonment, and for which he was released from serving any term of imprisonment related to that offense within 15 years of the commencement of the offenses charged.

THE COURT: All right. Thank you.

Members of the jury, you will have to go back and answer the question, which the stipulation related to. You have to decide beyond a reasonable doubt whether Mr. Horsley was convicted previously, as stated in the stipulation referred to in verdict form phase two. You have to answer that question yes or no. And you've heard all the evidence which is in the stipulation.

Have I made myself clear? You answer the question yes or no: Was he previously convicted? And you heard the stipulation that they have agreed that he was previously convicted.

So you may retire to the jury room one more time and then that will be it. And you'll take with you the stipulation and the verdict form.

**(Jury out, 3:00 p.m.)**

THE COURT: Tell them to notify us when they're ready.

(Pause.)

THE COURT: Do you have something?

MR. ANDERSON: Your Honor, if I may, if it please the Court, on the verdict after they announced they had a clerical error they came back. They've now included a finding that there was more than 100 grams of heroin. As for the reasons we previously stated, we object to that.

As to the return of the cocaine base, I believe I heard the clerk say they checked that this time. I don't believe that was a clerical error. I believe that was the general verdict, and that at least that amount of the cocaine base should not be there. And what I mean is that it should be found as a verdict of not guilty of the cocaine base.

MR. WELSH: Your Honor, I understand the objection. The Court's instruction to the jury was to fix a clerical error, and I believe what they came back with was what they perceived to be fixing a clerical error. So I don't think that there is any issue.

THE COURT: That was only with regard to the heroin. I did not ask about --

MR. WELSH: That would be fine.

THE COURT: I can ask them now.

MR. WELSH: Okay.

**(Jury in, 3:04 p.m.)**

THE COURT: Have a seat.

THE CLERK: As to phase two of the verdict form, ladies and gentlemen, is this your verdict: We, the jury, unanimously find beyond a reasonable doubt as follows. Prior to the commission of Count One of the superseding indictment, Quentin Lowell Horsley was convicted of a serious drug felony for which he served more than 12 months' imprisonment, and for which he was released from serving any term of imprisonment related to that offense within 15 years of the commencement of the offense charged in Count One. Answer: Yes. Signed by your jury foreman.

Do you and each of you agree upon this verdict, so say you all?

ALL JURORS: Yes.

THE COURT: Hand me the verdict.

When you first came out with the general verdict form, heroin had been checked, but the amount had not been checked. And I want to clarify again: You said that was a clerical -- or an oversight. Do all of you agree that that was an oversight?

ALL JURORS: Yes.

THE COURT: And then when you came back, cocaine base had not been checked, and it is checked now; is that correct?

ALL JURORS: Yes.

THE COURT: All right. Was there a finding -- unanimous finding by the jury that cocaine base should have been checked?

ALL JURORS: Yes.

THE COURT: All of you agree?

ALL JURORS: Yes.

THE COURT: All right. Thank you.

Are there any motions before the jury is discharged?

MR. ANDERSON: No, Your Honor.

THE COURT: Okay. All right. Members of the jury, I want to thank you for your service in this case. You've done an outstanding job for your community. I don't comment on whether the verdict is right or wrong, but you've obviously done a very great service to the community by serving as jurors and devoting the time and attention you have to this case. And your country and your community owe you a great service.

So at this time I'm going to excuse you, and you may go back to the jury room, and the marshals will show you out.

**(Jury out, 3:07 p.m.)**

THE COURT: All right. Any motions now?

MR. ANDERSON: Your Honor, again, just to renew the motion to set aside the verdict as being contrary to the law and evidence. I think the rule gives us seven days to respond to that.

And also we would reiterate -- restate our objections

to the clerical error as to heroin. With respect to the blank on the cocaine base, we submit again that that's not a clerical error. That was a general verdict finding that. I thought the government might have even conceded that before it went back. So we would also address that in a post-trial motion with the Court's permission.

THE COURT: All right. Anything else?

MR. WELSH: Not from the government, Your Honor.

THE COURT: All right. We'll recess. Thank you all.

(Proceedings adjourned, 3:09 p.m.)

C E R T I F I C A T E

I, Lisa M. Blair, RMR/CRR, Official Court Reporter for the United States District Court for the Western District of Virginia, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/s/ Lisa M. Blair                    Date: February 24, 2023